UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

KANEKA CORPORATION, : 23-CV-07483 (SJB)

Plaintiff, :

-against- : United States Courthouse
: Brooklyn, New York

COCRYSTAL TECHNOLOGY (JIAXING) CO., LTD., ET AL., : January 24, 2025
: 10:00 a.m.

Defendants. :

- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR MARKMAN HEARING
BEFORE THE HONORABLE SANKET J. BULSARA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Plaintiff: CARTER LEDYARD & MILBURN LLP
28 Liberty Street
41st Floor
New York, New York 10005
BY: GERALD WILLIAM GRIFFIN, ESQ.
MEREDITH B. SPELMAN, ESQ.
LEONARD TRIVIGNO, ESQ.

For the Defendant: MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
BY: CLARK BAKEWELL, ESQ.
GARY M. HNATH, ESQ.
JESSICA LEHRMAN, ESQ.

Court Reporter: JAMIE ANN STANTON, RMR, CRR, RPR
Official Court Reporter
Telephone: (718) 613-2274
E-mail: JamieStanton.edny@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.

* * * * *

(In open court.)

THE COURT: We are here for a *Markman* Hearing in 23-CV-07483.

Who is here for the plaintiffs?

MR. GRIFFIN: Your Honor, Gerald Griffin from Carter Ledyard & Milburn for plaintiff, Kaneka Corporation. With me, also, is Leonardo Trivigno and Meredith Spelman.

THE COURT: Good morning.

And for the defendants.

MR. HNATH: Good morning, Your Honor. Gary Hnath with Mayer Brown for the Cocrystal defendants. I am joined by Clark Bakewell and Jessica Lehrman. Clark Bakewell will be doing the presentation today on behalf of the defendants.

THE COURT: Okay, great.

So I have a couple of thoughts at the outset. One is I appreciate the briefing, which I thought was very good on both sides. I think unlike some *Markman* hearings, in my view, the issues are fairly narrow. The answer may not be clear, and the answer may be complicated, but unlike some cases where you have lots of, say, extrinsic evidence or prior art or prosecution history or even legal authorities to bear, and I do realize that there's another claim that bears on this one and I'm not saying there aren't things that are relevant here, but at least from an evidentiary perspective, it almost is like a -- and this is a

non-patent, former non-patent lawyer speaking, it's almost like a statutory construction of sorts.

And I do have a couple of questions that I would like the parties to at least attempt to answer as they make their presentations.

One question, which I know sometimes lawyers are hesitant to answer, is: What happens if you win? In other words, what happens if your construction prevails on this claim in terms of the rest of the case and infringement or noninfringement? You know, sometimes -- I raise that because I realize this is the claim that is up for discussion, but I don't necessarily have at this point, other than what's in the Complaint, you know, the broad context of how the parties have been litigating or what would happen in the future. So you don't need to answer that question at the outset, but I would love to know from what your perspective is.

For example, I had a -- and this doesn't drive the outcome by any stretch, because I don't decide cases based on what is easy or what the outcome is, but just as an example, I had a *Markman* Hearing a few months ago where the interpretation actually ended the case. The parties stipulated and went -- are at the federal circuit because it decided the rest of the issues effectively.

Now, that wouldn't lead me to pick one

interpretation to end the case, but it was just helpful for overall context, particularly because it gave me a sense of what the overall progression was of the case in terms of how much more time are we before we reach summary judgment or the like.

Obviously, the answer to that question may depend on how the claim is interpreted. And, you have, you know, in some respects some presented alternatives. And so you don't need to parse it that finely, but it's more sort of if you win or your brief wins or your arguments win, where does it leave us?

I guess the second question, and this is really, I think, perhaps the core question, is I think the defendants' position at the end of the day, and, obviously, I'm not going to prevent you from saying otherwise, but this is how I sort of glean from the papers is that the word "composition" and the concept of final composition, they're used in different ways and have different meanings as a result.

And I think the plaintiff's position is composition, at least in the claim, must be read in a certain way in light of the overall context and other arguments and other claims. And maybe you frame the question as you are going to present it to me that way, so I'd love your view as to whether you think composition does

or doesn't have different meanings, or are or are not interchangeable. Maybe that's how you've presented it.

I guess the third question, it's really for more of the defendants than the plaintiffs, which is -- and it's not the same as question one about what happens when you win. It's more of a question about the concept of indefiniteness. And its more, perhaps, even a legal question than a factual question. What happens if it's deemed to be indefinite? What does that do to the claim? Does that mean that it has to be read in some definite manner, if possible? Does it mean that the claim sort of disappears and goes away? Because the indefiniteness, it's sort of -- and I've had a different case with indefiniteness, but it was really sort of more about the diagrams in the invention and whether they were consistent with the claim language. And in that situation, the indefiniteness argument was presented in a way that suggested there was no way to harmonize the diagram in the claim language and, as a result, the claim provided no basis for anyone to claim infringement because a person of ordinary skill would not know what the heck is meant, right? And it wasn't presented as, well, in that case, the plaintiff's indefiniteness, means you can't read it that way, but there are other definite ways to harmonize. It's not the plaintiff's theory of infringement, but there are

ways to save it and you should apply the saving construction as it were, if that makes sense. But I am just more interested in what indefiniteness means.

Also, obviously, I am happy to begin with the plaintiff. I would like it, at least, if, in the first instance, you kept the presentation to around 30 minutes and the same on the defendants' side and then I will give you, each side an opportunity to sort of respond to the other and we'll talk about 15-minute increments. If this takes longer than that, because of the natural flow or my questioning, sure, but at least I would like to keep it at that in light of what I think are fairly narrow. I have done a lot of talking. I am happy to hear before we begin any questions about what I have said or anything?

MR. GRIFFIN: No, Your Honor. I am happy to go ahead when you are ready.

THE COURT: Please, go ahead.

MR. GRIFFIN: May I take the podium?

THE COURT: Whatever is easiest, frankly.

And I will take a copy of the -- great. Thank you so much.

MR. GRIFFIN: So to begin, maybe I can address all three questions even though the third one is really for the defendants. There are two asserted claims in this case, Claim 5 and 13, and they pretty much mirror each other with

the exception of Claim 15 is a method claim. And so it starts off with having oxidized coenzyme Q10 and then you reduce it and then you have the composition that follows and it's really a repeat of Claim 5.

And so the, I guess, broad answer to your first question, if I understood it right, is the case doesn't go away if Claim 15 goes away. The case will continue on Claim 5. There's no dispute about the language of Claim 5. The defendants concede that, it's clear. The only argument for indefiniteness that they make here is for the word "composition" in Claim 15.

THE COURT: Okay.

MR. GRIFFIN: You know, with respect to the second question, you know, it will be more detailed in the presentation. We think that the patent makes clear that composition meets the final reduced coenzyme Q10 the way it's spelled out in the specification, the way composition is defined, the way the other claims use the term "composition," it should be given the same meaning amongst all of the claims. And just, you know, the language of Claim 15 itself makes clear, even though Claim 15 refers to an oxidized composition because that's where you start with in the method, we think that the term "composition" throughout the claims in the patent make clear that it's the final reduced composition.

