IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

KANEKA CORPORATION,

Plaintiff,

v.

COCRYSTAL TECHNOLOGY (JIAXING) CO., LTD. (f/k/a SHANGHAI COCRYSTAL PHARMACEUTICAL TECHNOLOGY CO., LTD.) and COCRYSTAL HEALTH INDUSTRY (ZHEJIANG) CO. LTD.

Defendants.

Case No. 1:23-cv-07483-SJB

**PLAINTIFF KANEKA'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' INVALIDITY DEFENSES AND COUNTERCLAIMS**

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ..... 1

II. INTRODUCTION ..... 1

III. BACKGROUND ..... 3

A. The '080 Patent ..... 3

B. Kaneka's Initial Batches of QH and QH Products Shipped to the United States Did Not Practice the '080 Patent ..... 5

C. Defendants Infringe the '080 Patent ..... 7

IV. APPLICABLE LAW ..... 8

V. ARGUMENT ..... 9

A. Defendants Cannot Prove by Clear and Convincing Evidence that $CoQ_{11}$ Is Inherent in Every $CoQ_{10}$-Containing Composition ..... 9

1. Kaneka is Entitled to Summary Judgment on Anticipation ..... 12

2. Kaneka is Entitled to Summary Judgement on Obviousness ..... 12

3. Kaneka is Entitled to Summary Judgment on On-Sale Bar ..... 13

4. Kaneka is Entitled to Summary Judgment on Inequitable Conduct ..... 15

B. Defendants Cannot Prove by Clear and Convincing Evidence that the Asserted Patent Claims Are Invalid Under §112 For Lack of Enablement ..... 17

C. Defendants Cannot Prove by Clear and Convincing Evidence that the Asserted Patent Claims Are Invalid For Reciting Patent-Ineligible Subject Matter ..... 20

D. Defendants Cannot Prove Their Tortious Interference, Unfair Competition and Antitrust Counterclaims by Clear and Convincing Evidence ..... 22

1. Kaneka's Acts to Protect Its Patent Rights Are Legitimate ..... 22

2. Kaneka is Entitled to Summary Judgment on the Tortious Interference Counterclaim ..... 23

3. Kaneka is Entitled to Summary Judgment on the Unfair Competition Counterclaim ..... 25

4. Kaneka is Entitled to Summary Judgment on the Antitrust Counterclaim ..... 26

VI. CONCLUSION ..... 27




4931-7037-5278.v7

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A/S v. Zuru, Inc.*,
2020 U.S. Dist. LEXIS 262618 (D. Conn. Apr. 22, 2020) .....27

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014) .....21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .....8

*In re Angstadt*,
537 F.2d 498 (C.C.P.A. 1976) .....18

*Autronic Plastics, Inc. v. Apogee Lighting, Inc.*,
2021 U.S. Dist. LEXIS 96746 (E.D.N.Y. Mar. 25, 2021) .....23

*Avia Grp. Int'l, Inc. v. L.A. Gear Cal. Inc.*,
853 F.2d 1557 (Fed. Cir. 1988) .....8

*Bayer Schera Pharm AG v. Sandoz, Inc.*,
2010 U.S. Dist. LEXIS 33252 (S.D.N.Y. Mar. 29, 2010) .....27

*Bettcher Indus. v. Bunzl USA, Inc.*,
661 F.3d 629 (Fed. Cir. 2011) .....9, 10

*Biotec Biologische GmbH & Co. KG v. Biocorp, Inc.*,
249 F.3d 1341 (Fed. Cir. 2001) .....8

*In re Brana*,
51 F.3d 1560 (Fed. Cir. 1995) .....18

*Cap Exp., LLC v. Zinus, Inc.*,
2022 U.S. App. LEXIS 26483 (Fed. Cir. 2022) .....13, 14

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017) .....21

*Commer. Lubricants, LLC v. Safety-Kleen Sys.*,
2017 U.S Dist. LEXIS 125557 (E.D.N.Y. Aug. 8, 2017) .....24

*Continental Can Co. USA, Inc. v. Monsanto Co.*,
948 F. 2d 1264 (Fed. Cir. 1991) .....9

*Crown Operations Int'l, Ltd. v. Solutia Inc.*,
289 F.3d 1367 (Fed. Cir. 2002)....................8

*Eli Lilly & Co. v. Actavis Elizabeth LLC*,
435 F. App'x 917 (Fed. Cir. 2011)....................18

*Env. Designs, Ltd. v. Union Oil Co. of Cal.*,
713 F.2d 693 (Fed. Cir. 1983)....................19

*Envirotech Corp. v. Al George, Inc.*,
730 F.2d 753 (Fed. Cir. 1984)....................17, 19

*Finnigan Corp. v. United States Int'l Trade Comm'n*,
180 F.3d 1354 (Fed. Cir. 1999)....................9

*Foods, LLC v. Hamilton Beach Brands, Inc.*,
2019 U.S. Dist. LEXIS 65300 (D. Del. 2019)....................13, 15

*Gemmy Indus. Corp. v. Chrisha Creations, Ltd.*,
452 F.3d 1353 (Fed. Cir. 2006)....................13, 14, 15

*Glaxosmithkline LLC v. Banner Pharmacaps, Inc.*,
2013 U.S. Dist. LEXIS 112440 (D. Del. Aug. 9, 2013)....................17

*Jane Street Grp., LLC v. Millennium Mgmt. LLC*,
2024 U.S. Dist. LEXIS 127113 (S.D.N.Y. July 18, 2024) ("New York does not recognize bad faith litigation as a type of unfair competition)....................27

*Kaneka Corp. v. Designs for Health*,
760 F. Supp. 3d 152 (D. Del. 2024)....................2, 21, 22, 26

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019)....................27

*La. Health Serv. & Indem. Co. v. Celgene Corp.*,
2025 U.S. Dist. LEXIS 67207 (S.D.N.Y. Mar. 31, 2025)....................27

*In re Langer*,
503 F.2d 1380 (CCPA 1974)....................18, 20

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
566 U.S. 66 (2012)....................21

*Med. Depot, Inc. v. Med. Way United States, Inc.*,
774 F. Supp. 3d 554 (E.D.N.Y. 2025)....................25, 26

*Microsoft Corp. v. i4i Ltd.*,
564 U.S. 91 (2011)....................8, 9

*Nadel v. Play-by-Play Toys & Novelties, Inc.*,
208 F.3d 368 (2d Cir. 2000)....................25

*In re Oelrich*,
666 F.2d at 581 ....................9

*Par Pharm., Inc. v. TWi Pharm., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014)....................8, 10

*Phillips Petroleum Co. v. U.S. Steel Corp.*,
673 F. Supp. 1278 (D. Del. 1987)....................17

*PlaSmart, Inc. v. Wincell Int'l, Inc.*,
442 F. Supp. 2d 53 (S.D.N.Y. 2006)....................24, 25

*Plumtree Software, Inc. v. Datamize, LLC*,
473 F.3d 1152 (Fed. Cir. 2006)....................14, 15

*Raytheon Co. v. Roper Corp*,
724 F.2d 951 (Fed. Cir. 1983)....................17

*ResQNet.com, Inc. v. Lansa, Inc.*,
2006 U.S. Dist. LEXIS 85613 (S.D.N.Y. Nov. 22, 2006) ....................15, 16

*Ritz Camera & Image, LLC v. Sandisk Corp.*,
700 F.3d 503 (Fed. Cir. 2012)....................28

*Silver State Intellectual Techs., Inc. v. Garmin Int'l, Inc.*,
32 F. Supp. 3d 1155 (D. Nev. 2014)....................13

