# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KANEKA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>COCRYSTAL TECHNOLOGY (JIAXING) CO., LTD. (f/k/a/ SHANGHAI COCRYSTAL PHARMACEUTICAL TECHNOLOGY CO., LTD.), and COCRYSTAL HEALTH INDUSTRY (ZHEJIANG) CO., LTD.,<br><br>Defendants. | Civil Case No. 1:23-cv-07483-NCM-SJB |

# EXPERT REPORT OF DOUGLAS CAMERON PH.D. REGARDING INVALIDITY, INEQUITABLE CONDUCT, AND NON-INFRINGING ALTERNATIVE PRODUCTS OF U.S. PATENT NO. 7,829,080

**I hereby declare under penalty of perjury that the opinions set forth herein are true and accurate to the best of my knowledge, information, and belief.**

**Dated: June 2, 2025**

**Douglas Cameron, Ph.D.**

# TABLE OF CONTENTS

**I. INTRODUCTION - 1 -**

**II. BACKGROUND AND QUALIFICATIONS - 1 -**

**III. UNDERSTANDING OF LEGAL STANDARDS - 3 -**

A. Interpretation of Claim Language - 4 -

B. A Person of Ordinary Skill in the Art ("POSITA") - 4 -

C. Presumption of Validity - 5 -

D. Requirement that an Entire Claim be Valid. - 5 -

**IV. MATERIALS CONSIDERED - 5 -**

**V. OVERVIEW OF THE '080 PATENT - 7 -**

A. Background of the '080 Patent - 7 -

B. Level of Ordinary Skill in the Art - 9 -

C. Claims of the '080 Patent At Issue - 10 -

**VI. SUMMARY OF MY OPINIONS - 12 -**

**VII. DETAILED DISCUSSION OF MY VALIDITY OPINIONS FOR THE '080 PATENT - 12 -**

A. Ground 1: Claims 5 and 15 are invalid by lack of enablement - 13 -

1. My Understanding of Legal Principles Applicable to Enablement - 13 -

2. My Opinion Regarding Enablement - 13 -

3. Rebuttal to Anticipated Arguments by Kaneka - 18 -

B. Ground 2: Claims 5 and 15 are invalid for violation of the on-sale bar - 26 -

1. My Understanding of Legal Principles Applicable to the On-Sale Bar - 26 -

2. My Opinion Regarding the On-Sale Bar - 27 -

3. Rebuttal to Anticipated Arguments by Kaneka - 39 -

a) Kaneka's contention that certain testing allegedly shows that Kaneka QH does not include $CoQ_{11}$ - 39 -

b) Kaneka's contention that the sales to Enzymatic Therapy were allegedly for experimentation - 47 -

C. Ground 3: Claims 5 and 15 are invalid as anticipated by U.S. Patent Publication No. 2004/0215040 - 50 -

1. My Understanding of Legal Principles Applicable to Anticipation and the Doctrine of Inherency - 50 -

2. My Opinion Regarding Anticipation (Including Through the Doctrine of Inherency) .......... - 50 -

3. Rebuttal to Anticipated Arguments by Kaneka .......... - 60 -

D. Ground 4: Claims 5 and 15 are invalid as obvious in view of U.S. Patent Publication No. 2004/0215040 and Kaneka's Q10 Product .......... - 61 -

1. My Understanding of Legal Principles Applicable to Obviousness..... - 61 -

2. My Opinion Regarding Obviousness .......... - 62 -

a) Obviousness Factors 1 & 2 (the scope and content of the prior art, and differences between the claims and the prior art) .......... - 63 -

b) Obviousness Factor 3 (the level of ordinary skill in the pertinent art) .......... - 68 -

c) Obviousness Factor 4 (secondary considerations, if any) .......... - 68 -

3. Rebuttal to Anticipated Arguments by Kaneka .......... - 70 -

E. Ground 5: Claims 5 and 15 are invalid for containing patent ineligible subject matter .......... - 71 -

1. My Understanding of Legal Principles Applicable to Patent Eligibility - 71 -

2. My Opinion Regarding Patent Eligibility .......... - 71 -

a) Step 1: Does the claimed composition and process occur in nature - 71 -

b) Step 2: Does the precise claimed composition and process claimed in claims 5 and 15 have properties that are "markedly different" from the properties of naturally occurring counterparts .......... - 75 -

3. Rebuttal to Anticipated Arguments by Kaneka .......... - 76 -

a) Prior Analysis by a Delaware Court .......... - 76 -

b) 2008-era Testing of Stability by $Q_{11}$ .......... - 79 -

**VIII. DETAILED DISCUSSION OF MY INEQUITABLE CONDUCT OPINIONS FOR THE '080 PATENT .......... - 80 -**

1. My Understanding of Legal Principles Applicable to Inequitable Conduct - 80 -

2. My Opinion Regarding Inequitable Conduct .......... - 80 -

a) Materiality of the USP statement of known impurities of $CoQ_{10}$ - 81 -

b) Materiality of the 2006 sales of Kaneka QH combined with information that Kaneka's starting composition included coenzyme $Q_{11}$ as an impurity .......... - 83 -

c) Materiality of information that when coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance, reduced coenzyme $Q_{11}$ is an impurity ........ - 85 -

d) Materiality of lack of testing of any stabilizing effects of the co-presence of reduced coenzyme $Q_{11}$ upon reduced coenzyme $Q_{10}$ ... - 87 -

3. Rebuttal to Anticipated Arguments by Kaneka ........ - 89 -

**IX. HYPOTHETICAL NON-INFRINGING ALTERNATIVE PRODUCT ........ - 89 -**

**X. RESERVATION OF RIGHTS ........ - 90 -**

## I. INTRODUCTION

1. My name is Dr. Douglas Cameron. I have been asked by Defendants Cocrystal Technology (Jiaxing) Co., Ltd. (f/k/a Shanghai Cocrystal Pharmaceutical Technology Co., Ltd.) and Cocrystal Health Industry (Zhejiang) Co., Ltd. (collectively "Cocrystal") to provide my opinion as to the validity of U.S. Patent No. 7,829,080 (the "'080 Patent"). I have also been asked to provide certain opinions as would relate to information that may be deemed relevant to invalidity, which I understand may potentially relate to inequitable conduct, and to provide my opinions on whether a hypothetical redesigned composition of $CoQ_{10}$ would infringe claims 5 or 15 of the '080 Patent, as well as to explain the relevant technical background and certain scientific principles related to the '080 Patent. I am being compensated at my standard rate of $500/hr for consulting services and $700/hr for testimonial services. My compensation is not contingent on any opinions I offer or the outcome of this litigation.

2. Depending on new information learned during discovery, or positions taken throughout the case by Plaintiff Kaneka Corporation ("Kaneka") or its expert(s), I may edit, add to, or otherwise refine the topics and expected testimony described herein. I reserve the right to supplement my opinions based on new information.

3. If called upon to do so, I am prepared to testify before the Court regarding my opinions expressed herein. In such a situation, I may rely on live demonstrations, demonstratives, exhibits, or other visual aids to assist in presenting my testimony.

## II. BACKGROUND AND QUALIFICATIONS

4. My qualifications to testify about the '080 Patent and relevant technologies are set forth below, as well as in my CV, which I attach as Exhibit A.

5. I have been working in areas related to fermentation technology and the production of microbial products since 1981, when I started graduate school in biochemical engineering at M.I.T. I completed the program with a Ph.D. in Biochemical Engineering in 1986. During my time at M.I.T. I studied biochemistry, microbial physiology and genetics, industrial microbiology, fermentation technology, and chemical kinetics/reaction engineering. My research involved microbial fermentation, metabolic pathway modeling, enzyme assay development, product purification, and analysis of microbial products using methods such as HPLC, THC, GC, mass spectrometry, and NMR. In fact, I was responsible for the maintenance of the HPLCs in my advisor's laboratories.

6. Directly after I completed my Ph.D., I started as a professor of chemical engineering at the University of Wisconsin in Madison, where I taught undergraduate and graduate students and developed a research program. One class that I taught was Biochemical Engineering. My research was in the areas of metabolic engineering and fermentation technology. As a professor, I consulted on biotechnology for several companies, including DuPont, Genencor, and Cargill. After I became a tenured professor, I did a sabbatical in the Institute for Biotechnology at the ETH in Zurich, Switzerland, where I worked on the analysis of metabolic pathways in microorganisms.

7. In 1998, I was recruited by Cargill to start and lead their microbial biotechnology R&D group. At Cargill, one of the projects I started was for the development of microbial fermentation processes to produce a class of products called isoprenoids, including $CoQ_{10}$. My team developed a $CoQ_{10}$ producing organism and fermentation process. We filed several patents on the work. While at Cargill, I was named as an inventor on several patents on biochemical methods for the production of a sweetener called monatin.

8. I left Cargill in 2006 to join a new venture capital firm in Silicon Valley called Khosla Ventures. My main focus was on early-stage biotechnology and chemistry-related companies. I left Khosla Ventures in 2008 and since then have continued as an investor and advisor for a range of companies, mostly in the areas of metabolic engineering, synthetic biology, and fermentation technology. Several of the companies have worked on the fermentation, purification, formulation, and stabilization of nutritional supplements. The companies include Geltor, Arzeda, and Capra Bio.

9. I have received several awards and honors for my work in biotechnology and fermentation, including:

- College of Fellows, Class of 2001, American Institute of Medical and Biological Engineering (AIMBE)
- Fellow, Class of 2008, American Society for the Advancement of Science (AAAS)
- Fellow, Society of Industrial Microbiology, 2003
- Raphael Katzen Award of the Society of Industrial Microbiology, 2009
- Member, Class of 2025, National Academy of Engineering

## III. UNDERSTANDING OF LEGAL STANDARDS

10. I am not a lawyer and am not offering any opinions regarding legal matters. Legal principles relevant to my opinions herein have been explained to me by Cocrystal's counsel. My understanding of these applicable legal principles are largely set forth in the sections of this report that contain each of my individual opinions that I offer.

11. However, I understand certain legal principles that are broadly applicable across the opinions that I offer, and thus I set forth my understanding of these overarching principles here.

### A. Interpretation of Claim Language

12. I understand that the claims of a patent, and only the claims of a patent, define the scope of an alleged invention. I understand that the language of the claims is understood as having its plain and ordinary meaning from the perspective of a person of ordinary skill in the art ("POSITA") at the time of the alleged invention who has read the specification and prosecution history of the patent.

13. I understand that the Court has provided no particular constructions to any language of Claims 5 and 15 of the '080 Patent that would overrule the above rule for understanding the scope of claim language, other than that it has stated that "composition" as it is used in claim elements [15.c] and [15.d] refers to the final, reduced $CoQ_{10}$-containing composition.

14. I have applied this understanding of the claim language when rendering my opinions.

### B. A Person of Ordinary Skill in the Art ("POSITA")

15. I understand that a person of ordinary skill in the art (a "POSITA") is a legal term that refers to a hypothetical person who existed at the time of the alleged invention of the relevant patent and who generally had the capability of understanding the general principles that are applicable to the pertinent art. Factors that may be considered in determining the level of ordinary skill in the art include: (1) the "type of problems encountered in the art;" (2) "prior art[1] solutions to those problems;" (3) "rapidity with which innovations are made" in the field of art; (4) "sophistication of the technology" in the art; and (5) the "educational level of active workers in the field."

[1] I understand that, generally, "prior art" means information known publicly before the application for a patent was filed.

16. I understand that a POSITA is a person of ordinary creativity, not an automaton, and is capable of ordinary inferences, ordinary creative steps, and implementing predictable variations of teachings in prior art references. A POSITA is also presumed to be aware of all relevant prior art and capable of understanding and applying it in a routine manner.

### C. Presumption of Validity

17. I understand that all patents enjoy a presumption of validity. In other words, patents are presumed to have been correctly issued by the United States Patent and Trademark Office after undergoing an examination process that often lasts for years.

18. For this reason, the burden for proving a patent claim is invalid is one of "clear and convincing evidence." I understand that one way courts have articulated this clear and convincing standard is as follows: clear and convincing evidence is evidence that produces a firm belief or conviction as to the truth of the matter sought to be established. It is evidence so clear, direct, weighty, and convincing as to enable one to come to a clear conviction without hesitancy.

### D. Requirement that an Entire Claim be Valid.

19. I understand that if any portion of the scope of a claim covers invalid subject matter, the entire claim is invalid. Stated another way, to prove that a claim covering multiple alternative embodiments is invalid, a defendant need only prove that one of the covered embodiments is invalid for the entire claim to be invalid, regardless of the potential validity of any other covered embodiments.

## IV. MATERIALS CONSIDERED

20. I considered and relied upon the following materials at the time I formed my opinions presented herein:

- The '080 Patent and its prosecution history;

- The Amended Complaint and Exhibits filed by Kaneka in this matter;
- The following deposition transcripts:
    - The depositions of Iwao Funahashi, an employee of Kaneka, taken on June 20, 2022 and June 21, 2022 in the separate matter of *Kaneka Corporation v. Designs for Health*, Case No. 21-209-RGA (D. Del.),[2] and on April 25, 2025 in the present matter;
    - The depositions of Takahiro Ueda, an employee of Kaneka and named inventor of the '080 Patent, taken on June 21, 2022 and June 22, 2022 in the separate matter of *Kaneka Corporation v. Designs for Health*, Case No. 21-209-RGA (D. Del.), and on April 18, 2025 in the present matter;
    - The deposition of Shiro Kitamura, an employee of Kaneka and named inventor of the '080 Patent, taken on April 21, 2025 in the present matter;
    - The deposition of Hiroshi Kubo, an employee of Kaneka and named inventor of the '080 Patent, taken on April 22, 2025 in the present matter;
    - The deposition of Hidekazu Wakamatsu, an employee of Kaneka, taken on April 23, 2025 in the present matter;
    - The deposition Joshua Garey, an employee of Kaneka, taken on June 23, 2022 in the separate matter of *Kaneka Corporation v. Designs for Health*, Case No. 21-209-RGA (D. Del.);
    - The depositions of Ronald Martin, an employee of Kaneka, taken on June 23, 2022 in the separate matter of *Kaneka Corporation v. Designs for Health*, Case No. 21-209-RGA (D. Del.), and on May 7, 2025 in the present matter;
    - The deposition of Teresa Mansell, an employee of Kaneka, taken on May 8, 2025 in the present matter;
- The following discovery responses by Kaneka:
    - Kaneka's Response to Cocrystal's Third Set of Interrogatories (Nos. 23-25), dated March 10, 2025;
    - Kaneka's Supplemental Objections and Responses to Defendants' Second Set of Interrogatories (Nos. 17-22), dated April 14, 2025;

[2] I understand that this was separate litigation that did not involve Cocrystal, but the context of this deposition (and others taken in this separate litigation) does not affect its content or my understanding of it.

  - Kaneka's Supplemental Objections and Responses to Defendants' Second Set of Interrogatories (Nos. 2, 3, 6, 8, 9, 12, 13, 16), dated April 14, 2025; and

- All other documents explicitly cited herein.

21. In addition to these materials, I also relied upon my extensive experience and expertise in the fields of biochemical engineering, fermentation technology, industrial microbiology, and chemical engineering. In forming my opinions, I have also taken into account the knowledge and background principles that a POSITA would be familiar with, as well as my experience and training in the field of art.

## V. OVERVIEW OF THE '080 PATENT

### A. Background of the '080 Patent

22. Before forming my specific opinions on validity, I first reviewed the '080 Patent's disclosure as it would have been viewed by a POSITA.

23. The '080 Patent is entitled "Stabilization method of reduced coenzyme $Q_{10}$," and was issued by the U.S. Patent and Trademark Office on November 9, 2010. The patent application that eventually led to the '080 Patent (Application No. 11/741,290) was filed on April 27, 2007. This patent application claimed priority[3] to Japanese Patent Application No. 2006-126897, which was filed on April 28, 2006.

24. In the words of the '080 Patent, the alleged invention "aims at providing a convenient and preferable method and a composition for stably retaining reduced coenzyme $Q_{10}$

[3] I understand that a patent application may claim "priority" to an earlier application, in which case the claims are entitled to either the filing or publishing date of that earlier application for purposes of determining whether certain references or publicly available information qualifies as prior art so long as certain requirements are met. But because none of the opinions herein would change whether the priority date that claims 5 or 15 of the '080 Patent are entitled to is April 27, 2007 or April 28, 2006, I have not undertaken any priority date analysis and offer no opinion on this topic.

by protection against oxidation." '080 Patent at 2:26-28. According to the '080 Patent, this was considered a problem in the field, because while it was known that "[r]educed coenzyme $Q_{10}$ shows a higher level of oral absorbability as compared with oxidized coenzyme $Q_{10}$ and is a compound useful as an ingredient" (U.S. Patent Publication No. 2004/0215040, published on October 28, 2004, at [0001]), "reduced coenzyme $Q_{10}$ is easily oxidized by molecular oxygen into oxidized coenzyme $Q_{10}$." '080 Patent at 1:24-27. The '080 Patent purports to invent the solution of "protecting the reduced coenzyme $Q_{10}$ from oxidation by the co-presence of reduced coenzyme Q9 (not less than 0.6 wt % relative to reduced coenzyme Q10) and/or reduced coenzyme Q11." '080 Patent at 2:41-46.

25. Importantly, the '080 Patent is clear that the alleged and claimed invention is ***not*** about a new process of reducing coenzyme $Q_{10}$. The '080 Patent itself concedes that the process of reducing coenzyme $Q_{10}$ was already known in the art, and that reduced coenzyme $Q_{10}$ could be produced by the methods disclosed in at least JP-A-10-109933, WO 03/06408, WO 03/06409 and WO 03/32967, which included "reacting existing highly pure coenzyme $Q_{10}$ with [a] reducing agent." *See* '080 Patent at 1:6-22. The '080 Patent then reiterates this point: "reduced coenzyme $Q_{10}$ can be obtained by various methods as mentioned above. For example, reduced coenzyme $Q_{10}$ having a high proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ can be efficiently obtained by the method described in WO 03/06408." '080 Patent at 5:13-17.

26. The '080 Patent then recites that "[t]he stabilization method of the reduced coenzyme $Q_{10}$ of the present invention [] is a method characterized by the co-presence of (a) not less than 0.6 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and/or (b) reduced coenzyme $Q_{11}$, which suppresses oxidation of reduced coenzyme $Q_{10}$ into oxidized coenzyme $Q_{10}$ by molecular oxygen, and stably retains the reduced coenzyme $Q_{10}$" ('080 Patent at 5:18-26) and

that "[t]he method of reducing oxidized coenzyme $Q_{10}$ containing oxidized coenzyme $Q_9$ and/or oxidized coenzyme $Q_{11}$ can be performed according to the method described in WO 03/06408 and the like." '080 Patent at 5:64-67.

27. Thus, at a high level (because the claimed invention is defined only by the claims), the '080 Patent itself purports to describe a solution that is nothing more than applying the reduction process disclosed in WO 03/06408[4] on a composition of "oxidized coenzyme $Q_{10}$ containing oxidized coenzyme $Q_9$ and/or oxidized coenzyme $Q_{11}$" ('080 Patent at 5:64-67) or else separately reducing oxidized coenzyme $Q_9$ and/or oxidized coenzyme $Q_{11}$ "according to the aforementioned method described in WO 03/06408" and "adding" the resulting reduced coenzyme $Q_9$ and/or reduced coenzyme $Q_{11}$ "to reduced coenzyme $Q_{10}$" ('080 Patent at 1:48-58).

**B. <u>Level of Ordinary Skill in the Art</u>**

28. After reviewing the subject matter of the '080 Patent, it is my opinion that a POSITA at the time of the purported inventions of the '080 Patent (whether the date of invention is April 27, 2007 or April 28, 2006) would have had a Master's degree or Ph.D. in biochemical engineering, chemical engineering, chemistry, or biochemistry with at least two to three years of experience with the chemistry and extraction of fermentation products and natural products, and would have had experience in isolating and characterizing organic compounds using analytical methods. Additional work experience could substitute for additional education, and vice versa. I came to this conclusion in view of my own experience in the field, including whom I would have

[4] I understand that "WO 03/06408" refers to the foreign counterpart of U.S. Patent Publication No. 2004/0215040 (the "'040 Application") (CoCrystal_0000556). This is because the '040 Application claims priority to PCT/JP02/07143 (this can be seen on the first page of the '040 Application), and PCT/JP02/07143 is the Patent Cooperation Treaty application number corresponding to WO 03/06408, as can be seen on the first page of WO 03/06408 (WO 03/06408 is produced at CoCrystal_0010852 - 890, and the certified translation that I considered is produced at CoCrystal_0010813 - 851).

considered hiring for work in this sort of technology, and my understanding of the background of persons working within it.

29. I understand that in prior litigation concerning the '080 Patent, Kaneka's expert Dr. Myerson opined that "the person of ordinary skill in the art would have at least a Bachelors' degree in chemistry, biochemistry, chemical engineering, microbiology and/or biology with two to three years of laboratory experience. In addition, this person would have familiarity with the chemistry of fermentation products and natural products, and would have experience in processes, isolating and characterizing organic compounds using analytical methods, including High Performance Liquid Chromatography (HPLC), mass spectrometry (MS), and characterizing solid material using powder X-Ray diffraction." Expert Infringement Report of Dr. Myerson (dated August 31, 2022) (KAN0002123 at -128). In my opinion, a POSITA would have a Master's degree or Ph.D., not merely a Bachelor's degree, and merely focusing on general "biology" (as opposed to the more specific fields that are applicable) would have been insufficient experience, but I otherwise agree with Dr. Myerson, and my opinions expressed herein would not change even under his definition of a POSITA.

30. I at least met either definition of a POSITA at the time of the inventions of the '080 Patent (whether the date of invention is April 27, 2007 or April 28, 2006).

