# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KANEKA CORPORATION<br><br>Plaintiff,<br><br>-against-<br><br>COCRYSTAL TECHNOLOGY (JIAXING) CO., LTD. (f/k/a SHANGHAI COCRYSTAL PHARMACEUTICAL TECHNOLOGY CO., LTD.) and COCRYSTAL HEALTH INDUSTRY (ZHEJIANG) CO., LTD.<br><br>Defendants. | Case No. 1:23-cv-07483-SJB |

**REBUTTAL EXPERT REPORT OF DR. ALLAN S. MYERSON REGARDING VALIDITY**

Signed: ______________________
Allan S. Myerson Ph.D.

Dated: June 23, 2025

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

# EXHIBIT LIST

| Exhibit | Description |
|---|---|
| Exhibit 1 | US Patent No. 7,829,080 |
| Exhibit 2 | Myerson CV |
| Exhibit 3 | Myerson Cases Last 4 years February 2025 |
| Exhibit 4 | List of Materials Considered |
| Exhibit 5 | '080 Patent Prosecution History |
| Exhibit 6 | CoCrystal0000556 (‘040 Patent) |
| Exhibit 7 | WO2008145071A1 - A method of fermentation production of coenzyme q10 |
| Exhibit 8 | Shukla et al., CoQ10 a super-vitamin (Article) |
| Exhibit 9 | Hajime Yoshia Production of Ubiquinone Q10 using Bacteria (Article) |
| Exhibit 10 | Dixson et al., Reinvestigation of Coenzyme Q10 isolation from Sporidiobolus Johnsonii |
| Exhibit 11 | US Patent No. 4,367,289 |
| Exhibit 12 | Nishida et al., CoQ10 production in Schizosaccharomyces |
| Exhibit 13 | Ranadive et al., Morphological and Molecular Differentiation |
| Exhibit 14 | Littarru et al., Coenzyme Q10 multiple benefits in one ingredient |
| Exhibit 15 | Lee et al., Cellular Factories for Coenzyme Q10 Production |
| Exhibit 16 | Ha et al., Controlling the sucrose concentration increases coenzyme q10 production in fed-batch culture of agrobacter |
| Exhibit 17 | Tian et al., Improvement of cultivation medium for enhanced production of coenzyme Q10 by photosynthetic Rhodospirillum rubrum |
| Exhibit 18 | US Patent No. 6,686,485 |
| Exhibit 19 | Pierrel et al., Recent advances in the metabolic pathways and microbial production of coenzyme Q |
| Exhibit 20 | Ehud Keinan and Doron Eren, Total Synthesis of Linear Polyprenoids 2. Improved Preparation of Aromatic Nucleus of Ubiquoinone |
| Exhibit 21 | Aberg et al., Distribution and Redox State of Ubiquinones in Rat and Human Tissues; KAN_0002118 |

| | |
|---|---|
| Exhibit 22 | Whistance et al. (1969-2), The Nature Intergeneric Distribution and Biosynthesis of Isoprenoid Quinones |
| Exhibit 23 | Kishikawa et al., A comparative Study on the Reduction Modes for Quinone to Determine Ubiquinone by HPLC with Luminol Chemiluminescence Detection Based on the Redox Reaction molecules-28-00096 |
| Exhibit 24 | U.S. Patent No. 7,910,340 |
| Exhibit 25 | Lester et al., (1959), The Isolation of Coenzyme Q from Azotobacter Vinelandii and Torula Utilis |
| Exhibit 26 | Ikeda et al., Isolation and Identification of Ubiquinone 10 from Cultured Cells of Tobacco |
| Exhibit 27 | US Patent No. 4,220,719 |
| Exhibit 28 | US Patent Application Publication No. 2007/0025976A1 |
| Exhibit 29 | Cao et al., Purification of coenzyme Q10 from fermentation extract: High-speed counter-current chromatography versus silica gel column chromatography (2006) |
| Exhibit 30 | US Patent No. 11,453,633 |
| Exhibit 31 | Podar et al., An Overview of Analytical methods for Quantitative Determination of Coenzyme Q10 in Foods, metabolites-13-00272 |
| Exhibit 32 | Okamoto et al., Determination of Reduced and Total Ubiquinones in Biological Materials by Liquid Chromatography with Electrochemical Detection (1988) |
| Exhibit 33 | Roginsky et al., Reduction of ubiquinone-1 by ascorbic acid is a catalytic and reversible process controlled by the concentration of molecular oxygen, 1996 |
| Exhibit 34 | US Patent Application Publication No. 2006/0246565A1 |
| Exhibit 35 | Rakusa et al., Stability of Reduced and Oxidized Coenzyme Q10 in Finished Products |
| Exhibit 36 | KAN0000539-40 |
| Exhibit 37 | CoCrystal_0000448 (Rousseau) |
| Exhibit 38 | CoCrystal_0000482 (Natori) |

| | |
|---|---|
| Exhibit 39 | CoCrystal0000402 (Lester and Crane: The Natural Occurrence of Coenzyme Q and Related Compounds) |
| Exhibit 40 | CoCrystal 0000688 (Isoprenoid Quinones of the Genus Legionella) |
| Exhibit 41 | Takahiro Ueda (Deposition Sections) |
| Exhibit 42 | Kubo Deposition Sections |
| Exhibit 43 | Kitamura Deposition Sections |
| Exhibit 44 | Lekli et al, Coenzyme Q9 Provides Cardioprotection after Converting into Coenzyme Q10 (2008) |
| Exhibit 45 | KAN0079890 |
| Exhibit 46 | KAN0079897 |
| Exhibit 47 | KAN0022592 |
| Exhibit 48 | KAN0022590 |
| Exhibit 49 | KAN002916 (Certificate of Analysis of FB31-0002) |
| Exhibit 50 | KAN0031970 (Shipping Documents and Analytical Data) |
| Exhibit 51 | KAN0147817 |
| Exhibit 52 | CoCrystal_0010768 (Machine translation) |
| Exhibit 53 | CoCrystal_008258 (Ikematsu et al) |
| Exhibit 54 | Joshua Garey Deposition Sections |
| Exhibit 55 | KAN0009852 (Ha et al.) |
| Exhibit 56 | Tests showing no CoQ11 |
| Exhibit 57 | CoCrystal_0000610 (the '967 Patent Application Publication) |
| Exhibit 58 | Teresa Mansell Deposition Sections |
| Exhibit 59 | KAN0022587 (ET PO) |
| Exhibit 60 | KAN0080434 (Batch Record) |
| Exhibit 61 | KAN0032513-611 (Records and Certificate of Analysis) |
| Exhibit 62 | KAN 147551 and 148057 |
| Exhibit 63 | CoCrystal_0000693 (USP) |
| Exhibit 64 | KAN0012954 (9.13 Spec) |
| Exhibit 65 | CoCrystal_0000454 (Safety Assessment) |
| Exhibit 66 | CoCrystal_0000714 ('235 Patent Application Publication) |
| Exhibit 67 | CoCrystal_0000516 ('043 Patent) |
| Exhibit 68 | CoCrystal_0000771 (WO386 Patent.T) |
| Exhibit 69 | CoCrystal_0000749 (CN007T) |
| Exhibit 70 | CoCrystal_0000742 (CN014T) |

| | |
|---|---|
| Exhibit 71 | KAN0009876 (Whistance - Biosynthesis of Ubiquinone) |
| Exhibit 72 | Whistance (Proceedings of the Biochemical Society, Isolation of Ubiquinone-11 and Ubiquinone-12 from Green Peppers) |
| Exhibit 73 | KAN0010082 (Deng et al.) |
| Exhibit 74 | KAN009881 (Lipshutz et al.) |
| Exhibit 75 | KAN0009826 (Rao et al.) |
| Exhibit 76 | Strazisar et al., Quantitative Determination of Coenzyme Q10 by LC and LC/MS-MS in Dairy Products |
| Exhibit 77 | Bao et al., A Simple and Accurate Method for the Determination of Related Substances in Coenzyme Q10 Soft Capsules |
| Exhibit 78 | KAN0148156 (Battino et al.) |
| Exhibit 79 | CoCrystal_0000307 (Urakami et al.) |
| Exhibit 80 | CoCrystal_0000388 (Gilbart et al.) |
| Exhibit 81 | CoCrystal_0000589 (‘085 Patent Application Publication) |
| Exhibit 82 | Dr. Iwao Funahashi Deposition Sections |
| Exhibit 83 | KAN0000539 up to 0149894 |
| Exhibit 84 | KAN0147354 |
| Exhibit 85 | KAN0147360 |
| Exhibit 86 | KAN0147367 |
| Exhibit 87 | KAN0147461 |
| Exhibit 88 | KNA Proft and Loss Statement for QH Department |
| Exhibit 89 | US Patent No. 8,052,993 |
| Exhibit 90 | US Patent No. 8,906,420 |
| Exhibit 91 | US Patent No. 10,639,309 |
| Exhibit 92 | ECF 249 - Court Order - Findings of Fact & Conclusions of Law (Kaneka v. Designs for Health, Inc. et al.) |
| Exhibit 93 | KAN0001341 |
| Exhibit 94 | Rice-Evans et al., Structure-Antioxidant Activity Relationships of Flavonoids and Phenolic Acids |
| Exhibit 95 | Natella et al., Benzoic and Cinnamic Acid Derivatives as Antioxidants: Structure-Activity Relation |
| Exhibit 96 | Cluis et al., Reprogramming Microbial Metabolic Pathways, Chapter 15, The Production of Coenzyme Q10 in Microorganisms |

| | |
|---|---|
| Exhibit 97 | KAN0012930-49 |
| Exhibit 98 | KAN0150267-91 |
| Exhibit 99 | KAN0012729 (Master Formula Sheet of FB31) |

# TABLE OF CONTENTS

**Page(s)**


I. INTRODUCTION ..... 1

II. QUALIFICATIONS AND EXPERIENCE ..... 2

III. MATERIALS CONSIDERED ..... 6

IV. EXHIBITS ..... 6

V. SUMMARY OF THE ASSERTED CLAIMS ..... 7

VI. SUMMARY OF OPINIONS ..... 9

VII. LEGAL STANDARDS ..... 13

- A. Presumption of Validity ..... 13
- B. Enablement ..... 14
- C. On-Sale Bar ..... 15
- D. Anticipation ..... 16
- E. Obviousness ..... 17
- F. Patent-Eligible Subject Matter ..... 19

VIII. CLAIM CONSTRUCTION ..... 20

IX. THE BACKGROUND OF THE ’080 PATENT ..... 21

- A. CoQ10 ..... 21
- B. Production of Oxidized Coenzyme $Q_{10}$ ..... 22
- C. Production of Reduced Coenzyme $Q_{10}$ ..... 28
- D. Kaneka’s Production Process of Oxidized and Reduced Coenzyme CoQ10 ..... 29
- E. File History of the ’080 Patent ..... 31
- F. Priority Date ..... 33

X. PERSON OF ORDINARY SKILL IN THE ART ..... 34

XI. THE ASSERTED CLAIMS MEET THE ENABLEMENT REQUIREMENT ..... 35

- A. The ’080 Patent Enables a POSA to Practice the Invention ..... 35
- B. A POSA Would Have No Reasonable Basis to Doubt the Stabilizing Effects of CoQ11 ..... 36

XII. THE ON SALE BAR DOES NOT INVALIDATE THE ASSERTED CLAIMS ..... 42

A. KNL Used FB01-0001 to Make the 2006 Softgels and Thus the Softgels Did Not Practice the Asserted Claims ..... 43

B. Changes to Manufacturing Process Used to Make Kaneka Q10 from 2004 Through the Present ..... 44

C. Dr. Cameron Relies on Speculation and Ignores Contrary Evidence to Support his Opinion that the 2006 Softgels Practiced the Invention ..... 45

1. Claim Limitation 15[a] ..... 45

2. Claim Limitation 5[b] and 15[c] ..... 52

3. Evidence Supporting Experimental Use ..... 54

XIII. THE ASSERTED CLAIMS ARE NOT ANTICIPATED ..... 55

A. The '040 Application Does Not Inherently Disclose the Asserted Claims of the '080 Patent ..... 56

1. The '040 Application ..... 56

2. The USP Standard for Ubidecarenone ..... 59

3. The '967 Application ..... 59

4. Kaneka's September 13, 2006 Specification for Kaneka QH ..... 60

5. "Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics," Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety Members, April 14, 2022 ..... 60

6. U.S. Patent Publication No. 2020/0087235 and U.S. Patent No. 11,773,043B2.. 61

7. WO2021036386A1 ..... 62

8. CN108084007B ..... 63

9. CN108047014B ..... 63

10. Mr. Kitamura's Testimony ..... 64

B. Dr. Cameron's Opinion that the '040 Application "Inherently" Disclose the Presence of CoQ11 Because of its "Inherent Presence" in Every Reduced CoQ10-Containing Sample Ignores Scientific Literature to the Contrary ..... 65

1. Whistance, G.R. & Threlfall, D.R., *Biosynthesis of Ubiquinone—A Search for Polyprenyl Phenol and Quinone Precursors*, Phytochemistry, 9, 355-359 (1969) ("Whistance") ..... 65

2. Deng et al., *Characterization of unknown impurities in Coenzyme Q10 using LC-MS and NMR*, Journal of Pharmaceutical and Biomedical Analysis, 175 (2019) ("Deng") ........ 67

3. Lipshutz et al., *A Short, Highly Efficient Synthesis of Coenzyme $Q_{10}$*, J. Am. Chem. Soc., 124, 14282-14282 (2002) ("Lipshutz") ........ 67

4. Rao et al., Simultaneous Separation and Determination of Coenzyme $Q_{10}$ and Its Process Related Impurities by NARP-HPLC and Atmospheric Pressure Chemical Ionization-Mass Spectrometry (APCI-MS), J. of Pharm. And Biomed. Anal. 47, 230-237, (2008) ("Rao") ........ 68

5. Ha et al., Controlling the sucrose concentration increases Coenzyme Q10 production in fed-batch culture of Agrobacterium tumefaciens, Applied Microbiology and Biotechnology, 76(1), 109-116, (2007) ("Ha") ........ 69

6. Strazisar et al., Quantitative determination of coenzyme Q10 by liquid chromatography and liquid chromatography/mass spectrometry in dairy products, Journal of AOAC International, 88(4), 1020-1027 (2005) ("Strazisar") ........ 70

7. Bao et al., A simple and accurate method for the determination of related substances in coenzyme Q10 soft capsules, Molecules, 24(9), 1767 (2019) ("Bao") ........ 71

8. Battino et al., *Natural distribution and occurrence of coenzyme Q homologues*, Membrane Biochemistry, 9, 179-190 (2009) ("Battino") ........ 72

9. Cluis et al., The Production of Coenzyme Q10 in Microorganisms, In X. Wang et al. (Eds.), Reprogramming Microbial Metabolic Pathways (pp. 303-326). Springer Science+Business Media Dordrecht. (Subcellular Biochemistry, Vol. 64) (2012) ("Cluis") ........ 73

C. Dr. Cameron Misinterprets the Additional References He Relies Upon; They Do Not Establish that Oxidized CoQ11 is Inherently Present in Every Oxidized CoQ10-Containing Composition ........ 74

1. Urakami ........ 74

2. Gilbart ........ 75

3. U.S. Patent Publication No. 2006/0134085 ........ 75

4. Natori, Y., & Nagasaki, T., *Formation of Coenzyme Q11 by Pseudomonas M16, a Mutant*, Agricultural and Biological Chemistry, 43(4), 797-801 (1979) ("Natori") ........ 76

5. The Ikematsu Article ........ 76

D. Dr. Cameron's Remaining Cited References Fail to Show Inherent Anticipation Due to the Fundamental Flaw That All the Cited References Do Not Infer or Conclude that CoQ11 is Contained in Every CoQ10-Containing Composition ................................ 77

XIV. NONE OF THE DR. CAMERON'S CITED PRIOR ART RENDERS THE ASSERTED CLAIMS UNPATENTABLE UNDER OBVIOUSNESS ................................................ 78

A. Factors 1 and 2 (Scope and Content of Prior Art and Differences Between Claims and Prior Art) ........................................................................................................ 78

1. Dr. Cameron's References Do Not Support His Conclusion............................... 78

B. Dr. Cameron Fails to Explain Why A POSA Would Be Motivated to Combine the '040 Application with Kaneka QH.................................................................... 82

2. Factor 4 (Secondary Considerations of Obviousness)......................................... 85

XV. THE ASSERTED CLAIMS OF THE '080 PATENT ARE DIRECTED TO PATENT-ELIGIBLE SUBJECT MATTER........................................................................ 87

A. Step 1: The Asserted Claims are Directed to Patent Eligible Subject Matter Including a Composition Containing a Relative Amount of Reduced CoQ10 Not Found Naturally, and a Method for Producing That Non-Natural Composition..................................... 87

B. Step 2: The Asserted Claims Are Directed to Compositions and Methods That Are "Markedly Different" From Those That Occur in Nature........................................... 89

XVI. DR. CAMERON'S OPINIONS REGARDING INEQUITABLE CONDUCT ARE INCORRECT ........................................................................................................ 91

XVII. DR. CAMERON'S OPINIONS REGARDING HYPOTHETICAL NON-INFRINGING ALTERNATIVE PRODUCT .................................................................. 92

XVIII. CONCLUSION ................................................................................................ 93

# I. INTRODUCTION

1. My name is Dr. Allan Myerson. I have been retained to testify as an expert in this case on behalf of Kaneka Corporation ("Kaneka").

2. As part of this engagement, I have been asked to provide my analyses and opinions concerning U.S. Patent No. 7,829,080 (the "'080 Patent," attached as **Exhibit 1**). Specifically, I have been asked to provide my analyses and opinions concerning the validity of claims 5 and 15 of the '080 Patent (the "Asserted Claims").

3. I am being compensated for my work on this case at my standard consulting rate of $900 per hour. No part of my compensation is contingent upon the outcome of this litigation. I have no other interests in this litigation or with any of the parties.

4. I expect to be called to provide expert testimony regarding my opinions formed based on my analyses of the issues considered in this report.

5. I may also discuss my own work and publications in the field and knowledge of the state of the art in the relevant time period. I reserve the right to modify or supplement my opinions, as well as the bases for my opinions, based on the nature and content of the documentation, proof, and other evidence or testimony that Defendants or their experts may present, or based on any additional discovery or other information provided to me or found by me in this matter. All of the opinions stated in this report are based on my current personal knowledge and professional judgment, and if called as a witness during the trial in this matter, I am prepared to testify competently about them. I reserve the right to use and rely on certain demonstratives to do so. I also reserve the right to amend and/or supplement this report should additional information or developments that may affect my opinions become available.

6. This report includes figures. All annotations to these figures follow and reflect my analyses and opinions.

7. The opinions expressed in this report are based on my own personal knowledge, education, training, experience, and the materials considered. To the extent that it is necessary for any aspect of my analysis, I have formed my opinions from the perspective of a person of ordinary skill in the art ("POSA").

8. This report is submitted in response to the Expert Report of Dr. Douglas Cameron Regarding Invalidity, Inequitable Conduct, and Non-Infringing Alternative Products of U.S. Patent No. 7,829,080 (the "Cameron Report") dated June 2, 2025.

## II. QUALIFICATIONS AND EXPERIENCE

9. My curriculum vitae ("CV") is attached as **Exhibit 2**, which includes a more detailed statement of my professional qualifications, including education, publications, honors and awards, professional activities, and other relevant experience. While I incorporate my CV by reference herein, below is a brief summary of my background, including exemplary experience relevant to this case.

10. I am a Professor of the Practice of Chemical Engineering at the Massachusetts Institute of Technology ("MIT").

11. I have more than 40 years of experience in the area of the study and development of chemical and pharmaceutical manufacturing processes. This experience includes the study of crystalline solid forms, industrial applications of crystallization, with extensive experience in pharmaceutical and chemical manufacturing processes.

12. I obtained my Bachelor of Science degree in Chemical Engineering from Columbia University in 1973. In 1977, I obtained my Ph.D. in Chemical Engineering from the University of Virginia.

13. In January 1977, I started my academic career as an Assistant Professor of Chemical Engineering at the University of Dayton, where I worked until August 1979.

14. From September 1979 to December 1984, I was a faculty member at the Georgia Institute of Technology in Atlanta, serving first as an Assistant Professor of Chemical Engineering and subsequently as an Associate Professor.

15. In January 1985, I joined the faculty of the Polytechnic University in Brooklyn, New York. While there, I served in various positions including as the Joseph and Violet J. Jacobs Professor of Chemical Engineering, Head of the Department of Chemical Engineering, Dean of the School of Chemical and Materials Science, and as Vice Provost for Research and Graduate Studies.

16. In January 2000, I moved to the Illinois Institute of Technology in Chicago ("IIT"). I started as Professor of Chemical Engineering and the Dean of the Armour College of Engineering and Science. I remained in that position until January 2003, when I became the Philip Danforth Armour Professor of Chemical Engineering. Between 2003 and 2008, I was also Provost and Senior Vice President at IIT.

17. In August 2010, I moved to my current position as Professor of the Practice in the Department of Chemical Engineering at MIT.

18. My current research focuses on crystallization from solution, industrial applications of crystallization, pharmaceutical manufacturing, and novel pharmaceutical dosage forms. My

research interests further include crystallization from solution with an emphasis on nucleation, polymorphism, and industrial applications of crystallization.[1]

19. Over the course of my career, I have supervised the Ph.D. dissertation of approximately fifty Ph.D. students, and I have supervised the research of approximately fifty post-doctoral research associates. I currently supervise a research group consisting of fifteen post-doctoral research associates and four PhD students. In the past two years, I have taught graduate level elective courses entitled "Crystallization Science and Technology" and "Pharmaceutical Engineering."