THE COURT: And just so I understand, then, and you can frankly say I'll address this in your presentation. You are not saying that at some point in Claim 15 "composition" has a colloquial meaning or an ordinary meaning and has a specialized meaning that is present all throughout of a certain specified set of things? In other words, where I see the word "composition" has the same meaning throughout the entirety, at least, of Claim 15 and certainly throughout the whole patent?

MR. GRIFFIN: That's correct, Your Honor.

THE COURT: Okay.

MR. GRIFFIN: With respect to your third question, and it's for defendants mostly, the answer is that you can construe that term to mean reduced coenzyme Q10 and, in fact, we've asked the Court to, you know, give the term its plain and ordinary meaning, but if you were going to adopt a construction, it would be the one that we propose and it's on the last page of our presentation and our briefs that that term means reduced coenzyme Q10.

THE COURT: Great. Thank you.

MR. GRIFFIN: So I think you already have it, but we have a presentation to provide --

THE COURT: Great.

MR. GRIFFIN: -- that I think we're going to try to put up on the screen, but while she's trying to do that,

I'll just begin and you could follow along.

THE COURT: Yes, sure.

MR. GRIFFIN: Just a little bit about the plaintiff, Kaneka Corporation. It's a Japanese corporation that sells a variety of different products throughout the world including the United States. One of those products is coenzyme Q10. Coenzyme Q10 exists in your body. It is an antioxidant. It promotes cell health. When you get older, your body loses or it depletes and so Kaneka sells a supplement to allow you to replenish a coenzyme in your body.

In any event, coenzyme Q10 comes in two forms. One's an oxidized form and the other is a reduced form. The oxidized form is called ubiquinone and the reduced form is called ubiquinol. The reduced form is more therapeutic. It's more bioavailable and it's essentially a better product than the oxidized form. The problem with the ubiquinol, the reduced form, is that it easily oxidizes in the air or exposure to air.

And so what the invention here is, the '080 Patent, it's a way to stabilize, prevent the ready oxidation of reduced coenzyme Q10 or ubiquinol. And it does that through the composition that's described or set forth in Claim 5. And so it's really a combination of coenzyme Q10 with other coenzymes, specifically Q9 and Q11. Kaneka

invented the composition and then found if you combine the coenzyme Q10 with either Q9 or Q11 in the percentages that are set forth in the claim, you'll have a much more stable product. Meaning, the ubiquinol won't oxidize as readily as it would without it.

And I won't --

THE COURT: If you can just refer to the page numbers.

MR. GRIFFIN: Yes. I pretty much went through the first five pages.

THE COURT: Okay, great.

MR. GRIFFIN: And so the applicable law, I think, is agreed to here, not in dispute. And so obviously there is a presumption of validity for a patent that's issued.

I will add, and you'll see it on page 6, that Judge Bryson of the Federal Circuit in a case that he was sitting by designation in the District of Delaware last month found the '080 valid, and there's a citation for that for your reference.

THE COURT: And I didn't read that case, but when you say that, is it this claim or is it other claims?

MR. GRIFFIN: So we had another case against a different defendant in the District of Delaware on the same patent and on the very same claims, Claim 5 and 15. And so the reason why you don't have that case is that he issued it

last month after the briefing here. It was only a few weeks --

THE COURT: That's fine. I just wanted to understand. And I'll certainly go and read it. And is it the idea that, are you saying, obviously, for a different defendant, there's no preclusive effect or anything like that, but are you saying -- I just want to make sure, are you saying the issue presented to Judge Bryson is effectively the same issue presented here?

MR. GRIFFIN: No, Your Honor, I'm not saying that.

THE COURT: Okay.

MR. GRIFFIN: There were other different issues that were argued in that case with respect to validity. I think that they will at some point come into this case.

THE COURT: Okay.

MR. GRIFFIN: But the issue of indefiniteness that we're talking about now and the basically statutory construction of Claim 15 was not something that Judge Bryson decided.

THE COURT: I see. Okay, thank you.

MR. GRIFFIN: Again, the party asserting indefiniteness here, have to show by clear and convincing evidence that the term is indefinite and we'll go through the reasons why they have failed to meet that burden.

In sum, there are basically four reasons, primary

reasons, without addressing each of their specific arguments now, but, you know, the clause "wherein" in Claim 15 or the term "wherein" introduces the limitations that have the term "composition" in it. And that "wherein" clause follows, immediately follows the term "reduced coenzyme Q10." And so where you have a term, you know, with a comma and a "wherein" clause, it's obvious in the reading grammatically that the composition referred to afterwards is referring back to that initial term, the one preceding the "wherein" clause, which is "reduced coenzyme Q10."

THE COURT: Is that a different way of saying in a more, sort of, simply colloquial way, not to say that you are making it overly complex, just so I understand the argument is, the "wherein" is sort of definition, if I read it correctly, right? Where it says "wherein the composition comprises" and, you know, et cetera, et cetera, that defines the composition. And so I read the word "composition" elsewhere, including before, that's what it means?

MR. GRIFFIN: I think what I am saying is where you read it afterwards, it sets up the meaning of the composition after the "wherein" clause.

THE COURT: In other words, in the phrase, where it says "wherein not less than 0.01 weight percentage of reduced coenzyme Q is contained in the composition," that use of the word "composition" is defined by what you are

saying is the "wherein" clause; is that what you are saying?

MR. GRIFFIN: Correct. And if you could turn to page 11, that has --

THE COURT: I see that, okay. So what you have highlighted in yellow, the second yellow, the meaning is what's in the first yellow or what follows the words in the first yellow?

MR. GRIFFIN: Right. So the first yellow follows the "wherein" clause.

THE COURT: Yes.

MR. GRIFFIN: And before that -- the "wherein" term. Before that "wherein" term, there's a comma, which is preceded by the words "reduced coenzyme Q10-containing composition."

THE COURT: I see.

MR. GRIFFIN: And my point is where you have "reduced coenzyme Q10-containing composition," comma, and then a "wherein," which also means in which, you know, it's clear, I think from the language, specifically the "wherein" clause, that the composition that follows it is referring to the preceding "reduced coenzyme Q10" term.

THE COURT: I see. So when I look at -- if I were to follow that logic as it were, when I look back at the first few words of Claim 15 that say, "a method for producing a reduced coenzyme Q10-containing composition,"

and I'm trying to figure out what that means, that means what is contained in the "wherein" clause because the "wherein" clause is effectively a definition that follows those same words in the prior clause?

MR. GRIFFIN: Correct, Your Honor.

THE COURT: Okay.