*Smith v. Snow*,
294 U.S. 1 (1935)....................19

*Springs Window Fashions LP v. Novo Undus., L.P.*,
323 F.3d 989 (Fed. Cir. 2003)....................24

*SRI Intern. v. Matsushita Elec. Corp. of America*,
775 F.2d 1107 (Fed. Cir. 1985)....................19

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011)....................16

**Statutes**

35 U.S.C. § 101....................17, 21

35 U.S.C. § 102(b) ....................13

35 U.S.C. § 282....................8

Lanham Act....................................................................................................................26

Leahy-Smith America Invents Act ...........................................................................................13

Sherman Act...................................................................................................................27

## I. PRELIMINARY STATEMENT

Plaintiff Kaneka Corporation ("Kaneka") hereby submits this motion seeking summary judgement on each of Cocrystal Technology (Jiaxing) Co., Ltd.'s and Cocrystal Health Industry (Zhejiang) Co. Ltd.'s (collectively, "Defendants") defenses that claim 5 and 15 (the "Asserted Claims") of U.S. Patent No. 7,829,080 (the "'080 Patent") (**Exhibit 1**[1]) are invalid, and on Defendants' counterclaims for declaratory judgment of invalidity. Summary judgment is warranted because the record is devoid of any evidence, much less the clear and convincing evidence required to establish invalidity.

Kaneka further moves for summary judgment on Defendants' counterclaims for tortious interference with prospective economic advantage, unfair competition, and antitrust violations. Each of these counterclaims is impermissibly premised on the notion that Kaneka acted in bad faith when it asserted its rights to enforce the '080 Patent. For the reasons stated below, Kaneka's motion should be granted in its entirety.

## II. INTRODUCTION

Defendants no longer dispute infringement. Defendants have conceded that their Crystal QH product (the "Accused Product") infringes the Asserted Claims and have withdrawn their defense of non-infringement and their counterclaim seeking a declaratory judgment of non-infringement, each with prejudice. D.E. 74. Defendants continue, however, to pursue their baseless invalidity defenses and counterclaims.

Defendants' anticipation, obviousness, on-sale bar and inequitable conduct defenses rise and fall on a singular, flawed premise: that Coenzyme $Q_{11}$ ("$CoQ_{11}$") is inherent in Coenzyme $Q_{10}$ ("$CoQ_{10}$"). To meet their burden to establish inherency, Defendants must show by clear and

[1] All exhibits are attached to the Declaration of Gerald W. Griffin, dated October 6, 2025, in support of this motion.

convincing evidence that $CoQ_{11}$ is *always* and necessarily present in *every* $CoQ_{10}$-containing composition. Defendants fall well-short of this burden. First, their own expert, Dr. Douglas Cameron, admits there is no treatise, journal or scientific article that supports Defendants' theory. Second, Dr. Cameron admits that Defendants' inherency theory is a "statistical" one based on probability. The Federal Circuit has made clear that inherency cannot be based on probability. Finally, far from evidence in the record showing $CoQ_{11}$ is inherently present in $CoQ_{10}$-containing compositions, the record repeatedly reflects its absence, including numerous peer-reviewed scientific journals and Kaneka's own test results. Because Defendants' inherency argument fails, so too must their invalidity defenses that rely on it.

In addition, Defendants assert that claim 5 is not enabled for alleged lack of utility because the '080 Patent does not disclose that $CoQ_{11}$ has a stabilizing effect on reduced $CoQ_{10}$. This argument also fails for a number of reasons. As a threshold matter, Dr. Cameron has acknowledged that claim 5 does not have a stabilization requirement, and thus whether $CoQ_{11}$ has a stabilizing effect has no effect on the validity of claim 5. Moreover, the '080 Patent contains more than sufficient evidence of utility of the claimed composition containing $CoQ_{11}$, not only because it discloses $CoQ_{11}$'s stabilizing effect on reduced $CoQ_{10}$, but also because—as Dr. Cameron has acknowledged—the composition has utility beyond stabilization.

Defendants also assert that the Asserted Claims are invalid because they are directed to patent-ineligible subject matter. Here again Dr. Cameron has already acknowledged that neither the specific composition of claim 5 nor the method disclosed in claim 15 appear in nature. Nor is there any doubt that—as Federal Circuit Judge Bryson (sitting by designation) held last year in rejecting a similar argument—the Asserted Claims provide "significant utility" over what occurs in nature. *See* **Exhibit 3** (*Kaneka Corp. v. Designs for Health*, 760 F. Supp. 3d 152 (D. Del. 2024)).

Because Defendants cannot meet their burden to establish invalidity, their counterclaims (tortious interference, unfair competition, and antitrust violations), each of which is premised on the Patent's alleged invalidity, must also fail.

## III. BACKGROUND

### A. The '080 Patent

Kaneka Corporation is an international company that produces a number of different products at production plants around the world. Statement of Material Facts Not in Dispute, dated October 6, 2025 ("SMF"), ¶28. Kaneka has been the world's premier supplier of $CoQ_{10}$ supplements for more than 40 years. *Id*.

There are two types of $CoQ_{10}$, oxidized, known as ubiquinone ("QX"), and reduced, known as ubiquinol ("QH"). *Id.* The human body uses $CoQ_{10}$ to produce energy that it needs for cell growth and maintenance. *Id.*, ¶29. $CoQ_{10}$ also protects the body from damage caused by harmful molecules. *Id*. QX and QH provide similar health benefits, but QH is more easily absorbed by the human body, and thus more desirable. *Id.*, ¶30.

Kaneka was the first industrial scale manufacturer of QX in 1977. *Id.*, ¶31. Kaneka began manufacturing QH in 2004. *Id.*, ¶3. Kaneka has been awarded a number of patents covering its reduced $CoQ_{10}$ products, including the '080 Patent. *Id.*, ¶32. Claim 5 of the '080 Patent is directed toward a composition of QH, and claim 15 is directed to a method of making the composition disclosed in Claim 5. *Id.*, ¶33.

Specifically, claim 5 provides:

> **5**. A reduced coenzyme $Q_{10}$-containing composition comprising reduced coenzyme $Q_{10}$ and one or both of (a) and (b):
> (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and
> (b) reduced coenzyme $Q_{11}$
> wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and
> wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %.

Claim 15 provides:

> **15**. A method for producing a reduced coenzyme $Q_{10}$-containing composition, which method comprises
> providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, and then
> reducing oxidized coenzyme $Q_{10}$ and reducing one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition,
> wherein the composition comprises reduced coenzyme $Q_{10}$ and one or both of (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$ and (b) reduced coenzyme $Q_{11}$,
> wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and
> wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %.

SMF, ¶¶73-74.

The composition disclosed in claim 5 has many benefits. The '080 Patent states that the composition stabilizes QH in that the composition prevents QH from converting back to QX. The '080 Patent includes specific data to show that the use of QH, in combination with a specific amount of reduced coenzyme $Q_9$ minimizes oxidation. *See* **Exhibit 1**, Example 1, col. 14, ll. 35-67, Example 2, col. 15, ll. 1-10. Because $CoQ_9$ and $CoQ_{11}$ are structurally similar compounds

known as analogs and "show the same effect in the body," the '080 Patent makes clear that this stabilizing effect is also present when QH and $CoQ_{11}$ are combined. *Id.*, col 4, ll. 46-48, col. 13, ll. 10-11. The '080 Patent specification also makes clear that the composition has other utility beyond stability, including that it provides "high biological absorbability of reduced coenzyme Q10," *i.e.,* QH (*id.*, col. 13, ll. 14-15, col. 15, ll. 60-col.16, ll. 10, Fig. 2), and also that it can be safely used as a means to carry other antioxidants or active ingredients into the human body. *Id.*, col. 11, ll. 7-18.