### C. Claims of the '080 Patent At Issue

31. I understand that Kaneka has asserted two claims of the '080 Patent, claims 5 and 15, and accordingly these two claims are the only claims addressed by my opinions. The language of these claims is as follows:

| **Claim 5** | |
|---|---|
| **Claim Element** | **Claim Text** |
| [5.preamble] | A reduced coenzyme $Q_{10}$-containing composition comprising |

| | |
|---|---|
| [5.a] | reduced coenzyme $Q_{10}$ and |
| [5.b] | one or both of (a) and (b): (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and (b) reduced coenzyme $Q_{11}$ |
| [5.c] | wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and |
| [5.d] | wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. |
| **Claim 15** | |
| **Claim Element** | **Claim Text** |
| [15.preamble] | A method for producing a reduced coenzyme $Q_{10}$-containing composition, which method comprises |
| [15.a] | providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, |
| [15.b] | and then reducing oxidized coenzyme $Q_{10}$ and reducing one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition, |
| [15.c] | wherein the composition comprises reduced coenzyme $Q_{10}$ and one or both of (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$ and (b) reduced coenzyme $Q_{11}$, |
| [15.d] | wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and |
| [15.e] | wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. |

32. As I mentioned above, it is my understanding that the Court has stated that "composition" as it is used in claim elements [15.c] and [15.d] refers to the final, reduced $CoQ_{10}$-containing composition.

33. For any terms not specifically construed, I have applied the plain and ordinary meaning that these terms would have had to a POSITA at the time of the invention (whether by April 27, 2007 or April 28, 2006, as the difference would be immaterial) in view of the patent's specification.

34. Claims 5 and 15 are both written such that they cover embodiments with "one or both" of coenzyme $Q_9$ and coenzyme $Q_{11}$. This means that the scope of both claims covers

embodiments where the coenzyme $Q_9$ limitation(s) may be ignored (so long as the alternative coenzyme $Q_{11}$ limitations are met).

## VI. SUMMARY OF MY OPINIONS

35. After considering the material available to me in this case, and in view of my experience in the fields of biochemical engineering, fermentation technology, industrial microbiology, and chemical engineering, it is my opinion that:

1. Claims 5 and 15 are invalid by lack of enablement;
2. Claims 5 and 15 are invalid by anticipation for violation of the on-sale bar;
3. Claims 5 and 15 are invalid by anticipation in view of the teachings of the '040 Application;
4. Claims 5 and 15 are invalid as obvious in view of the teachings of the '040 Application as implemented with obvious-to-try Kaneka Q10 as a starting composition;
5. Claims 5 and 15 are invalid for containing patent ineligible subject matter within the scope of their claims;
6. Certain information not disclosed to the U.S. Patent and Trademark Office during prosecution of the '080 Patent would have been material to one or more of the invalidity grounds described above; and
7. Hypothetical non-infringing alternative products consisting of a $CoQ_{10}$ composition that contains less than 90 percent by weight of reduced $CoQ_{10}$ as a percentage of the total amount of $CoQ_{10}$ (*i.e.*, a composition where the ratio of reduced $CoQ_{10}$ to oxidized $CoQ_{10}$ is less than 9:1), and a process used to make such a composition, would not infringe either claim 5 or 15 of the '080 Patent.

## VII. DETAILED DISCUSSION OF MY VALIDITY OPINIONS FOR THE '080 PATENT

36. In this section, I provide my full opinions and supporting evidence regarding the validity of the '080 Patent.

### A. Ground 1: Claims 5 and 15 are invalid by lack of enablement

#### *1. My Understanding of Legal Principles Applicable to Enablement*

37. I understand that one of the requirements for patent validity is that the claimed invention must be "enabled" such that a POSITA, after reading the specification of the patent, would be able to make and use the claimed invention without undue experimentation.

38. I understand that a part of the "enablement" requirement is that the utility of the alleged invention must be shown in the specification of the patent as of the effective filing date of the patent's application.

39. I understand the enablement requirement is not satisfied by mere plausible hypotheses of utility or respectable guesses as to the likelihood of the utility of an alleged invention made in a patent specification, regardless of whether a guess is later proven to be true. As I understand was stated by one court: "A patent is not a hunting license. It is not a reward for the search, but compensation for its successful conclusion."

#### *2. My Opinion Regarding Enablement*

40. It is my opinion that claims 5 and 15 are invalid by lack of enablement.

41. The disclosures of the '080 Patent provide no evidence for any stabilizing effects (or other benefits/utility) of reduced $Q_{11}$ on reduced $Q_{10}$, and thus do not provide evidence of any utility (whether stabilization or otherwise) of the entire scope of the inventions claimed in claims 5 and 15 of the '080 Patent. There are only four tests shown in the specification of the '080 Patent, and none provides evidence of any benefit/utility (whether stabilization or otherwise) of reduced $Q_{11}$ in combination with reduced $Q_{10}$ (as compared to an otherwise-equal composition lacking reduced $Q_{11}$):

- "Example 1" described by the '080 Patent at 14:34-55 concerns alleged stability effects of "reduced coenzyme $Q_{10}$ (reduced coenzyme $Q_{10}$/oxidized

coenzyme $Q_{10}$=99.4/0.6) containing 1.5 wt % of reduced coenzyme $Q_9$ obtained in Production Example 3" in comparison to "reduced coenzyme $Q_{10}$ (reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$=99.4/0.6) free of reduced coenzyme $Q_9$, which were obtained in Production Example 1." Example 1 does not discuss or otherwise concern $Q_{11}$ in any manner, and therefore does not show any stabilizing effects (or other benefits/utility) of reduced $Q_{11}$ on reduced $Q_{10}$.

- "Example 2" described by the '080 Patent at 14:57-15:11 also concerns alleged stability effects of "reduced coenzyme $Q_{10}$ (reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$=99.4/0.6) containing 1.5 wt % of reduced coenzyme $Q_9$ obtained in Production Example 3" in comparison to "reduced coenzyme $Q_{10}$ (reduced coenzyme $Q_{10}$/oxidized coenzyme Q10=99.4/0.6) free of reduced coenzyme $Q_9$, which were obtained in Production Example 1." Example 2 does not discuss or otherwise concern $Q_{11}$ in any manner, and therefore does not show any stabilizing effects (or other benefits/utility) of reduced $Q_{11}$ on reduced $Q_{10}$.

- "Example 3" described by the '080 Patent at 15:12-38 and Fig. 1 concerns "concentration of the total coenzyme Q (μg/ml) in plasma from male and female rats following administration of (1) corn oil (control), (2) reduced coenzyme $Q_9$, and (3) reduced coenzyme $Q_{10}$." Example 3 does not discuss or otherwise concern $Q_{11}$ in any manner, or test for stability or any other benefits of the alleged invention, and therefore does not show any stabilizing effects (or other benefits/utility) of reduced $Q_{11}$ on reduced $Q_{10}$.

- "Example 4" described by the '080 Patent at 15:60-16:10 and Fig. 2 concerns "concentration of the total coenzyme Q (μg/ml) in plasma from male rats following the administration of (1) reduced coenzyme $Q_{10}$ or (2) a reduced coenzyme $Q_{10}$ and reduced coenzyme $Q_{11}$ mixture." Example 4 does not test for stability or any other benefits of the alleged invention (indeed, the finding is merely that the administration of both compounds resulted in "about" the same result), and therefore does not show any stabilizing effects (or other benefits/utility) of reduced $Q_{11}$ on reduced $Q_{10}$. *See also* Ueda Deposition Testimony (April 18, 2025) at 59:9-60:18 (Examples 3-4 and Figs. 1-2 indicate that "absorption does not change with the presence of Coenzyme Q11" and "[t]his alone does not tell us anything" about stability)[5]; Kubo Deposition Testimony (April 22, 2025) at 32:20-23 (Example 4 is "an experiment to evaluate absorbability so it has no direct connection" to stability).

[5] Mr. Ueda went on to say that "other facts" (none of which are in the '080 Patent) link $Q_9$ test results to $Q_{11}$, and I will address this contention separately below.

42. Thus, because at least part of the claimed scopes of claims 5 and 15 of the '080 Patent includes embodiments without any $Q_9$ and instead require just the presence of $Q_{11}$, for which no utility was tested or shown in the specification of the '080 Patent, claims 5 and 15 of the '080 Patent do not meet the enablement requirement and are thus invalid.

43. Furthermore, there is not even discussion in the specification of the '080 Patent about ***reasons*** why either reduced $Q_9$ or reduced $Q_{11}$ would have any stabilizing effect on reduced $Q_{10}$, or why (or whether) any alleged stabilizing effect of reduced $Q_9$ on reduced $Q_{10}$ might mean that reduced $Q_{11}$ would have a stabilizing effect on reduced $Q_{10}$. At most, the utility of the co-presence of reduced $Q_{11}$ with reduced $Q_{10}$ appears to be a hypothesis of the inventors of the '080 Patent, but I understand that this is not enough to satisfy the utility requirement.

44. Even looking beyond what is disclosed in the '080 Patent (although I understand that the enablement inquiry looks only at the disclosures made within a patent's specification), the evidence is clear that, at the time the application for the '080 Patent was filed, no testing had been performed by the inventors on any stabilizing effects (or other benefits/utility) of reduced $Q_{11}$ on reduced $Q_{10}$. I understand that Kaneka has conceded that the testing shown at KAN0000539-540, KAN0000572-573, and KAN00001341 "reflect the tests located and produced in this litigation that evidence the effects of $CoQ_9$ and $CoQ_{11}$ on the stability of reduced $CoQ_{10}$ by Kaneka and the inventors of the '080 Patent." *See* Kaneka's Supplemental Response to Interrogatory No. 17 (April 14, 2025); *see also* Ueda Deposition Testimony (April 18, 2025) at 109:17-110:15 (KAN0000572-573 is "the only data" relating to reports or tests done before the application for the '080 Patent).

45. But none of the tests at KAN0000539-540, KAN0000572-573, or KAN00001341 show any stabilizing effects (or other benefits/utility) of reduced $Q_{11}$ on reduced $Q_{10}$ at the time that the '080 Patent was filed:

- KAN0000539-540[6] shows testing performed in September of 2008. While this testing purports to show a minor stabilizing effect of reduced $Q_{11}$ on reduced $Q_{10}$ (at least according to the conditions of this test), the testing occurred ***after*** April 27, 2007, which is when the application for the '080 Patent was filed.

    - Mr. Ueda confirmed that these tests were performed in 2008, because "I was aware, as of the time of the application in 2006, that we would not have data for the reduced form of Q11" and that "I was aware that there was a risk that in the application process in various countries [including the United States], we might be asked or there might be an issue with our not having that data, so to head that off, we were trying to get the data ahead of time." Ueda Deposition Testimony (April 18, 2025) at 112:15-113:6.

- o KAN00001341 is a 2015 testing summary "presented in connection with European Patent Application No. 07 742 687.2" which I understand is a foreign counterpart patent application to the '080 Patent. This document thus similarly reflects testing performed ***after*** April 27, 2007, which is when the application for the '080 Patent was filed.

    - Mr. Ueda confirmed that KAN00001341 shows "stability data for the case where Q11 is present" and was performed in 2008. Ueda Deposition Testimony (April 18, 2025) at 112:2-11.

    - Mr. Ueda also said that this was the "same experiment" as reported in KAN0000539-540, although there may be a "misprint" in the results. Ueda Deposition Testimony (April 18, 2025) at 117:4-16.

- KAN0000572-573[7] shows testing performed in March, 2006 that purports to show a minor stabilizing effect of reduced $Q_9$ on reduced $Q_{10}$ (at least according to the conditions of this test). The results correspond to "Example 1" and "Example 2" disclosed in the '080 Patent and addressed above. Nothing in this testing shows testing of any stabilizing effects (or other benefits/utility) of reduced $Q_{11}$ on reduced $Q_{10}$, and indeed, $Q_{11}$ is not referenced at all.

---

[6] I have relied upon a machine translation of KAN0000539-540 (produced at CoCrystal_0010740 – 741), but the fact that this testing occurred in 2008 is also confirmed by other evidence. *See, e.g.*, Ueda Deposition Testimony (April 18, 2025) at 112:15-113:6.

[7] I have relied upon a machine translation of KAN0000572-573 (produced at CoCrystal_0010742 – 743), but the absence of $Q_{11}$ is even apparent in the original Japanese. Moreover, the fact that this testing does not concern $Q_{11}$ is also confirmed by other evidence. *See* Ueda Deposition Testimony (April 18, 2025) at 109:17-110:1.

- Mr. Ueda testified that there is not "anything in this test relating to Q11." *See* Ueda Deposition Testimony (April 18, 2005) at 109:17-110:1.

46. [redacted]

[redacted]

[redacted]

[redacted]

8 Mr. Ueda also testified that he had responsibility for the '080 patent "starting with its original conception and up to office action responses." Deposition Testimony of Takahiro Ueda (April 18, 2025) at 28:9-22.

[redacted]

[redacted]

47. Even now, inventors who were deposed in this matter did not know of a reason for any stabilization effects of the co-presence of reduced coenzyme $Q_{11}$. *See* Deposition Testimony of Shiro Kitamura (April 21, 2025) at 38:18-39:15 ("Q: Did you have any understanding, at the time, as to why either reduced CoQ9 or reduced CoQ11 would contribute to the stability of Coenzyme Q10? [] A: I still don't have an understanding of the reason for that… Q: And why do you believe that the reduced forms of Q9 and Q11 would be more easily attacked by oxygen? [] A: I have no idea about the reason."); Deposition Testimony of Hiroshi Kubo (April 22, 2025) at 50:25-52:18 ("Q: How would the side chain length of reduced CoQ9 have some effect on stability? [] A: I don't know. What I thought at the time was that because Coenzyme Q9 is a different substance from Coenzyme Q10, it might have some contribution, some effect. [] Q: Do you have any understanding as to how reduced CoQ11 would have contributed to the stability of reduced CoQ10? [] A: It would be the same as I just said about Coenzyme Q9").

48. On these bases too, the full claim scope of claims 5 and 15 of the '080 Patent (and specifically the scope that includes the co-presence of reduced $Q_{11}$ with reduced $Q_{10}$ without reduced $Q_9$) does not meet the enablement requirement and is thus invalid.

### *3. Rebuttal to Anticipated Arguments by Kaneka*

49. I understand that Kaneka may contend that "Based on the knowledge and experience of the inventors of the '080 Patent, it was known that reduced coenzyme Q9 and reduced coenzyme Q10 *[sic]* exhibited similar stabilizing effects on reduced coenzyme Q10." *See*

Kaneka's Supplemental Response to Interrogatory No. 17 (April 14, 2025). I am also aware that Mr. Ueda, a named inventor on the '080 Patent, testified that "in talking about stability, the only factor that matters is the Hydroquinone, and there is no difference between whether CoQ9 or CoQ11 is present. So I believe that looking at [the data in Figs. 1-2 of the '080 Patent], one can conclude that since CoQ11, CoQ9 have the same properties, they would have the same stability." Ueda Deposition Transcript (April 18, 2025) at 60:15-61:20 (I considered Mr. Ueda's full answer, not just the excerpt that I have quoted here). On the basis of this Interrogatory answer and Mr. Ueda's deposition response, I understand that Kaneka and/or its expert witness may argue that the enablement requirement has been satisfied by the '080 Patent even without any testing of any stabilizing effects of reduced $Q_{11}$ on reduced $Q_{10}$.

50. However, it is my opinion that, even if Kaneka and/or Mr. Ueda accurately stated the belief of the ***individual inventors*** at the time of the alleged invention of the '080 Patent, this statement would not accurately reflect the understanding of a POSITA at the time of the alleged invention (which is the only relevant viewpoint for the enablement inquiry).

51. Even if there were a stabilizing effect shown by the presence of reduced $Q_9$ alongside reduced $Q_{10}$ in the compositions tested in "Example 1" and "Example 2" of the '080 Patent (namely, a mixture of reduced coenzyme $Q_{10}$ and oxidized coenzyme $Q_{10}$ in a ratio of 99.4/0.6 that contained 1.5% by weight of reduced $Q_9$, as compared to a mixture of reduced coenzyme $Q_{10}$ and oxidized coenzyme $Q_{10}$ in a ratio of 99.4/0.6 without reduced $Q_9$), a POSITA would not believe without evidence that any stability would be alternatively provided by the presence of reduced $Q_{11}$ in minute amounts. In other words, even stabilizing effects of 1.5% by weight of reduced $Q_9$ (if indeed there are any) would not show that there would be stabilizing effects of minute amounts of reduced $Q_{11}$ on reduced coenzyme $Q_{10}$.

52. ***First***, any findings about stabilizing effects of reduced $Q_9$ would not be seen as applying to reduced $Q_{11}$ without further testing. As an initial matter, it is unlikely that analogs of reduced $Q_{10}$ with different Q chain lengths[10] would provide stabilization effects at all, given that the oxidation occurs at the other end of the molecule (as shown below) and would not have any apparent relationship to the Q chain length:

Figure 1 Structures of coenzymes Q




*Illustration of the location of oxidation of $CoQ_{10}$, taken from Kaneka's 2005 NDI application (KAN0012163 at -168).*




[10] The number at the end of the CoQ term in the CoQ naming system (in this report, generally 9, 10, or 11, although other Q chain lengths are known) refers to a structure containing hydrogens (H) and five carbon atoms called an isoprene unit. I use the term "Q chain lengths" herein to describe the number of isoprene units on a given coenzyme Q molecule. So, for example, the $CoQ_{10}$ molecule has a tail with 10 isoprene units, and therefore has a Q chain length of 10.

Line Models (Reduced)




Stick Models (Oxidized)




Stick Models (Reduced)









*Models created at my direction to show the location of oxidation on $CoQ_9$, $CoQ_{10}$, and $CoQ_{11}$ molecules.*

The reasoning for a supposed stabilization effect by reduced $CoQ_{11}$ offered by Mr. Ueda was that "in talking about stability, the only factor that matters is the Hydroquinone, and there is no difference between whether CoQ9 or CoQ11 is present." Ueda Deposition Transcript (April 18, 2025) at 60:15-61:20. But even if this reasoning (which I note is not provided in the '080 Patent specification) is accepted, the closest Q chain length to $CoQ_9$ is $CoQ_{10}$ (and $CoQ_8$), not $CoQ_{11}$, and $CoQ_{10}$ cannot have a stabilizing effect on itself – its co-presence would just be more of itself. So, even if a POSITA accepted that the shortened Q chain length of reduced $Q_9$ would result in a

stabilizing effect on reduced $Q_{10}$ based on the testing shown in the '080 Patent, a POSITA would not assume that the same effect would be exhibited by a ***lengthened*** Q chain length in reduced $Q_{11}$, and especially not without test results to show this. Stated differently, even if the Q chain length matters for stability (and I am skeptical that it does), reduced $Q_{11}$ and reduced $Q_9$ have longer and shorter Q chain lengths from reduced $Q_{10}$, and thus their opposite differences would not be assumed to both positively affect the stability of reduced $Q_{10}$.[11]

53. ***Second***, the full claim scope of claims 5 and 15 of the '080 Patent includes the co-presence of reduced $Q_{11}$ in any quantity whatsoever. At minute amounts of reduced $Q_{11}$, there would not be enough molecules of reduced $Q_{11}$ in physical proximity to reduced $Q_{10}$ molecules such that stability could be enhanced.

54. By way of example, it can be easily calculated that a typical Ubiquinol tablet with 100 mg of $CoQ_{10}$ with a proportion of reduced $CoQ_{10}$ consistent with claims 5 and 15 would have roughly 70 billion-billion reduced $CoQ_{10}$ molecules. The literal language of the claims allows for a single $CoQ_{11}$ molecule to be present, and at this ratio, it is preposterous that any effect on stabilization could be exhibited. This can be analogized to a single security guard trying to protect every person on Earth from sunburn with an umbrella, and a better analogy would be that security guard trying to protect every person on a billion earths—even with a large umbrella that can cover several people, the effect of a single security guard on the sunburns occurring across a billion earths would be negligible, and the sunburn rate across those billion earths would be unaffected.

[11] I note that, when asked about this, Mr. Kubo, a named inventor of the '080 Patent, said that "I do not have an understanding of that. I have only awareness that they [$CoQ_9$ and $CoQ_{11}$] are different substances." Kubo Deposition Transcript (April 22, 2025) at 52:4-18. This supports my opinion that a POSITA would not know that $CoQ_9$ and $CoQ_{11}$ would have similar effects on stability.

Without a lower limit to the number of $CoQ_{11}$ molecules (or security guards), the claim scope encompasses subject matter for which there is just no utility.

55. Thus, even if some amount of $CoQ_{11}$ exhibits a detectable stabilizing effect on reduced $CoQ_{10}$ (and I am skeptical that it actually does), as the amount of $CoQ_{11}$ is reduced, any resulting stability would approach zero and would be below a detection threshold. If any stabilization effects are below the threshold for detection, they cannot be said to have any utility.

56. The inventors did no investigation at the time the application for the '080 Patent was filed into what level of reduced $Q_{11}$ would be required to have any detectible and therefore useful stabilization effect. As Mr. Ueda testified, he was not aware of Kaneka ever testing any stabilizing effects of $Q_{11}$ below the ratio in KAN0000539-540 (1% by weight of reduced $Q_{11}$) at any time, and could only "speculate" as to stabilizing effects of reduced $Q_{11}$ at concentrations below this amount. *See* Ueda Deposition Testimony (April 18, 2025) at 116:3-117:2 ("I would speculate that if this was the affected thing with 1% presence, that with a 0.1%, the effect would be about a tenth thereof"). Mr. Ueda did not test this speculation. Mr. Kitamura provided similar testimony. Kitamura Deposition Transcript (April 21, 2025) at 52:2-20 (Mr. Kitamura was unaware of any testing using a lower amount of reduced $CoQ_{11}$ and did not know "what the effect would have been of using less than 1 to 99 wt % of RQ11 on stability"). Mr. Kitamura also testified that he does not remember any belief by the "group doing research on the 080 patent" that "what ever results you got for reduced Q9 would also apply to reduced Q11." Kitamura Deposition Transcript (April 21, 2025) at 79:22-80:1.