20. I have presented the results of my research at numerous national and international meetings.

21. I have published approximately 305 papers in refereed scientific journals. Many of those papers pertain to crystallization as well as pharmaceutical manufacturing.

22. I have taught short courses on crystallization (sponsored by the Center of Professional Advancement, the American Chemical Society, and MIT Continuing Education) in the U.S., Europe, and Singapore and have taught special crystallization courses at pharmaceutical and chemical companies in the U.S., Europe, India, and Japan. I have also consulted for major chemical and pharmaceutical companies in those same regions.

23. I have edited six books in the field of crystallization, including the Handbook of Industrial Crystallization (1st edition 1992, 2nd edition 2001, 3rd edition 2019).

24. My research accomplishments have been recognized by several awards. These include:

[1] https://cheme.mit.edu/profile/allan-s-myerson/

- The American Institute of Chemical Engineers ("AIChE") Separation Division, Clarence G. Gerhold award in 2015;
- The AIChE Process Development Division, Excellence in Process Development award in 2015; and
- The American Chemical Society award in Separation Science and Technology in 2008.

25. I have extensive experience over my career in using the various analytical techniques relevant to physical and chemical analysis of compounds and pharmaceutical formulations, including, among others, methods of x-ray powder diffraction, differential scanning calorimetry, thermogravimetric analysis, high-performance liquid chromatography ("HPLC") and Liquid Chromatography-Mass Spectrometry/Mass Spectrometry ("LC-MS/MS").

26. I have extensive experience in developing purification processes for products originally found in nature such as antibiotics. In addition, I was involved in the development of processes for the purification and crystallization of the compound Rebaudioside A ("Reb A") isolated from the Stevia plant and marketed by Cargill as the high sweetener Truvia. I am a named inventor on two patents involving Reb A purification and crystallization as well as one patent on another Stevia component known as Rebaudioside B.

27. I am a registered Professional Engineer in New York and in Ohio.

28. In the last four years, I served as an expert in and was deposed and/or testified in connection with the cases listed in **Exhibit 3**.

29. It is for at least these reasons that I am well qualified to opine on the materials covered in this report and to testify as one skilled in the art with respect to the subject matter of the '080 Patent.

## III. MATERIALS CONSIDERED

30. A list of materials I have considered in preparing this report is attached as **Exhibit 4.**

31. In particular, I reviewed the '080 Patent, including its claims, specification, and drawings. I also reviewed the file history of the '080 Patent (attached as **Exhibit 5**), including the prior art documents identified therein. I also reviewed, among other things, the prior art referenced and discussed in Defendants' Invalidity Contentions, the Cameron Report, and this report.

32. I cite to evidence in this report to assist in understanding the various bases used to support my conclusions. I do not intend for this report to contain an exhaustive citation of every piece of evidence that supports my opinions. Accordingly, I expressly reserve the right to affirm, update, or modify my opinions based on such other evidence as necessary.

33. To the extent necessary, I will supplement this report after the completion of any further deposition or after the receipt of any additional documents or materials produced in the future.

## IV. EXHIBITS

34. At any trial in this case, I may provide and rely on visual aids and demonstrative exhibits to demonstrate principles of biochemical engineering, separation processes, chemical plant design, microbial fermentation, chemical engineering unit operations, and the technologies that are the subject of the '080 Patent. In addition, I may provide and rely on such aids and exhibits to demonstrate the bases of my opinions. Examples of these visual aids and demonstrative exhibits may include, but are not limited to, claim charts, patent drawings, excerpts from patent specifications, file histories, interrogatory responses, deposition testimony, scientific literature and

excerpts, and deposition exhibits, as well as charts, models, diagrams, photographs, videos, and animated or computer-generated videos.

## V. SUMMARY OF THE ASSERTED CLAIMS

35. The invention disclosed in the '080 Patent "provides a method for stabilizing reduced coenzyme $Q_{10}$." **Exhibit 1** at Abstract. The invention disclosed in the '080 Patent "also provides a method of producing a reduced coenzyme $Q_{10}$-containing composition which includes the co-presence of reduced coenzyme $Q_{10}$ and reduced coenzyme $Q_9$ and/or reduced coenzyme $Q_{11}$." *Id.*

36. The Asserted Claims disclose a reduced coenzyme $CoQ_{10}$ ("CoQ10")-containing composition (claim 5) and a method for producing such composition (claim 15). Claim 5 discloses a reduced CoQ10 containing composition in which the total composition contains not less than 0.01 wt% of reduced CoQ10. In addition, the claim requires that the proportion of the reduced CoQ10, relative to the total amount of CoQ10, be not less than 90 wt%. The claim also requires the presence of either or both of reduced coenzyme Q9 ("CoQ9") and/or reduced coenzyme Q11 ("CoQ11"). The amount of reduced CoQ9 must be not less than 1.5% and not more than 99% relative to the reduced CoQ10.

37. Reduced CoQ10 can be stabilized by the copresence of reduced CoQ9 and/or reduced CoQ11. **Exhibit 1**, col. 2, ln. 36-40. Moreover, a composition containing reduced CoQ9 and reduced CoQ11 in combination with reduced CoQ10 shows higher absorption in terms of the total amount of CoQ10. *Id.* at col. 13, ln. 1-15. Therefore, when reduced CoQ9 and reduced CoQ11, contained in reduced CoQ10, are ingested, a greater effect of CoQ10 is exhibited as compared to a composition containing reduced CoQ10 alone. *Id.*, col. 4, ln. 51-53 and col. 13, ln. 10-15.

38. A composition containing the elements described above can be used for a food or pharmaceutical agent and, in so doing, will result in higher absorption in the human body of CoQ10 as a whole. *Id.*, col. 2, ln. 25-35 and col. 13, ln. 1-15.

39. A claim map for each of the Asserted Claims is below.

**Claim 5:**

| Claim Term | Claim Limitation |
|---|---|
| 5[preamble] | A reduced coenzyme $Q_{10}$-containing composition comprising |
| 5[a] | reduced coenzyme $Q_{10}$ and one or both of (a) and (b): (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and (b) reduced coenzyme $Q_{11}$ |
| 5[b] | wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and |
| 5[c] | wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt % |

**Claim 15**

| Claim Term | Claim Limitation |
|---|---|
| 15[preamble] | A method for producing a coenzyme $Q_{10}$-containing composition, which method comprises |
| 15[a] | providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, |
| 15[b] | and then reducing oxidized coenzyme $Q_{10}$ and reducing one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition |
| 15[c] | wherein the composition comprises reduced coenzyme $Q_{10}$ and one or both of (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$ and (b) reduced coenzyme $Q_{11}$, |
| 15[d] | wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and |
| 15[e] | wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt % |

## VI. SUMMARY OF OPINIONS

40. I have been informed that Defendants are asserting that the Asserted Claims are invalid because they: (i) lack enablement; (ii) were on-sale prior to '080 Patent's United States filing date; (iii) are inherently anticipated; (iv) are obvious (v) allegedly cover patent-ineligible material; (vi) are unenforceable due to inequitable conduct; and (vii) do not cover hypothetical non-infringing alternatives. In my opinion, each of Defendants' assertions are incorrect.

41. Dr. Cameron opines that the Asserted Claims are invalid pursuant to 35 U.S.C. § 112 because the Asserted Claims lack enablement because the disclosures of the '080 Patent provide no evidence of any stabilizing effects (or other benefits) of reduced CoQ11 on reduced CoQ10, and thus do not provide evidence of any utility of the entire scope of the inventions claimed in the Asserted Claims. Cameron Report at ¶¶ 37-60.

42. Dr. Cameron is incorrect. His enablement arguments fail because the '080 Patent specification provides sufficient guidance to enable a POSA to make and use the claimed invention without undue experimentation. The claimed invention has sufficient utility beyond stabilization, as the patent claims do not require stabilization as a claim limitation and the composition provides multiple benefits including increased bioavailability of CoQ10 and use as a safe pharmaceutical carrier for delivering other active ingredients. A POSA would understand that CoQ11 would have similar stabilizing effects to the demonstrated effects of structurally similar CoQ9, based on their identical reactive hydroquinone groups and well-established principles that molecules with the same functional groups exhibit similar antioxidant and protective properties.

43. Dr. Cameron also opines that the Asserted Claims are invalid pursuant to the on-sale bar under 35 U.S.C. § 102(b) because Kaneka allegedly sold "Kaneka QH Softgels" (the "QH Softgels") prior to April 27, 2006 (one year before the '080 Patent application filing date), and that

these products practiced the claimed invention. Dr. Cameron argues that the QH Softgels contained the required CoQ11 either through inherent presence or based on post-2006 testing results and admissions. Cameron Report at ¶¶ 63-95.

44. Dr. Cameron is incorrect. As set forth below, the on-sale bar was not triggered because the QH Softgels sold in February 2006 did not practice the claimed invention. Contemporary testing records show that the relevant batch (FB01-0001) contained only about 0.003% of reduced CoQ9 relative to reduced CoQ10—far below the required 1.5 wt% minimum—and contained no CoQ11. Dr. Cameron's arguments rely impermissibly on post-2006 evidence, and speculation.

45. Dr. Cameron also opines that the Asserted Claims are invalid pursuant to 35 U.S.C. § 102. Dr. Cameron asserts that U.S. Patent Publication No. 2004/0215040 (the "'040 Application," attached hereto as **Exhibit 6**, CoCrystal_0000556) discloses each claim limitation of the Asserted Claims, either expressly or inherently. Cameron Report at ¶¶ 99-108. Specifically, Dr. Cameron states that prior art disclosures of ubiquinol inherently disclose the presence of CoQ11 because CoQ11 "would inherently occur in a yeast fermentation." Cameron Report at ¶ 104. Dr. Cameron is incorrect.

46. As more fully set forth below, there is no scientific basis for Dr. Cameron to assert that CoQ11 is necessarily and always present in every CoQ10-containing composition irrespective of the starting materials and methods used. Indeed, my report discusses scientific literature that failed to find CoQ11 present with CoQ10. I also cite references that teach methods to obtain CoQ10 that would not result in any CoQ11, including by chemical synthesis using specific starting materials and reaction pathways. Finally, I cite references that demonstrate the removal of CoQ11 through purification and crystallization processes. *See*, e.g., *infra* Section XIII.

47. Moreover, the references relied upon by Dr. Cameron do not support the alleged inherency of CoQ11. Indeed, as set forth below, these references do little more than stand for the unremarkable proposition that CoQ11 *might* be present with CoQ10. They fall far short of showing that it is necessarily present. The references used by Dr. Cameron for his inherency argument related to the presence of CoQ11 actually undermine his arguments.

48. Dr. Cameron also opines that the Asserted Claims are invalid pursuant to 35 U.S.C. § 103 because the Asserted Claims of the ’080 Patent are invalid as obvious over the ’040 Application in view of Kaneka’s commercially available Kaneka Q10 product. Cameron Report at ¶¶ 115-133.

49. Dr. Cameron is incorrect. Dr. Cameron’s obviousness argument fails on multiple fundamental grounds. First, Dr. Cameron cannot establish that the allegedly prior art Kaneka Q10 product contained CoQ11 at or before the time of the invention. The contemporaneous testing records for relevant batches show no CoQ11, and Dr. Cameron’s reliance on post-2006 evidence, theoretical speculation, and mischaracterized references cannot overcome this evidentiary gap. Dr. Cameron also fails to establish that CoQ11 is necessarily present in every CoQ10-containing composition, as demonstrated by extensive scientific literature showing CoQ10 production methods that yield no CoQ11, including chemical synthesis routes and optimized fermentation processes followed by purification steps specifically designed to remove CoQ11 as an impurity.

50. Dr. Cameron provides no motivation for a person of ordinary skill in the art to combine the ’040 Application with Kaneka Q10 or to deliberately retain CoQ11 in a final composition. Every reference Dr. Cameron cites consistently characterizes CoQ11 as an “impurity” to be removed, and the ’040 Application specifically teaches crystallization processes to remove “impurities, in particular analogous compounds having a similar structure”—which

would include CoQ11. **Exhibit** 6 at [0086]. Without any teaching in the prior art about CoQ11's beneficial properties, a POSA would have no reason to deliberately include it or expect any beneficial results from such inclusion.

51. Dr. Cameron's obviousness analysis contradicts his own enablement arguments, as he simultaneously argues that CoQ11 provides no demonstrated benefits (for enablement) while suggesting it would be obvious to include CoQ11 in compositions (for obviousness). Finally, secondary considerations of non-obviousness, including the long-felt need for more stable reduced CoQ10 and the commercial success of Kaneka's Ubiquinol products that practice the claimed invention, further demonstrate that the Asserted Claims would not have been obvious to a POSA at the time of invention.

52. Dr. Cameron also opines that the Asserted Claims are invalid pursuant to 35 U.S.C. § 101 because "they claim merely isolated/purified forms of a composition existing in nature (and a non-specific method of producing this composition, which also exists in nature), and the full scope of the claimed invention does not have properties that are markedly different than the naturally occurring counterparts." Cameron Report at ¶ 136. I disagree.

53. As set forth below, the Asserted Claims are not directed to patent-ineligible subject matter. There is no dispute that the specific composition and the method for producing the specific composition are not found in nature. Nonetheless, the invention provides significant utility, which is absent in nature, by stabilizing reduced CoQ10 and increasing its bioavailability and thus provides greater health benefits. The composition provides a safe and effective pharmaceutical carrier, *i.e.,* it can be used as a means of delivering other pharmaceuticals to the user. **Exhibit 1**, col. 11, ln. 7-18.

54. My opinions, which are further described below, are based on (i) my analyses, (ii) my experience, and (iii) legal principles which counsel has provided me.

## VII. LEGAL STANDARDS

55. In formulating my opinions, I have been instructed by counsel to apply certain legal standards that apply concerning patent validity.

### A. Presumption of Validity

56. I have been informed that issued patents are presumed valid.

57. I have been informed that to overcome this presumption, the party challenging a patent's validity must establish invalidity by clear and convincing evidence.

58. I have been informed that the clear and convincing evidence standard imposes a higher burden of proof than the preponderance of evidence standard as used, for example, regarding issues of patent infringement. The preponderance of the evidence standard requires only that infringement be proved "more likely than not" to have occurred. In comparison, clear and convincing evidence means that it is highly probable that a fact is true.

59. I have been informed that each claim of a patent, whether in independent, dependent, or multiple dependent form, shall be presumed valid independent of the validity of the other claims. Dependent or multiple dependent claims are presumed valid even if dependent upon an invalid claim.

60. In support of the presumption of validity, I considered the Office Actions and the Response to Office Actions that were presented during the prosecution of the '080 Patent. **Exhibit 5**.

**B. Enablement**

61. I have been informed that a claim may be rendered invalid for lack of written description under 35 U.S.C. § 112(a) if the party asserting invalidity proves by clear and convincing evidence that there is a failure to provide a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms so as to enable a POSA to make and use the same.

62. I have been informed that compliance with the enablement requirement does not turn on whether working examples are disclosed, and that the specification need not contain examples if the invention is otherwise disclosed in such manner that one skilled in the art will be able to practice it without undue experimentation.

63. I have been informed that a patent specification need not explain the scientific principles underlying the claimed invention or provide a complete understanding of how or why the invention works, so long as a POSA can make and use what is claimed.

64. I have been informed that enablement focuses on whether a POSA can reproduce the claimed invention, not whether they can reproduce specific properties, effects, or utilities that are not expressly required by the claim language itself.

65. I have been informed that enablement does not require proof of utility or efficacy beyond what is necessary to satisfy the utility requirement under 35 U.S.C. § 101.

66. I have been informed that a specification disclosure which contains a teaching of the manner and process of making and using an invention in terms which correspond in scope to those used in describing and defining the subject matter sought to be patented must be taken as being in compliance with the enablement requirement unless there is reason to doubt the objective truth of the statements contained therein.

### C. On-Sale Bar

67. I have been informed that pre-American Invents Act ("pre-AIA") law applies to the '080 Patent

68. I have been informed that under pre-AIA 35 U.S.C. § 102(b), a person shall not be entitled to a patent if the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

69. I have been informed that to establish an on-sale bar, the party challenging validity must prove by clear and convincing evidence that: (1) the product was the subject of a commercial offer for sale or sale, and (2) the invention was ready for patenting, both occurring more than one year before the effective filing date.

70. I have been informed that the on-sale bar analysis requires that the allegedly sold product must embody or anticipate every limitation of the patent claim at issue, and that if even a single claim limitation is missing from the sold product, the on-sale bar does not apply.

71. I have been informed that the commercial sale or offer for sale must be of the patented invention itself, not merely of products that might be used to practice the invention or that contain some elements of the claimed invention.

72. I have been informed that there is an experimental use exception to the on-sale bar, which applies when the primary purpose of the sale or offer for sale was experimental rather than commercial, such as to test the claimed invention or determine whether it will work for its intended purpose.

73. I have been informed that the experimental use exception is evaluated based on the totality of the circumstances, including factors such as: the length of the test period, whether

payment was made, whether there was a secrecy obligation, whether progress reports were made concerning the experiment, the degree of control retained by the inventor, and whether the invention was commercially exploited during the test period.

**D. Anticipation**

74. I have been informed that the applicable standard for anticipation is set forth in pre-AIA 35 U.S.C. §§ 102(a), (b), and (e), which provide:

> 35 U.S.C. § 102 – A person shall be entitled to a patent unless –
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
>
> …
>
> (e) the invention was described in – (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent.

75. I have been informed that determining anticipation of a patent claim requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

76. I have been informed that a single prior art reference "anticipates" an asserted claim, and thus renders the claim invalid, if the party asserting invalidity proves by clear and convincing evidence that all elements of the claim are disclosed in that prior art reference. A prior art reference does not anticipate if a single limitation of the claim is missing from the prior art reference.

77. I have been informed that, under the doctrine of inherency, if an element is not expressly disclosed in a prior art reference, the prior art reference may still be deemed to anticipate if the missing element is necessarily present in the thing described in the prior art reference and that it would be so recognized by a POSA. I understand that inherency cannot be established by mere possibilities or probabilities. The mere fact that a certain thing may result or is likely to result from a given set of circumstances is insufficient.

**E. Obviousness**

78. I have been informed that a claim of a patent may be rendered obvious under 35 U.S.C. § 103 if the party asserting invalidity proves by clear and convincing evidence that the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious at the time the invention was made to a POSA to which the subject matter pertains.

79. I have been informed that the obviousness analysis requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

80. I have been informed that an obviousness determination includes the consideration of various factors such as (1) the scope and content of the prior art, (2) the differences between the prior art and the Asserted Claims, (3) the level of ordinary skill in the pertinent art, and (4) the existence of secondary considerations or objective indicia of obviousness or non-obviousness.

81. I have been informed that a patent composed of several elements is not proved obvious merely by demonstrating that each element was independently known in the prior art.

82. I have been informed that obviousness requires a clear articulation of the reasons why the claimed invention would have been obvious to a POSA at the time of the invention. I have been informed that where a party argues a skilled artisan would have been motivated to combine

references, it must show the artisan would have had a reasonable expectation of success in doing so and must identify a reason that would have prompted a POSA to combine the alleged prior art elements in the manner claimed.

83. I have been informed that obviousness cannot be proven using hindsight reasoning or by using the claimed invention as a roadmap to piece together prior art references. I have been informed that the obviousness analysis must be conducted from the perspective of a POSA at the time of the invention, without knowledge of the claimed invention.

84. I have been informed that secondary considerations of non-obviousness may include (1) a long felt but unmet need in the prior art that was satisfied by the alleged invention of the patent; (2) commercial success or lack of commercial success of processes covered by the patent; (3) unexpected results achieved by the invention; (4) praise of the alleged invention by others skilled in the art; (5) taking of licenses under the patent; and (6) deliberate copying of the alleged invention.

85. I have been informed that commercial success requires a nexus between the claimed invention and the commercial success. I have been informed that if the patentee shows that the success is tied to a specific product that embodies and is coextensive with the claimed invention, then the objective evidence is entitled to a rebuttable presumption of nexus.

86. I have been informed that the nexus requirement focuses on whether the commercial advantages being achieved in the marketplace flow from the technical advantages provided by the claimed invention, and that patentees need not disclose every technical detail of their inventions in commercial materials for the nexus to exist.

**F. Patent-Eligible Subject Matter**

87. I have been informed that, under 35 U.S.C. § 101, any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof may constitute patent-eligible subject matter.

88. I have been informed that the courts have broadly construed Section 101's meaning to include "everything under the sun that is made by man." I have also been informed that the courts have created three judicially created exceptions to patent-eligible subject matter relating to laws of nature, natural phenomena, and abstract ideas.

89. I have been informed that there is a two-step test (the "Alice Test") for courts to follow in assessing patentability under Section 101. At the first step, the court determines whether the patent is directed to a patent-ineligible concept. If the court determines that the claims are directed to a patent-ineligible concept, the court then determines whether the claim contains an inventive concept sufficient to transform the claim into a patent-eligible application. I have been further informed that, if the claims are directed to eligible subject matter, the inquiry ends at step one.

90. I have been informed that in considering the first step of the Alice Test, it is important to review the entire specification and claims to determine what the applicant believed that he or she invented. It is improper to dissect a claimed invention into discrete elements and then evaluate the elements in isolation because it is the combination of claim elements functioning together that establish the boundaries of the invention and limit its scope.

91. I have been informed that claims having a natural phenomenon as a limiting element or step should be evaluated by determining whether the claim includes additional elements/steps or a combination of elements/steps that integrate the natural phenomenon into the

claimed invention such that the natural phenomenon is practically applied, and are sufficient to ensure that the claim amounts to significantly more than the natural phenomenon itself. If the claim as a whole satisfies this inquiry, the claim is directed to patent-eligible subject matter.