MR. GRIFFIN: Claim 15 starts with, "a method for producing reduced coenzyme Q10," and then, you know, logistically, if you follow the order of the language following that, you start with an oxidized form and you reduce it. And then you obtain -- and this is where the language is clear -- the reduced coenzyme Q10-containing composition wherein the composition has these limitations. And so just a logistical order of Claim 15, itself, where you have, right upfront, you're telling the world that this is a method for producing this final reduced product. This is how you start. You start with the oxidized, you reduce it, and then that final reduced coenzyme Q10 product has to have these limitations. And that's where the "wherein" clauses come in.

THE COURT: I see.

MR. GRIFFIN: I think we can now skip to page 16. And so I said there were four reasons. We talked about two of them so far. The "wherein" term was one of them and then just the logical order of Claim 15 was a second one.

The third reason they haven't met their burden, and as I mentioned in the beginning, there are many instances in which "composition" throughout the patent and its specifications refer to reduced coenzyme Q10 and, in fact, and on page 16, we repeat the language. The patent actually defines composition to mean the reduced coenzyme Q10-containing composition. And that's at the patent column 6, lines 1 through 6.

THE COURT: And that's earlier in the patent, right? That's not in 15. That's just the definition you are saying applies throughout and that's consistent, whether you looked at Claim 5 or Claim 15?

MR. GRIFFIN: Correct.

THE COURT: Okay.

MR. GRIFFIN: So there are many instances in the patent that is referred to in our brief where "composition" is referred to as the final reduced coenzyme Q10-containing composition. I won't go through all of them here, but that was the primary one that we wanted to bring Your Honor's attention to.

The other --

THE COURT: I'm going to ask a very -- and this is kind of a silly question in a certain sense because I suspect the answer is unknown or perhaps unknowable, but why not, when this was drafted, someone define it up at the

front in light of its repeated use throughout? Or are you saying we did that, look at, you know, 6:1 through --

MR. GRIFFIN: Six.

THE COURT: Yes.

MR. GRIFFIN: That's my answer, we did that.

THE COURT: Okay.

MR. GRIFFIN: It's defined there and there is further support throughout the patent for that meaning. That's the clearest one.

The other, I guess, fourth main reason that they haven't met their burden is that the other claims in the patent -- and we can use Claim 5 as an example -- use the word "composition" in the very same way Claim 15 does. And there's no dispute that those other claims, when they use the term "composition", that means the final reduced coenzyme Q10-containing product. And so, you know, it's necessary to give terms in different claims the same meaning. And Claim 5 is just an example.

We have further examples of how that term "composition" is used referenced in our brief.

THE COURT: I take it that -- and not to get into litigation strategy, but, you know, you are talking to someone who has some experience, but not a lot, necessarily. I mean, that argument goes only so far, right?

So let's say the defendants win -- I'm not saying

they're going to or that you are going to win, but let's say they win and they say that this term is indefinite in Claim 15. Does it not have a cascading effect to the way you litigate the rest of it? In other words, are they precluded in some way from arguing, well, now you can't use an indefinite term to argue for infringement whether it's in 15 or 5 or any other claim, frankly, because the term is indefinite -- and part of that is from the way you've said, look, we define it upfront and it pervades throughout. And they say, well, it's indefinite in 15 and so you can't claim infringement whether in 15 or anywhere else on the basis of an indefinite term.

MR. GRIFFIN: So no, I wouldn't be precluded. The only argument they're making with respect to this term is in Claim 15. They've conceded that "composition" in Claim 5 means the final reduced coenzyme Q10 product.

THE COURT: I see, okay.

And the parties are progressing, at least from your perspective, to litigating infringement on that based on that agreement?

MR. GRIFFIN: Right. So answer your first question, the case will move forward with proof on infringement on Claim and everyone agrees what the terms of Claim 5 mean, whether Claim 15 is in the case or not.

THE COURT: And what is the difference between 5

and 15? Is it just that 15 is a method claim?

MR. GRIFFIN: Correct.

THE COURT: Okay.

MR. GRIFFIN: Yes, I mean, it's really the only difference. I mean, the language pretty much mirrors Claim 5 with the exception of the first three lines which talk about a method for producing this composition and starting with oxidized coenzyme Q10. Otherwise the language is exactly the same.

THE COURT: Okay.

MR. GRIFFIN: They made an argument in their briefing, and they'll probably make it here, that says, well, you can't really look at the language of Claim 5 because it's a composition claim; it's not a method claim. And I think they said that's apples and oranges, which is untrue, and we address that in our reply brief, but one only has to go look again in different places in the patent. And we point them out on page 22. I won't go through them all here, but one claim that we would like Your Honor to note is Claim 14. Claim 14 is clear that the term "composition" is referring to reduced -- the final reduced coenzyme Q10-containing composition and I don't believe that they dispute that at all. That's a method claim. It's not a composition claim. And so you could look at many different places in claims in the patent where the term "composition"

is absolutely clear.

THE COURT: In other words, that's your answer to the --

MR. GRIFFIN: The method.

THE COURT: -- the apples and oranges argument?

MR. GRIFFIN: Correct.

THE COURT: If I were to accept that as a legal matter for some reason, I could look at 14?

MR. GRIFFIN: Yes, Your Honor, that's right.

I have about two minutes I think.

THE COURT: You've got a little bit more than that.

MR. GRIFFIN: I think I will reserve it because then I get into more detailed specific responses to their argument and I will save those for later.

THE COURT: That's fine.

MR. BAKEWELL: Good morning, Your Honor.

THE COURT: Good morning.

MR. BAKEWELL: My name is Clark Bakewell. We have not met yet, but I am an attorney with Mayer Brown on behalf of the Cocrystal defendants.

I would like to start with addressing the three questions that you began with, because I do think there's some characterizations that the parties would differ on, but fundamentally, I think we are in alignment, which is

probably music to your ears.

The first question, what happens if defendants are successful in this motion? The parties are in agreement. The case continues just on the basis of Claim 5. It's a narrowed case, of course, and this is, in our view, an appropriate thing because there is a difference between Claim 5 and Claim 15.

The patent as a whole is discussing this final form of allegedly stabilized reduced CoQ10. It's not really a method of reducing the -- the invention isn't alleged to be the reduction method. It's the specification itself, basically says, actually explicitly says you can use the reduction method for prior art. It's the presence of additional impurities, this CoQ9 or CoQ11, that allegedly distinguishes it from what it was doing before. So you're doing the same process, there are just some different ingredients involved.

THE COURT: Or in other words, it's the end product that you look at, it's not how you get there, that you're claiming is the invention or innovation?

MR. BAKEWELL: Precisely.

THE COURT: Okay.

MR. BAKEWELL: And Claim 5 is a composition claim. It's the end product. There's no discussion of the starting point.

Claim 15 is a little more complicated. It has two compositions at issue and they don't dispute this. There is the starting composition and there's the final composition. And the starting composition is nowhere in Claim 5, it's not relevant, they just talk about the endpoint. And so there is a -- it's not just method versus composition. There's other things going on in Claim 15, which is why we have this indefiniteness issue.