The '080 Patent application was filed April 27, 2007, and the Notice of Allowance was issued July 23, 2010. SMF, ¶34. Prior to allowing the claims, the Primary Examiner was aware that $CoQ_{10}$, $CoQ_9$ and $CoQ_{11}$ were natural phenomena known to be present in vivo. *Id.*, ¶35. The Primary Examiner was also aware that $CoQ_{11}$ could be present in $CoQ_{10}$-containing compositions. *Id*. In allowing the '080 Patent, the Primary Examiner found that "the prior art does not teach nor suggest a reduced coenzyme $Q_{10}$-containing composition comprising reduced co enzyme $Q_{10}$ and . . . (b) reduced coenzyme $Q_{11}$ wherein not less than 0.01 wt% of reduced coenzyme $Q_{10}$ is contained in the composition and wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt% along with methods for using the composition and methods for making the composition." *Id.*, ¶36.

### B. Kaneka's Initial Batches of QH and QH Products Shipped to the United States Did Not Practice the '080 Patent

Kaneka manufactures QH by reducing QX with a reducing agent and then removing impurities in the QH by crystallization. *Id.*, ¶¶1, 11, 18. Kaneka manufactures QX by fermenting select yeast strains under controlled conditions and then removing impurities in the QX by crystallization. *Id.*, ¶2.

Kaneka manufactured its first batch of QH in September 2004. *Id.*, ¶3. Kaneka designated its first batch as FB01-001. "FB" refers to Functional Food Batch, "01" refers to bulk form, and "001" refers to the first batch. *Id.*, ¶4. Kaneka tested FB01-001 in September 2004 for the presence of potential impurities, including reduced $Q_9$ and reduced $Q_{11}$. *Id.*, ¶5. Kaneka's tests of FB01-001 showed that reduced $Q_9$ was not present in an amount of at least 1.5 wt % relative to QH, and reduced $Q_{11}$ was not present at all as required by the '080 Patent. *Id.*, ¶6.

Kaneka manufactured its second batch of QH in July 2005. *Id.*, ¶7. Kaneka designated its second batch of QH as FB01-002. *Id.*, ¶8. Kaneka tested FB01-002 in August 2005 for the presence of potential impurities, including reduced $Q_9$ and reduced $Q_{11}$. *Id.*, ¶9. Kaneka's tests of FB01002 showed that reduced $Q_9$ was not present in an amount of at least 1.5 wt % relative to QH, and reduced $Q_{11}$ was not present at all as required by the '080 Patent. *Id.*, ¶10.

Kaneka manufactured its third, fourth, fifth, sixth, seventh, eighth, ninth and tenth batches of QH between July 2006 and December 2006. *Id.*, ¶12. Kaneka designated its third batch of QH as FB01-003, its fourth batch as FB01-004, its fifth batch as FB01-005, its sixth batch as FB01-006, its seventh batch as FB01-007, its eighth batch as FB01-008, its ninth batch as FB01-009, and its tenth batch as FB01-010. *Id.*, ¶13. Kaneka tested batches FB01-003 through FB01-010 between July 2006 and December 2006 for the presence of potential impurities, including reduced $Q_9$ and reduced $Q_{11}$. *Id.*, ¶14. Kaneka's tests of batches FB01-003 through FB01-010 showed that reduced $Q_9$ was not present in an amount of at least 1.5 wt % relative to QH, and reduced $Q_{11}$ was not present at all as required by the '080 Patent. *Id.*, ¶15.

Kaneka tested batches FB01-001 through FB01-010 by high-performance liquid chromatography ("HPLC"), the testing methodology for determining the presence of potential impurities that is approved by the United States Pharmacopeia. *Id.*, ¶16. Indeed, Kaneka and

Cocrystal both regularly test their ubiquinol products to determine the presence of potential impurities by the HPLC methodology approved by the United States Pharmacopeia. *Id.*, ¶17.

Kaneka began manufacturing soft gel capsules containing QH in October 2004. *Id.*, ¶19. Kaneka designated its first two batches of soft gel capsules as FB31-001 and FB31-002. "FB" refers to Functional Food Batch, "31" refers to soft gels, "001" refers to first batch, and "002" refers to second batch. *Id.*, ¶20. Kaneka manufactured FB31-001 on October 27, 2004. Kaneka manufactured FB31-002 on May 18, 2005. *Id.*, ¶¶21-22. Kaneka used QH from FB01-001 to manufacture the soft gel capsules of FB31-001 and FB31-002. *Id.*, ¶23.

Kaneka shipped 127,900 soft gel capsules from FB31-001 and FB31-002 to Enzymatic Therapy, Inc. in February 2006, 91,600 of which were provided at no cost. *Id.*, ¶24. Kaneka's shipping documents included certificates of analysis stating that the soft gel capsules from FB31-001 and FB31-002 shipped to Enzymatic Therapy, Inc. in February 2006 were manufactured on October 27, 2004, and May 18, 2005, respectively. *Id.*, ¶¶21-22, 24. Thus, FB31-001 and FB31-002 were manufactured using QH from FB01-001, the only batch of QH that existed as of May 18, 2005, and which did not have reduced $Q_9$ in an amount of at least 1.5% relative to QH, and did not have any reduced $Q_{11}$.

**C. Defendants Infringe the '080 Patent**

In October 2022, Kaneka received samples of Defendants' ubiquinol from Tishcon, a longtime customer of Kaneka. *Id.*, ¶37. Kaneka received a second sample of Defendants' ubiquinol from Tishcon in June 2023. *Id.*, ¶38. After testing Defendants' product and determining that it infringed the '080 Patent, Kaneka filed this action on October 5, 2023. *Id.*, ¶39. On October 9, 2023, Kaneka issued a press release stating that it had commenced this action, and was "committed to enforcing its patent rights against any customer who purchases" Defendants' ubiquinol and

"subsequently engages in activities such as using, selling, or offering to sell" Defendants' ubiquinol in the United States. *Id.*, ¶40.

## IV. APPLICABLE LAW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Federal Circuit "has repeatedly emphasized that 'summary judgment is as appropriate in a patent case as in any other.'" *Avia Grp. Int'l, Inc. v. L.A. Gear Cal. Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988) (affirming summary judgment of no invalidity) (citation omitted). "[When] ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

Because each patent claim is presumed valid (*see* 35 U.S.C. § 282), a party must demonstrate invalidity by clear and convincing evidence. *See, e.g., Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 112–13 (2011). While testimony in the form of expert reports is often considered at summary judgment, "[i]t is well established that conclusory statements of counsel or a witness that a patent is invalid do not raise a genuine issue of fact. … It is not the trial judge's burden to search through lengthy technologic documents for possible evidence." *Biotec Biologische Naturverpackungen GmbH v. Biocorp, Inc.*, 249 F.3d 1341, 1353 (Fed. Cir. 2001). Therefore, to obtain summary judgment that the asserted claims are not invalid, Kaneka need only "point[] out to the district court" the absence of evidence supporting Defendants' assertions of invalidity. *Avia Grp.*, 853 F.2d at 1560; *see also Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377–78 (Fed. Cir. 2002).