[redacted]

[redacted]

58. This evidence indicates that even Mr. Ueda (an inventor of the '080 Patent and Kaneka's corporate representative on the technical deposition topics) did not know the reasons for any stabilization effects of the co-presence of reduced coenzyme $Q_{11}$ at the time the '080 Patent was filed. And even in 2025, the other inventors who were deposed did not know of a reason for any stabilization effects of the co-presence of reduced coenzyme $Q_{11}$. *See* Deposition Testimony of Shiro Kitamura (April 21, 2025) at 38:18-39:15 ("Q: Did you have any understanding, at the time, as to why either reduced CoQ9 or reduced CoQ11 would contribute to the stability of Coenzyme Q10? [] A: I still don't have an understanding of the reason for that… Q: And why do you believe that the reduced forms of Q9 and Q11 would be more easily attacked by oxygen? [] A: I have no idea about the reason."); Deposition Testimony of Hiroshi Kubo (April 22, 2025) at 50:25-52:18 ("Q: How would the side chain length of reduced CoQ9 have some effect on stability? [] A: I don't know. What I thought at the time was that because Coenzyme Q9 is a different

substance from Coenzyme Q10, it might have some contribution, some effect. [] Q: Do you have any understanding as to how reduced CoQ11 would have contributed to the stability of reduced CoQ10? [] A: It would be the same as I just said about Coenzyme Q9").[12]

59. That the reasons for stabilization effects (if any) of the co-presence of reduced $Q_{11}$ with reduced $Q_{10}$ were unknown even to Kaneka and the '080 Patent's inventors a year ***after*** the '080 Patent application was filed is further evidence that this knowledge would not be known to a POSITA ***at the time*** that the '080 Patent application was filed.

60. Accordingly, a POSITA would not understand that any stabilizing effects (or other benefits/utility) of reduced $Q_{11}$ on reduced $Q_{10}$ was shown in the specification of the '080 Patent. On this basis, Kaneka's anticipated argument does not show that either of claims 5 or 15 meets the enablement requirement for patent validity.

## B. Ground 2: Claims 5 and 15 are invalid for violation of the on-sale bar

### *1. My Understanding of Legal Principles Applicable to the On-Sale Bar*

61. I understand that the so-called "on-sale bar" prevents a person from patenting a product (or a method used to make a product) more than one year after the product was subject to an offer for sale, sale, or public use. I understand that a sale of a product made by a patented process (whether or not the process was disclosed to the purchaser of the product) triggers the on-sale bar because the seller is commercializing the patented process in the same sense as would occur when commercializing a patented product by selling that product.

62. I understand that to trigger the on-sale bar, the product (or method used to make the process) must satisfy all language of the claim, the product must be offered for sale or sold more

[12] I understand that the fourth and final inventor, Kazunori Hosoe, is retired and unavailable to be deposed.

than a year before the patentee filed the patent application, and the product must be ready for patenting.

### *2. My Opinion Regarding the On-Sale Bar*

63. It is my opinion that claims 5 and 15 of the '080 Patent are invalid for violation of the on-sale bar.

64. The evidence shows that "Kaneka QH" was sold by Kaneka prior to April 27, 2006, which is one year before the application for the '080 Patent was filed (on April 27, 2007).[13] This can be seen in at least two sources of evidence:

1. KAN0022585 to -594, which is a sales invoice and related documents showing that 36,000 "Kaneka QH Softgels" from Lot No. FB31-0002 were billed to Enzymatic Therapy in Green Bay, Wisconsin, and shipped to Thermo Pak in Wood Dale, Illinois by at least February 17, 2006, in an invoice signed by Kaneka Nutrients L.P.'s Assistant Sales Manager. These were sold at a unit price of $205 per thousand, with a $0 discount, for a total price of $7,380. Page KAN0022587 indicates that the order was placed by January 30, 2006. Page KAN0022590 is a certificate of analysis that confirms that Kaneka QH Capsules would conform to the "Master Formula," and that Lot No. FB31-0002 was manufactured on May 18, 2005.

    - I understand from the deposition testimony of Mr. Ueda that Lot No. designations starting with "FB31" refer to Ubiquinol in "soft gel" form. *See* Ueda Deposition Testimony (April 18, 2025) at 54:6-15.

    - I note that there are separate shipments of Kaneka QH referred to in this document from Lot No. FB31-0001, with a price of $0 and statements of non-commercial value. These are separate potential sales (they are not Lot No. FB31-0002), and thus any potential non-commercial purpose of these shipments (I offer no opinion about whether they are in fact sales) would not affect the FB31-0002 sales.

    - Mr. Funahashi confirmed that these records were kept "among the Kaneka North America sales documents," which indicates that these were in fact sales. Funahashi Deposition Testimony (April 25, 2025) at 67:11-19.

[13] I understand that whether or not the '080 Patent can claim priority to an earlier Japanese Patent Application has no bearing on the on-sale bar.

2. KAN0047697 to -901, which is a trademark application file for "KANEKA QH." At page KAN0047697, it is shown that the trademark application was filed on October 15, 2004, and pages KAN0047747 to -750 show a signed statement from Kaneka Corporation's General Manager of the Intellectual Property Department Eiichi Muramatsu dated December 8, 2006, that "The mark [Kaneka QH] was first used on the goods specified on March 1, 2006 and was first used on the goods specified in commerce between the U.S. and Japan on March 1, 2006. Pages KAN0047747 to -749 show that the lot number of the goods sold (in three 12,000 capsule drums) was from Lot No. FB31-0002Z.

65. Regardless of whether the Kaneka QH capsules from Lot No. FB31-0002 were sold on February 17, 2006 (as shown on the invoice) or March 1, 2006 (as shown on the trademark application), or both, this evidence independently shows that Kaneka QH was both offered for sale and sold prior to April 27, 2006.

66. On the basis of Kaneka QH being sold prior to April 27, 2006, claims 5 and 15 of the '080 Patent are invalid for violation of the on-sale bar because the evidence shows that Kaneka QH (and the process used to make it) met the claim language requirements of claims 5 and 15.

67. As can be seen in Kaneka's 2005 Revised NDI application to the FDA (KAN0012163 to -246), Kaneka QH is manufactured by performing a reduction, crystallization, separation, and drying process that starts with Kaneka Q10:




Figure 2 The manufacturing process of KANEKA QH™

KAN0012163 at -170; *see also* Ueda Deposition Testimony (April 18, 2025) at 88:6-12 ("you're reducing the Q10 when you make QH"); Kitamura Deposition Testimony (April 21, 2025) at 29:17-30:3 ("we would use an oxidized Coenzyme Q10 as a raw material and then reduce that to create a reduced Coenzyme Q10"). The resulting Kaneka QH composition is at least 96% reduced $CoQ_{10}$ (ubiquinol), less than 2% oxidized $CoQ_{10}$, and the corresponding dietary supplement "will be in softgel capsule form." KAN0012163 at -167.

68. Accordingly, all claim elements of claims 5 and 15 of the '080 Patent, except for elements [5.b], [15.a], and [15.c] (*i.e.*, the $Q_9$/$Q_{11}$ claim elements, which I will address below), are indisputably met by Kaneka QH (including Lot No. FB31-0002) and the process used to manufacture Kaneka QH (including Lot No. FB31-0002):

| Claim 5 | |
|---|---|
| **Claim Element** | **Evidence that Kaneka QH meets claim language** |
| [5.preamble] A reduced coenzyme $Q_{10}$-containing composition comprising | Kaneka QH is a reduced coenzyme $Q_{10}$-containing composition. *See* KAN0012163 at -167 (Kaneka's NDI); KAN0022585 at -590 (certificate of analysis of Lot No. FB31-0002) that confirms that Kaneka QH Capsules would confirm to the "Master Formula" and include ubiquinol. |
| [5.a] reduced coenzyme $Q_{10}$ and | Kaneka QH is a reduced coenzyme $Q_{10}$-containing composition. *See* KAN0012163 at -167 (Kaneka's NDI); KAN0022585 at -590 (certificate of analysis of Lot No. FB31-0002) that confirms that Kaneka QH Capsules would confirm to the "Master Formula" and include ubiquinol. |
| [5.b] one or both of (a) and (b): (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and (b) reduced coenzyme $Q_{11}$ | *As addressed below, Kaneka QH includes at least some reduced coenzyme $Q_{11}$.* |
| [5.c] wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | Kaneka QH comprises at least 96% reduced $CoQ_{10}$, and therefore meets this limitation. KAN0012163 at -167. |
| [5.d] wherein the proportion of reduced coenzyme Q10 relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | Kaneka QH comprises at least 96% reduced $CoQ_{10}$ and less than 2% oxidized $CoQ_{10}$, and therefore meets this limitation, because 96/(96+2) = 98%. KAN0012163 at -167. |

| Claim 15 | |
|---|---|
| **Claim Element** | **Evidence that Kaneka QH meets claim language** |
| [15.preamble] A method for producing a reduced coenzyme $Q_{10}$-containing composition, which method comprises | Kaneka's method of producing Kaneka QH is a method of producing a reduced coenzyme $Q_{10}$-containing composition. KAN0012163 at -170 (the method of production) and at -167 (the produced Kaneka QH comprises at least 96% reduced $CoQ_{10}$); KAN0022585 at -590 (certificate of analysis of Lot No. FB31-0002 that confirms that Kaneka QH Capsules would conform to the "Master Formula" and include ubiquinol). |

| | |
|---|---|
| [15.a] providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, | Kaneka's method of producing Kaneka QH starts with Kaneka Q10, which is a composition comprising oxidized coenzyme $Q_{10}$. KAN0012163 at -170 (Kaneka Q10 is more than 98% oxidized coenzyme $Q_{10}$).<br><br>*The presence of oxidized coenzyme $Q_{11}$ in the starting composition used for the production of Kaneka QH is addressed below.* |
| [15.b] and then reducing oxidized coenzyme $Q_{10}$ and reducing one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition, | Kaneka's method of producing Kaneka QH reduces Kaneka Q10, which means that both the oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$ contained in Kaneka Q10 are reduced.<br><br>*I also incorporate by reference my below analysis showing that the Kaneka QH reduction process will inevitably reduce oxidized coenzyme $Q_{11}$ alongside oxidized coenzyme $Q_{10}$.* |
| [15.c] wherein the composition comprises reduced coenzyme $Q_{10}$ and one or both of (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$ and (b) reduced coenzyme $Q_{11}$, | The resulting Kaneka QH comprises at least 96% reduced $CoQ_{10}$, and therefore comprises reduced coenzyme $Q_{10}$. KAN0012163 at -167.<br><br>*The resulting Kaneka QH also includes reduced coenzyme $Q_{11}$, which is addressed below.* |
| [15.d] wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | The resulting Kaneka QH comprises at least 96% reduced $CoQ_{10}$, and therefore meets this limitation. KAN0012163 at -167. |
| [15.e] wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | The resulting Kaneka QH comprises at least 96% reduced $CoQ_{10}$ and less than 2% oxidized $CoQ_{10}$, and therefore meets this limitation, because 96/(96+2) = 98%. KAN0012163 at -167. |

69. Regarding the presence of oxidized $Q_{11}$ in the Kaneka Q10 starting composition, which satisfies claim element [15.a], this is shown by at least the following evidence:

- A January, 2006 article in Regulatory Toxicology and Pharmacology by Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi[14] (that was submitted in August, 2005), entitled *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-*

[14] As shown by this article, Kenjiro Nakamura, Kenji Fujii, and Naoki Fukutomi were employees of Kaneka Corporation. *See* CoCrystal_0008258.

*blind, randomized, placebo controlled trial* notes that "The capsule *[sic]* used in this study was provided by Kaneka Corporation" and "***The content of CoQ10 in Kaneka Q10 is over 98%, with CoQ9 and CoQ11 as major impurities***"). *See* CoCrystal_0008258 at -259.

- The June 23, 2022 sworn deposition testimony[15] of Joshua A. Garey, who started working at Kaneka in 2007 and was hired as a quality control analyst to conduct concentration and impurity testing of $CoQ_{10}$ (15:4-17, 18:18-19:3), and who testified that Kaneka's production of $CoQ_{10}$ resulted in $Q_{11}$ as an impurity (54:10-14, 59:23-60:8).

- The June 22, 2022 sworn deposition testimony[16] of Takahiro Ueda, a named inventor of the '080 Patent, who testified that "the yeast strain Kaneka uses [] produce[s] coenzyme $Q_{11}$" (82:11-17).

- My own expertise and knowledge indicates that the process by which yeast creates $CoQ_{10}$ is not a perfect one, and that at least some $CoQ_9$ and $CoQ_{11}$ will be inherently created. The tail portion of $CoQ_{10}$ is made by an enzyme called prenyl diphosphate synthase that takes a molecule called isopentenyl pyrophosphate (IPP) and connects several of them together into a chain, similar to adding beads to a necklace. The enzyme used to make $CoQ_{10}$ mostly adds "beads" to the "necklace" until it is 10 beads long. However, just like a person making a necklace (or rather, billions of necklaces), occasionally the enzyme gets the count wrong and misses a "bead" or adds an extra "bead" and therefore inevitably makes a small amount of $CoQ_9$ and $CoQ_{11}$. Another way to say this is that the enzyme is not always perfect and will make errors. Moreover, mutations sometimes occur in the genes that encode enzymes. Mutations can occur in the gene for prenyl diphosphate synthase that can make it even more prone to make different chain lengths of CoQ such as $CoQ_{11}$. *See* Rey-Ting Guo et al., *A Molecular Rule for Chain Elongation Catalyzed by Octaprenyl Pyrophosphate Synthase and Its Structure-Based Engineering to Produce Unprecedented Long Chain trans-Prenyl Products* (Biochemistry 2004, 43, 7678 – 7686) (CoCrystal_0010731 - 739). Thus, small amounts of $CoQ_9$ and $CoQ_{11}$ would inherently occur in a yeast fermentation.

- I have reviewed certain high-level testing results from the "1st Crystallization" of the Kaneka Q10 product, dating from 2017 to 2024, and each testing result shows the presence of some amount of $CoQ_{11}$. *See* KAN0032750 at -769 (from 2017, showing 0.07% $CoQ_{11}$); KAN0093259 at -267 (also from 2017, showing 0.06% $CoQ_{11}$); KAN0107670 at -678

[15] I understand that this deposition testimony was taken in different litigation that did not involve Cocrystal, but the context of this deposition does not affect its content or my understanding of it.
[16] I understand that this deposition testimony was taken in different litigation that did not involve Cocrystal, but the context of this deposition does not affect its content or my understanding of it.

(from 2022, showing 0.08% $CoQ_{11}$); and KAN0140790 at -798 (from 2024, showing 0.07% $CoQ_{11}$).

70. Next, regarding the presence of reduced $Q_{11}$ in the resulting Kaneka QH, which satisfies claim elements [5.b] and [15.c], this is shown by at least the following evidence:

- The '080 Patent itself confirms the scientific fact that when performing a reduction process on a composition that includes both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$, the oxidized coenzyme $Q_{11}$ will be reduced. *See* '080 Patent at 5:50-56 ("reduction of [] oxidized coenzyme $Q_{11}$ [can be accomplished] according to the aforementioned method described in WO 03/06408"), 5:64-67 (a "method of reducing oxidized coenzyme $Q_{10}$ containing oxidized coenzyme $Q_9$ and/or oxidized coenzyme $Q_{11}$ can be performed according to the method described in WO 03/06408 and the like").
    - Both the method invoked by the '080 Patent (that is described in WO 03/06408) and Kaneka's Kaneka QH production process (*see* KAN0012163 at -170 ) rely upon ethanol as a solvent and L-ascorbic acid as a reducing agent, as shown by the '040 Application at [0042]-[0045] (ethanol is "most preferred" as the solvent) and [0059], [0065]-[0066] (L-ascorbic acid is "most preferred" as a reducing agent), [0068] (ascorbic acid can be used in combination with an alcohol); *see also* WO 03/06408 (certified translation produced at CoCrystal_0010813 - 851) at 8:23-9:18, 11:5-14, and 12:11-13:8 (same disclosures). Thus, the '080 Patent confirms the fact that Kaneka's Kaneka QH production process will reduce oxidized coenzyme $Q_{11}$ alongside oxidized coenzyme $Q_{10}$.
- G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247 (CoCrystal_0000448) ("Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…").
- U.S. Patent Application No. 2007/0258967 (CoCrystal_0000610) (which shared named inventors with the '080 Patent (namely, Takahiro Ueda and Shiro Kitamura)) states that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein."

- Kaneka Q10 is formed by yeast fermentation, and thus the resulting Kaneka QH (reduced coenzyme $Q_{10}$) is indicated by this statement by two inventors of the '080 Patent to contain reduced coenzyme $Q_{11}$.

▪ Mr. Kitamura, a named inventor of the '080 Patent, testified that "I can speculate that if an oxidized form of Q10 is reduced to a reduced form of Q10, then oxidized Q9 would similarly be reduced to reduced Q9" and that "oxidized Q11 [would] similarly be reduced to reduced Q11." Kitamura Deposition Testimony (April 21, 2025) at 62:18-63:4.

▪ Mr. Funahashi of Kaneka testified that he had requested the testing of reduced $CoQ_{10}$ samples from CoCrystal and other entities called Designs for Health, Piping Rock, Shin Kairikan, and Guang Dong Bio, and using LC-MS/MS has never failed to find the presence of reduced $CoQ_{11}$ in these samples. *See* Funahashi Deposition Testimony (April 25, 2025) at 95:20-97:19.

▪ My own experience and knowledge indicates that the $CoQ_{11}$ in a starting composition will be reduced alongside the $CoQ_{10}$ in the same reaction, such as with L-ascorbic acid and $LiAlH_4$, two well-known reducing agents taught by the '040 Application. *See* '040 Application at [0059] and [0065].

71. Thus, all claim elements of claims 5 and 15 of the '080 Patent are met by Kaneka QH (including Lot No. FB31-0002) and the process used to manufacture Kaneka QH (including Lot No. FB31-0002).

72. Adding further independent evidence in support of my opinions that Kaneka QH and the process used to manufacture Kaneka QH meets the claim requirements of claims 5 and 15 of the '080 Patent is the fact that Kaneka and its employees have made the following admissions about Kaneka QH and/or Kaneka Q10:

- Mr. Ueda admitted that reduced $Q_{11}$ is present in Kaneka QH manufactured in at least 2024, and "our current products" practice the '080 Patent "because of the presence of Q11." Ueda Deposition Transcript (April 18, 2025) at 120:3-12. Mr. Ueda also stated that he had reviewed testing records of Kaneka's "bulk ubiquinol" from 2024 and that these testing results

showed the presence of "reduced Q11" on the order of "[e]ither 0.0x% or 0.00x%." Ueda Deposition Transcript (April 18, 2025) at 73:11-77:10.[17]

- Mr. Funahashi testified that he occasionally looked at HPLC testing results for Kaneka Q10 starting in 2010, and reduced $CoQ_{11}$ was "sometimes" detected (he could not say whether that was more or less than half the time). Funahashi Deposition Testimony (April 25, 2025) at 105:21-106:24.

- Kaneka has admitted that "Kaneka QH met the limitations of claim 5 of the '080 Patent sometime after April 28, 2006," "Kaneka QH met the limitations of claim 15 of the '080 Patent sometime after April 28, 2006," and "Kaneka QH sometimes contained reduced CoQ11 sometime after April 28, 2006" (Kaneka's Responses to Defendants' Second Set of Requests for Admission, Nos. 15 and 17).

- Ms. Mansell testified that Kaneka's ubiquinol product "has always been covered by the '080 Patent." Mansell Deposition Testimony (May 8, 2025) at 39:5-18.

73. While the above admissions by Kaneka and its employees were not specific in time or else applied to Kaneka QH after April 28, 2006 (except for that of Ms. Mansell), it is my opinion after considering the relevant evidence that there have been no process changes in the production of Kaneka QH that would either introduce for the first time the presence of $Q_{11}$ where none was previously present, or remove it. I understand that Kaneka has alleged that KAN0147817 - KAN0147882 show "all ways that Kaneka's production of oxidized $CoQ_{10}$ has changed since April 27, 2006" (*see* Kaneka's Response to Interrogatory No. 24, dated March 10, 2025), but these documents show no changes to the production processes of either the Kaneka Q10 starting

[17] I have not been provided with these testing results or data to consider them myself, if they exist. The results that I considered at KAN0032750 at -769, KAN0093259 at -267, KAN0107670 at -678, and KAN0140790 all were testing results for the "1st Crystallization" of the Kaneka Q10 product. I note, however, that these results consistently show the presence of $CoQ_{11}$, without exception, as I would expect. I understand that counsel for Kaneka has represented by email to counsel for Cocrystal that these "1st Crystallization" of the Kaneka Q10 product tests are in fact the types of tests that Mr. Ueda referenced in his deposition testimony when he refers to testing records of Kaneka's "bulk ubiquinol." *See* Ueda Deposition Transcript (April 18, 2025) at 73:11-77:10.

composition or to the Kaneka QH production process that would affect whether or not $Q_{11}$ was produced and present in at least some quantity in the resulting Kaneka QH product. Therefore, none of these changes would cause $CoQ_{11}$ to be produced where none was previously produced:

- KAN0147817 – 844 (machine translation produced at CoCrystal_0010768)
    - This reference describes a range of minor process changes from 2006 to 2019 including: changes in aeration rate, changes in the level of ethanol as a feedstock, increases in the number of times that silica gel is reused, increases in phosphate level in the growth media, changes in rinsing and cleaning protocol, changes in the aeration timing and protocol, changes in the stirring blades, changes in the steam piping, and changes in the recycling of caustic used in cleaning. $CoQ_{11}$ is not referenced. Based on my experience, none of these changes would cause $CoQ_{11}$ to be produced where none was previously produced.
    - Additionally, Mr. Ueda was unable to say "whether any of the changes reflected in [KAN0147817 – 844] would increase or decrease the amount of reduced Q11 in the Ubiquinone final product." *See* Ueda Deposition Testimony (April 18, 2025) at p. 82-84.
- KAN0147845 – 864 (machine translation produced at CoCrystal_0010769 - 788)
    - This reference discusses the testing from 2006 to 2019 of a range of modified strains for improved performance over the standard production strain. In some cases, changes are made in the levels of glucose and phosphate. Tests are typically done in 30 liter vessels. Some test are called "factory experiments." $CoQ_{11}$ is not referenced. Based on my experience, none of these changes would cause $CoQ_{11}$ to be produced where none was previously produced.
    - Additionally, Mr. Ueda was unable to say whether any of the changes reflected in KAN0147845 – 864 would "increase the amount of reduced Q11 in the Ubiquinol, decrease the amount." *See* Ueda Deposition Testimony (April 18, 2025) at 82-84.
- KAN0147865 – 872 (machine translation produced at CoCrystal_0010789 - 796)
    - This document (dating to 2004) covers the reduction of QX by ascorbic acid to make the reduced product QH and the following

crystallization, centrifugation, drying, grinding and packaging steps. It addresses operator error, time delays, and product removal from surfaces. Based on my experience, no subsequent changes from this process that I've reviewed in these other documents identified by Kaneka would cause $CoQ_{11}$ to be produced where none was previously produced.