92. I have been informed that the additional elements or steps must narrow the scope of the claim such that others are not foreclosed from using the natural phenomenon. Although elements or steps that are purely conventional and routinely taken by others in order to apply the natural phenomenon, a claim with steps that adds something of significance to the natural phenomenon would be eligible because it would confine its reach to a particular patent-eligible application of the natural phenomenon.

93. I have been informed that a claim does not need to specifically mention a particular characteristic or a particular activity to demonstrate utility.

## VIII. CLAIM CONSTRUCTION

94. I have been informed that the words of a patent claim are generally given their ordinary and customary meaning. I understand the ordinary and customary meaning of a claim term is the meaning that the term would have to a POSA in question at the time of the invention. I understand that the ordinary and customary meaning is determined in the context of the entire patent, including the patent claims, specification, and prosecution history.

95. I have been informed that claim terms are interpreted as a POSA would have interpreted them at the time of the invention.

96. I also have been informed that claim terms must be interpreted the same way, whether analyzed for invalidity or non-infringement. Essentially, one must be consistent and apply the same understanding of each claim element when determining (1) whether an accused product practices those claim elements and (2) whether a prior art reference discloses those claim elements.

97. In this case, I have applied the plain and ordinary meaning that a POSA would understand for each term at the time of the invention. I note that Dr. Cameron has not proposed any special constructions for any claim terms in his invalidity analysis. To the extent Dr. Cameron implicitly adopts any special claim constructions in his invalidity opinions, I reserve the right to address those constructions in a supplemental report.

## IX. THE BACKGROUND OF THE '080 PATENT

### A. CoQ10

98. CoQ10 is a fat-soluble chemical compound that is distributed in nature and found in, among other things, fatty fish (salmon, tuna), organ meats (liver, heart), nuts, whole grains, yeast, plant leaves and seeds. It binds to mitochondria in cells such as animals, plants, and microorganisms, and acts as a hydrogen donor in the electron transport chain, which is an essential component of the respiratory chain and helps convert food into adenosine triphosphate ("ATP"), the body's main energy source. The human body uses CoQ10 for, among other things, cell growth and maintenance, heart health and overall cellular function.

99. CoQ10 takes two forms, oxidized CoQ10, also known as ubiquinone, and reduced CoQ10, also known as ubiquinol.

100. Oxidized CoQ10 has the chemical formula $C_{59}H_{90}O_4$. Oxidized CoQ10 contains two ketone (-C=O) groups as the quinone ring, which participate in redox reactions by allowing it to accept and donate electrons. Before the body can use oxidized CoQ10, it must convert it to reduced CoQ10.

101. Reduced CoQ10 has the chemical formula $C_{59}H_{92}O_4$. Reduced CoQ10 has two hydroxyl (-OH) groups that form a hydroquinone ring. This hydroquinone ring can donate electrons more readily than the quinone ring in oxidized CoQ10 making ubiquinol more

bioavailable for immediate use for energy production and antioxidant protection. When exposed to air, however, reduced CoQ10 quickly oxidizes to the oxidized version of CoQ10.




**Figure 1:** Redox reaction showing the interconversion between oxidized Coenzyme Q10 (ubiquinone, left) and reduced Coenzyme Q10 (ubiquinol, right). The reaction involves the transfer of two electrons, with reduction occurring when electrons are added (+2e-) and oxidation occurring when electrons are removed (-2e-). The quinone ring structure transitions between ketone groups (C=O) in the oxidized form and hydroxyl groups (-OH) in the reduced form, while the isoprenoid side chain with 10 isoprene units remains unchanged.

102. While both forms of CoQ10 provide benefits for the body, reduced CoQ10 is generally recommended for individuals who need higher bioavailability and stronger antioxidant protection, which include those with heart issues, chronic fatigue, or oxidative stress concerns. Moreover, because the human body's ability to convert oxidized CoQ10 into reduced CoQ10 can become less efficient with age, reduced CoQ10 is often recommended for individuals over the age of 40.

**B. Production of Oxidized Coenzyme $Q_{10}$**

103. Oxidized CoQ10 is produced through one of three methods described below: fermentation, synthesis, or extraction.

104. Fermentation is the process by which microorganisms convert simple carbohydrates and other nutrients into CoQ10 through their metabolic pathways. The fermentation process uses bacteria or yeast that naturally produce CoQ10. The yeast or bacteria are cultivated in large bioreactors and fed with a carbon source, such as glucose or glycerol, which is

supplemented with precursors like p-hydroxybenzoate, to stimulate CoQ10 production. The fermentation process takes place under controlled conditions, but the precise method for fermentation can differ in many key aspects, including the temperature, pH, and aeration conditions used.

105. After fermentation, the CoQ10 must be isolated and purified from the microbial cells. This purification process typically involves several steps: first, the microbial cells are harvested from the fermentation broth by centrifugation or filtration. Then, the cells are disrupted through mechanical, chemical, or enzymatic methods to release the intracellular CoQ10. The released CoQ10 is extracted using organic solvents such as hexane, ethanol, or acetone. Following extraction, the CoQ10 is further purified through techniques such as column chromatography, crystallization, or preparative HPLC to remove cellular debris, unused nutrients, and other fermentation byproducts. The final purification steps often include recrystallization to achieve pharmaceutical-grade purity, typically above 98%. The specific purification methods employed can significantly affect the final composition of the CoQ10 product, including the presence or absence of homologs such as CoQ9 and CoQ11.

106. There are a large variety of strains of bacteria and yeast that can be used for CoQ10 production, which include, but are not limited to, yeast (such as Candida, Chandler, Cryptococcus, Rhodotorula), Pseudomonas, red bacillus, yellow bacillus, Agrobacterium tumefaciens, Agrobacterium radiobacter, Agrobacterium rhizogenes, Agrobacterium rubi, Alcaligenes eutruphus, Alcaligenes faecalis, Aspergillus, Monascus, Photosynthetic bacteria, Rhodospirillum, Rhodobacter sphaeroides, Chlorella sp., Paracoccus denitrificans, and Rhodobacterium. *See*, *e.g.*, WO2008145071A1 (attached as **Exhibit 7**); Shraddha Shukla, Kashyap Kumar Dubey, *CoQ10 a super-vitamin: review on application and biosynthesis*, 3 Biotech, 8:249 (2018) ("Shukla")

(attached as **Exhibit 8**); Hajime Yoshia, *Production of ubiquinone010 using bacteria*, J. Gen. Appl. Microbiol., 44 19-20 (1998) (attached as **Exhibit 9**). In addition, there may be further strains of each of the microbes listed above, which could be used to ferment CoQ10.

107. There are a wide variety of fermentation conditions and procedures which can be used to produce CoQ10 from any of the microbes listed above. Some illustrative examples of fermentations found in patents and scientific literature include Dixson et al*., Reinvestigation of Coenzyme Q10 isolation from Sporidiobolus johnsonii*, Chemistry & Biodiversity, Vol. 8 (2011) at 1033 (attached as **Exhibit 10**); U.S. Patent No. 4,367,289 issued to Kaneko, et al. (attached as **Exhibit 11**); Nishida et al., *CoQ10 production in Schizosaccharomyces pobme is increased by reduction of glucose levels or deletion of pka1*, Applied Microbiology and Biotechnology, 103:4899-4915, (2019) (attached as **Exhibit 12**); Ranadive et al., *Morphological and Molecular Differentiation of Sporidiobolus johnsonii ATCC 20490 and Its Coenzyme Q10 Overproducing Mutant Strain UF16*, Indian J Microbiol., 54(3):343–357, (2014) (attached as **Exhibit 13**); Littarru and Lambrechts, *Coenzyme $Q_{10}$: multiple benefits in one ingredient*, OCL Vol. 18 (2011) (attached as **Exhibit 14**); Lee et al., *Cellular factories for coenzyme Q10 production*. Microbial Cell Factories, 16, 39, (2017) (attached as **Exhibit 15**); Ha et al., *Controlling the sucrose concentration increases Coenzyme Q10 production in fed-batch culture of Agrobacterium tumefaciens*, Applied Microbiology and Biotechnology 76, no. 1: 109-116, (2007) (attached as **Exhibit 16**); Tian et al., *Improvement of cultivation medium for enhanced production of coenzyme Q10 by photosynthetic Rhodospirillum rubrum*, Biochemical Engineering Journal, 51(3), 160-166 (2010) (attached as **Exhibit 17**).

108. The concentration of CoQ10 produced and the bioproducts produced depend on the microorganism used as well as the fermentation conditions and media employed.

109. Synthesis is the process by which CoQ10 is artificially produced through controlled chemical reactions. During synthesis, the isoprenoid tail is attached to the benzoquinone core via Friedel–Crafts alkylation using an acidic catalyst. Synthesis takes place under controlled conditions, but the precise methods can differ in many key aspects, including reaction temperature, reaction time, catalyst type and concentration, solvent systems, pressure conditions, and purification techniques. Chemical synthesis typically follows defined reaction pathways with specific reagents and conditions to build the CoQ10 structure step by step.

110. Microbial synthesis using genetically engineered microorganisms represents an advanced form of fermentation where specific microbes are genetically modified to overproduce CoQ10 beyond their natural biosynthetic capacity. In this approach, researchers introduce additional copies of key biosynthetic genes (such as those encoding for polyprenyl diphosphate synthase, 4-hydroxybenzoate octaprenyltransferase, and other enzymes in the CoQ10 biosynthetic pathway) or optimize the expression levels of existing genes to redirect more cellular resources toward CoQ10 production. These engineered strains are then cultivated under controlled fermentation conditions similar to traditional microbial fermentation, but with the advantage of significantly higher yields due to the enhanced metabolic flux through the CoQ10 biosynthetic pathway. The genetic modifications can also include the introduction of heterologous genes from other organisms known to produce CoQ10 efficiently, or the deletion of competing metabolic pathways that would otherwise consume the precursor molecules needed for CoQ10 synthesis. While this method still relies on fermentation as the production process, the engineered nature of the microorganisms allows for more predictable and controlled production of CoQ10, potentially with different impurity profiles compared to wild-type fermentation, depending on the specific genetic modifications and metabolic engineering strategies employed. **Exhibit 15** at 2-3 and 6-9.

111. After synthesis, the crude CoQ10 product requires extensive purification to remove reactants, catalysts, intermediates, solvents, and byproducts. Purification typically involves extraction with organic solvents, followed by multiple chromatographic separation steps such as silica gel column chromatography, HPLC, or flash chromatography. The final purification often includes crystallization and recrystallization steps to achieve pharmaceutical-grade purity. Each purification step can selectively remove certain impurities, including potential homologs like CoQ9 and CoQ11.

112. Starting materials for chemical synthesis include but are not limited to solanesol, decaprenol, trimethylhydroquinone, and synthetic isoprenoid precursors. **Exhibit 15** at 2-3; U.S. Patent No. 6,686,485, issued to West at col. 6, ln. 1-43 (attached as **Exhibit 18**); **Exhibit 8** at 1. Starting materials for microbial synthesis include p-hydroxybenzoic acid, tyrosine, phenylalanine, and various isoprenoid precursors such as isopentenyl pyrophosphate (IPP) and dimethylallyl pyrophosphate (DMAPP) that can be metabolized by engineered microorganisms into the CoQ10 structure. Pierrel et al., *Recent advances in the metabolic pathways and microbial production of coenzyme Q. World Journal of Microbiology and Biotechnology*, 38, 58, (2002) at 2-5 (attached as **Exhibit 19**).

113. There are a variety of methods to synthesize CoQ10 including processes described in published literature and patents. These include the Keinan-Eren route, the Lipshutz method, the "solanesyl Friedel-Crafts" approach, convergent syntheses involving coupling of the quinone head group with the isoprenoid tail, and various modifications of these methods. Each synthetic route involves different reactions, catalysts, and conditions that can influence the final product's purity profile. **Exhibit 8** at 3-5 and 10; **Exhibit 18** at Abstract; Keinan, E. & Eren, D., *Total Synthesis of*

*Linear Polyprenoids. 2. Improved Preparation of the Aromatic Nucleus of Ubiquinone*, J. Org. Chem., 52(17), 3872-3875 (1987) at 3872-74 (attached as **Exhibit 20**).

114. The overall purity and impurity profiles of oxidized CoQ10 that results from synthesis depends upon the type of synthesis (chemical or microbial), the chemical route and starting material (for chemical synthesis) and the microorganism, fermentation conditions and media (for microbial synthesis). Thus, the method of synthesis will impact what impurities are present. In general, chemical synthesis typically yields products with specific impurity profiles based on side reactions of the synthetic pathway. Microbial synthesis impurity profiles are influenced by the organism's metabolic pathways and can include various homologs depending on the strain and fermentation conditions used.

115. Extraction is the process in which CoQ10 is taken from certain plants, animal tissues or fish. To extract CoQ10, several different methods can be employed, depending on the source material and desired purity of the final product.

116. Solvent extraction is the most common approach, where the biological material is first prepared by drying, grinding, or homogenizing to increase surface area. The prepared material is then treated with organic solvents such as hexane, petroleum ether, acetone, or ethanol, which dissolve the lipid-soluble CoQ10. For animal tissues, this often involves multiple extraction cycles to maximize yield. The extraction can be performed at various temperatures, with higher temperatures generally increasing extraction efficiency but potentially degrading CoQ10.

117. Supercritical fluid extraction using carbon dioxide ("CO2") represents a more environmentally friendly alternative that avoids organic solvent residues. This technique uses high-pressure CO2 in a supercritical state to selectively extract CoQ10 from the source material.

118. Enzymatic extraction methods are also employed, particularly for animal tissues, where proteolytic enzymes break down cellular structures to release CoQ10 before solvent extraction.

119. Following the initial extraction, the crude extract undergoes further purification steps including liquid-liquid partitioning, column chromatography, crystallization, and in some cases, preparative HPLC to remove impurities and achieve the desired purity level.

120. The efficiency and specific impurity profile of the extracted CoQ10 varies significantly based on the source material, extraction method, and subsequent purification techniques employed.

121. Sources from which to extract CoQ10 include, but are not limited to, green melon fruit, cucumber, leek, brussels sprouts and green peppers, animal tissues, including but not limited to, the human heart, kidney, liver, muscle, brain, pancreas, spleen, lung, thyroidea, testis intestine, colon and ventricle, sardines and mackerel, some of which are described in Åberg et al. (1992), which details ubiquinone distribution in rat and human tissues, as well as Whistance et al. (1969), which describes ubiquinone homologues in bacterial sources. *See* Åberg et al. *Distribution and Redox State of Ubiquinones in Rat and Human Tissues*, Archives of Biochemistry and Biophysics, 295(2) (1992) (attached as **Exhibit 21**, KAN_0002118-122); *see also* Whistance et al., *The Nature, Intergeneric Distribution and Biosynthesis is Isoprenoid Quinones and Phenols in Gram-Negative Bactiera*, Biochem. J., Vol. 111, 461 (1968) (attached as **Exhibit 22**).

**C. Production of Reduced Coenzyme $Q_{10}$**

122. After first obtaining oxidized CoQ10 via fermentation, synthesis or extraction in the ways discussed above, oxidized CoQ10 is reduced to create reduced CoQ10 through several methods. *See, e.g.,* **Exhibit 21** at 230–234; Kishikawa et al., *A Comparative Study on the*

*Reduction Modes for Quinone to Determine Ubiquinone by HPLC with Luminol Chemiluminescence Detection Based on the Redox Reaction*, Molecules 28, 96 (2022) (attached as **Exhibit 23**).

**D. Kaneka's Production Process of Oxidized and Reduced Coenzyme CoQ10**

123. Kaneka's production process of oxidized and reduced CoQ10 involves a carefully optimized yeast-based fermentation process followed by controlled extraction, purification, and product reduction steps.

124. Kaneka's CoQ10 is produced industrially through aerobic fermentation using carefully selected, non-genetically modified yeast strains. These yeasts produce large amounts of ubiquinone-10 (oxidized CoQ10) due to their isoprenoid biosynthetic pathways. The fermentation process involves culturing yeast under controlled conditions. *See* U.S. Patent No. 7,910,340, issued to Yajima, et al., at col. 5, ln. 36 to col. 6, ln. 8 (attached as **Exhibit 24**).

125. After fermentation, the yeast biomass is harvested typically by centrifugation or filtration. Methods included alkaline saponification or mild solvent extraction techniques to disrupt yeast cells and liberate intracellular ubiquinone. Extraction involves organic solvents, commonly hexane, ethanol, or combinations thereof, facilitating efficient isolation of the lipid-soluble CoQ10 from yeast biomass. Modern practices have improved solvent recovery, reduced solvent usage, and enhanced extraction efficiency.

126. Purification of CoQ10 has relied on one or more chromatographic separations followed by crystallization to obtain the desired purity. Lester R. L. & Crane F. L., *Studies on the Electron Transport System XIX: The isolation of coenzyme Q from Azotobacter vinelandii and Torula utilis*. Biochimica et Biophysica Acta 32 (1959) 492–498 at 492-94 (attached as **Exhibit 25**); Ikeda T., Matsumoto T., Kato K. & Noguchi M., *Isolation and Identification of Ubiquinone-*

*10 from Cultured Cells of Tobacco*, Agricultural & Biological Chemistry 38 (11) (1974) at 2297–2298 (attached as **Exhibit 26**); U.S. Patent No. 4,220,719 issued to Aida, et al., at col. 3, ln. 61 to col. 4, ln. 10 (attached as **Exhibit 27**). Today, there are simplified purification techniques involving controlled solvent extraction, followed by crystallization processes optimized to yield CoQ10 with exceptionally high purity levels—typically above 99%. U.S. Patent Application Publication No. 2007/0025976 at [0018] and [0034] (attached as **Exhibit 28**); Cao, X.-L. et al., *Purification of coenzyme Q10 from fermentation extract: high-speed counter-current chromatography versus silica-gel column chromatography*, J. Chromatogr. A 1127 (1-2): 92-96 (2006) (attached as **Exhibit 29**); U.S. Patent No. 11,453,633 issued to Yamaguchi, et al., at col. 12, ln. 20-37 (attached as **Exhibit 30**); Podar et al., *An Overview of Analytical Methods for Quantitative Determination of Coenzyme Q10 in Foods*, Metabolites 13, 272 (2023) at pgs. 22 and 28 (attached as **Exhibit 31**). This streamlined approach significantly reduces reliance on chromatography, minimizes solvent use, and improves product yield, ensuring consistent compliance with pharmaceutical-grade standards.

127. The reduction of ubiquinone to ubiquinol has generally been done chemically (e.g., using reducing agents, such as sodium borohydride, ascorbic acid, lithium aluminum hydride, zinc dust, or iron powder). *See* Okamoto et al., *Determination of reduced and total ubiquinones in biological materials by liquid chromatography with electrochemical detection*, J. Chromatogr. 430 (1988) at 11 and 13-14 (attached as **Exhibit 32**). While chemically simple, these reductions could, in some cases, produce impurities. *See* Roginsky, V. A., Mohr, D., & Stocker, R., *Reduction of ubiquinone-1 by ascorbic acid is a catalytic and reversible process controlled by the concentration of molecular oxygen*, Redox Report 2 (1) 55–62 (1996) at 55 and 59-60 (attached as **Exhibit 33**); *see* U.S. Patent Publication No. 2006/0246565A1 at [0002]-[0003] (attached as **Exhibit 34**).

128. After the reduction reaction, the ubiquinol can easily oxidize and chemical stabilizers were often employed. *See* **Exhibit 1** at col. 2, ln. 1-21. The presence of chemical stabilizers in final formulations could lead to issues related to product safety and regulatory acceptance. *Id.*; *see also* Temova et al., *Stability of Reduced and Oxidized Coenzyme Q10 in Finished Products*, Antioxidants 10 (3): 360 (2021) at 1 (attached as **Exhibit 35**).

129. The invention described in the ’080 Patent represents a significant advance in ubiquinol stabilization. The inventors discovered that stabilization of reduced CoQ10 could be improved by the presence of reduced coenzyme Q analogues (i.e., Coenzyme Q9 and Coenzyme Q11). The patent introduces the concept of intentionally combining small amounts of reduced CoQ9 and/or CoQ11 to enhance the stability of reduced CoQ10.

**E. File History of the ’080 Patent**

130. On April 27, 2007, Kaneka filed U.S. Patent Application No. 11/741,290 (the ’080 Patent’s application number) with the U.S. Patent and Trademark Office (“USPTO”). **Exhibit 5** at KAN0000338.

131. On December 30, 2008, Kaneka responded to the USPTO’s Office Action dated October 1, 2008. **Exhibit 5** at KAN0000136-146. Kaneka’s counsel, among other things, amended claims 7 and 18 (ultimately issued as claims 5 and 15, respectively)[2] to recite that the reduced

---

[2] Although claim 18 (now claim 15) was initially excluded from examination as part of a non-elected invention group, it was ultimately allowed through the process of rejoinder. During patent prosecution, the Examiner issued a restriction requirement dividing the application into four invention groups, with Group II (including product claim 7, now claim 5) being elected for examination. Claim 18 was part of Group III covering process claims.