THE COURT: And so -- and this may be slightly afield from my first question, but if it's true that the invention is the end product, not the method, what does invalidating -- or what's the theory, as you understand it, from plaintiff's theory of infringement on 15? In other words, why is even the method here relevant if it's not -- I don't want to say background, but it's simply -- it cannot be the basis of infringement because it's not the claimed invention?

MR. BAKEWELL: First of all, it's never wise to put words in opposing counsel's mouth, but I don't think they are going to disagree with what I say. The reason Claim 15 is at issue is because a party getting to this final composition has to perform a process.

THE COURT: Okay.

MR. BAKEWELL: And so there's a process at issue, but there's also the final composition. It doesn't mean

that that is the inventive part of it, but there's a process. That's how our company works. It's how their company works.

THE COURT: And so if you had a company that came to it through a different process, that would implicate the litigation in various ways?

MR. BAKEWELL: The --

THE COURT: Not to be hypothetical, but --

MR. BAKEWELL: Yeah, Claim 15 is written very broadly. Basically says you have to do a reduction process. It doesn't specify what the process is.

THE COURT: I see.

MR. BAKEWELL: And so it's hard to talk about two hypotheticals, but...

THE COURT: Understood.

MR. BAKEWELL: Your framing, initially, I think of what the parties are arguing, I think, is accurate. Kaneka is arguing that these subsequent "wherein" clauses can only have one possible meaning. We're saying there's at least some uncertainty in that it could be referring to the resulting composition or the initial composition. That's the dispute. It's whether there's any wiggle room, any ambiguity.

And we're not saying that they can't be right. We're just saying it's not reasonably certain, and we'll get

to that in a minute.

And finally, you would ask what happens if there's an indefiniteness finding. The answer is Claim 15 is invalid, it's out of this case. And Claim 5 goes on untouched.

You asked about cascading. I think it's a related question. There is no cascading effect here. And the reason for it, it's a little bit different than I think you might have had previously in this case that you had referenced.

We aren't disputing whether point one percent by weight means something different in the context of Claim 5 than Claim 15. So it's not the words so much of the "wherein" clause that we're arguing and how you'd interpret it. It's what that refers to. In Claim 5, it can only possibly refer to one thing because there's only one composition at issue in Claim 5. In Claim 15, there are two terms. And so it's a slightly different -- but the emanating purpose of indefiniteness is the same in both cases. It's this policy objective set forth by *Nautilus* that you have to be very clear in your claims because it's a public notice function. The public needs to know what is distinctly claimed. They shouldn't be afraid of what the patent owner is going to come at them with, any weird interpretations. This happens in patent litigation all the

time. And the penalty for having ambiguous claims is the ambiguous claim is invalid. Definite claims, they can continue.

And here, as defendants were kind of stepping into the public as a role, we're saying, this claim, Claim 15, this one was messy. This one, there's some ambiguity. A reasonable person reading this patent, thinking about joining the field, wouldn't necessarily know which way the patent owner's going to go with this.

Finally, you asked a question about this earlier litigation. We agree, this particular issue was not in the case. There is also no claim preclusion going on.

So with that in mind, I would like to start about the legal standard. They said there's no dispute. It's correct. I think they provided the overall legal standard, which is clear and convincing burden on behalf of defendants.

I would like to point to the specific inquiry here. And that's a patent is invalid for indefiniteness if its claims fail to inform with reasonable certainty. It's this reasonable certainty that's the target here. And they need to show that their patent has reasonable certainty. We have to show that there's at least not certainty in this.

THE COURT: Can I ask a question? And it goes to more of the clear and convincing standard, which is that,

you know, I think that's rightfully thought of and understood as a fact-based standard, right, that you bring evidence to bear on that, right? And, whether rightly or wrongly, you know, sometimes when you talk about those skilled in the art, you bring in experts to say, this is what someone skilled in the art would think, I work in this field, this is my expertise, and the Court can rely on this as evidence to satisfy that evidentiary burden.

Here, it's almost like, you know, and, again, it's an imperfect analogy, but it's almost like your argument is, well, as a matter of law, when there are two plausible competing constructions, the term must be indefinite and therefore that would be sufficient to satisfy clear and convincing standard. And obviously that's overlaid with this idea of, well, maybe it's not plausible, but lack of reasonable certainty, but I take it that's the way I think about it from your perspective?

MR. BAKEWELL: Absolutely.

THE COURT: Okay.

MR. BAKEWELL: It's not that it's analogous to an issue of law; it is an issue of law.

THE COURT: Okay.

MR. BAKEWELL: And that being said, I do want to be upfront. The overall standard and burden on us is clear and convincing evidence. How that applies to a burden of

law, it's weird, it's not truly been fleshed out by the federal circuit. The best way I can say to understand it is just to follow *Nautilus* which incorporates the clear and convincing evidence and then brings us to the inquiry in front of us.

THE COURT: And I don't need the answer now, I will take it you have it now, but in the cases you've cited, are those ones where the indefiniteness is found solely on what amounts to the language of the patent itself, and without reference to affidavits, expert reports, prior art, whatever you have it? Is that the case?

MR. BAKEWELL: Correct with a caveat.

THE COURT: Okay.

MR. BAKEWELL: The underlying evidence is the patent and that is the answer.

Given that the inquiry puts one in the shoes of the public, a person of ordinary skill reading it, sometimes parties do bring experts to tell the Court how they think someone of expert here would understand it. I think that's a little bit more applicable to perhaps the other case you were involved in, where there's -- about meanings of the claims. Here, it's really a grammatical or -- you know, the subject matter of the patent matters and we will go into that, but it's really just a: Which one is it referring to.

THE COURT: And in your view, the patent is the

evidence itself to meet the clear and convincing standard, the language itself is sufficient?

MR. BAKEWELL: Yes.

THE COURT: You are not relying on anything else really?

MR. BAKEWELL: No.

THE COURT: Okay.

MR. BAKEWELL: And that is also in the precedent. And the courts might consider what experts tell them, but the experts are talking about just the patent, itself.

So we've talked about the standard, now let's talk about the claims. And I've mentioned the initial composition, the resulting composition, and then these "wherein" clauses. And I think, kind of graphically, I can show you this to be very clear.

So this is Claim 15 up here on the screen. And first the patent discusses what I am going to call the initial composition, which is a composition comprising oxidized coenzyme CoQ10. It is a composition. They're saying it. It's not the reduced. Then they say you end up with a reduced coenzyme-containing composition. That's the resulting composition. So there's two compositions upfront. And then they start providing certain modifiers for one of the compositions.

What opposing counsel has stressed is reasons why

these "wherein" clauses apply to the second composition. But what they haven't done is shown why they can't and don't apply to the first. They haven't shown reasonable certainty. They've just shown, I would argue, a one plausible reading. And we're not disputing it's plausible. But there are other readings possible. And, again, as we go through why this other reading is plausible, I want to emphasize the public notice function that animates it.