## V. ARGUMENT

### A. Defendants Cannot Prove by Clear and Convincing Evidence that $CoQ_{11}$ Is Inherent in Every $CoQ_{10}$-Containing Composition

A party must "meet a high standard in order to rely on inherency." *Par Pharm., Inc. v. TWi Pharms., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014). Specifically, the party asserting inherency must prove by clear and convincing evidence that "the limitation at issue necessarily must be present." *Id.* at 1196. "Inherency … may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Bettcher Indus. v. Bunzl USA, Inc.*, 661 F.3d 629, 639 (Fed. Cir. 2011) (quoting *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981)). "[W]hen [a] reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence." *Finnigan Corp. v. United States Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999) (quoting *In re Oelrich*, 666 F.2d at 581). "Such evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *Id.*

Defendants assert that $CoQ_{11}$ is present in every $CoQ_{10}$-containing composition. SMF, ¶41. Defendants offer no evidence, much less the clear and convincing evidence required, in support of this argument. Indeed, Dr. Cameron admitted during his deposition that he cannot cite a single treatise, textbook, or scientific article supporting his position that $CoQ_{11}$ is always present in $CoQ_{10}$-containing compositions. Specifically, when asked directly for authority supporting universal $CoQ_{11}$ presence, Dr. Cameron plainly conceded: "I don't know of any treatise or paper that addresses that...." *Id.*, ¶42. This admission alone dooms Defendants' inherency argument.[2]

---

[2] Dr. Cameron's *ipse dixit* opinion with respect to the alleged inherent presence of CoQ11 is the subject of Kaneka's *Daubert* motion.

*See, e.g., Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F. 2d 1264, 1269 (Fed. Cir. 1991) (inherency may not be established by probabilities or possibilities, but only when the natural result flowing from the operation as taught would result in the performance of the questioned function); *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981) (inherency cannot be established by probabilities or possibilities); *Microsoft Corp. v. I4i Ltd. P'ship*, 564 U.S. 91, 95 (2011) (clear and convincing evidence standard for proving patent invalidity). Nor did Dr. Cameron perform any testing in an attempt to prove this theory. SMF, ¶43.

In addition, at its core, Defendants' inherency argument is not an inherency argument at all, but instead a "statistical" one based on "probabilities" and "error rates," which posits that if $CoQ_{10}$ made in large enough quantifies, $CoQ_{11}$ is likely to be present. *Id.*, ¶¶45-47. Specifically, Dr. Cameron analogizes the creation of $CoQ_{11}$ by yeast to "a person making a necklace" who "occasionally...gets the count wrong" and adds an eleventh bead to a necklace intended to have ten. *Id.*, ¶44. As Dr. Cameron concedes, however, a necklace maker will not always make a mistake, he will only "occasionally" do so. *Id.*. Thus, there are times when the necklace maker (i.e., the yeast) will make necklaces ($CoQ_{10}$) with exactly ten beads (i.e., with no $CoQ_{11}$). In Dr. Cameron's own words, his opinion with respect to the presence of $CoQ_{11}$ is "based on a sort of error rate and statistics" that admittedly breaks down if $CoQ_{10}$ is not made in sufficiently large quantities: "Yes, It's a statistical argument. So if you make a small enough numbers, the statistics starts to break down." *Id.*, ¶47. At heart—as Dr. Cameron also acknowledges—his opinion is one based on "probability." *Id*. Thus, even accepting the premise of Dr. Cameron's theory—which is wrong, as shown below—his inherency argument must fail because "[i]nherency … may not be established by probabilities or possibilities." *Bettcher Indus.*, 661 F.3d at 639. The fact that Dr. Cameron believes that $CoQ_{11}$ "may result from a given set of circumstances," i.e., in a

circumstance where $CoQ_{10}$ is made in sufficiently large quantities, cannot as a matter of law sustain Defendants' inherency argument. Indeed, it acknowledges that there are instances in which $CoQ_{11}$ is ***not*** present. *Par Pharm., Inc. v. TWi Pharm., Inc.*, 773 F.3d 1186, 1196 (Fed. Cir. 2014) (inherency requires "the limitation at issue necessarily must be present."*).*

Indeed, there are numerous examples of evidence in the record—both peer-reviewed scientific journals and Kaneka's test results—which record the presence of $CoQ_{10}$ ***without*** $CoQ_{11}$. For example, Biosynthesis of Ubiquinone—A Search for Polyprenyl Phenol and Quinone Precursors by D.R. Threlfall and G.R. Whistance ("Threlfall I") examines ubiquinone biosynthesis in plants and algae. SMF, ¶49. Following an "intensive search" for $CoQ_{11}$ (*see* Isolation of Ubiquinone-11 and Ubiquinone-12 from Green Peppers, by D.R. Threlfall and G.R. Whistance) ("Threlfall II"), Threlfall I and Threlfall II report that green melon, cucumber, leek and brussels sprouts all contain $CoQ_{10}$ ***but not*** $CoQ_{11}$. *Id.*, ¶¶50-51.

**TABLE 1. UBIQUINONE CONTENT OF HIGHER PLANT TISSUES**

| Plant tissue | Wet wt. of tissue analysed (kg) | Ubiquinone content (μg/kg fresh wt.) | | | | | |
|---|---|---|---|---|---|---|---|
| | | −7 | −8 | −9 | −10 | −11 | −12 |
| Etiolated maize shoots (*Zea mays*) | 0·8 | — | 50 | 2420 | Detected by radioautography | | |
| Young lettuce (head of *Latuca sativa*) | 0·4 | — | 13 | 331 | — | — | — |
| Young chicory (*Chicorium intybus*) | 1·0 | — | 3 | 260 | — | — | — |
| Green melon (fruit of *Cucumis melo*)* | 0·7 | 12 | 31 | 1786 | 121 | — | — |
| Cucumber (fruit of *Cucumis sativus*)* | 1·0 | — | Trace | 310 | 23 | — | — |
| Leek (*Allium parrum*) | 1·0 | — | 22 | 341 | 636 | — | — |
| Brussels sprouts (leaves of *Brassica oleracea*) | 1·0 | — | — | 24 | 2230 | — | — |
| Green Peppers (fruit of *Capsicum annuum*)* | 2·0 | — | 3 | 47 | 506 | 137† | 8† |

**Exhibit 7**, p. 357.

In another treatise, the authors report that that the microbe "*S. baekryungensis* produces $CoQ_{10}$ with only minor traces of $CoQ_9$, ***but no detectable*** $\boldsymbol{CoQ_{11}}$." SMF, ¶52. A third scientific article reports that $CoQ_{11}$ was only detectable in the mutant strain of a microorganism, but not in

its natural strain. *Id.*, ¶53 (reporting that Pseudomonas M16 reported "a significant amount of" $CoQ_{11}$, which was not present in the natural strain). And two additional articles discuss impurities that might be present in $CoQ_{10}$ with no mention of $CoQ_{11}$. SMF, ¶54; *see also* **Exhibit 6**, ¶304 (Dr. Cameron's opinion is "inconsistent with prior art references.").

These scientific articles are consistent with Kaneka's own tests dating back to well before the commencement of this litigation. Kaneka's first batch of QH was manufactured in September 2004. SMF, ¶3. The analysis report for this batch (FB01-001) and HPLC chart definitively show the absence of $CoQ_{11}$. *Id.*, ¶6. Similarly, analysis reports and HPLC results from FB01-001 to FB01-010 (manufactured in September 2004 through December 2006) all consistently show the ***absence*** of $CoQ_{11}$ in Kaneka's QH. *Id*. At least for all of these reasons, Defendants cannot sustain their high burden to show by clear and convincing evidence that $CoQ_{11}$ is always and necessarily present in every $CoQ_{10}$-containing composition.