- KAN0147873 (machine translation produced at CoCrystal_0010797)
    - This document is an Excel file with a process flow diagram (mostly labeled in Japanese) that seems to show the steps in the reduction to form QH followed by purification and crystallization. It seems to be a similar flow diagram to the one at the end of KAN0147865 – 872. Based on my experience, to the extent that any process changes are actually detailed in this document, none of these changes would cause $CoQ_{11}$ to be produced where none was previously produced.
    - Additionally, Mr. Ueda testified that changes made to this process "would not change" the amount of $Q_{11}$ in the resulting ubiquinol. *See* Ueda Deposition Testimony (April 18, 2025) at 94:16-24.
- KAN0147874 – 881 (machine translation produced at CoCrystal_0010798 - 805)
    - This document (dating to 2005) is similar to KAN0147865 – 872, but the prior problems (such as operator error, recovery of product from the centrifuge, and product sticking to surfaces) seem to now be resolved. Based on my experience, no subsequent changes from this process that I've reviewed in these other documents identified by Kaneka would cause $CoQ_{11}$ to be produced where none was previously produced.
- KAN0147882 (machine translation produced at CoCrystal_0010806)
    - This is a flow diagram similar to the one in KAN0147873. It shows the steps from reduction to crystallization, centrifugation, drying, size reduction, and packing. Based on my experience, to the extent that any process changes are actually detailed in this document, none of these changes would cause $CoQ_{11}$ to be produced where none was previously produced.

74. I understand that Mr. Ueda has testified that two "major changes" to the manufacturing process for Kaneka QH occurred between 2006 and 2024, the first being a switch from the Osaka Synthesis Lab to "our own company either at Takasago plant or the Texas," and

the second being reducing the number of crystallization steps in the manufacturing process of the oxidized CoQ composition from two to one, which could "increase the impurities." *See* Ueda Deposition Testimony (April 18, 2025) at 82:18-84:23. But neither of these changes, without more information, shows that $Q_{11}$ was introduced into the manufacturing process where none previously existed, and in particular, even if impurities were increased as a result of going from three to two total crystallization steps, there would still be at least <u>*some*</u> impurities even after three crystallization steps as a matter of basic chemistry, as no crystallization process is perfect. The documents produced by Kaneka showing the presence of $CoQ_{11}$ in Kaneka Q10 in post-2017 batches even after the first crystallization further support this. *See, e.g.*, KAN0032750 at -769, KAN0093259 at -267, KAN0107670 at -678, and KAN0140790 at -798. Mr. Kitamura testified that he was unaware of any changes in Kaneka's reduced $CoQ_{10}$ manufacturing process that "would either increase or decrease the amount of reduced Coenzyme Q11 in the final product" since Kaneka first started making reduced $CoQ_{10}$. *See* Kitamura Deposition Testimony (April 21, 2025) at 75:1-10. And Mr. Kitamura further testified that it would take "a tremendous effort" to "eliminate every molecule of reduced Q11 through purification." Kitamura Deposition Testimony (April 21, 2025) at 81:4-82:13. I have seen no evidence of such a "tremendous effort" in Kaneka's documents, especially given that $Q_{11}$ is not even mentioned in these change documents. Moreover, even if the manufacturer of Kaneka QH changed (such as speculated by Mr. Ueda as a possibly meaningful process change), "Kaneka's ubiquinol has only been made from ubiquinone that was fermented by Kaneka," and thus the source of the starting Kaneka Q10 did not change. *See* Ueda Deposition Testimony (April 18, 2025) at 92:12-18. Because the starting composition did not change, the mere change in production location would not cause $CoQ_{11}$ to be produced where none was previously produced.

75. Thus, because the process for producing Kaneka QH did not change in a way that would introduce the presence of $Q_{11}$ after the batches subject to the 2006-era testing, where absolutely none previously existed, and because any production methods employed by Kaneka would never have removed every molecule of $Q_{11}$, the above admissions from Kaneka and its employees about the presence of $Q_{11}$ in Kaneka QH would apply to all Lot Numbers of Kaneka QH, including Lot No. FB31-0002.

### *3. Rebuttal to Anticipated Arguments by Kaneka*

76. I understand that Kaneka may argue in response to Cocrystal's on-sale allegations either that (1) certain testing allegedly shows that Kaneka QH as sold in 2006 did not include $CoQ_{11}$, and/or (2) that the sales in 2006 were for experimental purposes and therefore outside of the scope of the on-sale bar. *See* Kaneka's Response to Interrogatory No. 8 (April 14, 2025). It is my opinion that neither argument is supported by the facts.

#### a) Kaneka's contention that certain testing allegedly shows that Kaneka QH does not include $CoQ_{11}$

77. First, I understand that Kaneka contends that:

> "Kaneka's initial reduced $CoQ_{10}$ product did not practice the claimed invention of the '080 Patent. Kaneka tested its batch productions FB01-0001 through FB01-0028, which were manufactured from September 2004 through February 2007, using HPLC in accordance with the testing standards outlined in the USP Pharmacopeia and none of the test results of the batches showed the presence of reduced $CoQ_9$ or reduced $CoQ_{11}$. *See* KAN0079890; KAN0079897; KAN0079915; KAN0079935; KAN0079974; KAN0079994; KAN0080022; KAN0080047; KAN0080072; KAN0080099. At least the first 28 batches of Kaneka's reduced $CoQ_{10}$ product did not practice the claimed inventions of the '080 Patent because they did not contain any reduced $CoQ_9$ or any reduced $CoQ_{11}$."

*See* Kaneka's Response to Interrogatory No. 8 (April 14, 2025).

78. As an initial matter, Lot No. FB31-0002 is the Lot No. that was the subject of Kaneka's sales, not Lot Nos. FB01-0001 through FB01-0028, which are the sales in these test results. These are different batches of Kaneka QH:

- Lots beginning with FB01 (where the F stands for Functional foods and the B stands for Batch) "means bulk Ubiquinol manufactured at Osaka Synthetic Organic Chemistry." Ueda Deposition Testimony (April 18, 2025) at 50:4-15.

- Lots beginning with FB31 mean ubiquinol soft gel batches, which were manufactured by different companies (initially RP Sealer in Kakegawa Prefecture). Ueda Deposition Testimony (April 18, 2025) at 52:12-53:4, 54:6-15.

Thus, Kaneka's argument is directed at differently numbered batches of Kaneka QH.

79. But additionally, the testing results at KAN0079890, KAN0079897, KAN0079915, KAN0079935, KAN0079974, KAN0079994, KAN0080022, KAN0080047, KAN0080072, and KAN0080099 (the documents cited by Kaneka) do not actually show the absence of reduced $Q_{11}$.

80. Specifically, these tests are not conclusive one way or the other about the absence of some amount of reduced $CoQ_{11}$, and therefore do not undermine or change my opinion (explained above) that the cumulative evidence shows that there was at least some reduced $CoQ_{11}$ in Kaneka QH sold in 2006. In considering these testing results, I have considered certified translations of KAN0079897 – 898 and KAN0079974 – 978 (both of which concern HPLC tests for batch FB01-0002) and KAN0079890 – 896 (which concerns HPLC tests for batch FB01-0001) (certified translations produced at CoCrystal_0010759 – 761, CoCrystal_0010762 – 767, and CoCrystal_0010751 - 758), and the Japanese language originals of the remaining tests to confirm that they show consistent tests and results (and consequently that my opinions concerning these tests/results are the same).

81. First, the detection limits of HPLC testing such as occurred in these tests would not be enough to rule out the presence of any amount of reduced $CoQ_{11}$; they would only show amounts above the detection threshold. This is true regardless of the specific testing apparatus and the detection limit of the 2006 tests.[18] HPLC testing is not a suitable method for detecting very low amounts of a chemical. For example, the HPLC testing in the above Kaneka examples uses a detector that measures the absorbance of UV light at 290 nm wavelength. *See, e.g.*, KAN0079974. But UV detectors are only sensitive in the nanogram ($10^{-9}$ gram) range. Even if the Kaneka HPLC system can detect as little as 0.01 nanograms of $CoQ_{11}$ (which is doubtful), one can calculate from the molecular weight of $CoQ_{11}$ and Avogadro's number that the detection limit of Kaneka's HPLC testing is therefore no less than approximately 6.5 trillion $CoQ_{11}$ molecules. Kaneka's witnesses, including one of the inventors of the '080 Patent (Mr. Kitamura), confirm that these 2006 test results do not show an absence of reduced $CoQ_{11}$, but just, at most, an absence of reduced $CoQ_{11}$ above a detection limit:

- Mr. Kitamura testified that in relation to these test results, "I do think there is an issue of the detection limit but I don't know what that detection limit is." *See* Kitamura Deposition Testimony (April 21, 2025) at 94:3-95:15.
- Mr. Funahashi testified that the presence or absence of reduced $CoQ_{11}$ varied in Kaneka's testing results, indicating that the presence or absence of reduced $CoQ_{11}$ was a matter of exceeding the detection threshold or not, not a matter of a categorical presence or absence of this molecule. *See* Funahashi Deposition Testimony (April 25, 2025) at 101:2-103:1 ("It seems that there are times [reduced coenzyme $Q_{10}$ is] included and other times when it's not… I have the recollection that because the RQ11 peak is small on the HPLC, there have been times when it was not recognized to be RQ11… when there's no peak whatsoever observed, there is considered to be no RQ11 present… if there is no presence detected by that recommended method [from USP], then [RQ11] isn't there.").

[18] I have also considered KAN0149410 (which shows additional data from these tests) but this document does not change the opinions that I have expressed herein.

- Mr. Funahashi also testified that even among Kaneka's later batches, Kaneka's HPLC testing for reduced $CoQ_{11}$ has inconsistent results: Mr. Funahashi occasionally looked at HPLC testing results for Kaneka Q10 starting in 2010 and reduced $CoQ_{11}$ was only "sometimes" detected (he could not say whether that was more or less than half the time). Funahashi Deposition Testimony (April 25, 2025) at 105:21-106:24.

- Mr. Wakamatsu testified that the detection limit for RQ11 in Kaneka's HPLC testing is less sensitive because there is no standard product for RQ11 to compare to. Wakamatsu Deposition Testimony (April 23, 2025) at 45:1-13.

In other words, even Kaneka's own employees acknowledge that these test results at most show no reduced $CoQ_{11}$ above a detection threshold, not a categorical absence of reduced $CoQ_{11}$.

82. As Kaneka itself acknowledges, there are more accurate methods than HPLC testing to reliably test for minute quantities of impurities such as reduced $CoQ_{11}$. One example would be LC-MS or LC-MS/MS testing. MS stands for mass spectrometry, LC-MS stands for liquid chromatography (LC)[19] with mass spectrometry (MS), and LC-MS/MS stands for liquid chromatography with mass spectrometry followed by a second round of mass spectrometry on mass fragments from the first round. MS detectors for HPLC systems are more sensitive than the UV detectors used by Kaneka. Their sensitivity is in the picogram ($10^{-12}$ gram) range. If such a detector can sense as little as 0.01 picograms, one can calculate that the detection limit is approximately 6.5 million $CoQ_{11}$ molecules. Moreover, there is an additional benefit of LC-MS/MS detection that is not present in the types of HPLC systems Kaneka used for its 2006-era testing: it provides information about the structure of the molecules being analyzed and can definitively identify the molecules being detected (unlike HPLC with a UV detector). Even one of Kaneka's listed inventors acknowledged that "mass analysis allows for a more accurate analysis" and is "appropriate for analyzing finite amounts, very small amounts." Ueda Deposition Testimony

[19] The "LC" portion of the test is almost always performed with an HPLC.

(April 28, 2025) at 123:8-126:1. Moreover, Kaneka itself uses LC-MS/MS (most likely HPLC-MS/MS, which is different from HPLC without an MS step) to test for reduced $CoQ_{11}$ in its competitor's products, including for purposes of litigation (for example, LC-MS/MS testing was how Kaneka tested Cocrystal's products, even though they used HPLC testing for the $Q_{10}$ ratios):

- Mr. Funahashi testified that he requested LC-MS/MS testing for reduced $Q_{11}$ and $Q_9$ impurities in Cocrystal's product because "RQ9 and RQ11 was small, that's why LC-Mass was needed" and that LC-MS/MS has a much greater sensitivity. *See* Funahashi Deposition Testimony (April 25, 2025) at 93:1-94:22.

- Mr. Funahashi also testified that he similarly requests LC-MS/MS testing for reduced $Q_{11}$ and $Q_9$ impurities in other companies' products. *See* Funahashi Deposition Testimony (April 25, 2025) at 95:20-97:7. Mr. Funahashi did not recall ever testing a reduced $CoQ_{10}$ sample using LC-MS/MS without finding reduced $CoQ_{11}$. Funahashi Deposition Testimony (April 25, 2025) at 97:16-19.

Methods that are very different from HPLC would be needed for single molecule detection (and therefore to prove or disprove any amount of $CoQ_{11}$)—potential methods to consider if such testing were to be attempted would include single-molecule photobleaching and single-molecule fluorescence spectroscopy.

83. I note that Kaneka and its inventors appear to argue that the 2006 test results are reliable to show the absence of reduced $CoQ_{11}$ because they were allegedly performed using "the analytical method of the USP." *See* Ueda Deposition Testimony (April 28, 2025) at 123:8-124:6; Funahashi Deposition Testimony (April 25, 2025) at 102:3-17 ("what that means is that if there is no presence detected by that recommended method, then it isn't there"). I disagree. First, according to the USP, the method described is used to verify that "[n]ot more than 1.0% [of 'coenzymes $Q_7$, $Q_8$, $Q_9$, $Q_{11}$, and related impurities'] is found," not that there is no amount whatsoever of these impurities. *See* CoCrystal_0000693. The USP does not purport that its disclosed testing method

can show the complete absence of impurities such as $CoQ_{11}$, but only that its disclosed testing method can show the absence of more than 1% of these impurities.

84. Second, it appears that the 2006 test results actually *do* show the presence of reduced $CoQ_{11}$, or at least show results consistent with some presence of reduced $CoQ_{11}$. Taking the FB01-0002 testing (KAN0079897 – 898 and KAN0079974 – 978)[20] as exemplary (although testing of all other batches in the documents that Kaneka cites show the same thing), the expected retention time for reduced $CoQ_{11}$ is 25.174 minutes (*see* KAN0079898, chart in lower right). In the five HPLC test results (KAN0079974 – 978), there are peaks at 24.977 (for test N1), 25.020 (for N2), 25.034 (for N3), 25.069 (for N4), and 25.094 (for N5). Moreover, each of these curves has a beginning and ending (shown by the up-and-down indicators / tick marks) that span the point of the expected retention time for reduced $CoQ_{11}$ of 25.174 minutes:[21]

[20] I considered certified translations at CoCrystal_0010759 - 761 and CoCrystal_0010762 - 767.

[21] Even taking the Kaneka QH specification, whereby the "relative retention time [of R11] to ubiquinol" is 1.74 (*see* KAN0012954 at -959), the retention time of R11 shows that R11 is well within the results displayed. For example, taking the results at KAN0079978 as exemplary, the peak of ubiquinol is at 14.484, and therefore the expected peak of R11 is 14.484*1.74=25.202, which is well within the peak shown (excerpt from this test on the following page). This analysis is true across Kaneka's 2006-era testing – for example, the ubiquinol peak of 14.431 on KAN0079974 multiplied by 1.74 is 25.120, which is well within the peak shown that is centered on 24.977.




*Excerpt from KAN0079978*

Thus, while whoever analyzed these results appears to have attributed the entirety of the curve area at approximately 25 minutes to QX and not R11 (reduced $CoQ_{11}$) (*see* KAN0079898, showing, for each of the N1-N5 tests, results for QX corresponding to these peaks but attributing "0" to R11), the raw test results themselves are actually consistent with the presence of at least some reduced $CoQ_{11}$.

85. The main advantage of an MS or MS/MS detector over the HPLC methods of Kaneka's 2006-era tests is that MS or MS/MS detectors can be used to determine the chemical composition and structure of the chemical being measured, and so could prove or disprove that an impurity was $CoQ_{11}$. The UV detector used by Kaneka in these 2006 HPLC tests cannot directly determine the compound that is being detected. Instead, the compound can only be surmised based on its HPLC retention time and comparison to known standards with the same or similar retention time—and Kaneka admitted that they did not have a reduced $CoQ_{11}$ standard for comparison in the 2006 HPLC tests. *See* Wakamatsu Deposition Testimony (April 23, 2025) at 45:1-13. Such detectors cannot be used to definitely prove the presence or absence of CoQ11 or any other compound. An MS or better yet, an MS/MS detector is needed for such a determination. The MS detector can be used to determine the molecular mass of the compound in an HPLC peak. The

molecular mass of reduced $CoQ_{10}$ is approximately 865.4 daltons. The molecular mass of reduced $CoQ_{11}$ is approximately 933.5 daltons. This difference can be measured with a MS detector. Although highly unlikely, there may also be other molecules in the mixture with the same molecular mass as reduced $CoQ_{11}$. To address this, a MS/MS detector has a second MS that measures the molecular mass of a fragment of the first MS results to definitively determine the identify of a compound being measured.

86. Finally, by way of circumstantial evidence consistent with my opinion, Mr. Ueda testified that, in 2006, he "knew" or "had heard that Ubiquinol was going to be put on sale and so that patent [the '080 Patent] had been given priority," and he was aware that "if you waited more than a year to file a patent after a product was on sale, that could invalidate the patent." *See* Ueda Deposition Testimony (April 18, 2025) at 111:8-23. These do not reflect the actions or priorities of an entity that believed that the product to be sold in fact did not practice the patent claims or believed that its testing showed no presence of reduced $CoQ_{11}$.

87. I understand that Kaneka may attempt to contrast certain alleged testing results dating from after 2006[22] to the 2006 testing in order to argue that presence of $Q_{11}$ in the post-2006 testing shows that the 2006 testing indicates the absence of any amount of $Q_{11}$. This would be a deeply flawed argument. First, Mr. Ueda testified that after 2006, "the group that did the analysis also changed" and that "the way in which the analysis was done changed." Ueda Deposition Testimony (April 18, 2025) at 79:10-80:4. Thus, Kaneka would seem to be comparing apples to

[22] Such post-2006 testing may be the testing results from the "1st Crystallization" of the Kaneka Q10 product, dating from 2017 to 2024, showing the presence of some amount of $CoQ_{11}$ (*see* KAN0032750 at -769, KAN0093259 at -267, KAN0107670 at -678, and KAN0140790 at -798), or may be the alleged testing records of Kaneka's "bulk ubiquinol" from 2024 referred to by Mr. Ueda in his April 18, 2025 deposition at 73:11-77:10 (but I understand that counsel for Kaneka has represented that these are in fact the same tests).

oranges in terms of testing, and there is no reason to think that the 2006 testing would not have also indicated the presence of $Q_{11}$ if it had been done with the same methodology as the post-2006 testing. And second, for all of the reasons that I have already explained, the 2006-era testing simply did not test (and could not have tested) at a detection level sufficient to show the categorical absence of $CoQ_{11}$ at any level in the Kaneka QH composition, so even though separate post-2006 testing showed $Q_{11}$, this does not indicate that pre-2006 Kaneka QH lacked $Q_{11}$ (and in fact, this later testing would actually indicate the presence of $Q_{11}$ in 2006-era Kaneka QH due to the lack of meaningful process changes in the production of Kaneka QH, as I have already explained).

88. Thus, the evidence as a whole that I have considered does not show that Kaneka QH in 2006 (such as in Lot No. FB31-0002) lacked reduced $Q_{11}$ in at least minute amounts, but rather, for all the reasons I have already discussed, the evidence shows the opposite.

**b) Kaneka's contention that the sales to Enzymatic Therapy were allegedly for experimentation**

89. Additionally, I understand that Kaneka contends that "Kaneka first offered a reduced $CoQ_{10}$ product for sale in the United States in 2006. In 2006, Kaneka offered its reduced $CoQ_{10}$ product to companies with physician-affiliations, such as Enzymatic Therapy, so that physicians could use Kaneka's reduced $CoQ_{10}$ product in clinical studies or trials. These sales were made using reduced $CoQ_{10}$ from Kaneka's Lot FB01-0001 and FB01-0002 and noted to have no commercial value. *See, e.g.*, KAN00022585-594." *See* Kaneka's Response to Interrogatory No. 8 (April 14, 2025).