When the product claim 5 was found allowable, the process claim 15 became eligible for rejoinder because it included all the limitations of the allowable product claim. This follows the standard practice outlined in MPEP 821.04, which permits process claims to be rejoined and allowed in the same application when they require all the limitations of an allowed product claim. In essence,

CoQ10-containing composition comprises not less than 1.5 wt% to not more than 99 wt% of reduced CoQ9 relative to reduced CoQ10. *Id.* at KAN0000137-139. Previously, the claims disclosed a claim limitation of "not less than 0.6 wt%" without an upper limit. *Id.*

132. Kaneka also made extensive arguments to distinguish the claimed invention from the references used by the Examiner to assert anticipation and obviousness. *Id.* at KAN0000142-145. In summary, Kaneka asserted that "None of the cited references teaches or suggests a reduced coenzyme $Q_{10}$-containing composition comprising reduced $Q_{10}$ and one or both of (a) not less than 1.5 wt% to not more than 99 wt% of reduced coenzyme o$Q_9$ relative to reduced CoQ10 and (b) reduced coenzyme Q11." *Id.* at KAN0000145.

133. On July 10, 2009, Kaneka responded to the USPTO's Office Action dated April 10, 2009, and repeated its arguments above without making any additional amendments to the claims. *Id.* at KAN0000104-107.

134. On September 10, 2009, Kaneka responded to the USPTO's Advisory Action dated July 10, 2009, further amending, among other things, claims 7 and 18 by adding the limitation, "not less than 0.01 wt% of reduced coenzyme $Q_{10}$ is contained in the reduced coenzyme $Q_{10}$-containing composition." *Id.* at KAN0000087-89.

135. On May 10, 2010, Kaneka responded to the USPTO's Office Action dated December 11, 2009, stating:

> In an effort to advance prosecution, the pending claims have been amended to recite that the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt%. The concept of the present invention is that reduced coenzyme $Q_{10}$ is present in a reduced coenzyme-containing composition in an extremely high ratio relative to the total amount of coenzyme $Q_{10}$ (*e.g.*, not less than 90 wt%) and impurities such as reduced coenzyme $Q_9$ and reduced

once the product was deemed patentable, the process specifically designed to make that product was also recognized as patentable and allowed to remain in the same patent

> coenzyme $Q_{11}$ also are present (*e.g.*, not less than 1.5 wt% to not more than 99 wt% of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$). This concept is not taught or suggested by any of the cited references when considered alone or in combination.
>
> In particular, none of the cited references teaches or suggests a reduced coenzyme $Q_{10}$ containing composition comprising reduced coenzyme $Q_{10}$ and one or both of (a) not less than 1.5 wt% to not more than 99 wt% of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and (b) reduced coenzyme Q11 wherein not less than 0.01 wt% of reduced coenzyme Q10 is contained in the composition, and wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme Q10 is not less than 90 wt%, as recited in the pending claims.

*Id.* at KAN0000049-50.

136. Kaneka's statement concerning the potential presence of coenzyme CoQ11 in a CoQ10-containing composition was also disclosed in two alternative method claims, one in which CoQ11 was *added* to the starting CoQ10-containing composition (*id.* at KAN0000046), and another in which CoQ11 was *already present* in the starting CoQ10-containing composition. *Id.*

137. On July 23, 2010, the Examiner issued a Notice of Allowance. *Id.* at KAN0000023.

**F. Priority Date**

138. I understand that the claimed priority date of a patent is the date on which it is filed, or the date on which an earlier-filed patent application is filed if the patentee claims the benefit of priority to that earlier-filed patent application.

139. I understand that the '080 Patent claims priority to Japanese Application No. JP2006-126897 filed on April 8, 2006. *See* **Exhibit 1**. For the purposes of my analysis, and in the absence of any information to the contrary, I have used April 8, 2006 (i.e., the "Priority Date"), as the relevant date for my analysis of the prior art.

## X. PERSON OF ORDINARY SKILL IN THE ART

140. All the opinions which I provide herein are provided through the lens of a POSA at the relevant time. I understand that the ’080 Patent claims priority to Japanese Application No. JP2006-126897 filed on April 8, 2006. *See* **Exhibit 1**.

141. I considered several factors to determine the skill level of a POSA of the ’080 Patent in April 2006, including the types of problems encountered in the art, solutions to those problems, the pace of innovation in the field, the sophistication of the technology, and the education level of active workers in the field.

142. Based on my expertise and the prior art cited in the ’080 Patent, it is my opinion that a POSA in the field of the ’080 Patent would have at least a Bachelor’s degree in chemistry, biochemistry, chemical engineering, microbiology and/or biology with two to three years of laboratory experience. In addition, this person would have familiarity with the chemistry of fermentation products and natural products, and would have experience in processes, isolating and characterizing organic compounds using analytical methods, HPLC and mass spectrometry (“MS”).

143. I understand that while I believe I might have greater than ordinary skill in the art, I believe that I know what one of ordinary skill in the art would understand because of my past experience and knowledge working with individuals of ordinary skill in the art. When I refer below to what one of ordinary skill in the art would understand or believe, I am referring to the understanding or belief of a POSA as defined above, at the time of the invention.

144. I understand that Dr. Cameron has opined that a POSA would have “a Master’s degree or Ph.D. in biochemical engineering, chemical engineering, chemistry, or biochemistry with at least two to three years of experience with the chemistry and extraction of fermentation

products and natural products, and would have had experience in isolating and characterizing organic compounds using analytical methods." Cameron Report at ¶ 28. While Dr. Cameron's definition requires a higher educational degree than my definition, which includes those with Bachelor's degrees, plus appropriate experience, my opinions expressed herein would not change even if Dr. Cameron's definition of a POSA were applied.

## XI. THE ASSERTED CLAIMS MEET THE ENABLEMENT REQUIREMENT

145. Dr. Cameron opines that the '080 Patent is invalid under 35 U.S.C. § 112 due to lack of enablement.

146. Specifically, Dr. Cameron asserts that because the '080 Patent does not provide "evidence for any stabilizing effects (or other benefits/utility) of reduced $Q_{11}$ on reduced $Q_{10}$, and … at least part of the claimed scopes of claims 5 and 15 … includes embodiments without any $Q_9$ and instead require just the presence of $Q_{11}$, for which no utility was tested or shown in the … '080 Patent … claims 5 and 15 do not meet the enablement requirement and are thus invalid." Cameron Report at ¶¶ 41-42. I disagree.

### A. The '080 Patent Enables a POSA to Practice the Invention

147. It is my opinion that the '080 Patent enables a POSA to prepare the composition described in claim 5 and use the process to prepare the composition described in claim 15. Dr. Cameron does not argue otherwise.

148. Claim 5 contains quantities, ranges and ratios for a specific composition, and claim 15 provides the reduction method to prepare the composition described in claim 5. The specification further provides detailed methods for preparing the compositions (**Exhibit 1**, cols. 13-14), and includes four Production Examples. **Exhibit 1**, col. 13, ln. 40 to col. 14, ln. 33. Production Example 4 describes a process in which oxidized CoQ10 containing 0.1% of oxidized

CoQ11 is reduced to form a mixture of reduced CoQ10 and reduced CoQ11 where the ratio of the reduced to oxidized CoQ10 was 99.4/0.6. **Exhibit 1**, col. 14, ln. 15-32. There is no question that a POSA would understand how to make compositions containing reduced CoQ11 and could vary the information in Production Example 4 to change the relative amount of CoQ11 present in the composition.

149. Moreover, a POSA would understand that by practicing Example 4 and isolating the final composition, they could easily measure the stabilizing effect of CoQ11 compared to examples without CoQ11.

**B. A POSA Would Have No Reasonable Basis to Doubt the Stabilizing Effects of CoQ11**

150. While it is my opinion that claims 5 and 15 are enabled without regard to stabilization (*supra* Section XI(A)), I will still rebut Dr. Cameron's arguments related to stabilization of the claimed composition by CoQ11.

151. As Dr. Cameron recognizes, Example 1 of the '080 Patent regards a composition containing the claimed ratio of CoQ9, and reports the "results of reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ ratio" as follows:

TABLE 1

| | weight ratio of reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ |
|---|---|
| reduced coenzyme $Q_{10}$ containing 1.5% of reduced coenzyme $Q_9$ | 96.7/3.3 |
| reduced coenzyme $Q_{10}$ free of reduced coenzyme $Q_9$ | 95.5/4.5 |

**Exhibit 1**, Table 1.

152. The test results in Table 1 show that CoQ9 has a stabilizing effect on reduced CoQ10 as the sample with reduced CoQ9 had a greater ratio of reduced CoQ10/oxidized CoQ10 than the sample with reduced CoQ10 free of reduced CoQ9. **Exhibit 1**, col. 14, ln. 35-45.

153. Similarly, Example 2 of the '080 Patent regards a composition containing the claimed ratio of CoQ9, and reports the "results of reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ ratio" as follows:

TABLE 2

| | weight ratio of reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ |
|---|---|
| reduced coenzyme $Q_{10}$ containing 1.5% of reduced coenzyme $Q_9$ | 90.2/9.8 |
| reduced coenzyme $Q_{10}$ free of reduced coenzyme $Q_9$ | 87.2/12.8 |

**Exhibit 1**, Table 2.

154. The test results in Table 2 similarly show that CoQ9 has a stabilizing effect on reduced CoQ10 as the sample with reduced CoQ9 had a greater ratio of reduced CoQ10/oxidized CoQ10 than the sample with reduced CoQ10 free of reduced CoQ9. **Exhibit 1**, col. 14, ln. 59-67.

155. While the specification does not report the specific results with respect to the stabilizing effect of CoQ11 (*see* **Exhibit 36**), a POSA would have no reason to question that CoQ11 would have a similar stabilizing effect on CoQ10 based on the similarities between CoQ9 and CoQ11 (*see, e.g.*, **Exhibits 94 and 95**). Dr. Cameron is incorrect when he states that the specification is silent as to why CoQ11 would have a stabilization effect similar to CoQ9. Cameron Report at ¶ 43. Indeed, the specification states that "reduced coenzyme Q9 and reduced coenzyme

Q11 show the same effect in the body," that CoQ9 and CoQ11 are analogs of each other.[3] **Exhibit 1**, col. 4, ln. 46-48. The specification further states, "[a]ccording to the present invention, reduced coenzyme Q10 can be preferably protected from oxidation." *Id.*, col. 4, ln. 46-48 and col. 13, ln. 10-11.

156. The similarities between CoQ9 and CoQ11—the other closest homolog to CoQ10—were well known at the time. Indeed, Dr. Cameron relies on multiple prior art references that recognize these similarities and the likelihood that CoQ9 and CoQ11 would react similarly. For example, in the article, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection* ("Rousseau"), the authors note that the "physico-chemical properties of Q11 are very similar to those of . . . Q9." **Exhibit 37**, CoCrystal_0000448. The authors further note that potential reactions involving CoQ9 "would likely also affect CoQ11." *Id*. Dr. Cameron also relies upon the article, *Formation of Coenzyme Q11 by Pseudomonas M16, a Mutant*, which states that coenzyme Q includes "members [who] differ in the length of their polyprenyl side chains," and that all homologues of coenzyme Q play an important role in the respiratory chain." **Exhibit 38**, CoCrystal_0000482.

157. Defendants also cite to references in their invalidity contentions that recognize the similarities in composition and function across all coenzymes, regardless of the length of the side chain. *See*, e.g., *The Natural Occurrence of Coenzyme Q and Related Compounds*, at 2169 (attached as **Exhibit 39**, CoCrystal_0000402) (recognizing that "the function of coenzyme Q [is] in electron transport" and that "coenzyme Q is not a single compound but rather a group of closely related homologoues"); *Isoprenoid Quinones of the Genus Legionella*, at 1044 ("in most

[3] A POSA would understand "analog" to mean a substance that is structurally similar to another substance.

organisms ubiquinones function as coenzymes in the cyto-chrome-containing terminal respiratory system. . . [and] act[] as a coenzyme in the succinic and NADH dehydrogenase system by transporting electrons from the dehydrogenases falvoproteins to the cytochromes of the electron transport system.") (attached as **Exhibit 40**, CoCrystal_0000688).

158. Accordingly, at the time of the invention, a POSA would have no reason to question that CoQ11 would have the same stabilizing effect on reduced CoQ10 as CoQ9. For this reason, I disagree with Dr. Cameron's assertion that a POSA would find it "unlikely that analogs of reduced Q10 with different Q chain lengths would provide stabilization effects at all, given the oxidation occurs at the other end of the molecule . . . and would not have any apparent relationship to the Q chain length." Cameron Report at ¶ 52.

159. Indeed, this assertion ignores the testimony of the main inventor of the '080 Patent, Mr. Ueda, who testified that "[t]he isoprenoid side chain itself does not affect oxidation or reduction . . . the only thing that affects stability is Hydroquinone." Deposition Transcript of Mr. Takahiro Ueda (attached as **Exhibit 41**) at 60:23-61:3 and 61:18-20 (a POSA "would conclude that since CoQ11, CoQ9 have the same properties, they would have the same stability."). I note that in his report, Dr. Cameron includes figures of CoQ9 and CoQ11 molecules that show that CoQ9 and CoQ11 have identical hydroquinone rings. Cameron Report at ¶ 52.[4]

---

[4] I have been informed Dr. Cameron relied on attorney-client material in support of his enablement argument. I have further been informed that Kaneka has clawed back those documents. I have also been informed that Defendants have moved to seek determination that the attorney-client privilege has been waived. Because the documents are currently protected by attorney-client privilege, I do not address them in this report and reserve the right to respond to those paragraphs in Dr. Cameron's report if the Court grants Defendants' motion.

160. In addition, as Dr. Cameron acknowledges that prior to the issuance of the '080 Patent, Kaneka performed stabilization studies with respect to CoQ11 that showed that CoQ11, like CoQ9, had a stabilizing effect on CoQ10. Cameron Report at ¶ 45; *see also* **Exhibit 83**.

161. Dr. Cameron also seems to assert that the invention was not enabled because "[a]t minute amounts of reduced $Q_{11}$, there would not be enough molecules of reduced $Q_{11}$ to reduced Q10 molecules such that stability could be enhanced." Cameron Report at ¶ 53. To further this argument, Dr. Cameron provides an analogy of a security guard "trying to protect every person on Earth from a sunburn." Cameron Report at ¶ 54.

162. First, it should be noted that Dr. Cameron has performed no studies and provides no test results to support his argument. Second, this assertion assumes incorrectly that the utility of the invention is limited to stability. Neither claim 5 nor claim 15 require the invention to have a stabilizing effect. *See infra* ¶¶ 163-168.

163. Dr. Cameron's assertion assumes incorrectly that the Asserted Claims mandate that CoQ11 provide the same stabilizing effect regardless of the quantity of CoQ11 in the composition. The Asserted Claims have no such requirement. Indeed, the main inventor, Mr. Ueda, testified that the stabilizing effect of CoQ11 is proportional to the amount of CoQ11 present in the composition. **Exhibit 41** at 116:19-21. In other words, to use Dr. Cameron's analogy, while a single security guard (i.e., CoQ11) may not be able to prevent every person on Earth from sunburn (i.e., oxidation), he could certainly reduce the amount of sunburn (i.e., oxidation), even if it is a proportionally smaller amount. To continue Dr. Cameron's analogy, the protection against sunburn (i.e., oxidation) would increase proportionally with the amount of security guards (i.e., CoQ11). Dr. Cameron appears to acknowledge this when he stated as the amount of CoQ11 is reduced, the

stability result would decrease. Cameron Report at ¶ 55 (as CoQ11 reduces its stabilizing effect would "approach zero").

164. Dr. Cameron also appears to base his lack of enablement opinion on his belief that Kaneka's representatives were unaware of the mechanism by which CoQ11 stabilized reduced CoQ10. As a threshold matter, I have been informed that it is not necessary that the inventors know the precise reason why the invention works. In any event, Dr. Cameron's opinion cites to inventors who were not involved in Kaneka's stability studies but were instead tasked with other aspects of Kaneka's development of a CoQ10-containing product. *See e.g.*, Deposition Transcript of Mr. Hiroshi Kubo (attached as **Exhibit 42**) at 10:10-13 (testifying that he was responsible for studying anti-aging effects of coenzyme Q10); Deposition Transcript of Mr. Shiro Kitamura (attached as **Exhibit 43**) at 35:24-25 (testifying that his role was "closer to formulation or also the question of packaging. . ."). And as set forth above, the main inventor, Mr. Ueda did testify as to his basis for the proposition that CoQ11 would have a similar stabilizing effect, namely (i) the hydroquinone ring of CoQ9 stabilized CoQ10, and (ii) CoQ11 and CoQ9 have identical hydroquinone rings (which rings are depicted in the figures included in Dr. Cameron's report at ¶ 52).

165. I also disagree with Dr. Cameron's lack of enablement opinion for the additional reason that unlike claim 1, neither claim 5 nor claim 15 include a stabilization requirement. *Compare* **Exhibit 1**, claim 1 (requiring as a claim limitation that the composition "thereby stabiliz[e] reduced coenzyme Q10") with claim 5 and claim 15 (each lacking such a stabilization claim limitation).

166. As the specification makes clear, the utility of the invention is not limited to stabilization. The composition could be used, for example, as a carrier for antioxidants or other

beneficial active ingredients. **Exhibit 1**, col. 11, ln. 7-18 and col. 2, ln. 6-16 (noting that prior compositions of reduced coenzyme Q10 "[were] not entirely safe" for processing into a food or pharmaceutical agent). Dr. Cameron does not suggest otherwise.

167. The specification also states that the current invention improves the absorbability of reduced CoQ10. *See* **Exhibit 1**, col 13, ln. 13-14 ("Moreover, a composition showing high biological absorbability of reduced coenzyme Q10 can also be provided."). Dr. Cameron does not suggest otherwise.

168. Additionally, the file history of the '080 Patent includes literature of CoQ9 providing benefits to living organisms (e.g., providing cardioprotective effects). Lekli et al., *Coenzyme Q9 Provides Cardioprotection after Converting into Coenzyme Q10*, Journal of Agricultural and Food Chemistry, 56, 5331-5337 (2008) (attached as **Exhibit 44**) at 5331.

## XII. THE ON SALE BAR DOES NOT INVALIDATE THE ASSERTED CLAIMS

169. I have been informed by counsel that if there was a sale of the claimed invention prior to April 27, 2006, i.e., one year before the United States filing date for the '080 Patent, that the sale would be invalidating. This is known as the on-sale bar. I have been informed that to invalidate the '080 Patent via the on-sale bar, the party asserting invalidity must establish by clear and convincing evidence that the product sold practiced the invention.

170. I have been informed that in February 2006, Kaneka Nutrients L.P. ("KNL") shipped a product described as Kaneka QH Softgels (the "2006 Shipment") to Enzymatic Therapy Inc. ("ETI"). I understand that the Kaneka QH Softgels shipped to ETI (the "2006 Softgels") contained ubiquinol. Dr. Cameron opines that the 2006 Shipment constituted a sale of the covered invention more than one year before the filing of the '080 Patent, and thus invalidates the '080 Patent. I disagree.

**A. KNL Used FB01-0001 to Make the 2006 Softgels and Thus the Softgels Did Not Practice the Asserted Claims**

171. I have reviewed Kaneka test results relating to the 2006 Softgels.

172. Specifically, I have reviewed the test results for Lot No. FB01-0001 (attached as **Exhibit 45**, KAN0079890-896). I have been informed that the "FB" stands for Functional Foods, the "01" indicates the product was bulk ubiquinol manufactured at the Osaka Synthetic Organic Chemistry, and the last three digits are the sequential batch number, where "001" indicates that this is the first ubiquinol batch produced by Kaneka. **Exhibit 41** at 50:4-15.

173. The test results for Lot No. FB01-0001 are dated September 28, 2004 and show, among other things, the presence of a small amount of CoQ9 and the absence of CoQ11. *See* **Exhibit 45** at KAN0079891. The small amount of CoQ9 is insufficient to meet the 1.5 wt% limitation of claim 5[b] and 15[c].

174. The next batch of ubiquinol that Kaneka produced was Lot No. FB01-0002. The test results (attached as **Exhibit 46**, KAN0079897-898) are dated August 2, 2005. As with Lot No. FB01-0001, these test results show the absence of CoQ11 and an insufficient quantity of CoQ9 to meet the claim limitation 5[b] and 15[c]. *See* **Exhibit 46** at KAN0079898. I have also reviewed the test results for Lot Nos. FB01-003 through FB01-020, and Lot Nos. FB01-028 through FB01-080. Every batch test result shows an absence of CoQ9 and CoQ11.

175. The particular softgel batches that are the subject of the 2006 Softgel Shipment were Lot Nos. FB31-001 and FB31-002. *See* **Exhibit 47**, KAN0022592; **Exhibit 48**, KAN0022590; *see also* **Exhibit 49**, KAN0029016. Here, again "FB" stands for "Functional Foods, "31" is a product code indicating that the product was a softgel. As above, the last three digits were used to sequentially number the batches. **Exhibit 41** at 54:6-15. Here, 001 and 002 indicate the first and second batches of softgels, respectively. I have reviewed the Certificates of

Analysis for Lot Nos. FB31-001 and FB31-002, each both dated February 8, 2006. **Exhibit 47,** KAN0022592; *see also* **Exhibit 48**, KAN0022590. The Certificates of Analysis indicate that Lot No. FB31-001 was manufactured on October 27, 2004 and Lot No. FB31-002 was manufactured in May 18, 2005. **Exhibit 47,** KAN0022592; **Exhibit 48**, KAN0022590.

176. I have been informed that KNL did not manufacture its own ubiquinol in 2006. Instead, Kaneka shipped ubiquinol to KNL to use for making softgels. From October 2004 through May 2005, Kaneka had made only one batch of ubiquinol, FB01-0001. Therefore, Kaneka must have shipped Lot No. FB01-0001 to KNL to use to produce Lot Nos. FB31-001 and FB31-002. I have reviewed shipping documents from August 2006 that show Kaneka shipping FB01-0001 to KNL. *See* **Exhibit 50,** KAN0031970-974.[5]

177. Because the ubiquinol used to make the 2006 Softgels, i.e., FB01-0001, contained less than 1.5 wt% of CoQ9 and contained no CoQ11, the 2006 Softgels must also have contained less than 1.5 wt% of CoQ9 and contained no CoQ11. Therefore, there is no evidence to conclude that the 2006 Softgels practiced the Asserted Claims, or that the on-sale bar has been triggered.