*Nautilus* is saying that when patentees are not clear, there is a zone of uncertainty for the public at large. And that deters innovation. It deters competition. It's unfair and that's why there's this penalty of invalidity. And it's up to defendants to point that out and to keep the patent system on track. It's not wildly dissimilar to several other doctrines, such as the on-sale bar, where it's -- the defendant can point out, like, the plaintiff has commercialized the invention for a year and a day before they filed a patent. It doesn't really affect the defendant so much, but they get to step in the shoes and keep the patent system on track. And that's what's going on here.

So the first reason why a member of the public would at least find some uncertainty about which composition these "wherein" clauses apply to is the language of the claims themselves, and, specifically, the way that the

compositions are framed in the claims.

We have, first, a composition comprising oxidized coenzyme Q10 and then we have the reduced coenzyme-containing composition and these are different compositions.

There is a rule, a what is called the starting assumption, that when you have two clauses, where you have a noun followed by the noun, "a apple" followed by "the apple," they refer to the same thing. And that is a starting assumption. So here we have "a composition" early in the claims followed by "the composition." There's a starting assumption, therefore, that these "wherein" clauses apply to "the composition" that starts "a composition."

If they were to refer to the reduced coenzyme Q10-containing composition, those "wherein" clauses should say, wherein the reduced coenzyme-containing composition, because that is the way the claim earlier uses -- distinguishes these terms, it's a composition, a reduced coenzyme-containing composition. And so there is at least a grammatical starting assumption, that's the rule, that it's referring to the first.

This should be sufficient. We need to prove that there's not reasonable certainty about which one it is, that there's at least some possibility it refers to the first one. Yes, there's some possibility it's referring to the

first one, that's the way the claims are written. But it goes beyond that.

Next, the production, if you look at the -- opposing counsel is saying it's implausible that these limitations which have reduced coenzyme Q10 in them refer to anything but the resulting reduced coenzyme-containing composition because they say once they're oxidized, once they're reduced, we are talking about at least in part of the reduced, therefore that's what we have to be talking about.

That's not true. If you look at the specification, what the specification talks about for the starting composition, it discloses, you follow a method and it cites to this PCT patent, this international patent application, you follow the method there. If you look at that patent, it says the starting composition can be a mixture of oxidized and reduced. And so if someone was to go, you know, there's no prohibition that the initial composition has reduced and, in fact, if you follow the specification, it does. And so that part leads to some uncertainty because we know that even if they're calling it the oxidized-containing composition, there is no prohibition on there being a reduced coenzyme there and, in fact, the specification says that this is a common starting place.

The '080 Patent also talks about the resulting

composition and it gives percentages about it. They do 20 percent by weight, up to 99 percent by weight, I believe. And what we have here in this limitation is not less than .01 percent by weight of the reduced coenzyme Q10 that's contained in the composition.

And so this is a pretty trivial small amount of reduced coenzyme Q10, I am not a chemist, but I understand this is kind of approaching the level of detection on what can be detected in these. It doesn't make sense that this is the endpoint if a reduction reaction you end at a tiny amount. This, if we know that there's reduced coenzyme Q10 possible in the first one, you look at this tiny amount, you go, yeah, we're talking about the first one. And then, again, it doesn't mean it's certainty. They have counter arguments for why they apply to the other composition. But again, all we're saying is it's not certain.

Addressing their arguments head-on. They say the patent explicitly defines "composition" to mean this resulting composition. And that's not so.

If you look at what they cite, the patent does provide a definition, lexicography is the term used in the patent world, but the term is "the composition of the present invention." And then the specification uses this lengthy "composition of the present invention" eight more times. So when they're talking about composition of an

invention, they say "composition of the present invention." That is the defined term. They're not defining composition on its own. And how do we know this? Because they use "composition" in -- unambiguously, they're not going to argue the other way -- in a different sense over 12 times in the specification.

I can provide cites if you were interested, but you can look no further than Claim 15. "Composition" is right there in the oxidized composition. If "composition" is a defined term, it shouldn't be a composition comprising oxidized Q11 because that would be a defined term. So no, they use a full definition if they are defining that. They are not defining composition. In their reply brief, after we made this argument to them, they switched a little bit and they said this specification uses "composition of the present invention" and "composition" interchangeably. And, again, the background uses composition in a different way thirteen times, the summary uses it once, the detailed description uses it once, and the Claim 15 obviously uses it in a different way. So "composition" is not interchangeable with "the composition of the present invention."

Next, Kaneka has been talking about this, there's "implicit antecedent basis." And here, this is somewhat of a summary of their overall arguments because if there is implicit antecedent basis, that is a form of definiteness,

there's no doubt. But the reason there's not is the ambiguity we've talked about. So it's almost arguing it's definite because it's definite.

They argue three cases that use this term implicit antecedent basis. Each one of them is pretty easily distinguished. We have *Entropic*. This used the final term, the final "wherein" clause, it wasn't technically wherein, but the final "wherein" clause, if you will. The Court said it applied to both of them. Both earlier uses. It was just applying to the class at whole. Neither side is arguing that. I suppose it's technically possible here. That would be yet another interpretation, more uncertainty, but that's not really what's going on. And that one was grammatically clear. The final clause applied to all previous instances.

*Fisher-Price* and *Sol IP*, these were not issues where there were multiple possible antecedent basis like we have here. These were terms where -- so there weren't two compositions possible. What happened in these claims is, for example, in *Fisher-Price*, the claim used, first it used "an upper seating surface" and then it said "wherein there is a seating area." And the court said, right, they're talking about the same thing, the seating area couldn't refer to anything else but the seating surface, so fine, you are not using the same words, but there's only one possible reading.

Essentially the same thing happened in *Sol IP*. There was only one possible antecedent basis and the Court said, yes, you've changed the language a little bit. That doesn't matter. Neither one of them had a possible alternative to what that "wherein" clause could possibly modify.

And when you have cases like we have here, where there are two possible antecedent basis these claims are invalid as indefinite.

We have *Cardware* here, and I would like to point you to the language of claim one here, which I have highlighted.

In Claim 1, in *Cardware*, they had two possible antecedent basis. They had "the user-provided payment information" and then "a static device account number payment information." And then there was a final clause, "wherein at least a portion of the payment information is a limited use number." And the Court said I don't know which one it refers to. Yes, this specification points me in one direction, but it's not certain in the claims which one that could be. That claim is invalid. That is very similar to what we have here.

Again, *Hawthorne* had a pretty similar case. We had one or more IP addresses. One or more second IP addresses. One or more third IP addresses. These were the

possible antecedent basis and we had a final "wherein" clause that said, "said different IP address." And the Court said I don't know which one is the different one. We have three possibilities. That is invalid.

Here is the same thing.

*Hawthorne* also went into the reasons why, you know, some of the public policy reasons behind it, but those are pretty well established.

Kaneka's third argument is telling us we should look at the other claims. In their opening brief, they did Claims 5 through 13. In their reply brief they've added in this Claim 14 that I can address as well. Claims 5 through 13, yes, they are method claims and I've already talked to you about the difference here. The apparatus claim versus the method claim, the apparatus claim has only one final resulting composition.