1. Kaneka is Entitled to Summary Judgment on Anticipation

Defendants argue that the Asserted Claims are anticipated by U.S. Patent Publication No. 2004/0215040 (the "'040 Application"). *Id.*, ¶55. Defendants admit that the '040 Application does not expressly disclose the presence of $CoQ_{11}$ but assert that it is inherent in any composition containing $CoQ_{10}$. *Id.*, ¶56. Defendants acknowledged that if they are unable to meet their burden to establish the inherency of $CoQ_{11}$, their anticipation argument necessarily fails. *Id.*, ¶57. For the reasons set forth above Defendants' inherency argument fails and summary judgment is warranted on Defendants' anticipation defense.

2. Kaneka is Entitled to Summary Judgement on Obviousness

Defendants also argue that the Asserted Claims are obvious based on the '040 Application in view of certain prior art references. *Id.*, ¶58. Defendants admit that their obviousness arguments

"rise and fall" on their ability to establish that $CoQ_{11}$ is inherent in $CoQ_{10}$. *Id*. For the reasons set forth above Defendants' inherency argument fails and summary judgment is warranted on Defendants' obviousness defense.

3. Kaneka is Entitled to Summary Judgment on On-Sale Bar

Defendants argue that the '080 Patent is invalid, claiming the Patent's invention was on sale for more than one year before the filing of the '080 Patent. *Id.*, ¶59. Because patents bear a presumption of validity, Defendants must establish invalidity based on on-sale bar by clear and convincing evidence. *Gemmy Indus. Corp. v. Chrisha Creations, Ltd.*, 452 F.3d 1353, 1358 (Fed. Cir. 2006); *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, 2019 U.S. Dist. LEXIS 65300, *6 (D. Del. 2019).

Under pre-AIA law,[3] 35 U.S.C. § 102(b) provided that:

> A person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

Thus, to establish an on-sale bar, the Defendants must show by clear and convincing evidence that before the one-year date, (1) the invention was the subject of a commercial offer for sale in this country, and (2) "ready for patenting" when the invention was offered for sale. *Cap Exp., LLC v. Zinus, Inc.*, 2022 U.S. App. LEXIS 26483, at *8-9 (Fed. Cir. 2022) (*citing Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67-68 (1998)). To qualify for the on-sale bar, "[t]he invention that is the subject matter of the offer for sale must satisfy each claim limitation of the patent." *Cap. Exp., LLC*, 2022 U.S. App. LEXIS 26483 at *9 (internal quotation marks omitted); *Plumtree*

[3] The '080 Patent application was filed on April 27, 2007, and granted by the USPTO on November 9, 2010, before the enactment of the Leahy-Smith America Invents Act ("AIA") in 2011. **Exhibit 1**, cover sheet. Accordingly, the '080 Patent is governed by pre-AIA law. *See Silver State Intellectual Techs., Inc. v. Garmin Int'l, Inc.*, 32 F. Supp. 3d 1155, 1169, n.1 (D. Nev. 2014).



4931-7037-5278.v7

*Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1163 (Fed. Cir. 2006); *Gemmy Indus. Corp.*, 452 F.3d at 1359-1360 (court noting that for on-sale bar to apply, "[t]he product offered for sale must be the product that is claimed in the patent," and vacating district court's summary judgment finding of invalidity based on the on-sale bar where undisputed facts established the "prototype" offered did not have an element required by the claims in the patent).

Thus, to succeed on their on-sale bar defense, Defendants have the burden to show by clear and convincing evidence that, prior to April 27, 2006—one year prior to the '080 Patent application—Kaneka commercially sold products that were covered by each limitation of the '080 Patent. In support of their on-sale bar claims, Defendants point to only one shipment of product, which was a shipment that Kaneka made in February 2006 of softgel capsules containing QH to Enzymatic Therapy Inc. ("ETI") (the "2006 Softgels"). SMF, ¶60**.** But as set forth below, there is no issue of material fact that the 2006 Softgels in the February 2006 shipment to ETI did ***not*** embody all of the claims in the '080 Patent – specifically, they did not have at least a minimum of 1.5% weight of $CoQ_9$, and/or the presence of the reduced coenzyme of $CoQ_{11}$, as required by the '080 Patent. *Id.*, ¶61.

Claim 5 requires:

> 5. A reduced coenzyme $Q_{10}$-containing composition comprising reduced coenzyme $Q_{10}$ and one or both of (a) and (b):
> (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and

*Id.*, ¶73. Claim limitation 15 has the same requirements. *Id.*, ¶74. Significantly, however, the test results for the QH that was used in manufacturing the 2006 Softgels shipped to ETI showed, among other things, the presence of a minimal amount of $CoQ_9$ that was insufficient to meet the 1.5 wt% limitation of claim 5 and 15, and the absence of $CoQ_{11}$. *Id.*, ¶61. Thus, there is no issue of material

fact that the 2006 Softgels shipped to ETI in February 2006 did not satisfy each claim limitation in the '080 Patent, as is required for the on-sale bar to apply. *Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1163 (Fed. Cir. 2006); *Gemmy Indus. Corp.*, 452 F.3d at 1359-1360.

Moreover, Defendants have failed to produce any admissible evidence, much less clear and convincing evidence, to the contrary. Accordingly, because the undisputed evidence establishes the 2006 Softgels delivered to ETI in February 2006 did not meet all of the claims of the '080 Patent, Kaneka is entitled to summary judgment dismissing Defendants' affirmative defense asserting invalidity of the '080 Patent based on the on-sale bar. *See f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, 2019 U.S. Dist. LEXIS 65300, at *6 (D. Del. 2019) (granting Plaintiff's motion for summary judgment on Defendants' on-sale defenses and counterclaims, finding the record did not support "Defendants' contention that Plaintiffs commercially offered for sale before November 17, 2002 a [product] that satisfied each limitation of one of the patented inventions, let alone provide a sufficient basis for a reasonable jury to conclude by clear and convincing evidence that Plaintiffs had made such an offer before that date").

4. Kaneka is Entitled to Summary Judgment on Inequitable Conduct

"To hold a patent unenforceable for inequitable conduct, a court must find, by clear and convincing evidence, that the applicant omitted or misrepresented material facts with the intention of misleading or deceiving the patent examiner." *ResQNet.com, Inc. v. Lansa, Inc.*, 2006 U.S. Dist. LEXIS 85613, at *17-18 (S.D.N.Y. Nov. 22, 2006) (citing *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358 (Fed. Cir. 2003)). Defendants allege that Kaneka "intentionally failed to disclose and/or mispresented known bases for invalidity" (D.E. 22, ¶53), and thus "must offer clear and convincing proof of (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art of information and of its materiality; and (3) failure of the



4931-7037-5278.v7

applicant to disclose the art or information resulting from an intent to mislead the PTO." *ResQNet.com, Inc.*, 2006 U.S. Dist. LEXIS 85613 at *18 (quoting *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987)).

To survive summary judgment, Defendants must show by clear and convincing evidence "from which a trier of fact could find materiality and intent." *Id.* at *18-19 (quoting *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1379 (Fed. Cir. 2002). "Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011). "Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *ResQNet.com, Inc.*, 2006 U.S. Dist. LEXIS 85613 at *20 (quoting *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996)). The "patentee need not offer any good faith explanation unless the accused infringer first . . . prove[s] a threshold level of intent to deceive by clear and convincing evidence." *Therasense*, 649 F.3d at 1291 (quotations omitted).