90. This appears to be an invocation of the experimental usage exception to the on-sale bar. I understand that the legal standard concerning the on-sale bar includes an exception for sales that occur primarily for purposes of experimentation. I understand that the on-sale bar draws a distinction between inventions put to experimental use and products sold commercially, on the

basis that a primarily experimental purpose indicates that an invention is not "ready for patenting" (as is a requirement for the on-sale bar). However, I understand that not all experiments qualify for this exception, and usage may only be considered experimental within the meaning of this exception if its purpose is either (1) to test claimed features of the invention, or (2) to determine whether an invention will work for its intended purpose.

91. As a threshold matter, the sales reflected in KAN00022585-594 (as well as the trademark application statement at KAN0047697, pages KAN0047747 to -750) are for Kaneka QH Lot No. FB31-0002, not FB01-0001 and FB01-0002. Thus, Kaneka's contentions concern different lots. *See* Ueda Deposition Testimony (April 18, 2025) at 54:6-15 (noting the difference between lots).

92. But additionally, the alleged inventors of the '080 Patent themselves were unaware of any such testing by Enzymatic Therapy:

- Mr. Ueda testified that he did not know about ***any*** joint research between Kaneka and any U.S. entities, and did not know of any circumstances of any samples set to Enzymatic Therapy in 2006. *See* Ueda Deposition Testimony (April 18, 2025) at 58:2-59:3, 141:15-20.

- Mr. Kubo testified that he no "interactions with any U.S. entities relating to research on Coenzyme Q10 of any kind," including no "interactions with Enzymatic Therapy or Thermopack." Kubo Deposition Testimony (April 22, 2025) at 54:6-18.

- Mr. Kitamura testified that he was not "aware of any research that was done between Kaneka and Enzymatic Therapy [or ETI] related to CoQ10." Kitamura Deposition Testimony (April 21, 2025) at 59:10-60:1.

If the inventors of the '080 Patent were unaware of any sales to, or experimentation by, Enzymatic Therapy, it is exceedingly unlikely that Enzymatic Therapy was conducting experiments in support of their supposed invention.

93. Furthermore, while there have been no allegations or evidence whatsoever by Kaneka about what such alleged experimentation by Enzymatic Therapy was for, based on my experience and understanding of the field, it would seem unlikely that physicians (and not Kaneka itself) would conduct stability studies that relate to the invention of the '080 Patent. Physicians might conduct other studies on a $CoQ_{10}$ product—such as benefits to patients—but would presumably not be used for stability studies that relate to the invention of the '080 patent (*i.e.*, stability studies relating to the presence or absence of $Q_{10}$ and/or $Q_9$).

94. Furthermore, based on the fact that Kaneka admitted that KAN0000539-540, KAN0000572-573, and KAN00001341 "reflect the tests located and produced in this litigation that evidence the effects of $CoQ_9$ and $CoQ_{11}$ on the stability of reduced $CoQ_{10}$ by Kaneka and the inventors of the '080 Patent" (*see* Kaneka's Supplemental Response to Interrogatory No. 17 (April 14, 2025)), and the fact that none of these tests were performed by Enzymatic Therapy, it is even more implausible that the sales to Enzymatic Therapy were for purposes of experimentation on the alleged invention of the '080 Patent. On the contrary, it appears quite clear that any (yet to be explained or evidenced) experimentation by Enzymatic Therapy would seem to be unrelated to the alleged invention of the '080 Patent.

95. Based on my conclusion that any alleged experimentation by Enzymatic Therapy (whether it was to, for example, experiment on health benefits, therapeutic dosage amounts, etc.) did not relate to the alleged invention of the '080 Patent, it is my opinion that the evidence shows that any experimental purposes of sales to Enzymatic Therapy (even if such purposes existed, of which I've seen no evidence) would not trigger an exception to the on-sale bar. The sales to Enzymatic Therapy resulted in a commercial benefit to Kaneka (Kaneka applied $0 of discounts to the sales and was paid thousands of dollars), and any experiments were neither (1) to test claimed

features of the claimed invention, nor (2) to determine whether the claimed invention would work for its intended purpose – indeed, there is no evidence that any experimentation (even if it existed) related to the alleged invention of the '080 Patent at all.

### C. <u>Ground 3: Claims 5 and 15 are invalid as anticipated by U.S. Patent Publication No. 2004/0215040</u>

#### *1. My Understanding of Legal Principles Applicable to Anticipation and the Doctrine of Inherency*

96. I understand that a patent claim is invalid if it claims subject matter that was not novel at the time that the patent application was filed.

97. I understand that one way to prove a lack of novelty is if the claimed subject matter was disclosed in the prior art, such as written publications dated prior to the patent application. Moreover, I understand that novelty does not exist merely by reciting and claiming a newly discovered function or property, inherently possessed by things or processes in the prior art. Thus, I understand that the discovery and disclosure of a new property or use of a previously known composition, even when that property and use are unobvious from the prior art, cannot impart patentability to claims. I understand that this is called the "doctrine of inherency."

98. Accordingly, I understand that a prior art reference without express reference to a claim limitation may nonetheless anticipate a patent claim by the doctrine of inherency if any claim limitation that is not explicitly disclosed in that reference will nevertheless always be present when that reference is practiced as taught.

#### *2. My Opinion Regarding Anticipation (Including Through the Doctrine of Inherency)*

99. It is my opinion that claims 5 and 15 of the '080 Patent are invalid as anticipated by U.S. Patent Publication No. 2004/0215040 (the "'040 Application") (CoCrystal_0000556), including through the doctrine of inherency.

100. The '040 Application is entitled "Method of producing reduced coenzyme q10 using solvent with high oxidation-protective effect," and names as inventors Takahiro Ueda, Shiro Kitamura, and Yasuyoshi Ueda (Takahiro Ueda and Shiro Kitamura are also named inventors of the '080 Patent). I understand that the '040 Application issued as U.S. Patent No. 7,145,044, was assigned to Kaneka Corporation, and expired in September, 2022. I understand that the '040 Application was published on October 28, 2004, and thus qualifies as prior art to the '080 Patent because it was published more than a year before the application for the '080 Patent was filed. There are several related patent applications and/or issued patents that are within the '040 Application's "family," and I include those family members that are referred to in this Report here for reference (although I recognize that there are others, which are not relevant to my opinions):

| **Patent Document** | **Description** |
|---|---|
| U.S. Patent Publication No. 2004/0215040 (the "'040 Application") | U.S. Patent Application published on October 28, 2004, and claiming the benefit of PCT[23] Patent Application No. PCT/JP02/07143 |
| U.S. Patent No. 7,145,044 | The U.S. Patent that issued on December 5, 2006 from the '040 Application |
| WO 03/06408 | This is the publication number of PCT Patent Application No. PCT/JP02/07143, which was filed on July 15, 2002 and published on January 23, 2003 in the Japanese language. I have considered the certified translation of WO 03/06408 produced at CoCrystal_0010813 - 851 |

101. As a starting point for my anticipation opinion, the '080 Patent states that "reduced coenzyme $Q_{10}$ having a high proportion of reduced coenzyme $Q_{10}$ relative to the total amount of

[23] I understand that "PCT" refers to the Patent Cooperation Treaty, and denotes an international patent application.

coenzyme $Q_{10}$ can be efficiently obtained by the method described in WO 03/06408,"[24] and that "[t]he method [claimed in the '080 Patent] of reducing oxidized coenzyme $Q_{10}$ containing oxidized coenzyme $Q_9$ and/or oxidized coenzyme $Q_{11}$ can be performed according to the method described in WO 03/06408 and the like." '080 Patent at 5:13-17, 5:64-67.

102. As is unsurprising, given the '080 Patent's invocation of WO 03/06408 as teaching the claimed method except for the presence of $Q_9$ or $Q_{11}$, all claim elements of claims 5 and 15 of the '080 Patent, except for elements [5.b], [15.a], and [15.c] (*i.e.*, the $Q_9$/$Q_{11}$ claim elements, which I will address below), are indisputably met by the explicit disclosures of the '040 Application in a straightforward manner:

| **Claim 5** | |
|---|---|
| **Claim Element** | **Evidence that the '040 Application meets claim language** |
| [5.preamble] A reduced coenzyme $Q_{10}$-containing composition comprising | The '040 Application teaches a reduced coenzyme $Q_{10}$-containing composition. "The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$." '040 Application at [0001]; *see also* '040 Application at [0103], [0010]-[0013]. |

[24] I understand that "WO 03/06408" refers to the foreign counterpart of the '040 Application (CoCrystal_0000556). This is because the '040 Application claims priority to PCT/JP02/07143 (this can be seen on the first page of the '040 Application), and PCT/JP02/07143 is the Patent Cooperation Treaty application number corresponding to WO 03/06408, as can be seen on the first page of WO 03/06408 (WO 03/06408 is produced at CoCrystal_0010852 - 890, and the certified translation that I considered is produced at CoCrystal_0010813 - 851). I have considered the certified translation of WO 03/06408, and its teachings are the same as those in the '040 Application, at least as they apply to my opinions herein (in other words, the portions of the '040 Application that I cite are also taught by WO 03/06408), and thus the '080 Patent's invocation of the teachings of WO 03/06408 also apply to the teachings of the '040 Application. For example, the '040 Application's teachings at paragraphs 1-3, 10-13, 16, 42-45, 57-59, 65-68, 85, and 99-118 (referenced in my opinions) have no relevant substantive differences from WO 03/06408's teachings at 1:4-28, 2:26-3:3, 3:9-10, 8:23-9:18, 11:5-14, 12:11-13:8, 16:12-16, and 19:26-27:19.

| | |
|---|---|
| [5.a] reduced coenzyme $Q_{10}$ and | The '040 Application teaches a composition comprising reduced coenzyme $Q_{10}$. "The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$." '040 Application at [0001]; *see also* '040 Application at [0103], [0010]-[0013]. |
| [5.b] one or both of (a) and (b): (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and (b) reduced coenzyme $Q_{11}$ | *As addressed below, following the process of the '040 Application results in at least some reduced coenzyme $Q_{11}$ in the final reduced coenzyme $Q_{10}$ composition.* |
| [5.c] wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | The '040 Application teaches that not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the resulting reduced coenzyme $Q_{10}$ composition. "The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.6/0.4, and the purity of the reduced coenzyme $Q_{10}$ was 99.2%." '040 Application at [0103]; *see also* '040 Application at [0108]-[0115], [0117]. |
| [5.d] wherein the proportion of reduced coenzyme Q10 relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | The '040 Application teaches that the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ in the resulting reduced coenzyme $Q_{10}$ composition is not less than 90 wt %. "The invention still further provides a reduced coenzyme $Q_{10}$ crystal with a reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of not lower than 96/4." '040 Application at [0016]; *see also id.* at [0099], [0103], [0108]-[0115], [0117].<br><br>A weight ratio of 96/4 of reduced coenzyme $Q_{10}$ to oxidized coenzyme $Q_{10}$ leads to a proportion of reduced coenzyme $Q_{10}$ in the total amount of coenzyme $Q_{10}$ of 96/(96+4)=96% by weight. |
| | |
| **Claim Element** | **Evidence that the '040 Application meets claim language** |
| [15.preamble] A method for producing a reduced coenzyme $Q_{10}$-containing composition, which method comprises | The '040 Application teaches a method for producing a reduced coenzyme $Q_{10}$-containing composition. "The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$." '040 Application at [0001]; *see also id.* at [0103], [0010]-[0013]. |

| | |
|---|---|
| [15.a] providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, | *As addressed below, the process of the '040 Application begins with a starting composition that includes at least some oxidized coenzyme $Q_{11}$.* |
| [15.b] and then reducing oxidized coenzyme $Q_{10}$ and reducing one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition, | The '040 Application teaches a method that comprises reducing oxidized coenzyme $Q_{10}$. "The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$." '040 Application at [0001]; *see also id.* at [0103], [0010]-[0013], [0100]-[0118].<br><br>As explained by the '080 Patent itself, the reduction process of the '040 Application will reduce both oxidized coenzyme $Q_{11}$ and oxidized coenzyme $Q_{10}$. *See* '080 Patent at 5:64-67 (a "method of reducing oxidized coenzyme $Q_{10}$ containing oxidized coenzyme $Q_9$ and/or oxidized coenzyme $Q_{11}$ can be performed according to the method described in WO 03/06408 and the like"). This is also my opinion, for the reasons that I explained in my on-sale bar analysis with respect to the reduction of both oxidized coenzyme $Q_{11}$ and oxidized coenzyme $Q_{10}$ in the production of Kaneka QH, which I incorporate here. |
| [15.c] wherein the composition comprises reduced coenzyme $Q_{10}$ and one or both of (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$ and (b) reduced coenzyme $Q_{11}$, | The '040 Application teaches a method that comprises reducing oxidized coenzyme $Q_{10}$ to create reduced coenzyme $Q_{10}$. "The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$." '040 Application at [0001]; *see also id.* at [0103], [0010]-[0013], [0100]-[0118].<br><br>*As addressed below, following the process of the '040 Application results in at least some reduced coenzyme $Q_{11}$ in the final reduced coenzyme $Q_{10}$ composition.* |
| [15.d] wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | The '040 Application teaches that not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the resulting reduced coenzyme $Q_{10}$ composition. "The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.6/0.4, and the purity of the reduced coenzyme $Q_{10}$ was 99.2%." '040 Application at [0103]; *see also* '040 Application at [0108]-[0115], [0117]. |

| | |
|---|---|
| [15.e] wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | The '040 Application teaches that the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ in the resulting reduced coenzyme $Q_{10}$ composition is not less than 90 wt %. "The invention still further provides a reduced coenzyme $Q_{10}$ crystal with a reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of not lower than 96/4." '040 Application at [0016]; *see also id.* at [0099], [0103], [0108]-[0115], [0117].<br><br>A weight ratio of 96/4 of reduced coenzyme $Q_{10}$ to oxidized coenzyme $Q_{10}$ leads to a proportion of reduced coenzyme $Q_{10}$ in the total amount of coenzyme $Q_{10}$ of 96/(96+4)=96% by weight. |

103. Regarding the presence of oxidized $Q_{11}$ in the starting composition of the process of the '040 Application, which satisfies claim element [15.a], this is shown by at least the following evidence:

- The '040 Application discloses that oxidized coenzyme $Q_{10}$ is used as the starting composition for the claimed process [0057], and that "[t]he oxidized coenzyme $Q_{10}$ to be used in the practice of the invention may be one prepared by synthesis, fermentation, or extraction from a natural product, for instance, as mentioned hereinabove, or may be an existing high-purity grade of coenzyme $Q_{10}$." '040 Application at [0058]; *see also* '040 Application at [0085], [0003].

- The USP standard[25] for Ubidecarenone (oxidized $Q_{10}$) states that $Q_{11}$ is a known "impurit[y]" of oxidized $Q_{10}$. *See* CoCrystal_0000693 at -697. Thus, oxidized $Q_{10}$ according to industry standards is known to possess oxidized $Q_{11}$.

- U.S. Patent Application No. 2007/0258967 (CoCrystal_0000610) (which shared named inventors with the '080 Patent (namely, Takahiro Ueda and Shiro Kitamura)) at [0002] states that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme

[25] USP is the United States Pharmacopeia, which is a 200 year old independent, scientific nonprofit organization that is dedicated to providing safe and quality medicines. Every five years, USP publishes revised standards for drugs in *The United States Pharmacopeia*. These standards are recognized as official by the federal government and are enforceable by the FDA. The standards include specifications pertaining to drug strength, quality, purity, packaging, and labeling.

$Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein."

- Both U.S. Patent Application No. 2007/0258967[26] and the '040 Application refer to the same process for the production of oxidized coenzyme $Q_{10}$, further showing that this statement in U.S. Patent Application No. 2007/0258967 shows the properties of what is taught in the '040 Application.
  - U.S. Patent Application No. 2007/0258967 at [0001] ("It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)").
  - '040 Application at [0003] ("It is known that reduced coenzyme $Q_{10}$ can be prepared by producing coenzyme $Q_{10}$ in the conventional manner, for example by synthesis, fermentation, or extraction from natural products, and concentrating a reduced coenzyme $Q_{10}$-containing eluate fraction resulting from chromatography (JP-A-10-109933).").

- Kaneka's September 13, 2006 specification for Kaneka QH notes in its "Test Methods" that "R9, RY, U, and R11 are Related Impurities of Ubiquinol." *See* KAN0012954 at -959.

- *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (CoCrystal_0000454) (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"

- U.S. Patent Pub. No. 2020/0087235 (CoCrystal_0000714) discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein

[26] I note that while I am aware that U.S. Patent Application No. 2007/0258967 was published after the application for the '080 Patent, that a reference comes later is irrelevant if it is just being used to show the inherent properties of an earlier disclosure (here, the disclosure of the '040 Application).

including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].

- US11773043B2 (CoCrystal_0000516) discloses that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."

- WO2021036386A1 (CoCrystal_0000659, and CoCrystal_0000776 is a machine translation) discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 - demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11."

- Chinese Patent Publication No. CN108084007B (CoCrystal_0000349, and CoCrystal_0000749 is a machine translation), which notes that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10."

- Chinese Patent Publication No. CN108047014B (CoCrystal_0000341, and CoCrystal_0000742 is a machine translation), which notes that "The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."

- Mr. Kitamura testified that "We, of course, did become aware that there was a reduced Q9 and reduced Q11 within reduced Q10, but when that happened, I don't remember." Kitamura Deposition Transcript (April 21, 2025) at 60:3-10.

104. It is also my opinion based upon my background knowledge that there would be an inherent presence of oxidized $Q_{11}$ in a composition containing oxidized $Q_{10}$ produced by at least fermentation. The tail portion of $CoQ_{10}$ is made by an enzyme called prenyl diphosphate synthase that takes a molecule called isopentenyl pyrophosphate (IPP) and connects several of them together into a chain, similar to adding beads to a necklace. The enzyme used to make $CoQ_{10}$ mostly adds "beads" to the "necklace" until it is 10 beads long. However, just like a person making a necklace (or rather, billions of necklaces), occasionally the enzyme gets the count wrong and misses a

"bead" or adds an extra "bead" and therefore inevitably makes a small amount of $CoQ_9$ and $CoQ_{11}$. Another way to say this is that the enzyme is not always perfect and will make errors. Moreover, mutations sometimes occur in the genes that encode enzymes. Mutations can occur in the gene for prenyl diphosphate synthase that can make it even more prone to make different chain lengths of CoQ such as $CoQ_{11}$. *See* Rey-Ting Guo et al., *A Molecular Rule for Chain Elongation Catalyzed by Octaprenyl Pyrophosphate Synthase and Its Structure-Based Engineering to Produce Unprecedented Long Chain trans-Prenyl Products*, (Biochemistry 2004, 43, 7678 – 7686) (CoCrystal_0010731 - 739). Thus, small amounts of $CoQ_9$ and $CoQ_{11}$ would inherently occur in a yeast fermentation.

105. Additional references in the art show the co-presence of oxidized $Q_{10}$ and oxidized $Q_{11}$ in various contexts, and their findings in various particular contexts are further supporting evidence for my opinions:

- *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3) (CoCrystal_0000307) (strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5);

- *High-performance liquid chromatographic analysis of ubiquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985) (CoCrystal_0000388) (strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$);

- U.S. Patent Pub. No. 2006/0134085 (CoCrystal_0000589) at [0029] ("since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited.").

- U.S. Patent No. 3,549,668 at cols. 1-2 (CoCrystal_0000620) (disclosing that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves as well as a preparation method for these compounds).

- Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979) (CoCrystal_0000482) ("$CoQ_5$ through $CoQ_{10}$ are widely distributed in nature" and $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and $CoQ_{11}$ accumulated in Pseudomonas samples that were otherwise "a potent $CoQ_{10}$ producer on glucose medium").

- A January, 2006 article in Regulatory Toxicology and Pharmacology by Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi (that was submitted in August, 2005), entitled *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo controlled trial* notes that "The content of CoQ10 in Kaneka Q10 is over 98%, with CoQ9 and CoQ11 as major impurities"). *See* CoCrystal_0008258 at -259.

106. Thus, the evidence firmly establishes that the oxidized coenzyme $Q_{10}$ source proposed by the '040 Application includes at least some oxidized coenzyme $Q_{11}$, and therefore the teachings of the '040 Application satisfy claim element [15.a] of the '080 Patent.

107. Next, regarding the presence of reduced $Q_{11}$ in the resulting composition (after reduction), which satisfies claim elements [5.b] and [15.c], this is shown by at least the following evidence:

- The '080 Patent itself confirms the scientific fact that when performing the '040 Application's reduction process on a composition that includes both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$ (as at least one starting composition taught by the '040 Application—Kaneka Q10—has), the oxidized coenzyme $Q_{11}$ will be reduced. *See* '080 Patent at 5:64-67 (a "method of reducing oxidized coenzyme $Q_{10}$ containing oxidized coenzyme $Q_9$ and/or oxidized coenzyme $Q_{11}$ can be performed according to the method described in WO 03/06408 and the like").

- G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247 (CoCrystal_0000448) ("Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions

that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…").

- Mr. Kitamura, a named inventor of the '080 Patent, testified that "I can speculate that if an oxidized form of Q10 is reduced to a reduced form of Q10, then oxidized Q9 would similarly be reduced to reduced Q9" and that "oxidized Q11 [would] similarly be reduced to reduced Q11." Kitamura Deposition Testimony (April 21, 2025) at 62:18-63:4.