**B. Changes to Manufacturing Process Used to Make Kaneka Q10 from 2004 Through the Present**

178. I have been informed that there have been a number of changes since 2004 to the manufacturing process used to make Kaneka Q10, which is the ubiquinone used to make Kaneka's ubiquinol, including at least seven modifications to the yeast strain. *see e.g.*, **Exhibit 51**, KAN0147817-882; **Exhibit 52**, CoCrystal_0010768-69, 0010806; **Exhibit 41** at 82:18-84:13.

---

[5] Dr. Cameron is not correct when he asserts that "Lot No. FB31-0002 is the Lot No. that was the subject of Kaneka's sales, not Lot Nos. FB01-0001…" Cameron Report at ¶78. While the lot numbers for the softgels were Lot Nos. FB31-0001 and FB31-0002, the ubiquinol used to make those softgels was Lot No. FB01-0001.

179. In addition, Kaneka no longer manufactures ubiquinone at Osaka Synthetic Organic Chemistry and instead manufactures ubiquinone in Japan at a manufacturing plant in Tagasago. **Exhibit 41** at 82:18-83:3. KNL also now manufactures ubiquinol in the United States. *Id.*

### C. Dr. Cameron Relies on Speculation and Ignores Contrary Evidence to Support his Opinion that the 2006 Softgels Practiced the Invention

180. Dr. Cameron asserts that the Asserted Claims are invalid for violation of the on-sale bar. Cameron Report at ¶ 63. Dr. Cameron's opinion ignores and is at odds with contemporaneous evidence that show that the 2006 Softgels lacked necessary amounts of CoQ9 and reduced CoQ11 and thus could not have practiced the Asserted Claims. *Supra* Section XII(A). Instead, Dr. Cameron relies on speculation and, to the extent he cites to evidence, it is evidence that long post-dates 2004, i.e., the date when Lot No. FB01-0001 was manufactured.

#### 1. Claim Limitation 15[a]

181. Claim limitation 15[a] requires a method of producing the composition described in claim 5 that begins with an oxidized coenzyme Q10-containing composition with oxidized CoQ11. **Exhibit 1**, col. 18, ln. 4-21. Dr. Cameron cites to the following evidence in support of his opinion that the 2006 Softgels met this claim limitation: (i) a January 2006 article in Regulatory Toxicology (the "Ikematsu Article"), (ii) deposition testimony by Joshua A. Garey; (iii) deposition testimony of Takahiro Ueda; (iv) Dr. Cameron's own experience; (v) certain post-2016 test results provided by Kaneka. Cameron Report at ¶ 69.

##### a) The Ikematsu Article

182. The Ikematsu Article (attached as **Exhibit 53**, CoCrystal_0008258) relied upon by Dr. Cameron states that "The capsule used in this study was provided by Kaneka Corporation" and that "The content of CoQ10 in Kaneka Q10 is over 98%, with CoQ9 and CoQ11 as major

impurities." **Exhibit 53** at CoCrystal_0008259. I disagree that this article supports Dr. Cameron's opinion.

183. As a threshold matter, the ubiquinone that was used to make the 2006 Softgels was made in September 2004, over a year before the article on which Dr. Cameron relied was published. Dr. Cameron provides no evidence to suggest that the process used in September 2004 was the same process used in January 2006. As I explain above, process changes can affect whether CoQ11 is present in the ubiquinone.

184. Moreover, Dr. Cameron misunderstands the language on which he relies. The Ikematsu Article nowhere states that all Kaneka Q10 necessarily contained CoQ9 and CoQ11. Indeed, there is nothing in the article to suggest that the authors undertook such a comprehensive study. Thus, such a broad statement would lack foundation and would be unreliable in any event.

185. Instead, and as Mr. Ueda testified, the language relied upon by Dr. Cameron only "describes CoQ9 and CoQ11 as potential major impurities, but it does not say that they are ·necessarily present." **Exhibit 41** at 107:18-19. Indeed, Mr. Ueda further testified that in or around 2006, he was not aware of either CoQ9 or CoQ11 as major impurities in Kaneka's Q10 product, and that CoQ11 "was not something which was always present, necessarily." *Id.* at 108:7-8, 21-22. Dr. Cameron ignores Mr. Ueda's deposition testimony.

186. Against this background, it is clear that, at most, the author's statement was limited to the contents of the particular capsules used for the particular study that was the subject of the article, which does not speak to the content of Kaneka's QH generally in 2006, or, more importantly, the content of Kaneka's ubiquinone in September 2004 when Lot No. FB01-0001 was manufactured.

187. Moreover, Dr. Cameron fails to appreciate that Kaneka's process of reducing ubiquinone to ubiquinol involves a crystallization step, whose purpose is to remove any impurities from the reduced CoQ10 containing composition. *See* **Exhibit 41**, 83:10-16, 84:20-23, 91:16-25, 92:1-11, 94:8-15, 123:107.

188. The Ikematsu Article appears to refer to a formula used for the capsule in the study, which differs from the formula generally used for Kaneka's Q10. **Exhibit 53** at CoCrystal_0008259; **Exhibit 97** at KAN0012945; **Exhibit 98** at KAN0150285; **Exhibit 99** at KAN0012729.

**b) Deposition Testimony of Joshua Garey**

189. Dr. Cameron reports Mr. Garey "testified that Kaneka's production of CoQ10 resulted in Q11 as an impurity." Cameron Report at ¶ 123. This testimony does not support the application of the on-sale bar.

190. First, as with the Ikematsu Article, Mr. Garey's testimony regarded the then-current process (2022) to make ubiquinone, not the process that existed in September 2004. *See* Deposition Transcript of Joshua Garey (attached as **Exhibit 54**) at 49:23-25. Indeed, Mr. Garey could not testify as to the 2004 process used to produce ubiquinone because Mr. Garey began working for Kaneka in 2007. **Exhibit 54** at 15:4-7.

191. Moreover, the testimony relied upon by Dr. Cameron does not state that CoQ11 was present in 2022, only that Kaneka tested for it. Cameron Report at ¶ 123; *see also* **Exhibit 54**, 54:10-14 ("Q: Do you measure anything else in that solution. A: Any other – other impurities that could be in there. Q: Like what? A. Like Q9, Q11"). Finally, in light of the production changes that have taken place (*see* Section XII.A above), any evidence about the presence of CoQ11 in 2022 is not evidence of the presence of CoQ11 in 2004.

**c) Deposition Testimony of Mr. Ueda**

192. Dr. Cameron also relies on the following deposition testimony of Mr. Ueda: "the yeast strain Kaneka uses [ ] produces coenzyme Q11." Cameron Report at ¶ 123. As with Mr. Garey's testimony, Mr. Ueda's testimony speaks to the current contents of Kaneka's ubiquinone, it says nothing about the contents in September 2004. Indeed, Kaneka has modified the very yeast strain Mr. Ueda refers to multiple times since 2004. For all of the other reasons stated above, this testimony does not provide evidence of the contents of Kaneka's ubiquinone in 2004.

**d) Dr. Cameron's Experience**

193. Dr. Cameron next asserts that based on his own experience "at least some CoQ9 and CoQ11 will be inherently created" when ubiquinone is created by yeast. Cameron Report at ¶ 123. Dr. Cameron cites to no tests to support this theory. Nor does Dr. Cameron cite to any peer-reviewed article or treatise.

194. As stated above, there are a wide variety of yeast strains, fermentation conditions and fermentation procedures that can be used to produce ubiquinone. *Supra* Section IX.B. The concentration of CoQ10 produced and the bioproducts produced depends on the microorganism used as well as the fermentation conditions and media employed. I do not believe it is possible to assert with any degree of certainty that fermentation, using any yeast strain under any fermentation conditions and using any fermentation procedure, will always produce CoQ10 containing CoQ11. I have also reviewed at least one article that discloses a method for optimizing CoQ10 production using Agrobacterium tumefaciens in fed-batch culture, that nowhere mentions the presence of CoQ11 as an impurity. *See* **Exhibit 55**, KAN00009852.

195. Nor does Dr. Cameron square his theory with the demonstrated absence of CoQ11 in Kaneka's fermentation-produced ubiquinone in batches Lot Nos. FB01-0001 through 010 and

FB01-058 through 080, other than to speculate that CoQ11 was present but not detected. Nor does Dr. Cameron adequately address how such theoretical small amounts of CoQ11, if they were present, would survive the crystallization phase during the reduction process. **Exhibit 56**, KAN0062953, KAN0057555-56, KAN0068219, KAN0069046, KAN0070374, KAN0072618, KAN0073182, KAN0082481.

196. Ignoring contemporaneous evidence, Dr. Cameron relies upon testing results from 2017-2024 that show the presence of some amount of CoQ11. First, as stated above, the presence of CoQ11 in 2017-2024 says nothing about the presence of CoQ11 in 2004, particularly in light of the modifications to the ubiquinone production-process. Moreover, the ubiquinone sold in the United States is now manufactured domestically by KNL and is no longer produced at the manufacturing plant in Japan. I note also that Dr. Cameron appears to allow for the possibility that these changes could affect whether CoQ11 is present in the ubiquinol as he states that "neither of these changes, *without more information*, shows that $Q_{11}$ was introduced into the manufacturing process where none previously existed." Cameron Report at ¶ 74 (emphasis added).

197. Second, Dr. Cameron is wrong when he states that Kaneka's 2017-2024 test results "consistently show the presence of CoQ11, without exception." Cameron Report at ¶ 73, n.17. I am aware of at least one batch of ubiquinol made in 2018 that lacked CoQ11. *See* **Exhibit 56**, KAN0062953, KAN0057555-56, KAN0068219, KAN0069046, KAN0070374, KAN0072618, KAN0073182, KAN0082481. Dr. Cameron fails to explain or otherwise address how the absence of CoQ11 in this batch is consistent with his theory that CoQ11 is always present.

198. Nor does Dr. Cameron adequately reconcile relying on the HPLC test results from 2017 to 2024 (that support his theory) and dismissing the HPLC test results from 2004 to 2007 that do not.[6]

199. Indeed, Dr. Cameron's attempts to address this inconsistency is unpersuasive. Dr. Cameron asserts that comparing 2004 test results to post-2004 test results would be "comparing apples to oranges" because the group who did the analysis changed and "the way in which the analysis was done changed." Cameron Report at ¶ 87. But Dr. Cameron provides no basis to question either set of test results. Indeed, so long as the HPLC method was properly validated, which I have been informed they were, the HPLC tests are reliable regardless of the identity of the lab technician performing the analysis or and whether the exact same HPLC method was used.

200. Dr. Cameron also asserts that the test results for batch Lot No. FB01-0002 evidence the presence of CoQ11. Dr. Cameron is wrong. As a threshold matter, Lot No. FB01-0001 was used to manufacture the 2006 Softgels, not Lot No. FB01-0002. Thus, the presence (or absence) of CoQ11 in Lot No. FB01-0002 is not relevant to the on-sale bar analysis. Dr. Cameron does not argue that the test results for batch Lot No. FB01-0001 show the presence of CoQ11. Indeed, the HPLC chromatograms show no peak at what Dr. Cameron believes (incorrectly) to be the retention time of CoQ11. *See* **Exhibit 45** at KAN0079891-896.

201. Moreover, the test results for Lot No. FB01-0002 do not evidence the presence of CoQ11. Dr. Cameron bases his argument on the fact that KAN0079898 (**Exhibit 46**) includes a table that (Dr. Cameron believes) indicates a 25.174 retention time for CoQ11. Cameron Report

[6] The fact that Kaneka may use LC-MS/MS testing (Cameron Report at ¶ 82) is irrelevant and does not overcome the lack of evidence concerning the presence of CoQ11 in the 2006 Softgels.

at ¶ 84. Dr. Cameron then points to the chromatograms associated with this lot that show a peak at 24.977 (for N1), 25.020 (for N2), 25.034 (for N3), 25.069 (for N4) and 25.094 (for N5). *Id.* Dr. Cameron then concludes "the raw test results themselves are actually consistent with the presence of at least some reduce CoQ11." Cameron Report at ¶¶ 84-85.

202. Dr. Cameron ignores the summary test results table which indicate that these peaks are for oxidized CoQ10 (referred to in the table below as "QX"), not CoQ11. Each of the retention times relied upon by Dr. Cameron—24.977 (for N1), 25.020 (for N2), 25.034 (for N3), 25.069 (for N4) and 25.094 (for N5)—are listed as the retention times for oxidized CoQ10, i.e., QX.

| HPLC法 | | 試料溶液 | | | | |
|---|---|---|---|---|---|---|
| | | N1 | N2 | N3 | N4 | N5 |
| 秤量値 | mg | 49.95 | 49.95 | 50.03 | 49.98 | 49.97 |
| QH保持時間 | min. | 14.431 | 14.447 | 14.462 | 14.473 | 14.484 |
| QH面積値 | | 1253541 | 1290710 | 1275976 | 1294343 | 1299715 |
| QH含量(※3)(少数2桁表示) | % | 97.68 | 99.36 | 98.18 | 99.39 | 99.80 |
| QX保持時間 | min. | 24.977 | 25.020 | 25.034 | 25.069 | 25.094 |

*See* **Exhibit 46** at KAN0079898.

203. Moreover, the table indicates that there was no CoQ11 detected.

| | | | | | | |
|---|---|---|---|---|---|---|
| R11面積値 | | 0 | 0 | 0 | 0 | 0 |

*Id.*

204. Other than the tiny peaks at 2.3 to 2.6 seconds, which not even Dr. Cameron contends is CoQ11, there are only two distinct peaks on each of the chromatograms for FB01-0002. Because at least some oxidized CoQ10 is expected to be present in the composition, the peaks at 24.977 (for N1), 25.020 (for N2), 25.034 (for N3), 25.069 (for N4) and 25.094 (for N5) must reflect oxidized CoQ10.

205. Indeed, Dr. Cameron's assertion ignores Mr. Ueda's deposition testimony in which he explained that the retention time shown in **Exhibit 46** at KAN0079898 for CoQ11 was only an "anticipated retention time." **Exhibit 41** at 128:5-6. Mr. Ueda explained that "the reason for that is that in liquid chromatography, a very minor change in composition in the middle phase can result in a change in location of the peak." *Id*. at 128: 8-11. As evidence of this volatility, Mr. Ueda noted that in each of the chromatograms, the retention time for oxidized CoQ10 moved. *Id*. at 128:11-21. Mr. Ueda further explained that if CoQ11 were depicted on the chromatograms, there would be an additional peak between the retention times for reduced CoQ10 and oxidized CoQ10.[7] Id. at 131:9-10, 16-18. There is no such peak.

**e) Trademark Application**

206. In his on-sale bar analysis, Dr. Cameron also relies upon a trademark application filed by Kaneka for "KANEKA QH" which states that "The mark was first used on the goods specified on March 1, 2006 and was first used on the goods specified in commerce in the U.S. and Japan on March 1, 2006." I have been informed that the fact that Kaneka may have sold a product named "Kaneka QH" in 2006 is inconsequential. The relevant question is whether that product practiced each claim limitation of the Asserted Claims. As explained above and below, contemporaneous evidence establishes that the 2006 Softgels did not practice the Asserted Claims.

**2. Claim Limitation 5[b] and 15[c]**

[7] As "circumstantial evidence" that the 2006 Softgels practices the invention, Dr. Cameron cites to Mr. Ueda's knowledge that ubiquinol was going to be put on sale and his testimony that the patent was to be given priority due to the on-sale bar. First, this "circumstantial evidence" cannot overcome definitive test results, showing there was not CoQ11 in the 2006 Softgels. Second, to the extent this "circumstantial evidence" is relevant, it indicates that Kaneka employees were well aware of the on-sale bar issue, and would have ensured they did not sell a product that practiced the invention of the '080 Patent more than a year before filing for the '080 Patent.

207. In his on-sale bar analysis, Dr. Cameron largely relies on the alleged presence of CoQ11 in the ubiquinone used to make the 2006 Softgels as his basis for concluding that claim limitation 5[b] and 15[c] are met. For the reasons stated above, Dr. Cameron's premise concerning the presence of CoQ11 in the starting ubiquinone is incorrect, and thus his conclusion that the 2006 Softgels satisfy claim limitations 5[b] and 15[c] is also incorrect.

208. Dr. Cameron also cites U.S. Patent Publication No. 2007/0258967 (the "'967 Application") (attached as **Exhibit 57,** CoCrystal_0000610) which states that "when reduced coenzyme Q10 is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme Q10 analogs (e.g., cis-reduced coenzyme Q10, ubichromenol, reduced coenzyme Q11, etc.) are contained therein." Cameron Report at ¶ 70. It is not clear why Dr. Cameron cites this provision, as he merely quotes that portion of the patent application without comment. *Id.* To the extent that Dr. Cameron is asserting that this language supports his opinion that CoQ11 is always present in any CoQ10-containing composition, he is wrong. Indeed, as one of the inventors of the '080 Patent testified, this language was intended to only list the possible impurities that might be present. *See* **Exhibit 41**, 100:17-18. ("[I]t says e.g., and then gives a list and ends with et cetera, therefore I do not think that these [are] necessarily present or contained" in CoQ10). As Mr. Ueda explained:

> [I]t is listing [CoQ11] as a substance, which could potentially be present. It is not saying that it is always present . . . It's saying that these items are also possibly present . . . My understanding is that depending on the manufacturing method, [CoQ11] could be included or it might not be included, and the same applies not only to . . . Ubichromenol.

*Id.* at 100:24-101:16; *see also id.* at 100:9-18, 101:1-8, 101:13-16, 106:10-13, 143:19-25, 106:10-13; *see also* **Exhibit 60**, KAN0080434 (showing the absence of ubichromenol in Kaneka's ubiquinol).

209. To add "further independent evidence" for his conclusion, Dr. Cameron also cites to the additional deposition testimony of Mr. Ueda, the deposition testimony of Dr. Funahashi, Kaneka's discovery responses and the deposition testimony of Ms. Mansell. Dr. Cameron's reliance is misplaced. Indeed, he admits that this purported evidence "[was] not specific in time or else applied to Kaneka QH after April 28, 2006 (except for Ms. Mansell)… ." Cameron Report at ¶ 73. With respect to Ms. Mansell, she testified that she began working for Kaneka long after the manufacture of Lot No. FB01-0001. *See* Deposition Transcript of Teresa Mansell (attached as **Exhibit 58**) at 10:8-17.

### 3. Evidence Supporting Experimental Use

210. I have been informed that the experimental use exception to the on-sale bar may apply when sales are made primarily for experimental purposes to test the claimed invention or determine whether it will work for its intended purpose. I have been informed that the experimental use exception focuses on the purpose and nature of the sale from the perspective of the buyer and the transaction itself, and does not require that the patent inventors be personally involved in or aware of the subsequent testing. I have been informed that courts consider factors such as whether the sales were made for experimental rather than commercial purposes, the relationship between the parties, any statements about the experimental nature of the transaction, and whether payment was made or the transaction had commercial value.

211. The documents I have reviewed support that the 2006 Softgel Shipment was for experimental use. I have been informed that Kaneka worked with ETI in the past to conduct trials of its products. With respect to the transaction at issue, KNL provided 127,900 softgels to ETI, the lion's share of which (91,600 softgels) were provided at no cost. *See* **Exhibit 59**, KAN0022587.

Handwritten notes on the shipping label indicates that these 91,600 softgels had "non commercial value." *Id.*

212. Moreover, I have reviewed documents evidencing transfers of ubiquinol from Kaneka or KNL to ETI in or around 2006 (*see* **Exhibit 61** at KAN0032513-611), which provide evidence that the 2006 Shipment was for experimental use. Indeed, the documents show that the 2006 Shipment was not the only shipment of softgels that KNL provided to ETI at no cost. On or about June 19, 2006, KNL provided 200 additional softgels (from Lot No. FB31-002) to ETI at no cost. **Exhibit 61** at KAN0032531. And on or about August 7, 2006, shipped 2 kilograms of bulk ubiquinol (from lot FB01-0001) to ETI again at no cost. **Exhibit 61** at KAN0032539-41. On September 25, 2006, KNL shipped an additional 200 softgels (from lot FB31-002) to ETI again at no cost. **Exhibit 61** at KAN0032560-563. On November 10, 2006, KNL shipped an additional 200 softgels (from lot FB31-002) to ETI again at no cost. 0032573. Finally, on November 30, 2006, KNL shipped an additional 300 softgels (from lot FB31-003) to ETI again at no cost. **Exhibit 61** at KAN0032582, 584-586. Thus in 2006, ETI was provided with 92,900 softgels and two kilograms of bulk ubiquinol at no cost. I have been informed that Kaneka's promotional materials indicate Kaneka first starting selling ubiquinol for commercial use in 2007. **Exhibit 62**, KAN0147551-558 and KAN0148057-071.

## XIII. THE ASSERTED CLAIMS ARE NOT ANTICIPATED

213. Inherent anticipation requires that all claim elements be explicitly or inherently present in a single prior art reference, and that, following the teaching of that reference, all claim elements are always present. Any undisclosed feature must be necessarily present, not merely likely or possibly present, in every reduced CoQ10-containing composition, regardless of the starting materials or the process used to create such a composition. *Supra* Section VII(D). Dr.