Claim 14 is actually more similar to Claim 5 than it is to Claim 15. Claim 14 is not the same method involved. Claim 14 is not a reduction method. Claim 14 has only one composition stated within it. It says you start with this reduced coenzyme Q10 and then you might add some reduced coenzyme Q9, reduced coenzyme Q11, but, again, there is only one possible antecedent basis for these limitations. Not so for Claim 15.

There's no authority finding that separate claims,

Claim 14, Claim 13, you import limitations from them. The federal circuit has actually made clear that importing -- in the context of this one, it wasn't apparatus element. But importing an apparatus element from a separate claim to correct a method element in the claim at issue constitutes an impermissible attempt to have the Court substantially redraft the patent claims.

So you should not redraft these claims to make them clear. What matters is what they are as written. Kaneka's also raised a couple arguments in its reply brief. The way the briefing went, we didn't have our chance to respond, so let me respond now.

They have stated that this final disputed -- one of the clauses has not less than 90 percent by weight of reduced coenzyme Q10, which, in their mind, says, well, there could be an upper bound there of 100 percent and how can that possibly be the starting composition, because if you have 100 percent reduced, you're not reducing it, it's already been reduced.

First of all, it's not impossible. You can start with 90 percent and you can reduce 90 percent. The claim says 90 percent. It doesn't say 100 percent. But even if it did say 99.9 percent, a hundred percent, what have you, courts may not -- I'm quoting the federal circuit here, courts may not redraft claims whether to make them operable

or to sustain their validity. Even a nonsensical result does not require the Court to redraft the claims.

So here we have, they're saying it's impossible. A, it's not impossible, but, B, that's not the inquiry. The inquiry is reasonable certainty.

The other new argument they're making is the fact that disputed term, this whole order of the claims, that the "wherein" terms comes last. And because they're last, they have to do the composition that immediately preceded it. That's what you talked about a little bit with opposing counsel. You mentioned the preamble.

This argument is not how patent claims are frequently written. I have been involved in cases about this. A very common claiming strategy is you first lay out all the building blocks that you are talking about. Then at the end of the claim, you start modifying them. That's pretty much -- it's a very common method. You don't have to do it that way. There's flexibility. That's common.

If the "wherein" clause automatically referred to the immediate preceding one, as co-counsel, then *Cardware*, *Hawthorne*, the two cases that I showed you, the Court would have said, right, it's modifying the one that is right before. But it doesn't, because that's not how claims are written. And in fact, they've cited a case *Nippon*, for why this whole order matters. Actually, *Nippon* says the

opposite, if you look at it. It's a little convoluted, the opinion. It took me a while to parse through. But what's going on is they had a --

THE COURT: I want to move -- I can read *Nippon*.

MR. BAKEWELL: Sure.

THE COURT: I actually want to go to your slide 14 which, I think, is the next one because it's very similar substantively to slide two, which I wanted to go back to and ask you a question about.

MR. BAKEWELL: Yes.

THE COURT: Which is I understand the legal authorities talking about, you know, claim rewriting and, you know, court saving and the limitations and inability to do certain things in certain situations. I guess from a factual perspective, right, I think if I look at just your slide 2 or 14 and the question is, as you frame it, limits on which composition I take it to mean, is that a limit on the initial or the resulting? And it seems to me that the way -- in order for something to lack reasonable certainty, and, again, is if in reading here these limits, someone might plausibly, as opposed to implausibly, in other words, irrationally would pick both of them, potentially.

In other words, the fact that a limit upon which composition, someone should be able to figure that out with a high degree of confidence.

So what is the answer to the question or what's your response to the argument that, look, nobody would read the composition limits to refer to the initial composition?

In other words, yes, it could be because it's literally the same words, right? And so someone could be confused, but that simply is not, you know, anyone who's performing this would ever do that. And so because given what is at least with respect to -- we talked about, I mean, the argument about the 0.01 weight percentage, but what about the prior "wherein" clause, right? Their argument would be no one would read those limitations as applying to the initial composition just because that just doesn't make any rational sense. What's the answer to that argument?

MR. BAKEWELL: There might have been a couple of questions in there, but so I think it brings up an important distinction in the way you approach it. And then I'll get to exactly those limitations.

But the answer isn't, or the inquiry isn't someone reading the -- this claim would reasonable think. You know what, this one modifies the initial composition. It's not a worry about someone going down the wrong path on the interpretation of it.

THE COURT: Because it does seem to me in the other examples, right, you would read them and figure out, okay, which of these payment methodologies or the other

examples are you actually referring to and so the argument -- and it's a different kind of technology and so perhaps different to get your heads around, right? So here it's sort of like why would I ever -- and I take your point, that's not necessarily the inquiry --

MR. BAKEWELL: Yeah. The inquiry, if I can finish on that one, is whether someone goes, hold up, I'm actually not sure which way the patentee is going to try to attack me on this one, so I better not get involved because I think it's probably the resulting and it might be the first and, gosh, that's -- it's the deterrent affect on the public. That's what we're looking at.

So why is this different or why is this not different from, say, *Hawthorne*, where you had a different reading? Well, *Hawthorne*, too, goes to the specification had only one embodiment and it pointed to which one it went to. And the Court says, yeah, that's not enough because claims in the patent world are not recipes of here's what you should follow. Claims are legal stakes in the ground of here's what I'm claiming, you know, people aren't supposed to follow the claims; they're supposed to follow the specification. And the claims is the legal term.

So to your point about why would you not go, nine times out of ten, you know, anyone looking at this goes, I think that it probably modifies the resulting composition

and, of course, you're talking about one of these limitations. I think the other ones are less plausible, you know, it .01 is a little bit more plausible for the first and they don't have to be the same. You know, one composition can be one, the other composition can be the other.

THE COURT: I understand that.

MR. BAKEWELL: It's not that somebody's going, yeah, I'm pretty sure it's the resulting, that's enough, because that's not enough.

THE COURT: Isn't that the whole concept of what reasonable means in the reasonable certainty inquiry? That the flip side of it is that there is uncertainty and that uncertainty has to be necessarily reasonable?

MR. BAKEWELL: Correct.

THE COURT: And so I am trying to figure out why the certainty or the uncertainty, rather, that you are pointing to, is a reasonable one, that it could be the initial composition.

MR. BAKEWELL: I think it's a fair reading of the standard. I don't think courts have talked about reasonable uncertainty, but that's the logical flip side of it.

And the two reasons that I think it's reasonable are the two points that I started with. One, you have this initial assumption that applies to claim reading where you

have "a composition," "the composition," that's the first reasonable way. How can someone say, yeah, there's no way that someone's going to argue, come at me and say, we were clear as day, we were saying "a composition," "the composition." That's a reason that somebody would hesitate. The other reason they would hesitate is they would look at the -- and, again, I'm looking at this .01 percent limitation, they would look at that one and say, yeah, that's a really low percentage, how is that possibly going to be the resulting composition? Now, Kaneka is saying it is and they have a right to do so, but we're saying someone looking at it goes, I'm not sure that they can't come at me and say, aha, but your starting composition had .01 percent reduced, therefore you meet our claims. And do they know that Kaneka is not going to come at them with that interpretation? The answer is no, they don't, they don't have that reasonable certainty.