Defendants inequitable conduct invalidity defense and counterclaim are both premised on the alleged "inevitable" presence of $CoQ_{11}$ in $CoQ_{10}$-containing compositions. *See* D.E. 22, p. 11. For the reasons stated above, Defendants' inherency arguments fail, and therefore so too must their inequitable conduct defense and counterclaim. *See* **Section V.D**. Moreover, the documents and information listed by Defendants that Kaneka allegedly did not provide the Patent Examiner stands for the anodyne proposition that $CoQ_{11}$ *might* be present in a $CoQ_{10}$-containing composition, not that it was always present. Indeed, it is not. SMF ¶62. To the extent that any of these documents or information could be deemed to be material, Defendants' inequitable conduct assertions would

still fail because the Patent Examiner was already apprised of this fact. *Id*. Nor do Defendants provide any evidence that Kaneka had a specific intent to deceive the PTO.

**B. Defendants Cannot Prove by Clear and Convincing Evidence that the Asserted Patent Claims Are Invalid Under §112 For Lack of Enablement**

"Courts impose a heavy burden on a defendant in an infringement suit who contends that the patent lacks utility because it will not operate as disclosed." *Phillips Petroleum Co. v. U.S. Steel Corp.*, 673 F. Supp. 1278, 1325 (D. Del. 1987). Indeed, the fact that an invention "meets at least one stated objective" is sufficient to defeat an argument of alleged lack of utility. *Raytheon Co. v. Roper Corp*, 724 F.2d 951, 958-59 (Fed. Cir. 1983). To prove the of non-utility requires a party to provide "proof of total incapacity." *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 762, (Fed. Cir. 1984).

"The Federal Circuit has stated that deference is owed to the utility statements in a patent absent a reason to disbelieve them." *Glaxosmithkline LLC v. Banner Pharmacaps, Inc.*, 2013 U.S. Dist. LEXIS 112440, at *79 (D. Del. Aug. 9, 2013). Thus, "a specification which contains a disclosure of utility which corresponds in scope to the subject matter sought to be patented *must* be taken as sufficient to satisfy the utility requirement of § 101 for the entire claimed subject matter *unless* there is reason for one skilled in the art to question the objective truth of the statement of utility or its scope." *In re Langer*, 503 F.2d 1380, 1391 (CCPA 1974) (emphasis added); *Eli Lilly & Co. v. Actavis Elizabeth LLC,* 435 F. App'x 917, 924 (Fed. Cir. 2011); *see also In re Brana*, 51 F.3d 1560, 1566 (Fed. Cir. 1995) (teachings in patent as to enablement should be taken in compliance with §112 absent reason to doubt the objective truth of those statements).

Defendants contend that "claims 5 and 15 do not meet the enablement requirement" because the '080 Patent lacks specific "evidence for any stabilizing effects (or other benefits/utility) of reduced Q11 on reduced Q10." SMF, ¶63. Defendants are wrong.

First, Dr. Cameron concedes that the '080 Patent enables one skilled in the art to prepare the specific composition recited in claim 5 and use the reduction method to prepare the composition recited in claim 15. *Id.*, ¶64. Specifically, the '080 Patent specification discloses not only the detailed methods for preparing the claimed compositions (**Exhibit 1**, col. 13, ll. 1-col. 16, ll. 18), but also four separate and discreet Production Examples prepared using the claimed reduction method (*id.* at col. 13 ll. 40-col. 14, ll. 33). Thus, it is clear that a POSA "would understand how to make compositions containing reduced $CoQ_{11}$ and could vary the information in Production Example 4 to change the relative amount of $CoQ_{11}$ present in the composition." SMF, ¶65. Moreover, one skilled in the art could practice Example 4 and easily measure the stabilizing effect of $CoQ_{11}$. *Id.*; *In re Angstadt*, 537 F.2d 498, 502-03 (CCPA 1976); *In re Brana*, 51 F.3d 1560, 1566 (Fed. Cir. 1995).

Moreover, Defendants' non-utility argument is premised on the mistaken notion that claim 5 requires a stabilizing effect. It does not. Indeed, unlike claim 1 that expressly requires the claimed composition to "stabiliz[e] reduced coenzyme Q10," neither claim 5 nor claim 15 require any stabilization. SMF, ¶66. Dr. Cameron does not assert otherwise. *Id***.** "It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement." *SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1122 (Fed. Cir. 1985); *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 699 (Fed. Cir. 1983) ("It is improper for courts to read into an independent claim a limitation explicitly set forth in another claim."); *e.g.*, *Smith v. Snow*, 294 U.S. 1, 13–14 (1935) (absence in claim 1 of limitations appearing in other claim supported construing the claim broadly).

In addition, while $CoQ_{11}$ *does* provide a stabilizing effect (see below), the utility of the claimed invention is not limited to stabilization. The specification of the '080 Patent makes clear that the claimed composition could be used as a carrier for, among other things, antioxidants or other beneficial active ingredients (**Exhibit 1** at col. 2, ll. 6-16, col. 11, ll. 7-8), as well as to improve the absorbability of reduced $CoQ_{10}$ (*id.* at col. 13, ll. 14-15) ("Moreover, a composition showing high biological absorbability of reduced coenzyme Q10 can also be provided."). Dr. Cameron does not dispute either point. SMF ¶67. These admissions alone render it impossible for Defendants to establish "total incapacity" of the Asserted Claims lack utility. *Envirotech*, 730 F.2d at 762.

Finally, the '080 Patent provides clear disclosure that $CoQ_{11}$ does have a stabilizing effect on QH. First, the '080 Patent provides stability studies that show that the composition has a stabilizing effect on $CoQ_{10}$. Examples 1 and 2 of the '080 Patent both describe a composition containing the claimed ratio of $CoQ_9$, and report the "results of reduced coenzyme Q10/oxidized coenzyme Q10 ratio," as shown below in Tables 1 and 2, respectively.

TABLE 1

| | weight ratio of reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ |
|---|---|
| reduced coenzyme $Q_{10}$ containing 1.5% of reduced coenzyme $Q_9$ | 96.7/3.3 |
| reduced coenzyme $Q_{10}$ free of reduced coenzyme $Q_9$ | 95.5/4.5 |

TABLE 2

| | weight ratio of reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ |
|---|---|
| reduced coenzyme $Q_{10}$ containing 1.5% of reduced coenzyme $Q_9$ | 90.2/9.8 |
| reduced coenzyme $Q_{10}$ free of reduced coenzyme $Q_9$ | 87.2/12.8 |

**Exhibit 1**, col. 14, ll. 34-55 (Example 1), col. 14, ll. 57 – col. 15, ll. 10 (Example 2). The test results in both Table 1 and Table 2 definitively show a stabilizing effect on reduced $CoQ_{10}$ because the sample with reduced $CoQ_9$ had a greater ratio of reduced $CoQ_{10}$/oxidated $CoQ_{10}$ (boxed red above) than the sample with QH free of reduced $CoQ_9$. *Id.*

The '080 Patent also makes clear that $CoQ_{11}$ and $CoQ_9$ are "analogs," i.e., they have the same chemical structure, that they have the "same effect in the body," and thus that $CoQ_{11}$ similarly

stabilizes and protects QH from oxidation. *Id.*, col. 4, ll. 36-62. These statements "*must* be taken as sufficient to satisfy the utility requirement," unless Defendants can provide clear and convincing evidence that there is reason for one skilled in the art to question the objective truth of these statements. *In re Langer*, 503 F.2d 1380, 1391 (CCPA 1974) (emphasis added). Defendants cannot meet this burden. Dr. Cameron himself recognizes the similarities between $CoQ_9$ and $CoQ_{11}$ and the likelihood that $CoQ_9$ and $CoQ_{11}$ would react similarly. SMF, ¶68. Moreover, the inventors of the '080 Patent testified that one skilled in the art "would conclude that since $CoQ_{11}$, $CoQ_9$ have the same properties, they would have the same stability." *Id.*, ¶69. Kaneka has also specifically studied the stabilizing effect of $CoQ_{11}$ and the test results confirm that it has a stabilizing effect on QH. *Id.*, ¶70. Thus, it is not surprising that Judge Bryson recently held that these exact claims provide "significant utility." **Exhibit 3** (*Kaneka Corp. v. DFH, et al.*, 760 F. Supp. 3d 152, 176 (D. Del. 2024)). Accordingly, for at least these reasons, Defendants cannot show—as they must—the "total incapacity" of the Asserted Claims by clear and convincing evidence, summary judgment is warranted on their non-utility invalidity defense.