- Mr. Funahashi of Kaneka testified that he had requested the testing of reduced $CoQ_{10}$ samples from CoCrystal and other entities called Designs for Health, Piping Rock, Shin Kairikan, and Guang Dong Bio, and using LC-MS/MS has never failed to find the presence of reduced $CoQ_{11}$ in these samples. *See* Funahashi Deposition Testimony (April 25, 2025) at 95:20-97:19.

- Kaneka's September 13, 2006 specification for Kaneka QH notes in its "Test Methods" that "R9, RY, U, and R11 are Related Impurities of Ubiquinol." *See* KAN0012954 at -959.

- U.S. Patent Application No. 2007/0258967 (CoCrystal_0000610) at [0002] states that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein."

- My own experience and knowledge indicates that the $CoQ_{11}$ in a starting composition will be reduced alongside the $CoQ_{10}$ in the same reaction, such as with L-ascorbic acid and $LiAlH_4$, two well-known reducing agents taught by the '040 Application. *See* '040 Application at [0059] and [0065].

108. Thus, all claim elements of claims 5 and 15 of the '080 Patent are clearly met by the teachings of the '040 Application, either explicitly or inherently.

### *3. Rebuttal to Anticipated Arguments by Kaneka*

109. I am not aware of any rebuttal arguments to this ground of invalidity set forth by Kaneka. I reserve the right to respond if Kaneka or its expert makes any.

## D. <u>Ground 4: Claims 5 and 15 are invalid as obvious in view of U.S. Patent Publication No. 2004/0215040 and Kaneka's Q10 Product</u>

### *1. My Understanding of Legal Principles Applicable to Obviousness*

110. I understand that even if all teachings in a patent's claims are not present in a single prior art reference, the claims may still be invalid as obvious if the differences between that prior art reference and the patent claims would have been "obvious" from the standpoint of a POSITA, or if a modification to the teachings of the prior art would have been "obvious to try" and would result in a product or process meeting the claim language, whether explicitly or inherently.

111. I understand that the test for obviousness requires the consideration of the following factors: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations of non-obviousness.

112. I understand that a conclusion of obviousness may be based upon either a single prior art reference or a combination of prior art references, particularly if the combination of elements does no more than yield predictable results. However, I understand that merely demonstrating that each of the claim elements was, independently, known in the prior art does not prove that a patent composed of several claim elements is obvious. Moreover, I understand that it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in a way the claimed new invention does, and it can be helpful to consider whether there is some teaching, suggestion, or motivation in the prior art to combine the prior art and whether there would have been a reasonable expectation of success in doing so.

113. I understand that obviousness of a patent claim cannot properly be established through hindsight, and that elements from different prior art references, or different embodiments

of a single prior art reference, cannot be selected to create the claimed invention using the invention itself as a roadmap. Nevertheless, I understand that the following exemplary rationales may lead to a conclusion of obviousness: the combination of prior art elements according to known methods to yield predictable results; the substitution of one known element for another to obtain predictable results; and the use of known techniques to improve similar devices or methods in the same way.

114. I understand that certain categories of evidence (referred to as "secondary considerations of non-obviousness") may be relied on as evidence that could indicate that a certain invention was not obvious at the time that the patent application was filed. Nevertheless, I understand that secondary considerations of non-obviousness cannot be used to overcome a strong showing of obviousness by the evidence in the prior art.

### *2. My Opinion Regarding Obviousness*

115. It is my opinion that claims 5 and 15 of the '080 Patent are invalid as obvious by the '040 Application in view of Kaneka's commercially available Kaneka Q10 product.

116. While I go through the obviousness factors below, the high-level outline of my obviousness opinion is that the '040 Application explicitly teaches every claim element except elements [5.b], [15.a], and [15.c] (as I discussed in my anticipation opinion with regard to the '040 Application), and that:

1. The '040 Application discloses that "[t]he oxidized coenzyme $Q_{10}$ to be used in the practice of the invention may be [] an existing high-purity grade of coenzyme $Q_{10}$." '040 Application at [0058]; *see also* '040 Application at [0085], [0003].
2. Kaneka Q10 was an "existing high-purity grade of coenzyme $Q_{10}$" on the market.
3. Kaneka Q10 contained at least some amount of oxidized coenzyme $Q_{11}$.

4. Therefore, an obvious source of an "existing high-purity grade of coenzyme $Q_{10}$" on the market contained at least some amount of oxidized coenzyme $Q_{11}$.

117. Thus, practicing the reduction process of the '040 Application in an obvious-to-try manner (indeed, a manner specifically suggested by the '040 Application, and therefore a manner that a POSITA would have been motivated to try) by using Kaneka Q10 as a starting composition would lead to the practice of a process that meets all of the claim limitations of claim 15 of the '080 Patent and the creation of a compound that meets all of the claim limitations of claim 5 of the '080 Patent.[27]

**a) Obviousness Factors 1 & 2 (the scope and content of the prior art, and differences between the claims and the prior art)**

118. As I established above with respect to anticipation, there is very little difference between the teachings of the prior art and claims 5 and 15 of the '080 Patent. Specifically, as I already showed in my anticipation analysis for the '040 Application (and I incorporate herein by reference), the '040 Application explicitly discloses all claim elements of claims 5 and 15 of the '080 Patent, except for elements [5.b], [15.a], and [15.c] (*i.e.*, the $Q_9$/$Q_{11}$ claim elements).

119. But any arguable lack of explicit disclosure is easily overcome by other prior art that would have been known to a POSITA and would have been obvious to try when performing the method disclosed in the '040 Application. Specifically, given the '040 Application's instruction that "[t]he oxidized coenzyme $Q_{10}$ to be used in the practice of the invention may be [] an existing high-purity grade of coenzyme $Q_{10}$" ('040 Application at [0058]), a POSITA would

[27] I understand that the doctrine of inherency also applies to obviousness, such that if an obvious-to-try modification to the prior art inherently results in meeting all of the claim limitations of a given patent claim, that patent claim is invalid as obvious.

have been motivated to try Kaneka Q10 as this starting composition, and would have found this combination of the '040 Application with the use of Kaneka Q10 obvious.

120. Kaneka Q10 was indisputably available (on sale) in the United States as "an existing high-purity grade of coenzyme $Q_{10}$" long before even April 28, 2006, which is the earlier of the two possible priority dates of the '080 Patent, and therefore I understand that it is available as a prior art reference to combine with the '040 Application:

- Kaneka's 2005 Revised NDI application to the FDA (KAN0012163 to -246) notes at KAN0012170 that "Ubidecarenone ($CoQ_{10}$) has been marketed in the United States as a dietary ingredient before Oct. 15, 1994. Kaneka Q10™ acquires self-affirmed GRAS. The purity of Kaneka Q10™ is more than 98%."

- Kaneka's "About [Kaneka]" portion of its webpage states that "Kaneka started to manufacture highly purified CoQ10 from yeast in 1977" and maintains a "reputation as a leader" in this field. *See* KAN0011110.

- Mr. Ueda testified that Kaneka was "selling Ubiquione at the time [he] started doing research into Ubiquinol" and that this product was "a high purity form of CoQ10." Ueda Deposition Testimony (April 18, 2025) at 46:2-12.

- Mr. Kitamura recalled that oxidized $CoQ_{10}$ that was being manufactured by Kaneka at the time he began doing his work on reduced $CoQ_{10}$ (2000 or 2001) had a "high purity" and was "probably" being sold in the United States at the time. Kitamura Deposition Transcript (April 21, 2025) at 27:17-28:1.

- Mr. Funahashi testified that between 2003 and 2006 "the oxidized form of CoQ10 became a product for mass market sales [in the United States] through places such as Walmart and CostCo." Funahashi Deposition Testimony (April 25, 2025) at 21:5-24:8.

121. Moreover, the inventors of the '040 Application worked for Kaneka. The patent that resulted from the '040 Application (U.S. Patent No. 7,145,044) was assigned to Kaneka Corporation. It would have been extremely obvious to a POSITA to try the commercially available $CoQ_{10}$ from Kaneka (*i.e.*, Kaneka Q10) as the starting "existing high-purity grade of coenzyme

$Q_{10}$" discussed by Kaneka's own inventors, and a POSITA would have therefore been motivated to combine this prior art (the '040 Application and commercially available Kaneka Q10).

122. And should Kaneka Q10 have been used as the "existing high-purity grade of coenzyme $Q_{10}$" and the process of the '040 Application followed, all claim elements of claims 5 and 15 of the '080 Patent would be met.

123. Regarding the presence of oxidized $Q_{11}$ in the Kaneka Q10 starting composition, which satisfies claim element [15.a], this is shown by at least the following evidence:

- A January, 2006 article in Regulatory Toxicology and Pharmacology by Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi (that was submitted in August, 2005), entitled *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo controlled trial* notes that "The capsule *[sic]* used in this study was provided by Kaneka Corporation" and "***The content of CoQ10 in Kaneka Q10 is over 98%, with CoQ9 and CoQ11 as major impurities***"). *See* CoCrystal_0008258 at -259.

- The June 23, 2022 sworn deposition testimony[28] of Joshua A. Garey, who started working at Kaneka in 2007 and was hired as a quality control analyst to conduct concentration and impurity testing of $CoQ_{10}$ (15:4-17, 18:18-19:3), and who testified that Kaneka's production of $CoQ_{10}$ resulted in $Q_{11}$ as an impurity (54:10-14, 59:23-60:8).

- Mr. Ueda testified[29] that "the yeast strain Kaneka uses [] produce[s] coenzyme $Q_{11}$." Ueda Deposition Testimony (June 22, 2022) at 82:11-17.

- Mr. Kitamura testified that "I don't know what the timing was, but I was aware that there was CoQ9 and CoQ11 contained in Kaneka's Q10." Kitamura Deposition Testimony (April 21, 2025) at 66:1-67:25.

- U.S. Patent Application No. 2007/0258967 (CoCrystal_0000610) (which shared named inventors with the '080 Patent (namely, Takahiro Ueda and Shiro Kitamura)) at [0002] states that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme

---

[28] I understand that this deposition testimony was taken in different litigation that did not involve Cocrystal, but the context of this deposition does not affect its content or my understanding of it.
[29] I understand that this deposition testimony was taken in different litigation that did not involve Cocrystal, but the context of this deposition does not affect its content or my understanding of it.

$Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein."

- Kaneka Q10 is formed by yeast fermentation, just like one of the "aforementioned" processes referred to by U.S. Patent Application No. 2007/0258967, and thus is indicated by this statement to contain reduced coenzyme $Q_{11}$.

- My own expertise and knowledge indicates that the process by which yeast creates $CoQ_{10}$ is not a perfect one, and that at least some $CoQ_9$ and $CoQ_{11}$ will be inherently created. The tail portion of $CoQ_{10}$ is made by an enzyme called prenyl diphosphate synthase that takes a molecule called isopentenyl pyrophosphate (IPP) and connects several of them together into a chain, similar to adding beads to a necklace. The enzyme used to make $CoQ_{10}$ mostly adds "beads" to the "necklace" until it is 10 beads long. However, just like a person making a necklace (or rather, billions of necklaces), occasionally the enzyme gets the count wrong and misses a "bead" or adds an extra "bead" and therefore inevitably makes a small amount of $CoQ_9$ and $CoQ_{11}$. Another way to say this is that the enzyme is not always perfect and will make errors. Moreover, mutations sometimes occur in the genes that encode enzymes. Mutations can occur in the gene for prenyl diphosphate synthase that can make it even more prone to make different chain lengths of CoQ such as $CoQ_{11}$. *See* Rey-Ting Guo et al., *A Molecular Rule for Chain Elongation Catalyzed by Octaprenyl Pyrophosphate Synthase and Its Structure-Based Engineering to Produce Unprecedented Long Chain trans-Prenyl Products*, (Biochemistry 2004, 43, 7678 – 7686). Thus, small amounts of $CoQ_9$ and $CoQ_{11}$ would inherently occur in a yeast fermentation.

124. Next, regarding the presence of reduced $Q_{11}$ in the resulting composition created by following the process of the '040 Application, which satisfies claim elements [5.b] and [15.c], this is shown by at least the following evidence:

- The '080 Patent itself confirms that a "method of reducing oxidized coenzyme $Q_{10}$ containing oxidized coenzyme $Q_9$ and/or oxidized coenzyme $Q_{11}$ can be performed according to the method described in WO 03/06408 and the like." *See* '080 Patent at 5:64-67. This will apply to reduction of Kaneka Q10. Both the method invoked by the '080 Patent (that is described in WO 03/06408) and Kaneka's Kaneka QH production process (*see* KAN0012163 at -170 ) rely upon ethanol as a solvent and L-ascorbic acid as a reducing agent, as shown by the '040 Application at [0042]-[0045] (ethanol is "most preferred" as the solvent) and [0059], [0065]-[0066] (L-ascorbic acid is "most preferred" as a reducing agent), [0068] (ascorbic acid can be used in combination with an alcohol); *see also* WO 03/06408 (certified translation produced at CoCrystal_0010813 - 851) at 8:23-9:18,

11:5-14, and 12:11-13:8 (same disclosures). Thus, the '080 Patent confirms the fact that Kaneka's Kaneka QH production process will reduce oxidized coenzyme $Q_{11}$ alongside oxidized coenzyme $Q_{10}$.

- G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247 (CoCrystal_0000448) ("Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…").

- Mr. Kitamura, a named inventor of the '080 Patent, testified that "I can speculate that if an oxidized form of Q10 is reduced to a reduced form of Q10, then oxidized Q9 would similarly be reduced to reduced Q9" and that "oxidized Q11 [would] similarly be reduced to reduced Q11." Kitamura Deposition Testimony (April 21, 2025) at 62:18-63:4.

- U.S. Patent Application No. 2007/0258967 (CoCrystal_0000610) (which shared named inventors with the '080 Patent (namely, Takahiro Ueda and Shiro Kitamura)) at [0002] states that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein."

- Kaneka's September 13, 2006 specification for Kaneka QH notes in its "Test Methods" that "R9, RY, U, and R11 are Related Impurities of Ubiquinol." *See* KAN0012954 at -959.

- My own experience and knowledge indicates that the $CoQ_{11}$ in a starting composition will be reduced alongside the $CoQ_{10}$ in the same reaction, such as with L-ascorbic acid and $LiAlH_4$, two well-known reducing agents taught by the '040 Application. *See* '040 Application at [0059] and [0065].

125. Thus, all claim elements of claims 5 and 15 of the '080 Patent are met by practicing the '040 Application with the obvious-to-try starting composition of Kaneka Q10.

**b) Obviousness Factor 3 (the level of ordinary skill in the pertinent art)**

126. Next I have considered the level of skill of a POSITA and whether a POSITA would have been able to implement this proposed combination of the teachings of the '040 Application using Kaneka Q10.

127. Anyone who is able to implement the alleged invention of the '080 Patent (as I understand a POSITA must be able to do by definition) would also be able to implement the teachings of the '040 Application using Kaneka Q10, which would have been a straightforward and commercially available starting composition for use in the process described by the '040 Application. Indeed, the '080 Patent does not describe a separate reduction reaction, but merely refers readers to WO 03/06408 (which corresponds to the '040 Application) as teaching the requisite reduction process. *See* '080 Patent at 5:64-67 (a "method of reducing oxidized coenzyme $Q_{10}$ containing oxidized coenzyme $Q_9$ and/or oxidized coenzyme $Q_{11}$ can be performed according to the method described in WO 03/06408 and the like"). Thus, the teachings of the '040 Application and the '080 Patent (which also does not specify a required source of oxidized coenzyme $Q_{10}$) with regard to the reduction reaction are essentially the same. A POSITA who could implement one could readily implement the other.

128. Thus, the level of ordinary skill in the pertinent art supports my obviousness opinion.

**c) Obviousness Factor 4 (secondary considerations, if any)**

129. Finally, I understand that certain categories of evidence (referred to as "secondary considerations of non-obviousness") may be relied on as evidence that could indicate that a certain invention was not obvious at the time that the patent application was filed, although I also understand that even strong secondary considerations of non-obviousness will not overcome a

strong case for obviousness made on the basis of prior art. Examples of secondary considerations of non-obviousness are things that might tend to show that an invention was not actually obvious at the time a patent was filed, such as commercial success of the patented invention; fulfillment by the patented invention of a long felt need in the art; industry failure to solve the problems solved by the patented invention; unexpected results; skepticism of the patented invention; copying of the patented invention by others; and/or industry, academic or other tributes or accolades for the patented invention. I understand that any secondary consideration of non-obviousness must have a demonstrated "nexus" to the claimed invention—for example, commercial success must be due to the benefits of the invention and not, say, lower prices or benefits unrelated to the invention.

130. I understand that Kaneka has argued that a long list of documents[30] supposedly supports "the commercial success of Kaneka's QH product and Kaneka's market position; attempts by others in the industry, including Defendants, to produce ubiquinol products that are more stable; efforts by others, including Defendants, to copy and infringe upon the '080 Patent; and studies and literature that support the benefits of Kaneka's QH, a ubiquinol, over prior ubiquinone products." *See* Kaneka's Supplemental Response to Interrogatory No. 6 (April 14, 2025).

[30] These documents are KAN0002797; KAN0012531; KAN0012536; KAN0012537; KAN0012625; KAN0012678; KAN0012724; KAN0012727; KAN0012551; KAN0012553; KAN0012616; KAN0012617; KAN0012888; KAN0012910; KAN0013100; KAN0013149; KAN0013199; KAN0013257; KAN0013302; KAN0013564; KAN0013683; KAN0013696; KAN0147142; KAN0147159; KAN0147176; KAN0147193; KAN0147210; KAN0147229; KAN0147248; KAN0147267; KAN0147290; KAN0147322; KAN0147354; KAN0147360; KAN0147362; KAN0147367; KAN0147369; KAN0147371; KAN0147372; KAN0147373; KAN0147374; KAN0147376; KAN0147378; KAN0147379; KAN0147380; KAN0147380; KAN0147381; KAN0147383; KAN0147389; KAN0147390; KAN0147391; KAN0147392; KAN0147419; KAN0147458; KAN0147459; KAN0147461; KAN0147463; KAN0147464; KAN0147465; KAN0147467; KAN0147536; KAN0147538; KAN0147539; KAN0147541; KAN0147543; KAN0147548; KAN0147551; KAN0147559; KAN0147562; KAN0147565; KAN0147566; KAN0147567; KAN0020724l; and KAN0020725.

131. I have reviewed these documents and see no basis for any of these documents supporting secondary considerations of non-obviousness. This is largely because most make no mention whatsoever of (or have any apparent connection to) the alleged invention of the '080 Patent, namely stability benefits resulting from the co-presence of reduced $Q_9$ or reduced $Q_{11}$, and the very few that mention "stability" make no mention of the co-presence of reduced $Q_9$ or reduced $Q_{11}$ and are authored by Kaneka itself. Thus, there is no "nexus" between this alleged evidence and the specific claimed invention of claims 5 and 15 of the '080 Patent. Furthermore, none of these documents appear to indicate in any way "efforts by others, including Defendants, to copy and infringe upon the '080 Patent" or "attempts by others in the industry, including Defendants, to produce ubiquinol products that are more stable," as alleged by Kaneka. And Ms. Teresa Mansell, Kaneka's corporate representative, testified that she was unaware of Kaneka ever referring to $Q_{11}$ or $Q_9$ in selling or marketing ubiquinol. *See* Mansell Deposition Transcript (May 8, 2025) at 38:4-25; *see also* Martin Deposition Transcript (May 7, 2025) at 81:20-24 (no knowledge of Kaneka ever promoting the inclusion of $Q_9$ or $Q_{11}$ in its products).

132. Thus, I see no support in the cited documents for any secondary considerations of non-obviousness, and certainly none that would overcome the strong showing of obviousness according to the teachings of the '040 Application in view of commercially available Kaneka Q10 as I have described above.

### *3. Rebuttal to Anticipated Arguments by Kaneka*

133. The only rebuttal arguments that I am aware that Kaneka might make regarding obviousness are those relating to secondary considerations, which I have addressed above. I am not aware of any other rebuttal arguments to this ground of invalidity set forth by Kaneka. I reserve the right to respond if Kaneka or its expert makes any.

### E. Ground 5: Claims 5 and 15 are invalid for containing patent ineligible subject matter

#### *1. My Understanding of Legal Principles Applicable to Patent Eligibility*

134. I understand that naturally-occurring molecules or compositions which are products of nature are not patent eligible merely because they have been isolated or purified. Furthermore, I understand that if claims cover both eligible and ineligible subject matter, the claims are not patent eligible. Therefore, a patent claim which covers (at least in part) a naturally occurring molecule or composition, whether or not in isolated/purified form, or a process directed to making such a molecule or composition that also exists in nature, is invalid.

135. However, I also understand that an exception to this rule occurs where all embodiments of the claimed isolated/purified molecule or composition (or the process used to make it) has properties markedly different than its naturally occurring counterparts.

#### *2. My Opinion Regarding Patent Eligibility*

136. It is my opinion that claims 5 and 15 of the '080 Patent are invalid as being patent ineligible because they claim merely isolated/purified forms of a composition existing in nature (and a non-specific method of producing this composition, which also exists in nature), and the full scope of the claimed invention does not have properties that are markedly different than the naturally occurring counterparts.

##### a) Step 1: Does the claimed composition and process occur in nature

137. First, regarding the composition claimed in claim 5 (and which is the claimed result of the process in claim 15), the co-presence of reduced coenzyme $Q_{10}$ and reduced coenzyme $Q_{11}$

occurs in nature, albeit not in an isolated/purified form.[31] This can be seen in the following evidence:

- *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3) (CoCrystal_0000307) (strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5);

- *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985) (CoCrystal_0000388) (strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$);

- U.S. Patent Application No. 2007/0258967 (CoCrystal_0000610) (which shared named inventors with the '080 Patent (namely, Takahiro Ueda and Shiro Kitamura)) at [0002] states that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein."