Cameron cites to no natural law, scientific article or treatise that stands for this proposition, because no such law, article or treatise exists. Indeed, scientific literature reports the existence of reduced CoQ10 without any mention of CoQ11.

**A. The '040 Application Does Not Inherently Disclose the Asserted Claims of the '080 Patent**

214. Dr. Cameron also opines that the Asserted Claims are invalid pursuant to 35 U.S.C. § 102 in light of the '040 Application and additional references. I disagree.

215. Dr. Cameron attempts to establish inherent anticipation by using the '040 Application as his primary reference, then improperly importing an "inherency" conclusion derived from multiple other references to fill the gaps in his primary reference. The '040 Application does disclose all the claim elements of the Asserted Claims. For example, Dr. Cameron cannot use Reference A to establish one claim element, Reference B to establish another, and Reference C to establish a third, then combine them all to argue that Reference D inherently anticipates. Moreover, none of the secondary references Dr. Cameron relies upon to establish his "CoQ11 is everywhere" premise actually disclose all the claim elements themselves—they uniformly fail to teach the specific weight percentages.

**1. The '040 Application**

216. Dr. Cameron opines that the '040 Application discloses each claim limitation for the Asserted Claims, either expressly or inherently. Cameron Report at ¶ 99. Specifically, Dr. Cameron opines the following: (1) that the claim 15 limitation of "providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$" is inherently anticipated by the '040 Patent (Cameron Report at ¶ 10); (2) that the limitation of "one or both of (a) and (b): (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and (b) reduced coenzyme $Q_{11}$" of the

Asserted Claims are inherently disclosed by the ’040 Patent (Cameron Report at ¶ 103); and (3) that the limitation of “wherein not less than 0.01 wt % of reduced coenzyme Q10 is contained in the composition” of the Asserted Claims is expressly disclosed by the ’040 Patent. Cameron Report at ¶ 102. Dr. Cameron’s arguments assume that both CoQ9 in the claimed amounts CoQ11 are present in every CoQ10 composition. There is no support for this opinion in this reference and he provides no evidence of inherency of either CoQ9 in the specific weight percentages or CoQ11 necessarily and inevitably being present in all compositions containing CoQ10.

217. As a threshold matter, regarding claim 15, Dr. Cameron’s inherent anticipation argument fundamentally fails when applied to Claim 15 because, as a method claim, it requires specific, deliberate, and intentional human actions that cannot be “inherently” disclosed by prior art references. Claim 15 recites “A method for producing a coenzyme $Q_{10}$-containing composition, which method comprises providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, and then reducing” these oxidized forms. This claim requires the deliberate and intentional act of (1) selecting and providing a starting composition that contains oxidized CoQ11, and (2) intentionally reducing both the CoQ10 and CoQ11 to achieve the specific ratios and purity levels recited in the claim limitations. Dr. Cameron’s theory that CoQ11 might accidentally be present as a trace impurity in some starting materials cannot establish inherent anticipation of a method that requires deliberately providing and reducing Q11-containing compositions. It is my understanding that the doctrine of inherent anticipation requires that the allegedly inherent feature be necessarily present and would be so recognized by a POSA—but a method claim demands intentional performance of each step, not merely accidental occurrence of the end result. None of Dr. Cameron’s cited references teach or suggest the deliberate selection of CoQ11-containing starting materials or the intentional reduction

of such materials to achieve the claimed composition characteristics. Indeed, many of the references he cites describe purification processes specifically designed to remove CoQ11 as an impurity, which is the opposite of the deliberate inclusion and reduction steps required by Claim 15.

218. Dr. Cameron's anticipation argument fails because the '040 Application explicitly teaches that "the oxidized coenzyme $Q_{10}$ to be used in the practice of the invention may be one prepared by synthesis, fermentation, or extraction from a natural product" or "an existing high-purity grade of coenzyme $Q_{10}$" – thereby encompassing multiple distinct production methods with vastly different impurity profiles. Since the '040 Application does not mandate any particular starting material or production method, Dr. Cameron cannot establish that every embodiment disclosed by the '040 Application would necessarily contain CoQ11. Chemical synthesis methods, for example, can produce CoQ10 with completely different impurity profiles than fermentation methods, and extraction from different natural sources yields varying compositions.

219. Dr. Cameron appears to recognize this limitation when he states that it is his opinion only that "there would be an inherent presence of oxidized Q11 in a composition containing oxidized Q10 produced by at least fermentation." Cameron Report, 104. It appears based on the qualifier "produced by at least fermentation" that Dr. Cameron offers no opinion on whether CoQ10 can be created by synthesis or extraction without CoQ11. Indeed, prior art references make clear that such methods do in fact produce CoQ10 without CoQ11. *See* Section XIII(B).

220. Because under Dr. Cameron's theory, all CoQ10 created in accordance with the disclosed invention must necessarily contained CoQ11, and because the CoQ10 in the '040 Application could be created by synthesis and extraction (*See* **Exhibit 6** at ¶ [0058]), it is clear

that even under Dr. Cameron's opinion, it is possible to create CoQ10 without CoQ11. For this reason, I disagree with Dr. Cameron's opinion.

221. Moreover, as I have made clear above and explain below, there is no evidence that creating CoQ10 by fermentation—regardless of yeast strain used, the fermentation conditions and the fermentation procedures—will always result in the production of CoQ11. For this additional reason, I disagree with Dr. Cameron's opinion.

### 2. The USP Standard for Ubidecarenone

222. Similarly, Dr. Cameron's reliance on the USP Standard (attached as **Exhibit 63**, CoCrystal_0000693) listing CoQ11 as a known "impurity" is misplaced because identifying something as a potential impurity means only that it could be present in some samples, not that it is necessarily present in all samples. The USP Standard establishes testing protocols and limits precisely because the presence and concentration of impurities like CoQ11 varies depending on the source and manufacturing method – if CoQ11 were inherently present in all oxidized CoQ10, there would be no need for testing protocols to detect its presence or absence. Dr. Cameron's anticipation theory thus fails because he cannot demonstrate that every possible embodiment of the '040 Application's broad disclosure would necessarily contain CoQ11, particularly given the multiple production pathways explicitly contemplated by the reference.

### 3. The '967 Application

223. Dr. Cameron's reference to the '967 Application fares no better, as the '967 Application repeatedly mentions that CoQ11 may *or may not* be included in the CoQ10-containing composition, thereby refuting Dr. Cameron's position that CoQ11 is necessarily in the CoQ10-containing composition of the Asserted Claims. *See* **Exhibit 57**, '967 Patent, Claims 1, 7, 13, 21

("at least one reduced coenzyme $Q_{10}$ analog selected from the group consisting of cis-reduced coenzyme $Q_{10}$, reduced coenzyme $Q_{11}$, and ubichromenol").

**4. Kaneka's September 13, 2006 Specification for Kaneka QH**

224. Kaneka's September 13, 2006 Specification for Kaneka QH (attached as **Exhibit 64**, KAN0012954-960) fails to disclose that CoQ11 is an impurity that is present in every CoQ10-containing composition. While this reference notes that CoQ11 is a related impurity of Ubiquinol, besides disclosing its relative retention time for HPLC analysis, there is no further discussion or mention of CoQ11. *See* **Exhibit 64** at KAN0012959. This reference does not state that CoQ11 is always present.

**5. "Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics," Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety Members, April 14, 2022**

225. The referenced article entitled *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics* is a scientific review article (attached as **Exhibit 65**, CoCrystal_0000454) that evaluates the safety of four ubiquinone-related ingredients used in cosmetic formulations (Disodium Ubiquinone, Hydroxydecyl Ubiquinone, Ubiquinol, and Ubiquinone/coenzyme Q10). *See* **Exhibit 65**, CoCrystal_0000454-481. The assessment contains detailed information about chemical properties, manufacturing methods, natural occurrence, and potential impurities—notably mentioning that CoQ9 and CoQ11 are the two major impurities in ubiquinone produced by yeast fermentation. *Id.* That CoQ11 may be a potential impurity in yeast-produced CoQ10 does not establish that it is always an impurity. Moreover, this reference says nothing about CoQ10 produced from other yeast strains or bacterial sources, chemically synthesized or extracted from plants, animals or seeds. Nor does this reference conclude or disclose that CoQ11 is inherently present in every CoQ10-contianing composition.

**6. U.S. Patent Publication No. 2020/0087235 and U.S. Patent No. 11,773,043B2**

226. Dr. Cameron references U.S. Patent Publication No. 2020/0087235 (the "'235 Application") (attached as **Exhibit 66**, CoCrystal_0000714), which is a patent application primarily directed toward purification methods for CoQ10 rather than its initial production. **Exhibit 66**, CoCrystal_0000714, Abstract. The entire technical disclosure focuses on purifying pre-existing CoQ10-containing crude product that has already been obtained through other means such as animal/plant extraction, chemical synthesis, or microbial fermentation. *Id.* It nowhere states that CoQ11 is always present in CoQ10.

227. The '235 Application details a multi-step purification process involving chromatographic columns (both normal-phase and reverse-phase), various solvent systems, and crystallization techniques to achieve highly purified CoQ10 with greater than 99.7% purity. *Id*. at ¶¶ [0103]-[0136]. The application addresses purification challenges such as removing impurities like CoQ9, CoQ10 isomeride, and/or CoQ11 while improving yield and reducing solvent usage compared to existing methods. *Id.* at ¶¶ [0053], [0109]. At no point does the patent describe actual biosynthesis or chemical synthesis methods for creating the initial CoQ10 molecules, nor does it state that CoQ11 is always an impurity.

228. Dr. Cameron also references U.S. Patent No. 11,773,043B2 (the "'043 Patent") (attached as **Exhibit 67**, CoCrystal_0000516), which is the issued patent of the '235 Application. The '043 Patent is also directed towards methods for purifying CoQ10. **Exhibit 67**, CoCrystal_0000516, Abstract.

229. Dr. Cameron cites the following passage from this reference: "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the

aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride [and] coenzyme $Q_{11}$." Cameron Report at ¶ 103.

230. As explained with regards to the other references above, and for the same reasons as those relating to the '235 Application, this statement from the '043 Patent merely recites the possible presence of certain homologs in a CoQ10 sample. Neither reference teaches nor otherwise concludes that CoQ11 is necessarily present in every CoQ10-containing compound.

**7. WO2021036386A1**

231. WIPO(PCT) Application No. WO2021036386A1 (the "WO Patent Application") (attached as **Exhibit 68**, CoCrystal_0000771) teaches a simulated moving bed continuous chromatography system and an application thereof, and a method for purifying CoQ10. **Exhibit 68**, CoCrystal_0000771 at Abstract. Dr. Cameron cites this reference for the proposition that for CoQ10 extract, the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 - demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11." Cameron Report at ¶ 103.

232. A crude extract in the context of coenzyme isolation represents the initial preparation obtained from biological sources (typically microorganisms for coenzymes like CoQ10) containing a complex mixture of the target coenzyme along with various cellular impurities. For CoQ10 specifically, the crude extract is obtained from microbial fermentation and contains numerous structurally similar compounds that make purification challenging. *Id.* at CoCrystal_0000773. According to the WO Patent Application, the microorganisms are filtered, dried, and ground to prepare for extraction. *Id.*

233. The resulting crude extract requires significant further purification, as the WO Patent Application notes that CoQ10 crude extracts typically contain various related quinone

compounds with different isoprenoid side chain lengths, which have very similar chemical properties, making separation particularly difficult. *Id.*

234. The purification system detailed in the WO Patent Application addresses the limitations of working with coenzyme crude extracts, achieving purity levels above 99% while extending column life and improving process efficiency – critical factors when scaling up from laboratory to industrial production of high-purity coenzymes for pharmaceutical and nutritional applications.

235. As with the other references, this statement merely recites the possible presence of certain homologs in a CoQ10 sample. It does not teach nor otherwise conclude that CoQ11 is necessarily present in every CoQ10-containing compound.

**8. CN108084007B**

236. Chinese Patent Publication No. CN108084007B (attached as **Exhibit 69**, CoCrystal_0000749) states that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10." **Exhibit 69** at CoCrystal_0000750.

237. Again, this reference fails to disclose that even as an impurity, CoQ11 is necessarily present in every CoQ10-containing compound. This reference, and the statement quoted by Dr. Cameron, merely recites the possibility that CoQ11 may be present in the "crude extract of coenzyme Q10." *Id.*

**9. CN108047014B**

238. Chinese Patent Publication No. CN108047014B **(**attached as **Exhibit 70**, CoCrystal_0000742) states that the "crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and

because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar." **Exhibit 70** at CoCrystal_0000743.

239. For the same reasons set forth above regarding the other references, Dr. Cameron's reliance on this reference does not establish that CoQ11 is necessarily present in every CoQ10-containing compound, only the mere possibility that such presence could occur.

**10. Mr. Kitamura's Testimony**

240. Dr. Cameron references Mr. Kitamura's testimony that he "bec[a]me aware that there was reduced Q9 and reduced Q11 within reduced Q10." **Exhibit 43**, 60:8-9. However, similar to the references discussed above, Mr. Kitamura does not state or otherwise assert that CoQ11 could be found within every CoQ10-containing composition.

241. Although the above references identify CoQ11 as an impurity, they are absent of any disclosure that the starting material, oxidized CoQ10 or reduced CoQ10, necessarily contains oxidized CoQ11 in every instance. Furthermore, these references do not disclose the "not less than 1.5 wt % to not more than 99 wt% of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$," limitation as required by the Asserted Claims.

242. Dr. Cameron's own testimony refutes the notion that CoQ11 is inherently present in the CoQ10-containing compositions of the Asserted Claims, stating that "**occasionally** the enzyme gets it wrong … and therefore makes a small amount of $CoQ_9$ and $CoQ_{11}$. Another way to say this is that the enzyme is **not always perfect**, and will make errors." Cameron Report at ¶ 104 (emphasis added). By Dr. Cameron's own admission, CoQ11 is not always present in a CoQ10-containing composition.

243. Moreover, under Dr. Cameron's argument, if the mere fact that CoQ11 is an impurity of CoQ10 and is therefore inherently present, then this would mean that each of the

homologs (e.g., those listed in the USP Standard, including CoQ7, CoQ8, CoQ9, CoQ11) would also be inherently present—in every CoQ10-containing sample. *See* **Exhibit 63** at CoCrystal_0000697. Each of the aforementioned references, and the additional references discussed below, refute such a position, as nothing in scientific literature makes the claim that CoQ11, let alone every impurity, is always necessarily present in a CoQ10-containing composition.

### B. Dr. Cameron's Opinion that the '040 Application "Inherently" Disclose the Presence of CoQ11 Because of its "Inherent Presence" in Every Reduced CoQ10-Containing Sample Ignores Scientific Literature to the Contrary

244. Dr. Cameron opines that CoQ11 is inherently in the starting composition of the CoQ10-containing composition of the Asserted Claims, but for the reasons set forth above, I disagree. *See supra* at Section XIII.A.. Furthermore, the scientific literature discussed below reports on the absence of CoQ11 in CoQ10 samples, thereby refuting Dr. Cameron's arguments. *See infra* at Section XIII.B.1-9.

#### 1. Whistance, G.R. & Threlfall, D.R., *Biosynthesis of Ubiquinone—A Search for Polyprenyl Phenol and Quinone Precursors*, Phytochemistry, 9, 355-359 (1969) ("Whistance")

245. Whistance (attached as **Exhibit 71**, KAN0009876-880) examines ubiquinone biosynthesis in plants and algae and identifies various ubiquinone homologs, including CoQ9, CoQ10, and CoQ11. It shows that different plant and algal species produce different ubiquinone homologs. While CoQ11 is present following biosynthesis of certain plants and algae, it is absent with respect to others.

246. Whistance specifically examined eight "higher plant species . . . to determine the identities of the ubiquinone homologues present." *Id.* at 356. All of the examined tissues were

found to contain a series of ubiquinones. *Id.* The authors summarized their findings in the table set forth below:

TABLE 1. UBIQUINONE CONTENT OF HIGHER PLANT TISSUES

| Plant tissue | Wet wt. of tissue analysed (kg) | Ubiquinone content (μg/kg fresh wt.) −7 | −8 | −9 | −10 | −11 | −12 |
|---|---|---|---|---|---|---|---|
| Etiolated maize shoots (*Zea mays*) | 0·8 | — | 50 | 2420 | Detected by radioautography | | |
| Young lettuce (head of *Latuca sativa*) | 0·4 | — | 13 | 331 | — | — | — |
| Young chicory (*Chicorium intybus*) | 1·0 | — | 3 | 260 | — | — | — |
| Green melon (fruit of *Cucumis melo*)* | 0·7 | 12 | 31 | 1786 | 121 | — | — |
| Cucumber (fruit of *Cucumis sativus*)* | 1·0 | — | Trace | 310 | 23 | — | — |
| Leek (*Allium parrum*) | 1·0 | — | 22 | 341 | 636 | — | — |
| Brussels sprouts (leaves of *Brassica oleracea*) | 1·0 | — | — | 24 | 2230 | — | — |
| Green Peppers (fruit of *Capsicum annuum*)* | 2·0 | — | 3 | 47 | 506 | 137† | 8† |

**Exhibit 71** at KAN0009878.

247. As is evident from the table above, and relevant for my analysis here, Whistance reports that the homologs extracted from each of green melon, cucumber, leek and brussels sprouts contain CoQ10 *but not* CoQ11.

248. Despite "an intensive search," the authors of Whistance found "no evidence for the presence of ubiquinones-11 . . . in other higher plants" that contain CoQ10. *See* Whistance et al., *Isolation of Ubiquinone-11 and Ubiquinone-12 From Green Peppers*, Biochem J. 1969 Jul; 113(3):38P–39P (attached as **Exhibit 72**). Indeed, the analysis conducted was sensitive enough to detect homologs in the amount of 3 μg/kg, or approximately 0.00000003% in young chicory, and found even an even smaller amount of coenzyme $Q_8$ ("CoQ8")—described as "trace" amounts—in cucumber. **Exhibit 71** at KAN0009878.

249. This article makes clear that the presence of CoQ11 is neither inevitable nor inherently present in the CoQ10-containing composition of the Asserted Claims.

**2. Deng et al., *Characterization of unknown impurities in Coenzyme Q10 using LC-MS and NMR*, Journal of Pharmaceutical and Biomedical Analysis, 175 (2019) ("Deng")**

250. Deng (attached as **Exhibit 73**, KAN0010082) investigates impurities in commercial CoQ10 production using ultra-high-performance liquid chromatography (UHPLC) and Nuclear Magnetic Resonance (NMR) spectroscopy. The study identifies the following "six known impurities" of CoQ10: the hydroquinone form of coenzyme Q, coenzyme Q5, coenzyme Q6, coenzyme Q7, a cyclized form of CoQ10 that exists as enantiomers, and CoQ8. *See* **Exhibit 73** at KAN0010083-89, Figure 1, structures E–J.

251. Deng does not list CoQ11 as an impurity of the CoQ10 analyzed in his article. *See* **Exhibit 73**.

**3. Lipshutz et al., *A Short, Highly Efficient Synthesis of Coenzyme $Q_{10}$*, J. Am. Chem. Soc., 124, 14282-14282 (2002) ("Lipshutz")**

252. Lipshutz (attached as **Exhibit 74**, KAN0009881-82) discloses a synthetic route to produce CoQ10. It details a six-step chemical synthesis pathway that achieves a 64% overall yield of CoQ10, which the authors claim is the most efficient synthesis reported up to that date. **Exhibit 74** at KAN0009882. The route begins with solanesol (extracted from tobacco leaves) and employs a nickel-catalyzed cross-coupling reaction to join the two main structural components of CoQ10: the polar quinone headgroup and the lipophilic 49-carbon hydrocarbon side chain. **Exhibit 74**. What makes this synthesis particularly noteworthy is that it avoids typical impurities found in commercially produced CoQ10 (which is primarily manufactured through fermentation), such as cis-isomers and CoQ9. *Id.* at KAN0009882. The authors emphasize that their synthetic CoQ10 was identical to authentic material in all respects. *Id.*

253. It is clear that this reference teaches the synthesis of CoQ10 that would result in CoQ10 with no CoQ11. I know this because the synthesis route described by Lipshutz employs a

highly controlled step-by-step process that precisely builds the molecule with exactly 10 isoprenyl units. **Exhibit 74**. The synthesis begins with solanesol (which has 9 isoprenyl units) and converts it through well-defined chemical transformations to create the exact 50-carbon side chain needed for CoQ10. *Id.* The authors specifically emphasize that "by virtue of the synthetic sequence outlined herein, typical impurities such as the corresponding cis-isomer and CoQ9, oftentimes found in CoQ10 which is produced industrially almost entirely by fermentation, are completely averted." **Exhibit 74** at KAN0009882. This indicates that the synthetic pathway eliminates common impurities through precise chemical control. Since CoQ11 would require an additional isoprenyl unit (resulting in a 55-carbon side chain), and there is no mechanism in this synthesis that would create or incorporate this extra unit, the process would not generate CoQ11 as an impurity. The authors also note that their synthetic CoQ10 "was identical to authentic material in all respects," further confirming the high purity of the final product. *Id*. Lipshutz does not disclose the presence of CoQ11 in conjunction with the synthesized CoQ10.