THE COURT: And if I buy that argument from your perspective and let's say I don't buy it with respect to the other limitation, right, which is to say that leads to -- and this goes back to one of my initial questions -- the entirety of the claim being rendered invalid or indefinite and not just striking, for lack of a better term, "wherein not less than 0.1 percent" and keeping the rest because it's all part of one integrated claim and also it's part of one

integrated method that has certain starting points and you can't just have one and not the other.

Is that the argument?

MR. BAKEWELL: That's exactly right. If you agree that at least one of these "wherein" clauses, probably the .01 percent has at least some reasonable uncertainty, if you will, Claim 15 is, in its entirety, invalid and we are back to where we started, which is we're talking about only Claim 5 in this case. There's no cascading effect from that on to Claim 5. Claim 5 is not indefinite.

And that's where the litigation proceeds and, frankly, where it should because that's what the alleged invention is.

THE COURT: I'm going to switch gears to the plaintiffs -- and I wonder if you could actually keep up your slide that's here for opposing counsel to address this kind of same question --

MR. BAKEWELL: Absolutely.

THE COURT: -- at the podium and then I have some questions for him directly on his slides.

MR. BAKEWELL: It's my colleague's computer anyway.

MR. GRIFFIN: Your Honor, I was going to address, in the order they were argued, points that he made in his presentation. Unless you want to skip to the questions,

specific questions you had for me?

THE COURT: You don't have to address all of his points.

MR. GRIFFIN: No, I wasn't going to.

THE COURT: But I would like to start with this slide, if I may.

MR. GRIFFIN: Sure.

THE COURT: Which is that -- because I take it their -- they may disagree with my characterization -- a central point of their argument is reflected in this slide, which is this question limits which composition. And that at least in two instances, in two "wherein" clauses, it is unknown whether you are referring to the initial composition or resulting composition. Obviously, you can infuse the unknown with the legal standards that we have been discussing. And you may be repeating, which is fine, some of the things you said earlier, but what's your answer to that not being a lack of reasonable certainty on these limits as to which it applies to?

MR. GRIFFIN: First, it's their burden, not our burden to show reasonable certainty. They have to show by clear and convincing evidence that it's not reasonable certain and they haven't done that. We've already gone through the many places in the patent which I believe and have argued make clear that the term "composition" refers to

the final reduced coenzyme Q10-containing composition.

Looking at this slide, they made two arguments, as I understood it, and it was, first, you had, "a composition" followed by "the composition" and they think that that, the normal way of reading that language, according to the case laws that they've cited, sort of points someone of ordinary skill in the art to reading it, what they've pretty much said, is a nonsensical way or an illogical way.

I would refer the Court to the preamble of 15, which starts with "a reduced coenzyme Q10-containing composition." And so I think that if you are going to follow that argument, and it doesn't make any sense for the reasons I've already said, including the "wherein" clauses that introduce the term "composition" twice, and the fact that it's following, directly following by comma, the term "reduced Q10-containing composition," you can look at that preamble and still say that the "a" and "the" follows.

THE COURT: But put differently, not to put words in your mouth, but if I look at resulting composition, right, your argument is, look, the "wherein" clauses follow that. There's no way that it could refer to the initial composition. And beyond that, beyond placement and comma and meaning of "wherein," the initial composition is sort of its own defined term, which is slightly different than, perhaps, your initial argument because it says "a

composition, compromising oxidized coenzyme Q," and when it refers to -- the "wherein" clauses are referring to "reduced coenzyme Q-containing composition," right?

MR. GRIFFIN: Right. And the other argument I heard had to do with .001 and that being a small weight percentage and that you may possibly think that because of that, you are starting with the oxidized portion. But that "wherein" clause, you know, is a weight percentage of the final product that's sold. And so for instance, defendants' product has more than just reduced coenzyme Q10 in it. It has other things like nicotinamide. And so what that clause is referring to is you at least have to have this weight percentage of the product that's sold be this reduced -- the final reduced coenzyme Q10 product.

And so it's a little different than the following clause which talks about the proportion between the reduced coenzyme Q10 and the total coenzyme Q10. And so, you know, I think Your Honor put your finger on it in the questions that you asked. No one, no person of ordinary skill in the art would possibly read this language to refer to the initial oxidized form that's later reduced. And they've said or argued that, you know, it could be nonsensical and illogical, that's just not right. They have the burden of showing that it's not reasonable certainty and through clear and convincing evidence and the patent just doesn't do that.

THE COURT: Do you have any view, and you don't need to -- sorry. Do you have any authorities, and you don't need to off the top of your head, which sheds a little bit more light on this evidentiary question that I posed at the outset to defendants counsel, which is, you know, we have clear and convincing evidence, you've argued they don't meet the standard and we discussed the patent itself is evidence, you know, but we are in a situation where we're talking about, I think, what evidence factually or otherwise is sufficient and they're arguing essentially it must be as a matter of law, in fact, it's a similar kind of argument, but beyond that, so I am giving you authority to shed more light on this.

MR. GRIFFIN: I am trying to think off the top of my head. I'm not sure that we address the, you know, specific factual burden that they would have.

I do know that we cited some cases and there's a footnote in which the Court found -- and I can't remember the name of the case -- that, you know, the factual record wasn't established. And so deciding indefiniteness at claim construction was premature, right? Because it is a factual issue and the record had to be, you know, further explored and the party are just in discovery now.

I honestly can't remember if that case addresses your specific question, but it's --

THE COURT: That's fine.

And then on the view of the question that I was having the back and forth with defendants counsel sort of at the end of his presentation about reasonable certainty and reasonable uncertainty, right, do you have a view or an authority that you want to talk about? I mean, I think I understand what your view is about --

MR. GRIFFIN: Yeah -- sorry.

THE COURT: Go ahead.

MR. GRIFFIN: No, you can't just come up with an irrational reading and speculate that someone would do so and meet your clear and convincing burden of showing it's, you know, not reasonable certainty. And that's what they're doing here.

THE COURT: Is it your view that a person of ordinary skill in the art would have to plausibly read it in both directions for it to be indefinite or invalid as a result of the competing interpretations?

MR. GRIFFIN: So if I understand the question, if a person of ordinary skill could read it in both ways, whether that would --

THE COURT: Is that what they have to establish, or is it something different?

MR. GRIFFIN: I think it's none, it's reasonable certainty. And so I don't think that you could just come up

with -- and I don't agree that their reading of this is plausible at all and I've already said no one in their right minds would read these claims as referring back to the oxidized.

THE COURT: I understand.

MR. GRIFFIN: You know, at least with two of the provisions they agree that it's not plausible; that it's illogical.

I think it's more than that. I mean, I think their burden is higher than just showing that there's two compositions referred to here. And that, you know, because the claim has two compositions, you could take this irrational reading, that's not plausible, I guess is what I'm saying.