### C. Defendants Cannot Prove by Clear and Convincing Evidence that the Asserted Patent Claims Are Invalid For Reciting Patent-Ineligible Subject Matter

The Supreme Court has established a two-step test in assessing patentability under 35 U.S.C. § 101. First, the court determines whether the patent is directed to a patent-ineligible concept, including natural phenomena. If so, the court then determines whether the claim contains an inventive concept sufficient to transform the claim into a patent-eligible application. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72 (2012). If the claims are directed to eligible subject matter, the inquiry ends at step one. *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017).

Defendants contend that "each of the [asserted claims of the '080 Patent] is invalid as patent-ineligible subject matter because the claimed subject matter is directed to naturally-occurring compounds, processes, and phenomena." SMF, ¶71. Defendants are wrong.

It is undisputed that $CoQ_9$, $CoQ_{10}$, and $CoQ_{11}$ are each found in nature. Indeed, the Primary Patent Examiner was well-aware of this fact. *Id.*, ¶35. It is also undisputed that claim 5 recites a specific combination of compounds, and claim 15 recites a method to produce that specific combination, neither of which is found in nature. Dr. Cameron himself recognized this fact in his expert report and he confirmed it during his deposition:

> Q: [A]re you aware of a composition in nature that meets each claim limitation of claim 5?
>
> A: **I am not aware of something in nature that meets each one** . . . yeah, I am not aware of any that meets exactly each one.
>
> Q: Okay And then are you aware of a method in nature that results in a specific composition recited in claim 15.
>
> A. . . . **I don't know if there are examples in nature that fit exactly the claims in 15**.

SMF, ¶72**, Exhibit 5**, 221:22-222:5 (emphasis added).

Nor is there any real dispute that the composition of claim 5 and the method of producing it in claim 15 provide "significant utility" over what occurs in nature, at least because it stabilizes QH, it can be used as a carrier for other beneficial compounds and it provides a composition with a higher bioabsorbability for $CoQ_{10}$. *See* **Section V.B**, *supra*. Indeed, this same patent-ineligibility argument was previously raised and rejected by Judge Bryson who expressly found that "the composition recited in claims 5 and 15 has significant utility over what occurs in nature." **Exhibit 3** (*Kaneka Corp. v. DFH, et al.*, 760 F. Supp. 3d at 176). For at least these reasons, Defendants' arguments that the Asserted Claims are invalid as patent-ineligible subject matter fail, and summary judgment is warranted.

### D. Defendants Cannot Prove Their Tortious Interference, Unfair Competition and Antitrust Counterclaims by Clear and Convincing Evidence

Defendants assert counterclaims for tortious interference under New York common law (D.E. 22, ¶¶77-88), unfair competition under New York common law (*id.*, ¶¶89-94), and antitrust violations under Section 2 of the Sherman Act (*id.*, ¶¶95-116). Each of these counterclaims require Defendants to prove that Kaneka acted maliciously, or in bad faith. Defendants' support for their counterclaims is provided in the Expert Report of Philip W. Kline, dated June 2, 2025 (**Exhibit 16**, the "Kline Report"). The alleged wrongful acts underlying each of these counterclaims consist of "legal threats, litigation, public statements, and direct communications with customers and potential customers" despite knowing or having reason to know the Asserted Claims are invalid or unenforceable. *Id.*, ¶46. None of the acts taken by Kaneka, and subsequently relied on by Defendants, support any of Defendants' counterclaims. Defendants cannot prove any of these counterclaims, let alone with the required clear and convincing evidence required, and thus, Kaneka is entitled to summary judgment on each.

1. *Kaneka's Acts to Protect Its Patent Rights Are Legitimate*

Kline describes the following "wrongful" acts taken by Kaneka: (i) Kaneka filed this lawsuit without prior notice and before a major tradeshow (*id.*, ¶47); (ii) Kaneka issued a press release reiterating its "intent to enforce its patent rights against any of Defendants' customers" (*id.*, ¶48); (iii) Kaneka's counsel sent a letter to Defendants alleging infringement and stating it would litigate against Defendants' customers who purchased and sold in the United States (*id.*, ¶51); (vi) Kaneka communicated with Defendants' potential customers (*id.*, ¶52); and (vii) Kaneka issued subpoenas to Defendants' customers and one draft complaint (*id.*, ¶58). All of these acts are well within Kaneka's rights as the owner of a validly issued patent.

"The law presumes a patent holder acts in good faith when asserting rights in a duly granted patent." *Autronic Plastics, Inc. v. Apogee Lighting, Inc.*, 2021 U.S. Dist. LEXIS 96746, at *17 (E.D.N.Y. Mar. 25, 2021) (citing *Springs Window Fashions LP v. Novo Indus., L.P.,* 323 F.3d 989, 999 (Fed. Cir. 2003)). "To avoid summary judgment, a party claiming bad faith patent enforcement 'must present affirmative evidence sufficient for a reasonable jury to conclude that the patentee acted in bath faith, in light of the burden of clear and convincing evidence that will adhere at trial.'" *Springs Window Fashions LP v. Novo Indus., L.P.,* 323 F.3d 989, 999 (Fed. Cir. 2003) (quoting *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1371 (Fed. Cir. 2002)). Defendants cannot meet this burden. Each of the allegedly wrongful acts involve Kaneka informing Defendants or the public that it has a valid patent, and it intends to enforce its right in that patent, as explained below that cannot form the basis for Defendants' counterclaims.

2. *Kaneka is Entitled to Summary Judgment on the Tortious Interference Counterclaim*

To state a claim for tortious interference with prospective economic advantage, Defendants must prove, among other things, that Kaneka acted solely out of malice, or used dishonest, unfair or improper means. *Commer. Lubricants, LLC v. Safety-Kleen Sys.*, 2017 U.S Dist. LEXIS 125557, at *46-47 (E.D.N.Y. Aug. 8, 2017) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)). Tortious interference with prospective economic advantage requires Defendants proof that the conduct was "more culpable," which "must amount to a crime or an independent tort." *Id*. at *47 (citations omitted). Acting in "normal economic self-interest" does not constitute unlawful means. *Id*. at *48. Further, any bad conduct must be directed "at the party with which the plaintiff has or seeks to have a business relationship." *Id*.