- U.S. Patent Pub. No. 2006/0134085 (CoCrystal_0000589) at [0029] ("since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited.")

- U.S. Patent No. 3,549,668 at cols. 1-2 (CoCrystal_0000620) (disclosing that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves as well as a preparation method for these compounds).

- Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979) (CoCrystal_0000482) ("$CoQ_5$ through $CoQ_{10}$ are widely distributed in nature" and $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and $CoQ_{11}$ accumulated in Pseudomonas

[31] All other aspects of claim 5 either encompass an alternative embodiment, such as the alternative presence of coenzyme $Q_9$ in certain amounts, or else specify the degree to which the claimed composition is isolated or purified, and thus do not affect my analysis of patent ineligibility.

samples that were otherwise "a potent $CoQ_{10}$ producer on glucose medium").

- *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (CoCrystal_0000454) (p.4) (for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities").

- Mikael Turunen et al., *Metabolism and function of coenzyme Q*, Biochemica et Biophysica Acta 1660 (2004) at 176 (CoCrystal_0000487) ("The main species in rat is CoQ9 that varies from 17 µg/g tissue in lung to 202 µg/g in heart. About 10-20% of the total CoQ in rat has 10 isoprenes, CoQ10, with the exception of brain, spleen and intestines where 30-40% of the total is CoQ10. In human the main species is CoQ10 which ranges from 8 µg/g in lung to 114 µg/g in heart. Small amounts, 2-7% of CoQ9, are also found in all human tissues.").

- Mr. Ueda testified[32] that "natural yeasts produce reduced coenzyme Q10[,] coenzyme Q9[, and] coenzyme Q11." Ueda Deposition Testimony (June 22, 2022) at 82:18-24.

138. Second, regarding the method claimed in claim 15, reduction of coenzyme $Q_{10}$ and coenzyme $Q_{11}$ from their oxidized forms also occurs in nature, albeit again not necessarily in the specific concentrations claimed.[33] This can be seen in the following evidence (in addition to the evidence above for claim 5):

- Reduced coenzyme $Q_{10}$ and oxidized coenzyme $Q_{10}$ are mitochondrial electron transport system-constituting factors in cells of a living body of a human and deal with ATP production by working as electron carriers in oxidative phosphorylation reactions. *See* US Patent No. 7,910,340 (CoCrystal_0000629). The oxidized and reduced forms of coenzyme $Q_{10}$ exist in a constant redox equilibrium in living organisms, in which they are mutually reduced or oxidized. *Id.*

- The reduced form of $CoQ_{10}$ is naturally synthesized in the mitochondria when two electrons are transferred to the oxidized for of $CoQ_{10}$, one from

[32] I understand that this deposition testimony was taken in different litigation that did not involve Cocrystal, but the context of this deposition does not affect its content or my understanding of it.
[33] As with claim 5, all other aspects of claim 15 either encompass an alternative embodiment, such as the alternative presence of coenzyme $Q_9$, or else specify the degree to which the claimed composition is isolated or purified, and thus do not affect my analysis of patent eligibility.

the cofactor NADH and one from succinate. *See* Watanabe, *Mol. Genet. Metab. Rep.* at *1 (March 2023) ("Coenzyme $Q_{10}$ ($CoQ_{10}$) is involved in ATP production through electron transfer in the mitochondrial respiratory chain complex. $CoQ_{10}$ receives electrons from respiratory chain complex I and II to become the reduced form, and then transfers electrons at complex III to become the oxidized form.").

- In fact, "[m]any biological functions involving ubiquinone result, in part, because of the redox reactions to/from ubiquinol," and "[m]ost endogenous ubiquinone is reduced to, and exists as, bioreactive ubiquinol in the mitochondria, endoplasmic reticulum, lysosomes, peroxisomes, and plasma membranes of eukaryotic cells." *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (CoCrystal_0000454).

- Additionally, reduction of all coenzyme Q analogs present would be expected or obvious because of their similar molecular structures and physicochemical properties. *See* G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247 (CoCrystal_0000448) ("Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…").

139. Thus, at least part of the subject matter claimed by claims 5 and 15 encompasses naturally-occurring molecules or compositions which are products of nature (albeit isolated or purified) and a method that also exists in nature of producing such molecules or compositions, and these claims are therefore not patent eligible.

140. I have also considered a Delaware Court's analysis in separate litigation (this litigation did not include Cocrystal) of claim ineligibility of claims 5 and 15 of the '080 Patent (specifically, an order dated December 20, 2024 in *Kaneka Corporation v. Designs for Health, Inc. and American River Nutrition, LLC*, Case No. 21-209-WCB). While I do not agree with all aspects of this Order, as I will explain in my "rebuttal" section below (Section VII.E.3), I note that this Order (at pages 30-33) recognizes that "[i]t is undisputed that $CoQ_9$, $CoQ_{10}$, and $CoQ_{11}$ are

chemical compounds found in nature" and that, ultimately, "the relevant question is whether the claimed composition of CoQ homologs in claims 5 and 15 has significant utility over—and is thus markedly different from—any combination of CoQ homologs that occurs in nature." Because this Order recognizes that the pertinent question for patent eligibility of the '080 Patent is whether the claimed compositions are "markedly different" from naturally occurring "CoQ homologs," and not whether the claimed composition or process exists in nature at all (albeit not in an isolated/purified form), the Delaware Court's opinion supports my opinion that the composition in claim 5 claims an isolated/purified form of a composition existing in nature, and claim 15 claims a naturally occurring process, albeit involving isolated/purified forms of compositions existing in nature.

**b) Step 2: Does the precise claimed composition and process claimed in claims 5 and 15 have properties that are "markedly different" from the properties of naturally occurring counterparts**

141. My analysis of patent ineligibility does not end with Step 1. I also analyze whether the full scope of the claimed composition in claim 5 (or the method in claim 15) has properties that are "markedly different" than the naturally occurring counterparts. In short, the full scope of these claims does not have properties markedly different from naturally occurring counterparts.

142. ***First***, as I explained with regard to my enablement opinion in Section VII.A (and which I therefore incorporate into this opinion), aside from the purported test results shown by Kaneka, which were only replicated once in each of the reported studies (*e.g.*, these tests had an "N of one" with no statistical analysis, error bars, etc.) and were only done with one percentage of $CoQ_{11}$ rather than a representative range of percentages, the underlying science suggests that $CoQ_{11}$ (and $CoQ_9$) will have no effect on stability of $CoQ_{10}$. The oxidation at issue takes place at

the other end of the CoQ molecule from the chain of isoprene units, and stability would therefore not have any apparent relationship to the Q chain length of the molecules within a composition.

143. ***Second***, even in nature there is at least some co-presence of $CoQ_{11}$ with $CoQ_{10}$, as I have discussed in my Step 1 analysis. Thus, given that the claim language does not specify the amount of $CoQ_{11}$ that is required to be present in the claims, any stabilizing effect of $CoQ_{11}$ that is exhibited in nature would be the same as claimed in claims 5 and 15, because the ratios (which are not actually provided in the claims) of $CoQ_{11}$ to $CoQ_{10}$ would inherently overlap—the claims cover ratios of $CoQ_{11}$ that occur in nature. There is no reason that any stabilizing effects of $CoQ_{11}$ would be different in the claimed compositions (whatever the concentration of $CoQ_{10}$ is) than the effects in nature.

144. ***Third***, the claim scope encompasses quantities of $CoQ_{11}$ that would be too small to detect, which could not provide "markedly different" effects. As the quantities of $Q_{11}$ decrease, any stabilization effects (if there are even any to begin with) would decrease and eventually fall below a detection threshold. If any stabilization effects are below the threshold for detection, they cannot be said to have any utility. This is also a matter of science, as shown by the security guard analogy that I provided in the context of my enablement analysis, in which a single security guard with even a very large umbrella cannot protect the people of a billion worlds from sunburns.

145. Accordingly, there are no "markedly different" properties with regard to stability of at least the claimed embodiments that include just a trivial amount of $Q_{11}$ and no $Q_9$.

### *3. Rebuttal to Anticipated Arguments by Kaneka*

#### a) Prior Analysis by a Delaware Court

146. I understand that Kaneka may attempt to point to a Delaware Court's analysis in the unrelated *Kaneka Corporation v. Designs for Health, Inc. and American River Nutrition, LLC*

litigation of claim ineligibility of claims 5 and 15 of the '080 Patent. In the Delaware Court's Order, the Court found that the defendants in that case "have not carried their burden of establishing that the composition recited in claims 5 and 15 fails to provide significant utility over what exists in nature."

147. However, it appears that the Delaware Court was not presented with certain arguments and evidence, and thus it is my opinion that this ruling does not actually conflict with finding patent ineligibility in view of the different, unconsidered arguments and evidence that I discuss above. This is largely because it appears that the Delaware Court was not presented with, and did not consider, the law that claims covering both eligible and ineligible embodiments are ineligible, because it appears that it never considered a patent ineligibility argument directed _only_ to the embodiments of claims 5 and 15 that include requirements for $Q_{11}$ but not $Q_9$. This is a crucial point. The Delaware Court's reasoning for its ultimate opinion appears to be:

- The Defendants in that case conceded that claims 5 and 15 "recite certain proportions of reduced $CoQ_{10}$ and $CoQ_9$ and/or $CoQ_{11}$" (*see* Order at 30); and
- "the defendants do not point to any testimony or exhibit establishing that the combinations of CoQ homologs that occur in nature have the same benefit of retaining CoQ10 in its reduced form and preventing oxidation" (*see* Order at 34-35). The Delaware Court specifically noted that "only evidence that the defendants cite to establish that 'claims 5 and 15 fail to provide significant utility' is Dr. Myerson's testimony regarding Figures 1 and 2 of the '080 patent" (*see* Order at 35).

There is no evidence that the Delaware Court considered the claim scope of just the $Q_{11}$-related claim embodiments, or evidence (or lack thereof) concerning utility of $Q_{11}$. In fact, any utility (or lack thereof) of specifically the presence of $Q_{11}$ is not addressed at all in the Delaware Court's order. This part of the claim scope appears to be entirely unconsidered.

148. When framed in the correct manner, whereby only the claimed embodiments that include requirements for $Q_{11}$ but not $Q_9$ are considered (because I understand that the ineligibility

of these embodiments alone may confer ineligibility to the whole claims), the Court's opinion does not address certain key points.

149. ***First***, claims 5 and 15 do not "recite certain proportions" of $Q_{10}$ to $Q_{11}$. There is no requirement in the claims at all about the amount of $Q_{11}$ that is required to be present – by the plain and ordinary language of the claims, it may theoretically be just a single molecule. Numerical limitations on the claimed compositions that are recited for the $Q_{11}$ embodiments in the patent claims relate to just $Q_{10}$:

- the weight percentage of reduced coenzyme $Q_{10}$ that is contained in the final composition (claim elements [5.c] and [15.d]); and
- the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ that is contained in the final composition (claim elements [5.d] and [and 15.e]).

Neither of these numerical limitations impose any requirement on the amount of $Q_{11}$ relative to $Q_{10}$. The amount of $Q_{11}$ in the claimed composition could be as low as one molecule or as high as 99.99% (such that there could still be .01 wt % of reduced $Q_{10}$, as recited in the claims). This is practically every ratio possible. There is thus no "certain proportion" of $Q_{10}$ to $Q_{11}$ set forth in the claims.

150. ***Second***, the Delaware Court's analysis of utility was based on evidence of the supposed utility for purposes of stability of the presence of $Q_9$, not $Q_{11}$. Any utility (or lack thereof) deriving from $Q_{11}$ does not appear to have been considered. The Court considered (and credited) (1) testimony from Kaneka's witnesses Dr. Funahashi and Dr. Myerson about the claimed compositions generally (*see* Order at 34-35), but this testimony did not concern the presence of $Q_{11}$ specifically; and (2) "Table 1 in the '080 patent [which] indicated the results of a stability test," but this table (and the specification in its entirety) does not test or concern the stability of $Q_{11}$, just $Q_9$, as I have explained in Section VII.A.2 in my Report (concerning lack of enablement).

151. Thus, because the question of whether or not the claims require a particular ratio of $Q_{10}$ to $Q_{11}$ was not considered, and because evidence of utility (or not) relating to $Q_{11}$ was not considered, the Delaware Court's opinion does not address the arguments and evidence for patent ineligibility that I have presented above. To the extent that Kaneka or its expert makes the same arguments, they will also be inapplicable to my opinions.

**b) 2008-era Testing of Stability by $Q_{11}$**

152. I understand that Kaneka may also point to testing it conducted in 2008 concerning the supposedly stabilizing properties of $Q_{11}$ (set forth at KAN0000539-540 and KAN00001341). But this testing is insufficient to show the utility of all claimed embodiments, and specifically those embodiments that contain just a trivial amount of $Q_{11}$.

153. First, this testing is of dubious quality, as these tests were only replicated once in each of the reported studies (*e.g.*, these tests had an "N of one" with no statistical analysis, error bars, etc.) and were only done with one percentage of $CoQ_{11}$ rather than a representative range of percentages.

154. But second, this testing involved just one amount of $Q_{11}$ (1% by weight) and does not concern lower amounts of $Q_{11}$ or even allow extrapolation of its results into lower amounts of $Q_{11}$, and thus is inapplicable to show any utility of embodiments with just trivial amounts of $Q_{11}$ (which are included within the full scope of the claims). As I discuss in Section VII.A.2 (concerning enablement), the evidence shows that the presence of $Q_{11}$ will not have a stabilizing effect, but even if there is one, it will not be exhibited if there is just a trivial amount of $Q_{11}$. Thus, the 2008-era testing does not show utility for the full scope of the claims.

## VIII. DETAILED DISCUSSION OF MY INEQUITABLE CONDUCT OPINIONS FOR THE '080 PATENT

### *1. My Understanding of Legal Principles Applicable to Inequitable Conduct*

155. I understand that inequitable conduct in the prosecution of a patent has occurred when (1) a patent applicant misrepresented or omitted material information when prosecuting a later-issued patent, and (2) the patent applicant did so with the specific intent to deceive the U.S. Patent & Trademark Office.

156. I understand that information is considered material for purposes of inequitable conduct if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. I understand that in examining a patent, a patent examiner is supposed to consider all grounds of invalidity and eligibility, including the ones on which I have opined in this report.

### *2. My Opinion Regarding Inequitable Conduct*

157. ***First***, I wish to be clear that I **am not** offering an opinion about whether Kaneka or any inventor of the '080 Patent withheld information with a specific intent to deceive the U.S. Patent & Trademark Office (the second part of the inequitable conduct analysis described above). I have no expert knowledge about the intent of Kaneka or the inventors of the '080 Patent, and accordingly I will not offer judgment even based on the evidence that I have seen.

158. ***Second***, I wish to be equally clear that I **am** providing an opinion about whether certain information would have been material to the validity analysis undertaken by the U.S. Patent & Trademark Office (in other words, I will opine on just the first part of the inequitable conduct inquiry). In my analysis, I will explain the importance of certain evidence to the invalidity grounds that I have described above.

159. I have been asked to opine on the materiality of only the following information which was not disclosed during prosecution of the '080 Patent (as can be seen in the prosecution history of the '080 Patent):

- The USP standard for Ubidecarenone listing $Q_{11}$ as an "impurit[y]" of oxidized $Q_{10}$.
- Information concerning the 2006 sales of Kaneka QH combined with information that the starting composition in the creation of Kaneka QH (Kaneka Q10) included coenzyme $Q_{11}$ as an impurity.
- Knowledge of Mr. Ueda and Mr. Kitamura by at least the date that the '080 Patent application was filed that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein." *See* CoCrystal_0000610 (U.S. Patent Application No. 2007/0258967 at [0002]).
- Information that as of the filing date of the application for the '080 Patent, the inventors had not tested any stabilizing effects of the co-presence of reduced coenzyme $Q_{11}$ upon reduced coenzyme $Q_{10}$.

160. It is my opinion that all of the above information (all of which was known to Kaneka and none of which has any evidence of being considered during examination of the '080 Patent) would have been material to validity during the prosecution of claims 5 and 15 of the '080 Patent application. I address the independent materiality of each of these categories of information below.

**a) Materiality of the USP statement of known impurities of $CoQ_{10}$**

161. There can be no reasonable dispute that Kaneka as an entity, as well as at least Mr. Ueda as an individual inventor, was aware of the USP standard for Ubidecarenone (oxidized $CoQ_{10}$) prior to the filing of the '080 Patent. Kaneka's 2005 NDI application to the FDA for Kaneka QH includes reference to this USP standard. *See* KAN0012163 at -171; *see also* KAN0031666 – 669 (the July 21, 2004 specification for Kaneka Q10 that references the USP standard for Ubidcarenone, and notes coenzymes $Q_7$, $Q_8$, $Q_9$, and $Q_{11}$ as "related impurities"). Mr. Ueda testified

that he became aware of "CoQ11 as a possible impurity in either Ubiquinol or Ubiquinone [] when I looked at the USP" in 2004. Ueda Deposition Transcript (April 18, 2025) at 108:5-109:12.

162. That the United States Pharmacopeia (which publishes standards recognized as official by the federal government and that are enforceable by the FDA) lists $Q_{11}$ as an "impurit[y]" of oxidized $Q_{10}$ (*see* CoCrystal_0000693 at -697) would have been extremely material information during examination—claims 5 and 15 should not have been issued had this information been known.

163. As I have discussed above in the context of anticipation in view of the '040 Application, the '080 Patent states that "reduced coenzyme $Q_{10}$ having a high proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ can be efficiently obtained by the method described in WO 03/06408," and that "[t]he method [claimed in the '080 Patent] of reducing oxidized coenzyme $Q_{10}$ containing oxidized coenzyme $Q_9$ and/or oxidized coenzyme $Q_{11}$ can be performed according to the method described in WO 03/06408 and the like." '080 Patent at 5:13-17, 5:64-67. The difference between these disclosures about what was already known in the prior art and the claims of the '080 Patent is the presence of $CoQ_{11}$ (or $CoQ_9$ above a certain amount).

164. But the USP standard for Ubidecarenone states that $CoQ_{11}$ (as well as $CoQ_9$) is an impurity that occurs in oxidized coenzyme $Q_{10}$. CoCrystal_0000693 at -697. Thus, by the '080 Patent's own admission, reducing oxidized coenzyme $Q_{10}$, ***which already includes oxidized coenzyme*** $Q_{11}$, "according to the method described in WO 03/06408 and the like" results in the process and resulting composition claimed by the '080 Patent. '080 Patent at 5:13-17, 5:64-67.

165. Thus, the reference in the USP to the presence of coenzyme $Q_{11}$ as a known impurity of coenzyme $Q_{10}$ is information extremely material to validity, was known by Kaneka and at least Mr. Ueda, and should have been considered during examination of the '080 Patent.

**b) Materiality of the 2006 sales of Kaneka QH combined with information that Kaneka's starting composition included coenzyme $Q_{11}$ as an impurity**

166. Kaneka knew that it had sold Kaneka QH in the United States prior to April 28, 2006, one year before the application for the '080 Patent was filed. For starters, it had made Kaneka QH sales to Enzymatic Therapy in February 2006 (KAN0022585 to -594), and these sales records were kept "among the Kaneka North America sales documents" (Funahashi Deposition Testimony (April 25, 2025) at 67:11-19). Furthermore, Kaneka Corporation's General Manager of the Intellectual Property Department Eiichi Muramatsu declared to the U.S. Patent and Trademark Office on December 8, 2006 that 'Kaneka QH' was first used on the goods specified [three 12,000 capsule drums from Lot No. FB31-0002Z] in commerce between the U.S. and Japan on March 1, 2006." KAN0047697 at -750. And even Mr. Ueda, named inventor of the '080 Patent, stated that in 2006, he "knew" or "had heard that Ubiquinol was going to be put on sale and so that patent [the '080 Patent] had been given priority," and he was aware that "if you waited more than a year to file a patent after a product was on sale, that could invalidate the patent." *See* Ueda Deposition Testimony (April 18, 2025) at 111:8-23.

167. There can also be no reasonable dispute that Kaneka and its inventors also knew that the starting composition in the manufacture of Kaneka QH was Kaneka Q10—this information was disclosed to the FDA in Kaneka's 2005 NDI Application. *See* KAN0012163 at -170; *see also* Ueda Deposition Testimony (April 18, 2025) at 88:6-12 ("you're reducing the Q10 when you make

QH"); Kitamura Deposition Testimony (April 21, 2025) at 29:17-30:3 ("we would use an oxidized Coenzyme Q10 as a raw material and then reduce that to create a reduced Coenzyme Q10").

168. Kaneka and its inventors also knew that Kaneka Q10, and even Kaneka QH, contained $CoQ_{11}$ as an impurity. Mr. Ueda and Mr. Kitamura filed a second patent application *on the same day that they filed the '080 Patent application*, in which they stated that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein." *See* CoCrystal_0000610 (U.S. Patent Application No. 2007/0258967) at [0002]. This information was not provided for the examination of the '080 Patent. Furthermore, several Kaneka employees (Kenjiro Nakamura, Kenji Fujii, and Naoki Fukutomi) published the Ikematsu article that I have described above, in which it was determined that "[t]he content of CoQ10 in Kaneka Q10 is over 98%, with CoQ9 and CoQ11 as major impurities." CoCrystal_0008258 at -259. Kaneka would have known of this information through its employees, and the inventors of the '080 Patent knew at least Mr. Fujii and Mr. Fukutomi. *See* Ueda Deposition Transcript (April 18, 2025) at 11:12-12:7 (Mr. Fujii, an author of this 2005 article, informed Mr. Ueda "at the point that I joined in the manufacturing research" in 2006 about the "research into those biological functions" of $CoQ_{10}$), 106:2-8 (Mr. Ueda also knew Mr. Fukutomi); Kubo Deposition Transcript (April 22, 2025) at 11:5-20 (Mr. Kubo worked with Mr. Fujii in researching the effects of reduced $CoQ_{10}$ on anti-aging), 39:17-40:3 (Mr. Kubo also knew Mr. Fukutomi); Kitamura Deposition Transcript (April 21, 2025) at 65:7-25 (Mr. Kitamura knew Mr. Fujii and Mr. Fukutomi). Kaneka also included the Ikematsu article in a July 22, 2008 GRAS application to the FDA (KAN0149306 at -376, -384), well before the '080 Patent issued on November 8, 2010. Mr. Kitamura also testified that "I don't

know what the timing was, but I was aware that there was CoQ9 and CoQ11 contained in Kaneka's Q10." Kitamura Deposition Testimony (April 21, 2025) at 66:1-67:25. And finally, Mr. Ueda testified that at a minimum, he knew "at the time this application was submitted" that "depending on the manufacturing method, [reduced $CoQ_{11}$] could be included or it might not be included" with reduced $CoQ_{10}$. Ueda Deposition Testimony (April 18, 2025) at 101:9-16.