**4. Rao et al., Simultaneous Separation and Determination of Coenzyme $Q_{10}$ and Its Process Related Impurities by NARP-HPLC and Atmospheric Pressure Chemical Ionization-Mass Spectrometry (APCI-MS), J. of Pharm. And Biomed. Anal. 47, 230-237, (2008) ("Rao")**

254. Rao (attached as **Exhibit 75**, KAN0009826-835) discloses a non-aqueous reversed phase high performance liquid chromatographic (NARP-HPLC) method for determination of CoQ10 in pharmaceutical preparations and identification of its process-related impurities. **Exhibit 75**, Abstract. The paper presents a validated analytical method using a Kromosil C8 column with acetonitrile and isopropyl alcohol (84:16, v/v) as the mobile phase, capable of separating and quantifying four specific impurities: 2,3-dimethoxy-5-methyl-p-benzoquinone, solanesol, solanesyl acetone, and isodecaprenol. **Exhibit 75**. The impurities were identified using atmospheric pressure chemical ionization-mass spectrometry ("APCI-MS"). **Exhibit 75** at

KAN0009834. This method is described as simple, rapid, selective, and capable of detecting process impurities at trace levels with detection limits below 0.1 µg/ml, making it suitable for both monitoring reactions during process development and quality assurance of CoQ10 products. **Exhibit 75**, Abstract.

255. It is clear that this reference teaches a validated analytical method for the separation and determination of CoQ10 and its four specific process-related impurities in pharmaceutical preparations. I know this because the paper presents detailed experimental procedures, optimization parameters, and validation data for a non-aqueous reversed phase HPLC method using a Kromosil C8 column with acetonitrile and isopropyl alcohol (84:16, v/v) as mobile phase. **Exhibit 75**. Figure 1 explicitly shows the chemical structures of CoQ10 (labeled as V) and its four related substances: 2,3-dimethoxy-5-methyl-p-benzoquinone (I), solanesol (II), solanesyl acetone (III), and isodecaprenol (IV). *Id.* at KAN0009829. The method's specificity is demonstrated in Figure 4, showing chromatograms with clear separation of all impurities from the main CoQ10 peak. *Id.* at KAN0009830. Tables 2-6 provide comprehensive validation data including accuracy, precision, linearity, and detection limits for all compounds. *Id.* at KAN0009831-833. Furthermore, the paper confirms the identity of these impurities using APCI-MS as shown in Figure 5, which displays their characteristic mass spectra and fragmentation patterns. *Id.* at KAN0009834. Rao does not disclose the presence of CoQ11 as an impurity of CoQ10.

**5. Ha et al., Controlling the sucrose concentration increases Coenzyme Q10 production in fed-batch culture of Agrobacterium tumefaciens, Applied Microbiology and Biotechnology, 76(1), 109-116, (2007) ("Ha")**

256. Ha discloses a method for optimizing CoQ10 production using Agrobacterium tumefaciens in fed-batch culture by controlling sucrose concentration. **Exhibit 16**, Abstract. The researchers discovered that maintaining lower sucrose concentrations during fermentation

significantly improved production efficiency while reducing byproducts. *Id.* Importantly, this method was successfully scaled up from laboratory (5L) to pilot scale (300L) fermentation with similar results, demonstrating its industrial applicability. *Id.* There is no mention of CoQ11.

**6. Strazisar et al., Quantitative determination of coenzyme Q10 by liquid chromatography and liquid chromatography/mass spectrometry in dairy products, Journal of AOAC International, 88(4), 1020-1027 (2005) ("Strazisar")**

257. Strazisar (attached as **Exhibit 76**) focuses on naturally occurring CoQ10 in food products rather than manufactured CoQ10, providing no support for Cameron's claims about inevitable CoQ11 presence in industrial fermentation processes. **Exhibit 76** at 1020.

258. Strazisar provides multiple lines of evidence that undermine Cameron's "necessarily present" argument for CoQ11 in CoQ10 production. First, this research demonstrates successful extraction and quantification of CoQ10 from complex natural matrices (dairy products) without any mention of CoQ11 as an inevitable co-occurring impurity. *See* **Exhibit 76**. The authors developed methods that could accurately measure CoQ10 concentrations ranging from 0 to nearly 2 ppm across various dairy products, suggesting that CoQ10 can exist in natural biological systems without necessarily containing CoQ11 impurities. *See id.*

259. Second, the sophisticated extraction and purification procedures described in this study prove that effective separation techniques exist for isolating CoQ10 from complex mixtures. The authors successfully used n-hexane extraction followed by concentration and filtration to obtain pure CoQ10 samples suitable for analysis. *Id.* at 1021. These purification methods demonstrate that advanced extraction techniques can effectively separate CoQ10 from other compounds, contradicting Cameron's argument that Q11 must inevitably remain present due to production limitations.

260. Third, the analytical methods employed (both LC with UV detection and LC/MS) achieved high sensitivity (LOD = 0.1-0.2 mg/kg), reproducibility (RSD = 3.0-4.0%), and linearity (R > 0.999), proving that sophisticated analytical techniques can precisely measure CoQ10 without interference from related substances. *See* **Exhibit 76**. This analytical sophistication directly refutes Cameron's arguments about detection limits preventing the identification of Q11-free CoQ10 products.

261. Finally, the study's findings that CoQ10 concentrations varied dramatically across different dairy products (from 0 ppm in soybean milk to nearly 2 ppm in fresh milk) demonstrate that CoQ10 presence is variable and context-dependent rather than following inevitable biochemical patterns. *Id.* at Table 2. This variability contradicts Cameron's enzyme imperfection theory, which would predict more consistent impurity profiles if CoQ11 presence were truly inevitable in biological CoQ10 production.

**7. Bao et al., A simple and accurate method for the determination of related substances in coenzyme Q10 soft capsules, Molecules, 24(9), 1767 (2019) ("Bao")**

262. In Bao (attached as **Exhibit 77**), discussion includes quality control of CoQ10 soft capsules. Bao's ability to establish specific percentage limits for impurities (0.5%) demonstrates precise control over impurity levels. *See* **Exhibit 77** at 13. If CoQ11 were "necessarily present" as Dr. Cameron argues, such precise quantitative control would be impossible. The pharmaceutical industry's establishment of specific limits proves that impurity presence is a controlled manufacturing outcome, not an inevitable result. *Id.* at 13.

263. The authors' use of sophisticated analytical equipment to precisely measure and control impurities demonstrates the pharmaceutical industry's capability to detect and manage even trace amounts of substances like CoQ11. This analytical sophistication contradicts Cameron's

arguments about detection limits and supports the possibility of achieving impurity-free production through advanced purification methods. *Id.* at 12.

**8. Battino et al., *Natural distribution and occurrence of coenzyme Q homologues*, Membrane Biochemistry, 9, 179-190 (2009) ("Battino")**

264. The Battino study (attached as **Exhibit 78**, KAN0148156-167) provides systematic evidence regarding the natural occurrence of coenzyme Q homologues across multiple species that contradicts Dr. Cameron's assertion that CoQ11 is necessarily present in CoQ10 production. The researchers examined coenzyme Q distribution in tissues from humans, monkeys, pigs, horses, beef, chickens, and fish using standardized HPLC methodology to ensure consistent analytical conditions across all samples. *Id.* at KAN0148158.

265. Table 4 of the study demonstrates that homologs of CoQ10 are frequently not present in biological CoQ10-containing systems. Across the examined species, CoQ10 concentrations are measurable in the samples. *Id.* at KAN0148163-164. This contradicts the hypothesis that enzyme imperfection in fermentation processes inevitably produces CoQ11 as a byproduct, since these biological systems utilize similar biosynthetic pathways involving prenyl diphosphate synthase, yet achieve CoQ10 production without producing CoQ11. *Id.*

266. Additionally, the authors specifically note that "only samples from rodents contain more than one CoQ homolog," indicating that multiple homologue presence is species-specific rather than universally inherent to coenzyme Q biosynthesis. *Id.* at KAN0148162. This finding suggests that the enzymatic machinery responsible for CoQ10 production can operate with sufficient fidelity to produce predominantly CoQ10 without generating quantities of related homologues, depending on the specific biological system involved. *Id.*

267. This study establishes biological precedent for CoQ11-free CoQ10 production through natural fermentation-like processes. If multiple animal species routinely produce CoQ10

without CoQ11 through endogenous biosynthetic pathways that employ the same basic enzymatic mechanisms proposed in Cameron's theory, this undermines arguments that industrial fermentation must inevitably produce CoQ11. The existence of natural systems that achieve high-fidelity CoQ10 production demonstrates that such precision is biologically achievable. *Id.* at KAN0148164.

268. The authors attribute previous conflicting reports in the literature to "technical improvement of the analysis" rather than genuine biological differences, suggesting that historical detection of multiple homologues may reflect analytical limitations rather than universal biological presence. *Id.* at KAN0148157. This interpretation supports the position that advanced purification and analytical methods can distinguish between systems that do and do not contain CoQ11, and that the absence of detection in sophisticated analytical systems may reflect genuine absence rather than detection threshold limitations. *Id.* at KAN0148162.

**9. Cluis et al., The Production of Coenzyme Q10 in Microorganisms, In X. Wang et al. (Eds.), Reprogramming Microbial Metabolic Pathways (pp. 303-326). Springer Science+Business Media Dordrecht. (Subcellular Biochemistry, Vol. 64) (2012) ("Cluis")**

269. Cluis (attached as **Exhibit 96**) examines the microbial production of Coenzyme Q10 for pharmaceutical and cosmetic applications. It analyzes using CoQ10-producing microorganisms versus genetically engineering E. coli to produce CoQ10.

270. Cluis provides evidence that CoQ11 is not inherent in productions of CoQ10. Most importantly, it directly compares natural versus engineered systems: "S. baekryungensis produces CoQ10 with only minor traces of CoQ9, but no detectable CoQ11." **Exhibit 96** at 311. Therefore, Cluis demonstrates that a natural system produced CoQ10 without CoQ11.

### C. Dr. Cameron Misinterprets the Additional References He Relies Upon; They Do Not Establish that Oxidized CoQ11 is Inherently Present in Every Oxidized CoQ10-Containing Composition

271. None of the additional references relied upon by Dr. Cameron establish or conclude that oxidized CoQ11 is necessarily present in every oxidized CoQ10-containing composition of the Asserted Claims.

272. This notion is disproven by the references on which Dr. Cameron himself relies, including the article by James Gilbart and Matthew Collins, entitled *High-Performance Liquid Chromatographic Analysis of Ubiquinones from New Legionella Species* ("Gilbart") and the article by Teizi Urakami and Kazuo Komagata, entitled *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosome, Flectobacillus and Runella Species* ("Urakami").

#### 1. Urakami

273. Dr. Cameron relies upon Urakami (attached as **Exhibit 79**, CoCrystal_0000307) to support his opinion that oxidized CoQ11 is inherently present in the oxidized CoQ10-containing composition of the Asserted Claims. I disagree that Urakami supports such assertions.

274. Urakami is a scientific paper from 1986 that studies methanol-utilizing Ancylobacter strains and compares their cellular fatty acid compositions and quinone systems with other bacterial species. *See* **Exhibit 79**.

275. The reference analyzes the different quinone systems of various bacterial strains, specifically identifying that certain strains contain CoQ10 as a major component, with certain strains containing CoQ9 and CoQ11 as minor components. *See id* at Table 5.

276. Urakami shows only that CoQ11 is present with CoQ10 when fermenting CoQ10 from certain limited strains of bacteria. *Id.* Urakami does not consider or discuss CoQ10 produced

via other microorganisms under varying conditions and procedures, or CoQ10 produced via chemical synthesis or extraction. Urakami does not state or otherwise conclude that oxidized CoQ11 is necessarily or always present in oxidized CoQ10-containing compositions.

**2. Gilbart**

277. Gilbart (attached as **Exhibit 80,** CoCrystal_0000388) analyzes ubiquinone compositions in different bacterial Legionella species using HPLC. **Exhibit 80**, Table 1. The study reveals that different Legionella species contain varying ratios of ubiquinone compounds, with some strains showing high CoQ11 content and others showing little to none. *Id.*

278. Gilbart reports multiple instances in which CoQ10 was found absent of other homologs, like CoQ8, in ubiquinone compositions made by Legionella oakridgensis ATCC33761(T), Legionella wadsworthii (ATCC33877(T), and Legionella species 1466(E) and 1362(E). *Id*.

279. While Gilbart shows that CoQ11 is s present with CoQ11 when fermenting CoQ10 from certain limited strains of bacteria, Gilbart does not consider or discuss CoQ10 produced via other microorganisms under varying conditions and procedures, or CoQ10 produced via chemical synthesis or extraction. *See* **Exhibit 80**. Furthermore, Gilbart does not state or otherwise conclude that oxidized CoQ11 is inherently or always present in oxidized CoQ10-containing samples.

**3. U.S. Patent Publication No. 2006/0134085**

280. United States Patent Publication No. 2006/0134085 (the "'085 Application") (attached as **Exhibit 81**, CoCrystal_0000589) discloses a CoQ10-containing composition designed to improve its storage stability and bioabsorbability, particularly for use in food and beverages. **Exhibit 81** at ¶ [0005]. The document details formulations incorporating hydrophilic and

lipophilic fatty acid esters of polyhydric alcohols to enhance dispersion and absorption. *Id*. at Abstract.

281. As with the other references relied upon by Dr. Cameron, the ’085 Application does not state or otherwise conclude that CoQ11 is necessarily or always present in CoQ11-containing compositions. In fact, the ’085 Patent recognizes that CoQ11 is not inherent in a CoQ10-contianing composition when it states that the present invention “may,” not “will,” contain isoprenoid chains composed of 1 to 12 isoprene units. *Id.*at ¶ [0029].

**4. Natori, Y., & Nagasaki, T., *Formation of Coenzyme Q11 by Pseudomonas M16, a Mutant*, Agricultural and Biological Chemistry, 43(4), 797-801 (1979) (“Natori”)**

282. Natori describes the isolation, purification, and structural elucidation of CoQ11 in conjunction with the production of CoQ10 via a mutant bacterial strain called Pseudomonas M16. *See* **Exhibit 38**. Dr. Cameron cites to Natori for the proposition that CoQ11 can occur in “tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria.” Cameron Report at ¶ 105. However, the mere fact that CoQ11 may appear in those organisms does not show that oxidized CoQ11 is necessarily present in every oxidized CoQ10-containing composition. Furthermore, even though Natori discloses that CoQ11 was present alongside CoQ10 in this specific production via Pseudomonas M16, Natori is specific to a single type of production of CoQ10 – CoQ10 produced by Pseudomonas M16 – and makes no claims that oxidized CoQ11 is always present in oxidized CoQ10-containing compositions produced by other means. *See* **Exhibit 38** at CoCrystal_0000485.

**5. The Ikematsu Article**

283. Dr. Cameron’s reference to the Ikematsu Article is not persuasive for the same reasons discussed above with regards to the other cited references. Although the Ikematsu Article

states that the "content of CoQ10 in Kaneka Q10 is over 98%, with CoQ9 and CoQ11 as major impurities," it does not state or conclude that oxidized CoQ11 is present as an impurity in all instances of oxidized CoQ10-containing compositions. *See* **Exhibit 53** at CoCrystal_0008259.

**D. Dr. Cameron's Remaining Cited References Fail to Show Inherent Anticipation Due to the Fundamental Flaw That All the Cited References Do Not Infer or Conclude that CoQ11 is Contained in Every CoQ10-Containing Composition**

284. To support his argument that reduced CoQ11 is always contained in the resulting composition of The Asserted Claims, Dr. Cameron references disclosures made in the following: (1) the '080 Patent at 5:64-67 (**Exhibit 1**); (2) Rousseau (**Exhibit 37**); (3) testimony by Mr. Kitamura and Dr. Funahashi (see **Exhibit 82**); (4) Kaneka's September 13, 2006 Specification for Kaneka QH (**Exhibit 64**); (5) the '967 Patent (**Exhibit 57**); and (6) Dr. Cameron's own experience and knowledge.

285. However, these references, some of which are recycled from his other arguments, all fail for the same reasons discussed above: none infer or conclude that CoQ11 is inherently present in every CoQ10-containing composition in every instance. Should Dr. Cameron's argument that because CoQ11 *can* be present as an impurity, that this should mean it is inherently present in all CoQ10-containing compositions, then it must be the case that *every* homolog of CoQ10 that is present as an impurity must also be inherently present. However, as shown by Whistance and Gilbart, inter alia, such is not the case. Therefore, I disagree with Dr. Cameron's proposition that CoQ11 is inherently anticipated by the '040 Application, or any other reference cited by Dr. Cameron.

286. Overall, Dr. Cameron's inherent anticipation theory is technically flawed because (among other things) I have been informed that inherent anticipation requires that the claimed

feature be necessarily present 100% of the time, and the scientific literature I cited demonstrates that CoQ11 is not always present in CoQ10-containing compositions.

## XIV. NONE OF THE DR. CAMERON'S CITED PRIOR ART RENDERS THE ASSERTED CLAIMS UNPATENTABLE UNDER OBVIOUSNESS

287. Dr. Cameron asserts that the Asserted Claims are invalid as obvious because the '040 Application explicitly teaches every claim element except the claim limitations related to the presence of CoQ9 and CoQ11, Cameron Report at ¶¶ 115-116. Dr. Cameron further opines that combining the '040 Application with commercially available Kaneka Q10 as a starting material would result in an obvious process that meets all claim limitations.

288. As a threshold matter, and for the reasons already stated above, there is no evidence that Kaneka's Q10 contained CoQ9 or CoQ11 at the time of the invention in 2006. See Section XII. Indeed, all available evidence makes clear that Kaneka's Q10 lacked CoQ9 and CoQ11. *Id.*, **Exhibits 45-46**.

289. For these reasons and for the reasons stated below, I disagree with Dr. Cameron's obviousness analysis and conclusion.

### A. Factors 1 and 2 (Scope and Content of Prior Art and Differences Between Claims and Prior Art)

#### 1. Dr. Cameron's References Do Not Support His Conclusion

290. Dr. Cameron considers the first two factors of the obviousness analysis together, so I will do the same. For the reasons stated below, I do not believe these factors support Dr. Cameron's obviousness conclusion.

291. Dr. Cameron begins his analysis by stating that there is "very little difference between the teachings of the prior art and claims 5 and 15 of the '080 Patent." Cameron Report at ¶ 118. Dr. Cameron then asserts that the '040 Application explicitly discloses all but claim

limitation 5[b], and 15[a] and [c], but that any lack of disclosure is overcome by other prior art known to a POSA at the time. Id. Dr. Cameron continues: "given the '040 Application's instruction that '[t]he oxidized coenzyme Q10 to be used in the practice of the invention may be an existing high-purity grade of coenzyme Q10,' a POSITA would have been motivated to try Kaneka Q10 as this starting composition." *Id.*

292. To support the alleged presence of CoQ9 and CoQ11 in Kaneka's Q10 product at the time of the invention, Dr. Cameron cites to the following prior art refences: (i) the Ikematsu Article, (ii) the deposition testimony of Mr. Garey; (iii) the deposition testimony of Mr. Ueda; the deposition testimony of Mr. Kitamura; (iv) the '697 Application, and (v) Dr. Cameron's own experience. For the reasons stated below, Dr. Cameron's reliance is misplaced.

**a) The Ikematsu Article**

293. The language relied upon by Dr. Cameron states that "The content of CoQ10 in Kaneka Q10 is over 98%, with CoQ9 and CoQ11 as major impurities." This statement does not purport to be a statement concerning all Kaneka QH. As already noted above, the authors did not undertake such an analysis. **Exhibit 53** at CoCrystal_0008259. At most, it appears to be a statement limited to the ubiquinone used in the study. It appears that the capsule used for this study came from a single study batch—not commercial Kaneka Q10. The study states that "Each capsule contained Kaneka Q10 150 mg, lecithin SLP-PasteNGS (Tsuji Oil Mill) 0.6 mg, safflower oil (Rinoru Oil Mills) 202 mg, Poem S-100 V (Riken Vitamin) 0.9 mg, and yellow beeswax (Miki Chemical Industry) 6.5 mg." This formulation differs from the typical formulation of Kaneka Q10. **Exhibit 97** at KAN0012945; **Exhibit 98** at KAN0150285; and **Exhibit 99** at KAN0012729.

294. Nor do the authors state that Kaneka Q10 necessarily contains CoQ9 and CoQ11. Indeed, as Mr. Ueda testified, the language relied upon by Dr. Cameron only "describes CoQ9 and

CoQ11 as potential major impurities, but it does not say that they are necessarily present." **Exhibit 41** at 107:17-19. Mr. Ueda further testified that in 2006, that CoQ9 or CoQ11 were not "major impurities" in Kaneka's Q10 product, and affirmatively testified that these homologs "were not something which was always present, necessarily." Id. Indeed, actual test results show from this time period that the ubiquinol made from Kaneka's ubiquinone lacked CoQ9 and CoQ11. See **Exhibit 45; Exhibit 46**.

**b) Deposition Testimony of Mr. Ueda**

295. Dr. Cameron also relies on the following deposition testimony of Mr. Ueda: "the yeast strain Kaneka uses [ ] produces coenzyme Q11." As explained above, Mr. Ueda's testimony speaks to the current contents of Kaneka's ubiquinone, it says nothing about the contents in 2006. Indeed, Kaneka has modified the very yeast strain Mr. Ueda refers to multiple times since 2006. For all of the other reasons stated above, this testimony does not provide evidence of the contents of Kaneka's ubiquinone in 2004.

**c) Deposition Testimony of Mr. Kitamura**

296. Dr. Cameron next cites to the following deposition testimony of Mr. Kitamura: "I don't know what the timing was, but I was aware that there as CoQ9 and CoQ11 contained in Kaneka's Q10." Cameron Report at ¶ 123. On its face, this testimony does not evidence the presence of CoQ9 and CoQ11 in Kaneka's QH in 2006. Indeed, Dr. Cameron acknowledges this fact in his own report. Cameron Report at ¶ 73.