THE COURT: Do you want to take a couple minutes and respond to any other arguments that you wanted to address?

MR. GRIFFIN: Yes, I will do it quickly.

So I addressed the burden, we just talked about that. I addressed the "a" and "the" issue and the .001 weight percentage issue.

They took issue with our argument about whether in the specification composition is defined. And they say that it's only defined as, not "the reduced composition," but, you know, "the composition of the present invention." And

they try to make that language distinguishable from "the reduced composition."

So we pointed out in the presentation materials and in our briefs where those terms are obviously interchangeable. You could find it at page 17 and 18 of the presentation. I won't go through each of the slides.

They talk about *Cardware* and *Hawthorne* as their primary, you know, sort of cases to support their, you know, construction argument. And so -- and to refute or try to our point about the "wherein" clause. And I will just say *Hawthorne* doesn't have a "wherein" clause. I thought opposing counsel had asserted it does. *Cardware* does have a "wherein" clause, but it's not a "wherein" clause that is preceded by a comma and then preceded by the very term it's introducing. So it's just the language is distinguishable; it doesn't support their construction.

And I will just go back to Claim 14. We're not importing an element from Claim 14 into Claim 15. Everyone agrees what the language of Claim 14 means. Everyone agrees that the term "composition" refers to the reduced -- final reduced coenzyme Q10-containing composition. It's the very same language in Claim 15. It's identical language. They're not distinguishable. What we're saying is you have to look at the claims and give the terms their same meaning. And they've already conceded, at least with respect to Claim

5, that that's what the term means.

I think that's all I have for you, Your Honor. Thank you.

THE COURT: Thank you.

Do you want to take two minutes and give any sur-reply? You are not required to.

MR. BAKEWELL: I think I can be efficient in two minutes.

THE COURT: Okay.

MR. BAKEWELL: Firstly, opposing counsel talked about this whole final product that's being sold. It's not in the claims. It's not -- actually, it's a new argument. I am not aware of it being in the specification either. So I think if that was only kind of a new argument, but it's also one that I don't think is supported by any discussion anywhere else in the specification.

You -- what I was thinking as I was sitting down about your question about this whole clear and convincing versus reasonable certainty interplay there, and I have some guidance, and it's a little bit of an analogy, but indefiniteness is a question of law. So, too, is patent eligibility at Section 101. And I know Your Honor has done a couple of those cases before. That's a two-step process. The first step is a pure legal step and it's a matter of determining what the claims are directed to. The second

step is a mixture of law in fact.

If you look at the way any Court is applying step one, the Court simply says, it's my job, it's a question of law, I look at what they are directed to. It's not a matter of patent challenge or proving by clear and convincing evidence what the patents are directed to. And so I would say that that is a template here. And why the inquiry simply collapses into, yes, as a matter of law, here I am, it's whether there's reasonable certainty.

THE COURT: That's, I guess, the whole point of *Markman* itself in some way?

MR. BAKEWELL: Yes, yes. *Markman* is not a clear and convincing -- you know, so ultimately I can't say that there isn't the Supreme Court law of clear and convincing ultimately is the burden, but when you look at the individual requirements and how you are supposed to apply them, you kind of look past that because those are already part of context. And you can look at *Cardware*, *Hawthorne* or any other court interpreting them and they look straight to there because the two are not inconsistent.

THE COURT: Okay.

MR. BAKEWELL: Finally, you know, they're called irrational readings. I guess that's just rehashing the exact core of the dispute. We don't think it's irrational. We think that someone looking at it is at least going to go,

pump the brakes, we are not positive. That's it.

THE COURT: Thank you. Thank you, all.

A couple questions -- you can have a seat.

So I don't encourage it, but, you know, after a hearing, do the parties want to submit anything in the form of short letters based on any of the questions I have asked? You are not required to, but if you thought it was necessary, I would give you the same opportunity to make a simultaneous, you know, short letter on any point.

MR. GRIFFIN: I don't see the need to submit additional letters.

THE COURT: Okay.

MR. GRIFFIN: Unless Your Honor would like more from us.

THE COURT: Great.

The second thing is I think, although I don't have my docket in front of me, but the parties seek an extension of time of discovery and the like. So I am inclined to do the following, but the parties should -- is that an agreed-upon schedule?

MR. GRIFFIN: Yes, Your Honor.

THE COURT: Okay. I will go back to my office and so order it and enter it in the light of that.

I was going to say, the parties consented to me, I changed position, and so now as a District Judge I have a

bunch of cases on consent that I had when I was a Magistrate Judge. In some of those cases I have assigned a Magistrate Judge for the purposes of, say, settlement because the parties have indicated to me that they have a desire to discuss settlement and since I would be at least, in part, adjudicating the merits, I would not sit on that. There are also some other cases -- this is not one of them -- where the parties are involved in deep discovery disputes and perhaps, you know, a Magistrate Judge can get to those a little bit faster given my new docket. That's really not why I would assign someone here.

Are the parties interested in me assigning a Magistrate Judge to have a settlement conference really and only for that purpose?

MR. GRIFFIN: Your Honor, no from our side.

THE COURT: Okay.

MR. GRIFFIN: We already had a settlement conference if you remember with you back in August.

THE COURT: Yes.

MR. GRIFFIN: I don't think, you know, we are ready for another one.

THE COURT: That's fine.

MR. HNATH: Yes, Your Honor. I think that's fine. At least as we stand here right now, I don't think that's necessary.

THE COURT: It's a longer way of me saying if the parties do wish to have a settlement conference in the future, I would not be holding the settlement conference even though I held one in the past and I would assign a Magistrate Judge to the case to deal with that.

Is there anything else we should talk about today?

MR. GRIFFIN: We really haven't had discovery disputes that needed a magistrate, but we may -- I hope not, but we may get to that point.

THE COURT: And so I am not inclined to assign anyone right now.

MR. GRIFFIN: Okay.

THE COURT: I would rather, frankly, if they are easily resolvable by me or I should hold the status conference anyway to see where the case is, I may just do that myself. That's my general impulse. Frankly, I would only reassign a magistrate to the case on the consent docket that I have taken, frankly, not to be disparaging, but the parties are simply incredibly unreasonable and are filing repetitive multiple motions and it's clear that they're not even engaging in the basic meet and confer.

This is not such a case. The parties are very professional with each other. We have had very few, if any, discovery disputes as far as I can tell that we've brought before the Court. So even if you are forced to make motions

to compel, the only other possibility would be if I'm in the middle of a criminal trial and simply can't get to it and see you in a reasonable time, I would, but at this point I am inclined to deal with those issues myself.

MR. GRIFFIN: We would like that. Thank you, Your Honor.

MR. HNATH: And fine with us, as well. Your Honor. Thank you and defendants have nothing further.

THE COURT: I wish you all good health. Have a nice day.

(Matter concluded.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Jamie Ann Stanton — January 24, 2025

JAMIE ANN STANTON — DATE