Defendants fail to put forth any evidence under the third prong requiring malice or improper means. Where, "as here, [Defendants assert] claims under state tort law based on

assertions of patent infringement . . . there can be no liability unless plaintiff clears the additional hurdle of proving bad faith." *PlaSmart, Inc. v. Wincell Int'l, Inc.*, 442 F. Supp. 2d 53, 57 (S.D.N.Y. 2006) (internal quotations and citations omitted). Defendants argue that Kaneka "threatened" its customers and potential customers by issuing a press release and communicating with customers at trade shows about the lawsuit. *See* **Exhibit 16**, ¶¶48-49, 51-52. But Defendants concede that the allegedly wrongful acts were limited to notifying customers of the litigation. *Id.* They acknowledge that Kaneka "did not threaten to sue any potential customer." *Id.* at ¶52, n.75 (citing **Exhibit 17**, pp. 40-44; 50-51). In any event, "[t]hreats of patent infringement suits cannot constitute 'improper means' for purposes of a tortious interference claim under New York law unless made in bad faith." *PlaSmart, Inc. v. Wincell Int'l, Inc.*, 442 F. Supp. 2d 53, 57 (S.D.N.Y. 2006) (internal quotations and citations omitted). Nor can prosecuting its patent rights in this infringement action against Defendants for infringement constitute wrongful acts. Indeed, Defendants have now conceded infringement and have withdrawn all defenses of non-infringement with prejudice. D.E. 74.

Finally, Defendants additionally allege that Kaneka knew or should have known that the '080 Patent was invalid and unenforceable. D.E. 22, ¶81. First, as explained above, $CoQ_{11}$ is not inherently present in a $CoQ_{10}$-containing composition. **Section V.A.**, *supra*, Second, the mere suspicion on the part of Defendants regarding Kaneka's knowledge and motivations "cannot suffice to support a claim for tortious interference." *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000). Defendants cannot meet their burden to show intent to deceive in light of the numerous peer-reviewed journals and Kaneka's own test results that ***disprove*** inherency. In light of the articles and test results, it is impossible for Defendants to sustain their burden of proof on their tortious interference claim. *PlaSmart, Inc. v. Wincell Int'l, Inc.,* 442 F.

Supp. 2d 53 (S.D.N.Y. 2006) (citing *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1375-77 (Fed. Cir. 2004)) (it is not enough to prove assertions of patent infringement incorrect, party must prove they were 'must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.'"); *see Med. Depot, Inc. v. Med. Way United States, Inc.*, 774 F. Supp. 3d 554, 579 (E.D.N.Y. 2025) (granting summary judgment on tortious interference counterclaim because conduct was not "solely malicious, dishonest, unfair, or improper.") (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)). This is particularly true here as just last year, Judge Bryson found the '080 Patent valid and enforceable. *See* **Exhibit 3** (*Kaneka Corp. v. Designs for Health*, 760 F. Supp. 3d 152 (D. Del. 2024)).

3. *Kaneka is Entitled to Summary Judgment on the Unfair Competition Counterclaim*

Defendants allege that Kaneka acted to "injure" Defendants' business through "improper and bad faith means" in violation of New York common law. D.E. 22, ¶¶89-94. Defendants specifically allege that some existing and potential customers would not show interest "until the case is resolved." *Id.*, ¶92. "To succeed on an unfair competition claim, a plaintiff must establish (1) a Lanham Act claim *and* (2) a defendant's bad faith or intent." *Med. Depot, Inc. v. Med. Way United States, Inc.*, 774 F. Supp. 3d 554, 573 (E.D.N.Y. 2025). "Under New York law, common law competition claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith or intent." *Id.* (quoting *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 56, n.3 (2d Cir. 2022)). As discussed above, Defendants have no evidence that Kaneka engaged in bad faith through its assertion of its own valid patent rights. Indeed, if Defendants were correct, then no patent-holder could ever sue any infringer lest it engage in allegedly unfair competition.

"The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another." *Med. Depot, Inc. v. Med. Way United States, Inc.*, 774 F. Supp. 3d 554, 574 (E.D.N.Y. 2025) (quoting *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980)). "[B]ad faith litigation – including bad faith patent infringement litigation – does not give rise to an unfair competition claim under New York law." *Bayer Schera Pharma AG v. Sandoz, Inc.*, 2010 U.S. Dist. LEXIS 33252, at *28 (S.D.N.Y. Mar. 29, 2010) (citing *CA, Inc. v. Simple.com, Inc.*, 621 F. Supp. 2d 45, 53 n.4 (E.D.N.Y. 2009)); *see also Jane Street Grp., LLC v. Millennium Mgmt. LLC*, 2024 U.S. Dist. LEXIS 127113, at *17 (S.D.N.Y. July 18, 2024) ("New York does not recognize bad faith litigation as a type of unfair competition"). Defendants have presented no evidence that Kaneka acted in bad faith, nor that Kaneka misappropriated any of Defendants' labor or expenditures. As such, summary judgment is warranted.

4. *Kaneka is Entitled to Summary Judgment on the Antitrust Counterclaim*

Defendants allege that Kaneka has violated Section 2 of the Sherman Act by maintaining a monopoly through "illegal, unfair, and predatory acts." D.E. 22, ¶¶102-103. Again, the basis for Defendants' counterclaim is that Kaneka used "illegal" means to obtain a monopoly though "knowingly assert[ing] invalid patents," that were obtained by "fraud and/or inequitable conduct." *Id.*, ¶¶103-104. A claim based on enforcing a so-called fraudulently obtained patent is referred to as *Walker Process* claim, under which Defendants "must show 'first, that the anti-trust defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement; and second, all the other elements necessary to establish a Sherman Act monopolization claim.'" *A/S v. Zuru, Inc.*, 2020 U.S. Dist. LEXIS 262618, at *13 (D. Conn. Apr. 22, 2020) (quoting *TransWeb, LLC v. 3M Innovative Props.*

*Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016)). To establish the second element, a party must establish, among other things, the willful acquisition or maintenance of monopolistic power by improper conduct. *La. Health Serv. & Indem. Co. v. Celgene Corp.*, 2025 U.S. Dist. LEXIS 67207, at *45-46 (S.D.N.Y. Mar. 31, 2025) (quoting *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, 383 F. Supp. 3d 187, 219 (S.D.N.Y. 2019)).

Even if Defendants could show the '080 Patent is invalid, which they cannot, "invalidity of the patent [is] not sufficient; a showing of intentional fraud in its procurement [is] required." *Ritz Camera & Image, LLC v. Sandisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012). Instead, Defendants must also show that Kaneka acted in bad faith by asserting its patent rights. For the reasons stated above, they cannot come close to meeting this burden. *See* **Section V.A.**, *supra*. As such, this claim also fails. In addition, Defendants have elicited no evidence to support any fraud or improper conduct by Kaneka. Indeed, the '080 Patent was upheld as valid in another litigation, cementing Kaneka's good faith belief in the validity of the Patent. *See* **Exhibit 3** (*Kaneka Corp. v. Designs for Health*, 760 F. Supp. 3d 152 (D. Del. 2024)). For at least these reasons, summary judgment on Defendants' antitrust claims is warranted.

## VI. CONCLUSION

For the foregoing reasons, Kaneka respectfully requests that the Court grant Kaneka's Motion.

Dated: October 6, 2025

Respectfully submitted,

*/s/ Gerald W. Griffin*

Gerald W. Griffin
Leonardo Trivigno
Meredith B. Spelman
Jodutt M. Basrawi
griffin@clm.com
trivigno@clm.com
spelman@clm.com
basrawi@clm.com

**CARTER LEDYARD & MILBURN LLP**
28 Liberty Street, 41st Floor
New York, NY 10005
Telephone: (212) 732-3200
Facsimile: (212) 732-3232

*Attorneys for Plaintiff*

**WORD COUNT CERTIFICATION**

Pursuant to Local Civil Rule 7.1 and the Individual Practices for Civil and Criminal Cases of Judge Sanket J. Bulsara Rule VI.H.4, I certify that this brief contains 8,156 words.

Dated: October 6, 2025 *_/s/ Gerald W. Griffin_*