169. This information, in combination, would have been extremely material information during examination—claims 5 and 15 should not have been issued had this information been known.

170. As I have discussed above in the context of the on-sale bar, Kaneka QH and Kaneka's process to manufacture it meet every claim limitation of claims 5 and 15 of the '080 Patent. Had the examiner known that (1) Kaneka QH was sold more than one year before the application for the '080 Patent was filed; (2) Kaneka QH was manufactured by reducing Kaneka Q10 according to the process disclosed to the FDA in 2005; and (3) Kaneka Q10 included $CoQ_{11}$, claims 5 and 15 of the '080 Patent would not have issued because of the on-sale bar.

171. This information, all of which was known to Kaneka and its inventors, should have been considered during examination of the '080 Patent.

**c) Materiality of information that when coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance, reduced coenzyme $Q_{11}$ is an impurity**

172. There can be no dispute that Mr. Ueda and Mr. Kitamura knew at the time that they filed the '080 Patent that reduced coenzyme $Q_{11}$ is an impurity of coenzyme $Q_{10}$ when produced by fermentation or extraction from a naturally occurring substance. Mr. Ueda and Mr. Kitamura filed a second patent application ***on the same day that they filed the '080 Patent application***, in which they stated that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis,

fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein." *See* CoCrystal_0000610 (U.S. Patent Application No. 2007/0258967 at [0002]). The "aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like" refers to the prior paragraph's disclosure that "It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)." Moreover, Kaneka's September 13, 2006 specification for Kaneka QH notes in its "Test Methods" that "R9, RY, U, and R11 are Related Impurities of Ubiquinol." *See* KAN0012954 at -959.

173. The '080 Patent makes substantively the same disclosure regarding JP-A-10-109933: "It is known that reduced coenzyme Q10 can be obtained, for example, by a method comprising producing coenzyme $Q_{10}$ by a conventionally known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like, and concentrating a reduced coenzyme $Q_{10}$ fraction in an eluate from chromatography and the like (see JP-A-10-109933)." *See* '080 Patent at 1:6-12. But the second part of the information provided in the '967 Application (that reduced coenzyme $Q_{11}$ is a naturally occurring impurity of coenzyme $Q_{10}$ when produced by fermentation or extraction from a naturally occurring substance) was not provided in the '080 Patent's application and would have been extremely material information during examination—claims 5 and 15 should not have been issued had this information been known.

174. As I have discussed above in the context of anticipation in view of the '040 Application, the '080 Patent states that "reduced coenzyme $Q_{10}$ having a high proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ can be efficiently obtained by

the method described in WO 03/06408," and that "[t]he method [claimed in the '080 Patent] of reducing oxidized coenzyme $Q_{10}$ containing oxidized coenzyme $Q_9$ and/or oxidized coenzyme $Q_{11}$ can be performed according to the method described in WO 03/06408 and the like." '080 Patent at 5:13-17, 5:64-67. The difference between these disclosures about what was already known in the prior art and the claims of the '080 Patent is the presence of $CoQ_{11}$.

175. The disclosure in the '967 Application that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein" (CoCrystal_0000610) establishes that $CoQ_{11}$ is an impurity contained in reduced coenzyme $Q_{10}$. Thus, by the '080 Patent's own admission, the prior art process ("the method described in WO 03/06408 and the like"), *already results in the co-presence of reduced coenzyme $Q_{11}$*. '080 Patent at 5:13-17, 5:64-67.

176. Thus, the production of reduced coenzyme $Q_{11}$ alongside reduced coenzyme $Q_{10}$ by prior art methods is information that was extremely material to validity, was known by Kaneka and at least Mr. Ueda and Mr. Kitamura, and should have been considered during examination of the '080 Patent.

**d) Materiality of lack of testing of any stabilizing effects of the co-presence of reduced coenzyme $Q_{11}$ upon reduced coenzyme $Q_{10}$**

177. The inventors of the '080 Patent knew that they had not performed, at the time the application for the patent was filed, any testing relating to stability provided by the co-presence of reduced $CoQ_{11}$ with reduced $CoQ_{10}$. As Kaneka and its inventors have admitted, no such testing existed. Mr. Ueda even confirmed that "I was aware, as of the time of the application in 2006, that we would not have data for the reduced form of Q11" and that "I was aware that the there was a

risk that in the application process in various countries [including the United States], we might be asked or there might be an issue with our not having that data, so to head that off, we were trying to get the data ahead of time." Ueda Deposition Testimony (April 18, 2025) at 112:25-113:10.

178. But this is not what the inventors told the examiner of the '080 Patent. Instead, the '080 Patent states the following:

> The present inventors have conducted intensive studies in an attempt to solve the above-mentioned problems and found that reduced coenzyme $Q_{10}$ can be stabilized by the co-presence of reduced coenzyme $Q_9$ and/or reduced coenzyme $Q_{11}$, which are analogs of reduced coenzyme $Q_{10}$.

'080 Patent at 2:36-40. Contrary to these statements, no such "intensive studies" had been performed relating to the co-presence of reduced $CoQ_{11}$ with reduced $CoQ_{10}$.

179. Further, as I have described above with respect to my opinions about enablement (which I incorporate herein), in the absence of testing showing stability caused by the co-presence of reduced $CoQ_{11}$ with reduced $CoQ_{10}$, a POSITA would not recognize any utility of the co-presence of reduced $CoQ_{11}$ with reduced $CoQ_{10}$, and the enablement standard for patentability would not have been met.

[redacted]

[redacted]

[redacted]

[redacted]

### *3. Rebuttal to Anticipated Arguments by Kaneka*

182. I am not aware of any rebuttal arguments to inequitable conduct set forth by Kaneka (other than those addressed in the context of invalidity, above). I reserve the right to respond if Kaneka or its expert makes any.

## IX. HYPOTHETICAL NON-INFRINGING ALTERNATIVE PRODUCT

183. I have been asked to opine on whether a $CoQ_{10}$ composition that contains less than 90 percent by weight of reduced $CoQ_{10}$ as a percentage of the total amount of $CoQ_{10}$ (*i.e.*, a composition where the ratio of reduced $CoQ_{10}$ to oxidized $CoQ_{10}$ is less than 9:1), or a process used to make such a composition, would infringe either claim 5 or 15 of the '080 Patent. In my opinion, it is clear that this composition and process would not infringe either claim 5 or 15. This is because claim 5 requires that "the proportion of reduced coenzyme $Q_{10}$ relative to the total

amount of coenzyme $Q_{10}$ is not less than 90 wt %," and claim 15 similarly requires that the composition created by the process has a "proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ [that] is not less than 90 wt %." Neither claim limitation would be met by such a hypothetical redesigned product/process.

184. While the total amount of $CoQ_{10}$ in a given capsule may hypothetically need to be slightly altered to provide a dosage with the same total amount of reduced $CoQ_{10}$ to a consumer as the current Cocrystal product,[35] I can think of no reasons why making such a hypothetical product with the modifications described in the preceding paragraph (namely, a slightly increased amount of oxidized $CoQ_{10}$ in proportion to reduced $CoQ_{10}$) would be technically difficult, and such a product would have the same ingredients as Cocrystal's current product, albeit in just a slightly different ratio.

## X. RESERVATION OF RIGHTS

185. In addition to the opinions and evidence expressed herein, I reserve the right to rebut any arguments made or evidence presented in response to this report. I also reserve the right to supplement this report based on further discovery produced in this case, or further investigation or analysis, to the extent that I am asked to do so.

186. At any evidentiary hearing/trial, I reserve the right to use graphic exhibits, demonstratives, live demonstrations using the accused products, or other visual aids to help illustrate the facts and opinions I have expressed herein.

[35] Per Kaneka's testing of Cocrystal's product in its Amended Complaint at Exhibit E, it appears that the current ratio of reduced $CoQ_{10}$ to oxidized $CoQ_{10}$ is approximately 80.34/5.97, or approximately 93.1% by weight reduced $CoQ_{10}$ as a percentage of the total amount of $CoQ_{10}$. Therefore, this proposed hypothetical modification—reducing the percentage of reduced $CoQ_{10}$ by about 3.1%—would be slight.

# EXHIBIT A

*Curriculum Vita*
Douglas C. Cameron, Ph.D.
Erie, Colorado
dccameron700@gmail.com

**Employment**

**Independent Consultant/Advisor, April 2020 – present.**
(See Section II for list of clients in my current role and also during previous work as a consultant/advisor.)
**U.S. China Green Fund, Beijing, China and Chicago, IL (now the Asia Green Fund), Senior Managing Director, July 2017 – March 2020.**
**National Renewable Energy Laboratory (NREL), Golden, CO, Consultant, January 2017 – June 2017.**
**First Green Partners, Minneapolis, MN, Co-president, Managing Director, 2011-present (no longer making new investments; fund will close when final portfolio company is sold).**
**Alberti Advisors, Minneapolis, MN, Managing Director, 2010-2016.**
(See Section II for list of clients in my current role and also during previous work as a consultant/advisor.)
**Piper Jaffray (now Piper Sandler), Minneapolis, MN, Managing Director and Chief Science Officer, 2008-2010.**
**Khosla Ventures, Menlo Park, CA, Chief Scientific Officer, 2006-2008.**
**Cargill, Minneapolis, MN, Director of Biotechnology, Chief Scientist, 1998-2006.**
(I managed a project on the microbial production of CoQ10 using strains of the bacterium, *Rhodobacter*, during this time.)
**University of Wisconsin, Madison, Department of Chemical Engineering (now Department of Chemical and Biological Engineering), Assistant, Associate, and Full Professor, 1986-2001 (was on leave-of-absence at Cargill, 1998-2001).**
**Advanced Harvesting Systems, Hillside, IL, Biochemical Engineer, 1979-1981.**
(Was in graduate school during the gap years.)

**List of Persons/Entities for whom I have advised and/or consulted**

**Corporate Boards**

Current/Recent
Arzeda
Biowish Technologies
Capra Bio
DMC Bio
Geltor
R2DIO
Switch Bioworks

U.S.-China Green Fund
none

First Green Partners

Monolith Materials
Rivertop Renewables
Trelys

Alberti Advisors
BioCee
Proterra
Renmatix
Sirrus Chemistry

Khosla Ventures
Coskata
Draths
Gevo
Kior
Lanzatech
LS9
Mascoma
Segetis

**Advisory Boards/Advising & Consulting**
Current/Recent
Apeel
Blue California/Sweegen/Steven Chen
Bluestem Bio
BP
Bunge
Conarium
CVictus
Echelon Ventures
ExoPolymers
First Bight Ventures
Fonterra
General Probiotics/AgThera
Google X
Joyn Bio
JM Huber/Kelco
MicroByre
Moija Bio
Nature’s Fynd
Novomer
Peak B
Plantible Foods
Prairie AquaTech
Prolific Machines
Sime Darby

Soul Brain
SynAppBio
Wild Microbes
Zymergen

<u>Alberti Advisors</u>
Abunda/Evolva
Allylix
Arzeda
BioAmber
Eastman Chemical
Evonik (advising related to the formation of their corporate ventures group)
Kiverdi
Warburg Pincus

<u>UW-Madison</u>
Biorenewal Technologies
Cargill
DuPont
Genencor
Small Potatoes

**Summary of work related to CoQ10 and other dietary supplements**

My only work on CoQ10 was when I was at Cargill. Several companies I have advised have worked on other nutritional supplements.

Abunda/Evolva (stevia derivatives; after I left they also did resveratrol)
Allylix (carotenoids)
Arzeda (stevia derivatives; general)
Blue California (stevia derivatives; broad general interest)
Capra Bio (retinol)
Cargill (CoQ10; general)
Conarium (melatonin)
Geltor (gelatin and proteins)
Evonik (board interest; I only advised on venture capital)

**<u>Education</u>**
Massachusetts Institute of Technology, Cambridge, Massachusetts, Ph.D., 1987, Biochemical Engineering.
Duke University, Durham, North Carolina, B.S.E., 1979, Biomedical Engineering.

**<u>Awards and Honors</u>**
National Academy of Engineering, Class of 2025.
Raphael Katzen Award, 2009.
Fellow, Class of 2008, American Society for the Advancement of Science (AAAS).

Featured profile, Nature Biotechnology, November 2007.
Fellow, Society of Industrial Microbiology, 2003.
College of Fellows, Class of 2001, American Institute of Medical and Biological Engineering (AIMBE).
Cargill Faculty Fellow, 1997.
DuPont Faculty Award, 1997.
Shell Faculty Fellow, 1988-1991.
Pfizer Biochemical Engineering Fellowship, 1981 & 1986.
Chicago Heart Association Research Fellowship, 1977.

**<u>Publications</u>**

Cameron, D.C. 2006. The roots of the Wang academic family tree. Biotechnol. Bioeng., 95(2), 218-219.
Zhu, M.M., P.D. Lawman and D. C. Cameron. 2002. Improving 1,3-Propanediol Production from Glycerol in a Metabolically Engineered *Escherichia coli* by Reducing Accumulation of *sn*-Glycerol-3-phosphate. Biotechnol. Prog.; 18: 694-699.
Zhu, M.M., F.A. Skraly and D.C. Cameron. 2001. Accumulation of methyglyoxal in anaerobically grown *Escherichia coli* and its detoxification by expression of the *Pseudomonas putida* glyoxalase I gene. Metabolic Engineering, 3: 218-225.
Altaras, N.E., M.R. Etzel and D.C. Cameron. 2001. Conversion of sugars to 1,2-propanediol by *Thermoanaerobacterium thermosaccharolyticum* HG-8. Biotechnol. Prog., 17:52-56.
Altaras, N.E. and D. Cameron. 2000. Enhanced production of R-1,2-propanediol by a metabolically engineered *Escherichia coli*. Biotechnol. Prog., 16:940-946.
Yu, W-C., P.J. Joyce, D.C. Cameron, B.H. McCown. 2000. Sucrose utilization during potato microtuber growth in bioreactors. Plant Cell Reports, 19(4): 407-413.
Altaras, N.E. and D.C. Cameron. 1999. Metabolic engineering of a 1,2-propanediol pathway in *Escherichia coli*. Appl. Environ. Microbiol., 65:1180-1185.
Cameron, D.C., N.E. Altaras, M.L. Hoffman, and A.J. Shaw. 1998. Metabolic engineering of propanediol pathways. Biotechnol. Prog., 14:116-125.
Sauer, U., D.C. Cameron, and J.E. Bailey. In 1998. Metabolic capacity *of Bacillus subtilis* for the production of purine nucleotides, riboflavin, and folic acid. Biotech. Bioeng., 59:227-238.
Skraly, F.A., B.L. Lytle, and D.C. Cameron. 1998. Construction and characterization of a 1,3-propanediol operon. Appl. Environ. Microbiol., 64:98-105.
Skraly, F.A. and D.C. Cameron. 1998. Purification and characterization of a *Bacillus licheniformis* phosphatase specific for D-alpha-glycerophosphate. Arch. Biochem. Biophys., 349:27-35.
Chaplen, F.W.R., W.E. Fahl, and D.C. Cameron. 1998. Evidence of high levels of methylglyoxal in cultured Chinese hamster ovary cells. PNAS, 95(10): 5533-5538.
Cameron, D.C. and F.W.R. Chaplen. 1997. Developments in metabolic engineering. Curr. Opin. Biotechnol., 8: 175-180.
Chaplen, F.W.R., W.E. Fahl, and D.C. Cameron. 1996. Effect of endogenously formed methylglyoxal on animal cells grown in culture. Cytotechnol., 22:33-42.
Chaplen, F.W.R., W.E. Fahl, and D.C. Cameron. 1996. Method for determination of free intracellular and extracellular methylglyoxal in animal cells grown in culture. Anal. Biochem., 238: 171-178.

Chaplen, F.W.R., W.E. Fahl, and D.C. Cameron. 1996. Detection of methylglyoxal as a degradation product of DNA and nucleic acid components treated with strong acid. Anal. Biochem., 236: 262-269.

Romich, M.S., D.C. Cameron, and M.R. Etzel. 1995. Three methods for large scale preservation of a microbial inoculum for bioremediation, in Bioaugementation for Site Remediation, R.E. Hinchee, J. Fredrickson and B.C. Alleman (eds.), Battelle Press, Columbus, MD.

Koob, M.D., A.J. Shaw, and D.C. Cameron. 1994. Minimizing the genome of *Escherichia coli*: motivation and strategy. Annals of the New York Academy of Sciences, 745: 1-3.

Cameron, D.C. and I.-T. Tong. 1993. Cellular and metabolic engineering: an overview. Appl. Biochem. Biotechnol., 38:105-140.

Wall, M.B., D.C. Cameron and E.N. Lightfoot. 1993. Biopulping process design and kinetics. Biotechnol. Adv., 11:645-662.

Flatt, J.H., J.M. Gonzalez, T.A. Cooper, D.E. Dogger, E.N. Lightfoot and D.C. Cameron. 1992. An anionic galactomannan polysaccharide gum from a newly-isolated lactose-utilizing bacterium: II. Fermentation kinetics and lactose transport. Biotechnol. Prog., 8:335-339.

Flatt, J.H., R.S. Hardin, J.M. Gonzalez, D.E. Dogger, E.N. Lightfoot and D.C. Cameron. 1992. An anionic galactomannan polysaccharide gum from a newly-isolated lactose-utilizing bacterium: I. Strain description and gum characterization. Biotechnol. Prog., 8:327-334.

Tong, I-T. and D.C. Cameron. 1992. Enhancement of 1,3-propanediol production by cofermentation in *Escherichia coli* expressing *Klebsiella pneumoniae dha* regulon genes. Appl. Biochem. Biotech., 34/35:149-159.

Malcata, F.X., and D.C. Cameron. 1992. Optimal design of a series of CSTR's performing reversible reactions catalyzed by soluble enzymes: a theoretical study. Biocatalysis, 5:233-248.

Tong, I.-T., H.H. Liao and D.C. Cameron. 1991. 1,3-propanediol production by *Escherichia coli* expressing genes from the *Klebsiella pneumoniae dha* regulon. Appl. Environ. Microbiol., 57(12):3541-3546.

Iuchi, S., D.C. Cameron and E.C.C. Lin. 1989. A second global regulator gene (*arcB*) mediating repression of enzymes in aerobic pathways of *Escherichia coli*. J. Bacteriol., 171(2):868-873.

Simon, E.S., G.M. Whitesides, D.C. Cameron, D. Weitz and C.L. Cooney. 1987. A combined microbial/chemical synthesis having high enantiomeric excess of (+)-(R)-methyloxirane. J. Org. Chem., 52:4042-4044.

Sanchez-Riera, F., D.C. Cameron and C.L. Cooney. 1987. Influence of environmental factors in the production of 1,2-propanediol by *Clostridium thermosaccharolyticum*. Biotechnol. Let., 9(7): 449-454.

Cameron, D.C. and C.L. Cooney. 1986. A novel fermentation: the production of R(-)-1,2-propanediol and acetol by *Clostridium thermosaccharolyticum*. Bio/Technology, 4:651-654.

**Issued U.S. Patents**

Cameron, D.C. et al. Polypeptides and biosynthetic pathways for the production of monatin and its precursors. U.S. Patent 9,034,610 B2, May 19, 2015.

Cameron, D.C. et al. Polypeptides and biosynthetic pathways for the production of monatin and its precursors. U.S. Patent 8,435,765 B2, May 7, 2013.

Cameron, D.C. et al. Polypeptides and biosynthetic pathways for the production of monatin and its precursors. U.S. Patent 8,435,765 B2, May 7, 2013.

Cameron, D.C. et al. Polypeptides and biosynthetic pathways for the production of monatin and its precursors. U.S. Patent 8,372,989 B2, February 12, 2013.

Cameron, D.C. et al. Production of Monatin and Monatin Precursors, U.S. Patent 8,206,955 B2, June 26, 2012.

Cameron, D.C. et al. Polypeptides and biosynthetic pathways for the production of monatin and its precursors. U.S. Patent 7,572,607, Aug. 11, 2009.

Cameron, D.C. and Patrick Suthers, Production of 3-hydroxypropionic acid in recombinant organisms, U.S. Patent 6,852,517, Feb. 8, 2005.

Cameron, D.C. et al. Microbial production of 1,2-propanediol from sugar, U.S. Patent 6,087,140 and U.S. Patent 6,303,352.

Cameron, D.C. and F.A. Skraly. Novel glycerol phosphatase with stereo-specific activity. U.S. Patent 5,733,749.

Hardin, R.S., J.H. Flatt and D.C. Cameron. Polysaccharide composition and process for preparing same. U.S. Patent 5,288,618.

Hardin, R.S., J.H. Flatt and D.C. Cameron. Galactomannan polysaccharide producing organism. U.S. Patent 5,130,249.