**d) U.S. Patent Application No. 2007/0258967**

297. Dr. Cameron also cites to the following language in U.S. Patent Application No. 2007/0258967 to support his obviousness analysis.

298. First, I have been informed that Dr. Cameron cannot rely on this reference as prior art because it was filed contemporaneously with the '080 Patent. Thus, the '967 Application is not prior art.

299. Second, the portion of the reference relied upon by Dr. Cameron does not specifically refer to Kaneka's Q10, nor does it state that CoQ9 or CoQ11 are necessarily present. In fact, the '967 Application acknowledges that they might be absent. **Exhibit 57** at [0002].

300. Moreover, one of the inventors of the '967 Application made clear that this statement "is listing [COQ11] as a substance, which could potentially be present. It is not saying that it is always present" and that "depending on the manufacturing method, it could be included or it might not be included." The inventor further testified that it was not his understanding "then or now that the Q11 would always be present in the fermentation product." *Id.* at 101:14 to 102:14. Dr. Cameron also cites to KAN0012959 which states that R9, RY, U and R11 are Related Impurities of Ubiquinol." Cameron Report, 124. This is entirely consistent with Mr. Ueda's testimony that CoQ9 and/or CoQ11 could be present, not that it was necessarily present. **Exhibit 41** at 100:24-101:16, 101:14-102:14.

301. Moreover, the '967 Application is directed to reduced CoQ10, whereas Kaneka Q10 is oxidized coenzyme Q10. Dr. Cameron cannot use a statement about reduced CoQ10 possibly containing reduced Q11 to prove that oxidized Q10 contains oxidized Q11.

**e) Dr. Cameron's Own Experience**

302. Dr. Cameron notes that Kaneka's QH is fermented from yeast and states that it is his opinion that all CoQ10 created from yeast will inherently create CoQ11. Cameron Report, ¶ 123.

303. As I have already given my reasons why I disagree with Dr. Cameron's inherent-creation from yeast argument (see Section XIII)), which are fully adopted herein, I will summarize my response here.

304. First, Dr. Cameron provides no test results or any other support for his opinion. Second, his opinion is directly contradicted by all known contemporaneous evidence, including test results and deposition testimony. Third, his opinion is inconsistent with prior art references.

305. Indeed, Cameron's argument that enzymes "occasionally" make "errors" and "sometimes" produce Q11 establishes possibility, not necessity.

306. Dr. Cameron next asserts that because the starting composition contained CoQ11, the final composition would have necessarily contained CoQ11. I disagree. First, as already stated, there is no basis to support Dr. Cameron's premise that the starting composition contained CoQ11.

307. Second, even if Kaneka's QH did contain some amount of CoQ11—and there is no evidence that it did—Dr. Cameron fails to account for the possibility that it would be removed in the process of reduction, which includes purification and crystallization steps. **Exhibit 41** at 83:10-16, 84:20-23, 91:16-25, 92:1-11, 94:8-15, 123:107; *see, e.g.*, **Exhibit 6**.

308. Moreover, the combination of prior art with Kaneka Q10 is not obvious when Q11 presence depends on undisclosed, specific manufacturing parameters that a POSA would not know to implement. Even inventors of the '080 Patent viewed Q11 presence as uncertain and method-dependent rather than inevitable.

### B. Dr. Cameron Fails to Explain Why A POSA Would Be Motivated to Combine the '040 Application with Kaneka QH

309. Dr. Cameron provides no motivation for a POSA to combine the '040 Application with Kaneka Q10, or why a POSA would deliberately seek to retain Q11 in the final composition.

310. Dr. Cameron cites no prior art reference that teaches or suggests that CoQ11 provides any beneficial properties, let alone stabilizing effects for reduced CoQ10. Without any teaching in the prior art about CoQ11's utility, a POSA would have no reason to deliberately include it in a composition.[8] Indeed, the '040 Application sought to remove "impurities" like CoQ11, so deliberately including it in the starting composition is contradictory.

311. Indeed, every reference Dr. Cameron cites consistently characterizes Q11 as an "impurity" to be removed. The '040 Application specifically teaches crystallization processes to remove "impurities, in particular analogous compounds having a similar structure"—which would include CoQ11. Even if a POSA used Kaneka Q10, a POSA would be motivated to remove it using the '040 Application's purification steps. CoQ11 differs from CoQ10 by only one isoprene unit, making it exactly the type of "analogous compound" the purification process is designed to eliminate.

312. Chinese patents CN108084007B and CN108047014B teach purification methods specifically designed to remove CoQ11. U.S. Patents 2020/0087235 and 11,773,043B2 describe purification systems to achieve "highly purified CoQ10" by removing CoQ11 and other impurities. That is, a POSA reading the '040 Application's teaching to use "high-purity grade of coenzyme Q10" would naturally seek the purest available starting material, not deliberately select Q11-contaminated sources. The safety assessment reference (CoCrystal_0000454) characterizes Q9 and Q11 as "the two major impurities" in ubiquinone produced by yeast fermentation - again treating them as contaminants rather than beneficial components.

---

[8] Dr. Cameron's assertion that "a POSITA who could implement one could readily implement the other" conflates the ability to perform chemical reactions with the required motivation.

313. Even if a POSA were somehow motivated to experiment with CoQ11 retention (which they would not be), Dr. Cameron provides no basis for a POSA to expect that such an approach would yield any beneficial results. Indeed, his own enablement argument suggests that a POSA would not be motivated for expecting that this approach would yield any results. Cameron Report, Section VII.A.

314. Dr. Cameron also does not establish his "obvious to try" approach. Dr. Cameron does not establish how many commercial CoQ10 products were available to a POSA or provide any basis to specifically select Kaneka Q10. Dr. Cameron appears to concede that there were other available ubiquinone products.

315. Dr. Cameron also fails to identify any problem in the prior art that would be solved by using CoQ11-containing starting materials, any teaching suggesting that CoQ11 provides beneficial properties, or any reason why a skilled artisan would deviate from standard industry practice of removing CoQ11 as an impurity.

**a) Factor 3 (Level of Ordinary Skill in the Pertinent Art)**

316. Dr. Cameron's assertions in this section are based on two assumptions, (i) Kaneka Q10 contains CoQ11, and (ii) following the '040 Application's process would necessarily retain Q11 in the final product. Neither assumption is correct. Testing records show that prior coenzyme Q10-containing compositions contained no Q11, and the '040 Application's purification steps sought to remove any Q11 that might theoretically be present in starting materials. Including a homolog in the starting material that the '040 Application seeks to remove is contradictory.

317. Although both the '040 Application and the '080 Patent may reference similar reduction chemistry, Dr. Cameron overlooks that the '040 Application teaches purification methods designed to remove impurities like Q11, while the '080 Patent claims the deliberate

retention of Q11. The fact that both patents use reduction reactions does not make the retention of specific impurities obvious.

### 2. Factor 4 (Secondary Considerations of Obviousness)

318. It is my opinion that certain secondary considerations of non-obviousness further show that the inventions claimed in the '080 Patent would not have been obvious to a POSA at the time of the invention. These secondary considerations of non-obviousness include, for example, the long-felt but unmet need for a more stable reduced CoQ10 that would be better absorbed in the body and the commercial success of Kaneka's Ubiquinol due to its practice of the '080 Patent.

319. Prior to the invention of the '080 Patent, there was a long-felt need for a more stable Q10 supplement that would stay in its reduced form rather than quickly oxidize so that it could be manufactured on a large scale for the market. Therefore, the primary goal of the inventors of the '080 Patent was to manufacture a more stable reduced CoQ10 that would have better absorption. *See* **Exhibit 41** at 13:20-14:10; **Exhibit 43** at 20:13-18.

320. Here, the '080 Patent specifically claims that the co-presence of reduced CoQ9 and/or reduced CoQ11 provides stability benefits to reduced CoQ10, stating that this combination "suppresses oxidation of reduced coenzyme Q10 into oxidized coenzyme Q10 by molecular oxygen, and stably retains the reduced coenzyme Q10."

321. I have reviewed Kaneka's marketing materials, including the documents referenced in footnote 30 of the Cameron Report, which emphasize that Kaneka's Ubiquinol has a more stable formula and is better absorbed by the body. For instance, Kaneka promotes that when CoQ10 "is converted to ubiquinol, it supports energy (ATP) production" and "becomes the most powerful known lipid-soluble antioxidant." **Exhibit 84**. Kaneka specifically advertises that Kaneka QH Ubiquinol "is the pre-converted form of CoQ10, ready for immediate utilization by the body."

**Exhibit 85**; *see also* **Exhibit 86**. There is a clear nexus between the stability and absorption benefits claimed in the '080 Patent and the marketing statements used by Kaneka to sell its Ubiquinol product.

322. Kaneka further promotes the benefits of its Ubiquinol product include that it "has been shown to be 2x better absorbed than conventional CoQ10." **Exhibit 87**. There is a nexus between this statement and the benefits of the claimed invention. This statement also highlights that there was a long-felt need in the market to have a product that was more effective, i.e. had better absorption, than the previous conventional CoQ10 products available on the market. *Id.* ("Unlike CoQ10, Ubiquinol requires no conversion in the body to perform its antioxidant functions, making it more readily available for the body to utilize. . . switching to Kaneka Ubiquinol [form CoQ10] offers enhanced absorption.").

323. I disagree with Dr. Cameron's statement that these marketing materials do not have apparent connection to the '080 Patent because they do not mention "stability benefits resulting from the co-presence of reduced Q9 or reduced Q11." I am not aware of any requirement that marketing materials must specifically claim the reason for the increased stability, rather than the stability itself. Pharmaceutical companies routinely establish nexus based on efficacy claims in marketing without detailing molecular mechanisms, and software companies can show nexus through performance claims without revealing algorithmic specifics. Given that stability is both the primary technical benefit claimed in the '080 Patent and a key selling point emphasized in Kaneka's marketing materials, the nexus is clear and well-established under controlling precedent.

324. The nexus between the '080 Patent and the benefits of Kaneka's Ubiquinol that are promoted and marketed by Kaneka in combination with Kaneka's significant sales volumes of its

Ubiquinol product demonstrate that Kaneka has achieved commercial success. See, e.g., **Exhibit 88** (showing $132.8 million in net sales from September 2022 to March 2025).

## XV. THE ASSERTED CLAIMS OF THE '080 PATENT ARE DIRECTED TO PATENT-ELIGIBLE SUBJECT MATTER

325. Dr. Cameron takes the position that the '080 Patent is invalid under 35 U.S.C. 101 as being directed to "naturally-occurring molecules or compositions which are products of nature and are not patent eligible." Cameron Report at ¶ 134. For the reasons set forth in this section, I disagree with Dr. Cameron's position and conclude that the Asserted Claims are directed to specific, concrete, and unconventional compositions of and a method of producing reduced CoQ10.

326. I have been informed that whether an invention is naturally-occurring and thus patent ineligible involves consideration of two factors, (i) whether the composition or method are is naturally occurring, and (ii) if so, whether the composition and method are "markedly different" from those that occur in nature.

327. I have been informed that in a prior litigation that Judge Bryson concluded that the Asserted Claims were not found in nature, and that they were markedly different from what is found in nature. **Exhibit 92**. I agree with Judge Bryson's analysis and conclusions.

### A. Step 1: The Asserted Claims are Directed to Patent Eligible Subject Matter Including a Composition Containing a Relative Amount of Reduced CoQ10 Not Found Naturally, and a Method for Producing That Non-Natural Composition

328. I believe that claims 5 and 15 of the '080 Patent are patent-eligible because they are directed, respectively, to a composition of matter not found in nature, and method not found in nature for producing a reduced coenzyme Q10 containing compound. Claim 5 of the '080 Patent requires:

> **5**. A reduced coenzyme Q10 containing composition comprising reduced coenzyme Q10 and one or both of (a) and (b): (a) not less than 1.5 wt % to no more than 99 wt % of reduced coenzyme Q9 relative to reduced coenzyme Q10, and (b) reduced coenzyme Q11 wherein not less than 0.01 wt% of reduced coenzyme Q10 is contained in the composition, and wherein the proportion of reduced coenzyme Q10 relative to the total amount of coenzyme Q10 is not less than 90 wt %.

329. Although CoQ9, CoQ10, and CoQ11 are found in nature, claim 5 recites a specific combination of those compounds in a specific combination or ratio not found in nature.

330. I have been informed by counsel that, although a claimed composition may include elements present in nature, the existence of those elements in nature does not necessarily render the subject matter of the claims to be directed to patent-ineligible subject matter. For example, numerous patents directed to pharmaceutical compositions are composed of naturally-occurring chemicals, but are patent-eligible because the precise composition is not naturally occurring. *See* US8052993B2 (**Exhibit 89**) issued to Muller et al.; US8906420B2 (**Exhibit 90**) issued to Nilsson et al.; US10639309B2 (**Exhibit 91**) issued to Herbig et al.

331. While Dr. Cameron cites to a number of prior art references, none of the references cited by Dr. Cameron disclose that the specific combinations and ratios as described in the Asserted Claims occur in nature, a fact that Dr. Cameron himself acknowledges. Cameron Report at ¶ 138 ("reduction of coenzyme Q10 and coenzyme Q11 from their oxidized forms also occurs in nature, albeit again **not necessarily in the specific concentrations claimed**") (emphasis added), at ¶ 137 ("the co-presence of reduced coenzyme Q10 and reduced coenzyme Q11 occurs in nature albeit **not in an isolated/purified form**") (emphasis added).[9]

332. Claim 15 of the '080 Patent provides:

---

[9] To the extent that Dr. Cameron's arguments rely on the "inherent" presence of CoQ11, I refer to my earlier responses above.

> **15**. A method for producing a reduced coenzyme Q10 containing composition, which method comprises providing a composition comprising oxidized coenzyme Q10 with one or both of oxidized coenzyme Q9 and coenzyme Q11, and then reducing oxidized coenzyme Q10 and reducing one or both of oxidized coenzyme Q9 and oxidized coenzyme Q11 to prepare the reduced coenzyme Q10 containing composition, wherein the composition comprises reduced coenzyme Q10 and one or both of (a) not less than 1.5 wt % to not more than 99 wt% of reduced coenzyme Q9 relative to reduced coenzyme Q10 and (b) coenzyme Q11, wherein not less than 0.01 wt % of reduced coenzyme Q10 is contained in the composition, and wherein the proportion of reduced coenzyme Q10 relative to the total amount of coenzyme Q10 is not less than 90 wt %

333. The method of claim 15 involves deliberate human intervention to reduce oxidized coenzymes using specific reducing agents and controlled conditions – this is fundamentally different from any natural biological processes that might occur in living organisms. Dr. Cameron provides no basis to assert that a method claim involving specific human-directed chemical processes should be treated as a natural phenomenon merely because some components exist in nature.

### B. Step 2: The Asserted Claims Are Directed to Compositions and Methods That Are "Markedly Different" From Those That Occur in Nature

334. Although it is my understanding that because the claims are not directed to a patent-ineligible concept, there is no need to proceed with this step. I will respond to Dr. Cameron's analysis with respect to step two.

335. As noted above, Judge Bryson has already found that the claimed invention has significant utility and is "markedly different" from naturally occurring CoQ homologs. *See* **Exhibit 1**, col. 1, ln. 24-29 ("[R]educed coenzyme $Q_{10}$ is easily oxidized by molecular oxygen into oxidized coenzyme $Q_{10}$ and therefore, stabilization of reduced coenzyme $Q_{10}$ is an important issue when it is processed into a food, food with nutrient function claims, food for specified health use, nutritional product, nutritional supplement . . . ."); *id*. at col. 2, ln. 26-28 ("The present invention

aims at providing a convenient and preferable method and a composition for stably retaining reduced coenzyme $Q_{10}$ by protection against oxidation . . . ."); *id.* at col. 4, ln. 36-45 ("According to the present invention, a stabilization method of reduced coenzyme $Q_{10}$ can be provided by a mere co-presence of an analog of reduced $Q_{10}$ even when multiple components, particularly a reducing agent, are not used as necessary components to protect the reduced coenzyme $Q_{10}$ from oxidation. Therefore, highly safe reduced coenzyme $Q_{10}$ can be provided, which is free of a noxious substance . . . used as a reducing agent."); *id.* at col. 5, ln. 19-26 ("The stabilization method of the reduced coenzyme $Q_{10}$ of the present invention. . . is a method . . . which suppresses oxidation of reduced coenzyme $Q_{10}$ into oxidized $Q_{10}$ by molecular oxygen, and stably retains the reduced coenzyme $Q_{10}$."). *See* **Exhibit 92** at 33-34.

336. The '080 Patent specifically describes how the presence of CoQ11 stabilizes and inhibits oxidation of the reduced CoQ10-containing composition. **Exhibit 1** at Abstract, col. 2, ln. 36–48, col. 12, ln. 57–60.

337. Other studies performed by Kaneka have further confirmed that the presence of CoQ11 aids in stabilization. KAN0001341. For example, researchers conducted a comparative test using two different samples under identical conditions. The results of this study provides evidence that even a small amount (1.0 wt%) of reduced CoQ11 significantly enhances the stability of reduced CoQ10 by inhibiting its oxidation when exposed to air. The protective effect resulted in approximately 13 times less oxidation in the CoQ11-containing sample compared to the control.

338. Moreover, the inventiveness of the Asserted Claims is not limited to stabilization or greater bioavailability. The '080 Patent makes clear that the composition, which can include either or both of reduced CoQ9 or CoQ11, can also be used as a food or pharmaceutical agent, i.e.,

as a means to deliver other nutrients or medicine to the consumer. *See* **Exhibit 1** at col. 11, ln. 7-18.

339. Moreover, the claimed invention shows that "high biological absorbability of reduced coenzyme Q10 can also be provided." *See id.* at col 13, ln. 13-14.

## XVI. DR. CAMERON'S OPINIONS REGARDING INEQUITABLE CONDUCT ARE INCORRECT

340. I note that Dr. Cameron's opinions in Section VIII rest entirely on the technical invalidity theories I have already addressed and found to be incorrect. Dr. Cameron's assertion that certain information would have been "material" depends wholly on whether his underlying technical arguments about anticipation, obviousness, enablement, and patent eligibility are correct. I disagree with his inequitable conduct opinion for all of the reasons already stated above.

341. In addition, Dr. Cameron asserts that the USP Standard for Ubidicarenone is "material" to the inequitable conduct analysis. Cameron Report at ¶ 159. But the USP Standard merely provides potential impurities, and it does not list impurities that are necessarily present, which is made apparent by Dr. Cameron's own references. Indeed, consistent with the USP Standard, Kaneka disclosed that CoQ11 might already be present in a CoQ10-containing composition. **Exhibit 57** at [0002].

342. Dr. Cameron's assertion that the 2006 Shipment was "material" fails for all of the reasons stated above, including that the 2006 Softgels did not practice the claimed invention. I have already discussed Dr. Cameron's misplaced reliance on deposition testimony. Dr. Cameron's misplaced reliance on the '967 Application was also discussed above.

343. Finally, Dr. Cameron implies that Kaneka was not forthright with the examiner because it did not perform any specific stability studies related to CoQ11. As explained above, I

have been informed that it is not necessary to perform specific studies or submit any results to the patent office.

344. Indeed, the specification accurately stated that "The present inventors have conducted intensive studies in an attempt to solve the above-mentioned problems and found that reduced coenzyme Q10 can be stabilized by the co-presence of reduced coenzyme Q9 and/or reduced coenzyme Q11, which are analogs of reduced coenzyme Q10." **Exhibit 1** at col. 2, ln. 36-40.

345. Dr. Cameron asserts that this statement is inaccurate because "no such 'intensive studies' had been performed relating to the co-presence of reduced CoQ11 with reduced CoQ10." Cameron Report at ¶ 178.

346. Dr. Cameron misunderstands the provision, which only states that the inventors "conducted intensive studies . . . to solve the above-mentioned problems," not that they had conducted "intensive studies" specifically related to CoQ11. There is no doubt that Kaneka did conduct intensive studies in an attempt to find a means by which to safely stabilize CoQ10. **Exhibit 41** at 13:20-14:10; **Exhibit 43** at 20:13-18; KAN0000539-540, KAN0000572-573, KAN0001341.

347. The specification also states that CoQ9 showed a stabilizing effect, and that CoQ9 and CoQ11 were analogs of each other (and CoQ10). I can see no misstatement in the language relied upon by Dr. Cameron.

## XVII. DR. CAMERON'S OPINIONS REGARDING HYPOTHETICAL NON-INFRINGING ALTERNATIVE PRODUCT

348. Dr. Cameron's analysis of "hypothetical non-infringing alternative products" in Section IX of his report is irrelevant to the validity issues that are the subject of his expert testimony and this rebuttal report.

349. Hypothetical non-infringing alternatives are typically relevant to damages calculations, not patent validity. Dr. Cameron provides no explanation for how his analysis of alternative product designs relates to any of the validity theories he advances (enablement, on-sale bar, anticipation, obviousness, or patent eligibility). That is, Dr. Cameron's analysis of alternative product formulations has no bearing on whether the asserted claims are enabled, novel, non-obvious, or directed to patent-eligible subject matter.

350. To the extent Dr. Cameron's analysis is intended to address damages-related issues, such analysis is outside the scope of validity and is addressed by Kaneka's damages expert, Mr. Donohue, upon which I would rely to the extent Dr. Cameron expands on this analysis in a manner that he contends relates to patent validity.

351. I reserve the right to supplement this response if Dr. Cameron expands on this analysis in a manner that he contends relates to patent validity, though I note that no such relationship is apparent from his current report.

## XVIII. CONCLUSION

352. For the foregoing reasons, I conclude that all of Dr. Cameron's invalidity arguments are incorrect, and that the '080 Patent's asserted claims are valid and enforceable.