# Exhibit 13

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KANEKA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>COCRYSTAL TECHNOLOGY (JIAXING) CO., LTD. (f/k/a/ SHANGHAI COCRYSTAL PHARMACEUTICAL TECHNOLOGY CO., LTD.), and COCRYSTAL HEALTH INDUSTRY (ZHEJIANG) CO., LTD.,<br><br>Defendants. | Civil Case No. 1:23-cv-07483-SJB |

**DEFENDANTS' SUPPLEMENTAL INVALIDITY CONTENTIONS**

In accordance with the Stipulated Scheduling Order (Dkt. 27), Defendants Cocrystal Technology (Jiaxing) Co., Ltd. (f/k/a Shanghai Cocrystal Pharmaceutical Technology Co., Ltd.) ("Cocrystal") and Cocrystal Health Industry (Zhejiang) Co., Ltd. ("CHI"; collectively the "Defendants") hereby serve the following supplemental contentions regarding the invalidity of claims 5 and 15 (the "Challenged Claims") of U.S. Patent No. 7,829,080 (the "'080 patent").[1]

For the reasons provided herein, each of the Challenged Claims is invalid at least under one or more of 35 U.S.C. §§ 101, 102, 103, and/or 112, and is additionally unenforceable because of inequitable conduct committed during prosecution of the '080 patent.

[1] In its infringement contentions, Plaintiff alleges infringement only of claims 5 and 15 of the '080 patent.

Defendants reserve all rights to amend and supplement these invalidity contentions in accordance with any scheduling order governing this case, the Local Rules for the United States District Court for the Eastern District of New York, the Federal Rules of Civil Procedure, and relevant case law, including in response to ongoing fact and expert discovery and any claim constructions issued in this or any other proceeding.

## I. EACH OF THE CHALLENGED CLAIMS IS INVALID UNDER SECTION 101.

For at least the reasons provided below, each of the Challenged Claims is invalid under 35 U.S.C. § 101 as patent-ineligible subject matter because the claimed subject matter is directed to naturally-occurring compounds, processes, and phenomena. Naturally-occurring molecules are products of nature, and not patent eligible merely because they have been isolated or purified. *Ass'n. for Molecular Pathology v. Myriad Genetics*, 569 U.S. 576 (2013).

### A. Claim 5

Claim 5 of the '080 patent is directed to a "reduced coenzyme $Q_{10}$-containing composition comprising reduced coenzyme $Q_{10}$ and one or both of" reduced coenzyme $Q_9$ and reduced coenzyme $Q_{11}$. The components of the claimed composition – both individually and in combination – are naturally-occurring products of nature and therefore patent-ineligible subject matter under *Myriad*. *Id.*

Claim 5 includes a claim limitation to a "reduced coenzyme $Q_{10}$-containing composition comprising reduced coenzyme $Q_{10}$" and reduced $Q_9$ and $Q_{11}$, which, by Plaintiff's own admissions, are other "analogs of reduced coenzyme $Q_{10}$." US7,829,080 at 2:41; Claim 5. Reduced coenzyme $Q_{10}$, or ubiquinol, is a well-known, naturally-occurring, product of nature. *See* EP2228360 (stating that reduced coenzyme $Q_{10}$ and oxidized coenzyme $Q_{10}$ are known to be localized in a variety of cellular structures and locations, are involved in numerous important biological functions, and are "substances indispensable for body function maintenance."); Turunen, *Metabolism and function*

*of coenzyme Q*, Biochemica et Biophysica Acta 1660 (2004) at 176 (disclosing the amount of coenzyme $Q_{10}$, including in reduced form, in human and rat tissues). Additionally, coenzyme $Q_{10}$ - both in oxidized and reduced form – is commonly found in nature mixed with other related coenzyme Q derivatives. *See id*. (disclosing the amounts of coenzyme $Q_9$ and coenzyme $Q_{10}$, including in reduced form, in human and rat tissues); Urakami (1986) (disclosing that coenzymes $Q_9$, $Q_{10}$, and $Q_{11}$ are naturally found in various bacterial species); *see also* references and evidence cited in appendices A-1 to A-4 in support of existence of coenzyme $Q_{10}$ in natural products along with at least $Q_{11}$. Further, when ubiquinone is produced by yeast fermentation, the content is > 98% coenzyme $Q_{10}$, with coenzyme $Q_9$ and coenzyme $Q_{11}$ as the two major impurities. *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics* (April 14, 2022) at *28. As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], "since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."

Claim 5 next includes claim limitations that the coenzyme $Q_{10}$ composition contains one or both of "not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$" and "reduced coenzyme $Q_{11}$." First, coenzyme $Q_{10}$, $Q_9$, and $Q_{11}$ all naturally occur in various bacteria species, and are therefore all naturally-occurring derivatives of ubiquinone. *See* Urakami (1986). Coenzyme $Q_{11}$ was isolated from green peppers. Threlfall, *Isolation of ubiquinone-11 and ubiquinone-12 from green peppers*, Biochem. J. 113(3) (July 1969). Furthermore, as noted in Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and that $CoQ_{11}$ accumulated

in Pseudomonas samples. The named inventors of the '080 patent, including Ueda, admitted that reduced coenzyme $Q_{11}$ is an impurity inherently produced in the synthesis of reduced coenzyme $Q_{10}$, including by natural synthetic routes. See U.S. Patent Pub. No. 2007/0258967A1 ("When reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein."). With respect to coenzyme $Q_{11}$, the claim includes a limitation to "reduced coenzyme $Q_{11}$" in any amount. Thus, that coenzyme $Q_{11}$ naturally exists in bacteria species and plants is sufficient to show that this component of the composition, and the overall composition comprised of a mixture of coenzyme Q analogs, are directed to patent-ineligible products of nature.

Any differences in the full scope of the claimed concentrations relative to that found in nature do not confer patent eligibility, because claims directed to products of nature, even if they are *isolated or purified*, are patent-ineligible. *Myriad*, 569 U.S. 576 (2013) (holding that isolation of a natural product is insufficient to confer patent eligibility); *see also Chromadex v. Elysium Health*, 59 F.4th 1280 (Fed. Cir. 2023) (holding that claimed compositions comprised of an isolated natural product (nicotinamide riboside) did not possess characteristics markedly different from those found in nature, and are thus invalid for claiming a patent-ineligible product of nature). Furthermore, coenzyme $Q_9$ naturally occurs in amounts that overlap with the claimed range. *See* Turunen at 176.

Claim 5 also includes claim limitations directed to the concentration or proportion of reduced coenzyme $Q_{10}$ in the claimed composition. In particular, claim 5 requires that the composition include "not less than 0.01 wt% of reduced coenzyme $Q_{10}$" and that "the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt%."

However, the concentration or proportion of reduced coenzyme $Q_{10}$ in the claimed composition cannot confer patent eligibility on a claim directed to patent-ineligible products of nature. *See Myriad*, 569 U.S. 576 (2013) (holding that isolation of a natural product is insufficient to confer patent eligibility); *see also Chromadex v. Elysium Health*, 59 F.4th 1280 (Fed. Cir. 2023) (holding that claimed compositions comprised of an isolated natural product (nicotinamide riboside) did not possess characteristics markedly different from those found in nature, and are invalid for claiming a patent-ineligible product of nature). Further evidence supporting the natural occurrence of coenzyme $Q_9$, $Q_{10}$, and/or $Q_{11}$ can be found in the appendices (and evidence therein) accompanying these invalidity contentions.

Claim 5 does not claim any particular ratio of reduced $CoQ_{10}$ and $CoQ_{11}$. Claim 5 instead requires "one or both of" $CoQ_9$ or $CoQ_{11}$, and there is no requirement for any $CoQ_9$ to be present in a claimed composition. This is plainly apparent from the claim language, and no aspect of the prosecution history of the '080 Patent would support an interpretation to the contrary. Consequently, the eligibility analysis may focus on the claims as they relate to $CoQ_{11}$ only, because such an option is covered by the claims, and it is at least this aspect of the claims that fails to include any specific ratio of $CoQ_{10}$ to $CoQ_{11}$. As a matter of law, if "claims cover both eligible and ineligible subject matter," the claims are not patent eligible. *See Regenxbio Inc. v. Sarepta Therapeutics, Inc.*, No. 20-1226-RGA, 2024 U.S. Dist. LEXIS 3076, *15 (D. Del. Jan. 5, 2024) (citing *ChromaDex*, 59 F.4th at 1285).

Accordingly, the entire scope of the subject matter claimed in Claim 5 does not possess "markedly different" characteristics than naturally-occurring coenzyme Q compositions that would otherwise transform the claim beyond the underlying natural product and confer patent eligibility. Within the claim scope of claim 5 is reduced $CoQ_{10}$ with just an infinitesimally small

amount of reduced $CoQ_{11}$. No evidence of utility exists (whether for stability or otherwise) regarding at least this part of the claimed scope. In fact, there is clear and convincing evidence showing a lack of utility of reduced $CoQ_{10}$ with just an infinitesimally small amount of reduced $CoQ_{11}$. As the industry has recognized, “the physicochemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, [and] potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent.” G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood,* Journal of Chromatographic Science, Vol. 36 (May 1998). Given that reduced $CoQ_{10}$ and reduced $CoQ_{11}$ have very similar properties, an infinitesimally small amount of reduced $CoQ_{11}$ with reduced $CoQ_{10}$ will not have “significant utility” over reduced $CoQ_{10}$ alone. There is no evidence to the contrary.

Claim 5 claims a composition – not a dietary supplement – that is designed to serve as a dietary supplement. This claim does not include any limitations directed at any particular characteristics or activity of the claimed composition. Moreover, dietary supplements simply provide compounds that permit a biological system to conduct the exact same reactions and perform the exact same functions as those with the naturally-occurring coenzyme Q product. Coenzyme $Q_{10}$ is known to be localized in a variety of cellular structures and locations, involved in numerous important biological functions, and to be “indispensable for body function maintenance.” *See* EP2228360. Thus, the dietary supplement is designed to merely mimic and supplement the naturally-occurring reactions and effects occurring in a given subject. This is not the same as having a “markedly different” effect as the naturally-occurring coenzyme Q compositions.

To the extent that the full scope of the claimed composition functions to restore the amount of Coenzyme $Q_{10}$ that naturally depletes over time with age, this is not a “markedly different”

effect or characteristic sufficient to impart patent eligibility. To the contrary, much like in *Mayo*, this allegedly markedly different effect simply represents the correlation that naturally exists upon consumption of the Coenzyme $Q_{10}$ supplement – that is, a subject consumes the $CoQ_{10}$ supplement, and the levels observed in the plasma increase accordingly. Additionally, it is known that levels of $CoQ_{10}$ in subjects decrease with age. Thus, this allegedly different effect simply represents a measure to combat the naturally-occurring phenomenon that results in declining amounts of $CoQ_{10}$ in living organisms. However, this is not a different effect at all: it simply achieves the same effect of naturally-occurring $CoQ_{10}$ compositions that are naturally present.

To the extent that the claimed compositions (containing $Q_{10}$, $Q_9$, and/or $Q_{11}$) purportedly provide a markedly different effect or improvement of reduced oxidation (or protection against oxidation of $Q_{10}$) in comparison to naturally occurring $Q_{10}$, this is not a "markedly different" effect either. The '080 patent compares differences in the weight ratio of reduced $CoQ_{10}$/oxidized $CoQ_{10}$ in compositions with and without $CoQ_9$ present. Although the data shows some slight compositional differences, the differences do not represent statistically significant or pharmaceutically effective amounts. Accordingly, these differences do not represent "markedly different" qualities or improvements over naturally-occurring $CoQ_{10}$ compositions.

To the extent that Plaintiff asserts that the claimed compositions (containing $Q_{10}$, $Q_9$, and/or $Q_{11}$) provide a markedly different effect or improvement of increased absorbability in comparison to naturally occurring $Q_{10}$, this is not a markedly different effect sufficient to impart patent eligibility. In fact, the '080 patent admits to the contrary. The '080 patent discloses that absorbability experiments revealed that "the concentration of coenzyme $Q_{10}$ in the plasma was about 3.4 ug/ml resulting from the administration of both reduced coenzyme $Q_{10}$ and a mixture of reduced coenzyme $Q_{10}$ and reduced coenzyme $Q_{11}$." US '080 patent (emphasis added).

Further, the disclosures in ’080 patent are fundamentally flawed and any conclusions drawn therefrom are erroneous, unreliable, and do not support the notion that the full scope of the claimed compositions have “markedly different” or improved characteristics over naturally-occurring $CoQ_{10}$ compositions. For example, the ’080 patent does not disclose any differences in the oxidative protective effect or absorbability for compositions containing $CoQ_{11}$. Since the Challenged Claims do not require $CoQ_9$, any differences disclosed in this alleged improvement or characteristic do not apply to the presence of $CoQ_{11}$, and therefore do not apply to the full scope of the Challenged Claims.

Additionally, the ’080 patent discloses the absorbability/plasma levels measured upon ingestion of reduced $CoQ_9$ and reduced $CoQ_{10}$ compositions. However, the data reported does not show any enhancement or “markedly different” effect arising from the full scope of the claimed compositions (e.g., $CoQ_{10}$ compositions also containing $CoQ_9$ or $CoQ_{11}$). Rather, the data shows the effects of reduced $CoQ_9$ and reduced $CoQ_{10}$ compositions separately, and does not support added absorbability (or stability) of $CoQ_{11}$. Accordingly, this data does not support that the full scope of the claimed compositions demonstrate any “markedly different” characteristics or improvements over the naturally-occurring compositions. Testing by Kaneka, for example at KAN0000539 or KAN0009969, does not even purport to establish any utility of the presence of any $CoQ_{11}$ below approximately 1%.

To the contrary, the ’080 patent admits that $CoQ_9$ has higher absorbability than $CoQ_{10}$, and that any higher absorbability or “greater CoQ effect” observed for the claimed compositions can be attributed to the fact that there are simply more bioactive CoQ species present. ’080 patent (“[R]educed coenzyme $Q_9$ and reduced coenzyme $Q_{11}$ show the same effect in the body as reduced coenzyme $Q_{10}$. Therefore, when reduced coenzyme $Q_9$ and reduced coenzyme $Q_{11}$ contained in

reduced coenzyme $Q_{10}$ are ingested, the effect of the reduced coenzyme $Q_{10}$ is not prevented, and a greater effect of coenzyme Q can be exhibited as compared to a composition containing reduced coenzyme $Q_{10}$ alone, and the like. Furthermore, since the absorbability of reduced coenzyme Q in the body is greater than that of reduced coenzyme $Q_{10}$, a composition containing reduced coenzyme $Q_9$ and reduced coenzyme $Q_{10}$ in combination shows higher absorbability in terms of the total amount of coenzyme Q.").

Here, just as in *Chromadex*, the claimed compositions do not possess markedly different characteristics or activity from the corresponding natural product(s). In fact, Claim 5 strictly recites a composition, and does not include any limitations directed at the particular characteristics or activity of the claimed composition. Thus, claim 5 is directed to a patent-ineligible product of nature, and is invalid.

**B. Claim 15**

Claim 15 of the '080 patent is directed to a method of producing the composition claimed in Claim 5, starting from "a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, and then reducing" said oxidized composition to prepare the reduced coenzyme $Q_{10}$-containing composition. Claim 15 merely recites a naturally-occurring process or phenomenon, and is therefore directed to patent-ineligible subject matter.

The method in Claim 15 recites (i) a starting composition that is a product of nature, (ii) a final composition that is also a product of nature, and (iii) a generically-claimed method to reach the final composition (i.e., "reducing" the starting composition) that is a naturally-occurring phenomenon. For the reasons explained above with regard to Claim 5, both the claimed starting and final compositions are directed to patent-ineligible products of nature.

Regarding the generically-claimed method to reach the final composition, the reduction of oxidized coenzyme Q species (ubiquinone) to its reduced form (ubiquinol) is a well-known, naturally-occurring phenomenon. Coenzyme Q derivatives naturally exist in both their oxidized and reduced forms. *See Safety Assessment*, at *5 ("Although structurally distinct, Ubiquinol is the predominant metabolite of Ubiquinone, and has higher bioavailability than Ubiquinone"); US2007/0258967A1 ("The coenzyme $Q_{10}$ includes oxidized coenzyme $Q_{10}$ and reduced coenzyme $Q_{10}$"); Lester, *The Natural Occurrence of Coenzyme Q and Related Compounds*, J. Biol. Chem. 224(8) (August 1959). Reduced coenzyme $Q_{10}$ and oxidized coenzyme $Q_{10}$ are mitochondrial electron transport system-constituting factors in cells of a living body of a human and deal with ATP production by working as electron carriers in oxidative phosphorization reactions. *See* US7,910,340. The oxidized and reduced forms of coenzyme $Q_{10}$ exist in a constant redox equilibrium in living organisms, in which they are mutually reduced or oxidized. *Id*. The reduced form is naturally synthesized via the transfer of electrons from the oxidized form of $CoQ_{10}$. Watanabe, *Mol. Genet. Metab. Rep.* at *1 (March 2023) ("Coenzyme $Q_{10}$ ($CoQ_{10}$) is involved in ATP production through electron transfer in the mitochondrial respiratory chain complex. $CoQ_{10}$ receives electrons from respiratory chain complex I and II to become the reduced form, and then transfers electrons at complex III to become the oxidized form."). Thus, the oxidized and reduced forms of $CoQ_{10}$ exist in a constant redox equilibrium, shuttling electrons between the respective forms. In fact, "[m]any biological functions involving ubiquinone result, in part, because of the redox reactions to/from ubiquinol." *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics* at *2. "Most endogenous ubiquinone is reduced to, and exists as, bioreactive ubiquinol in the mitochondria, endoplasmic reticulum, lysosomes, peroxisomes, and plasma

membranes of eukaryotic cells." *Id*. That is, the reduction of ubiquinone to ubiquinol occurs naturally throughout eukaryotic cells, among other natural environments.

Claim 15 recites that the claimed method involves "reducing oxidized coenzyme $Q_{10}$ and reducing one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition," without further specifying the use of particular reagents, methods, or synthetic pathways. Claim 15 is thus sufficiently broad to encompass the well-known and naturally-occurring reduction of ubiquinone (oxidized coenzyme $Q_{10}$) and other oxidized coenzyme Q derivatives or analogs that occurs via the Q cycle biopathway. Thus, claim 15 is directed to patent-ineligible subject matter.

Furthermore, Claim 15 also recites claim limitations directed to the reduction of $CoQ_9$ and $CoQ_{11}$ derivatives in the claimed $CoQ_{10}$ composition. These claim limitations are also directed at a naturally-occurring phenomenon – the very nature of fundamental redox chemistry – and one that occurs concomitantly with the reduction of oxidized $CoQ_{10}$. In fact, two listed inventors of the '080 patent, Takahiro Ueda and Shiro Kitamura, admitted such when they previously disclosed that a reduction reaction carried out on an oxidized coenzyme $Q_{10}$ composition that also contained related oxidized coenzyme Q derivatives inherently resulted in the reduction of *all* coenzyme Q species present. *See* U.S. Patent Pub. No. 2005/0008630A1 at [0144] ("A reduction reaction, and an addition of ethanol and water were carried out under exactly the same conditions as in Example S except that oxidized coenzyme $Q_{10}$ used had purity of 98.4% (containing 1.0% of oxidized coenzyme $Q_9$, 0.30% of oxidized coenzyme $Q_8$ and 0.04% of oxidized coenzyme $Q_7$). Thereby, a hydroethanolic solution of reduced coenzyme $Q_{10}$ at 50 C was prepared (containing 1.00% of reduced coenzyme $Q_9$, 0.30% of reduced coenzyme $Q_8$, and 0.40% of reduced coenzyme $Q_7$)"; *see also* U.S. Patent Pub. No. 2007/0258967A1 ("When reduced coenzyme $Q_{10}$ is obtained by the

aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein.”). Additionally, reduction of all coenzyme Q analogs present would be expected or obvious because of their similar molecular structures and physicochemical properties. *See* Rosseau at 247 (“Because the physicochemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…”).

Finally, Claim 15 also recites limitations describing the composition of the final product of the reduction reaction. In particular, claim 15 requires that the composition include “not less than 0.01 wt% of reduced coenzyme $Q_{10}$” and that “the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt%.” Aside from the fact that this final composition describes a product of nature, these compositional limitations cannot and do not transform Claim 15 into one that is patent eligible. The reaction yield, or amount of conversion from the starting material to the final product, is not sufficient to confer patent eligibility because simply demanding the production of a final result, such as a final product with a specified composition, without specifying how to achieve the claimed result is an abstract idea and patent-ineligible under the *Alice/Mayo* framework. Claim 15 states a method of “reducing” an oxidized $CoQ_{10}$ composition to produce a reduced $CoQ_{10}$ composition such that the composition includes “not less than 0.01 wt% of reduced coenzyme $Q_{10}$” and that “the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt%.” However, the claim does not provide any guidance as to how to achieve the final composition other than “reducing” the oxidized composition.

Claim 15 does not claim any particular ratio of reduced $CoQ_{10}$ and $CoQ_{11}$ used in the claimed method. Claim 15 instead requires "one or both of" $CoQ_9$ or $CoQ_{11}$, and there is no requirement for any $CoQ_9$ to be present in a claimed composition. This is plainly apparent from the claim language, and no aspect of the prosecution history of the '080 Patent would support an interpretation to the contrary. Consequently, the eligibility analysis may focus on the claims as they relate to $CoQ_{11}$ only, because such an option is covered by the claims, and it is at least this aspect of the claims that fails to include any specific ratio of $CoQ_{10}$ to $CoQ_{11}$. As a matter of law, if "claims cover both eligible and ineligible subject matter," the claims are not patent eligible. *See Regenxbio Inc. v. Sarepta Therapeutics, Inc.*, No. 20-1226-RGA, 2024 U.S. Dist. LEXIS 3076, *15 (D. Del. Jan. 5, 2024) (citing *ChromaDex*, 59 F.4th at 1285).

Within the claim scope of claim 15 is a process that reduces $CoQ_{10}$ along with just an infinitesimally small amount of reduced $CoQ_{11}$. No evidence of utility exists (whether for stability or otherwise) regarding at least this part of the claimed scope. In fact, there is clear and convincing evidence showing a lack of utility of reduced $CoQ_{10}$ with just an infinitesimally small amount of reduced $CoQ_{11}$. As the industry has recognized, "the physicochemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, [and] potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent." G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood*, Journal of Chromatographic Science, Vol. 36 (May 1998). Given that reduced $CoQ_{10}$ and reduced $CoQ_{11}$ have very similar properties, an infinitesimally small amount of reduced $CoQ_{11}$ with reduced $CoQ_{10}$ will not have "significant utility" over reduced $CoQ_{10}$ alone. There is no evidence to the contrary.

Claim 15 is directed merely to (i) a starting composition that is a product of nature, (ii) a final composition that is also a product of nature, and (iii) a naturally-occurring

reaction/phenomenon that is used to carry out the transformation between the two compositions. Under the *Alice/Mayo* framework, Claim 15 does not recite an "inventive step" or anything "significantly more" that would transform the claimed subject matter into one that is patent-eligible. To the contrary, it generically and broadly recites a method that (i) encompasses the naturally-occurring biopathway (*i.e.*, the Q cycle), (ii) fails to provide an inventive step that could possibly transform the claim and confer patent eligibility, and (iii) represents an abstract idea in that it fails to provide any additional guidance to achieve the desired result. The Plaintiff cannot validly claim a fundamental building block of nature that is well-known in the art and ubiquitous. Thus, Claim 15 is directed to a patent-ineligible natural phenomenon and is invalid.

Separately, each of the Challenged Claims is invalid for a lack of utility. Any trace amounts of reduced $CoQ_{11}$ present in the compound would not contribute to stability, and there is a dearth of supporting evidence in the '080 patent disclosure concerning compositions incorporating $CoQ_{11}$, especially not in quantities encompassing the full scope of the claim. Testing by Kaneka, for example at KAN0000539 or KAN0009969, does not even purport to establish any utility of the presence of any $CoQ_{11}$ below approximately 1%. Indeed, Example 4 in the '080 patent, the only example disclosing reduced $CoQ_{11}$, fails to use any control to show that the presence of reduced $CoQ_{11}$ had any effect on stability. Accordingly, the '080 patent has failed to establish utility for compositions containing $Q_{11}$. Further, since the claims do not require $CoQ_9$, but instead require only one of $CoQ_9$ or $CoQ_{11}$, the '080 patent has failed to demonstrate utility of the invention to the full and entire scope of the Challenged Claims as a whole, and fail under 35 U.S.C. § 101 for this reason as well.

## II. EACH OF THE CHALLENGED CLAIMS IS INVALID UNDER SECTION 102.

For the reasons provided in Appendices A-1 and A-2, each of the Challenged Claims is invalid under 35 U.S.C. § 102 as at least anticipated by the processes and compositions explicitly

and/or inherently taught by U.S. Patent Pub. No. 2004/0215040 and/or U.S. Patent Application Pub. No. 2004/0214301.

"[T]he discovery of a previously unappreciated property of a prior art composition [] does not render the old composition patentably new to the discoverer." *Atlas Powder Co. v. IRECO Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999); *see also In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1373 (Fed. Cir. 2007) ("The ingredients and protocols CKD gave to the KIPO and Astra in 1993 and 1994 necessarily resulted in *in situ* formation of a separating layer. Thus, the trial court correctly found inherent anticipation."). Furthermore, "when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if one of them is in the prior art." *Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 778 (Fed. Cir. 1985).

As shown in Appendices A-1 and A-2, the processes and compositions taught by U.S. Patent Pub. No. 2004/0215040 and/or U.S. Patent Application Pub. No. 2004/0214301 explicitly result in processes and compositions that meet each element of the Challenged Claims except for claim elements [5.a(ii)-(iii)], [15.a], [15.c], and [15.d(ii)-(iii)], and inherently result in processes and compositions that meet claim elements [5.a(ii)-(iii)], [15.a], [15.c], and [15.d(ii)-(iii)].

Moreover, Kaneka has made sales or offers for sale of compositions meeting the requirements of Claim 5 or made by processes meeting the requirements of Claim 15 prior to the priority date of the '080 patent, at least in the form of sales of Kaneka QH. *See* KAN0020724; KAN0021126; KAN0047697 at 750; KAN0022585; KAN0021170; KAN0031980 at 2021; KAN0032513 at 517-19; KAN0012775; KAN0012786; KAN0012788; KAN0012832; and KAN0012883; *see also In re Kollar*, 286 F.3d 1326, 1333 (Fed. Cir. 2002); *In re Caveney*, 761 F. 2d 671, 675 (Fed. Cir. 1985); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 867 (Fed. Cir. 2010). Kaneka QH, and the process used to manufacture Kaneka QH, satisfies the limitations of claims 5

and 15 of the ’080 Patent. KAN0012163 at -2170; CoCrystal_0008258; CoCrystal_0000610; KAN0079890 - KAN0079950; Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60; Deposition of Mr. Takahiro Ueda in Case No. 21-209-RGA (D. Del.) (June 22, 2022) at pages 68-70. Discovery is ongoing, and Defendants therefore reserve the right to rely upon any additional evidence provided in discovery, including information of Kaneka’s own production processes used for the creation and sale or offer for sale of reduced coenzyme $Q_{10}$ compositions prior to the priority date of the ’080 patent, which would invalidate the Challenged Claims under 35 U.S.C. § 102.

## III. EACH OF THE CHALLENGED CLAIMS IS INVALID AS OBVIOUS UNDER SECTION 103.

For the reasons provided in Appendices A-3 to A-4, each of the Challenged Claims is invalid under 35 U.S.C. § 103 as obvious.

Prior art relevant to the obviousness of the Challenged Claims includes:

| **Publication Number / Description** | **Country of Origin** | **Issue/Publication Date or Date of Availability/Sale** |
|---|---|---|
| U.S. Patent Pub. No. 2004/0215040 (the “’040 Application”) | USA | October 28, 2004 |
| U.S. Patent Pub. No. 2004/0214301 (the “’301 Application”) | USA | October 28, 2004 |
| *The United States Pharmacopeia 25: the National Formulary (“USP 25”)*, United States Pharmacopeial Convention | USA | 2002 |
| *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone* | USA | July 1986 |

| | | |
|---|---|---|
| *Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3) ("Urakami") | | |
| *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985) ("Gilbart") | UK | 1985 |
| G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 ("Rousseau") | USA | May 1998 |
| JP-A-10-109933 | Japan | April 28, 1998 |
| Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 ("Karr") | USA | June 1982 |
| Sales of Kaneka ubiquinone ($CoQ_{10}$) made prior to April 28, 2006 | USA | Prior to April 28, 2006 |
| U.S. Patent Pub. No. 2006/0134085 | USA | June 22, 2006 |
| U.S. Patent No. 3,549,668 | USA | May 25, 1967 |

| | | |
|---|---|---|
| Canadian Patent No. 2,550,186 (“Fujii”) | Canada | July 21, 2005 |

As shown by Appendix A-3 and further in view of the information below, U.S. Patent Pub. No. 2004/0215040 alone or in view of one or more of USP 25, Urakami, Gilbart, Karr, U.S. Patent No. 3,549,668, JP-A-10-109933, U.S. Patent Pub. No. 2006/0134085, Sales of Kaneka ubiquinone ($CoQ_{10}$) made prior to April 28, 2006, Fujii, and/or Rousseau renders obvious each of the challenged claims.

As shown by Appendix A-4 and further in view of the information below, U.S. Patent Pub. No. 2004/0214301 alone or in view of one or more of USP 25, Urakami, Gilbart, Karr, U.S. Patent No. 3,549,668, JP-A-10-109933, U.S. Patent Pub. No. 2006/0134085, Sales of Kaneka ubiquinone ($CoQ_{10}$) made prior to April 28, 2006, Fujii, and/or Rousseau renders obvious each of the challenged claims.

*A. Level of Ordinary Skill in the Art.*

A person of ordinary skill in the art would have at least a Ph.D. degree in chemistry, biochemistry, or a related field, and would have at least three years of experience in the synthesis, fermentation, or extraction, and analysis of chemical compounds, or similar. Additional education could substitute for additional design experience and *vice versa*.

*B. Motivation to Combine References.*

Each cited reference is in the exact same field of art—the synthesis, fermentation, or extraction of Coenzyme Q compounds or the commercial availability of Coenzyme $Q_{10}$ compounds. *See* ’040 Application at [0001]; ’301 Application at [0001]; USP 25 entry for Ubidecarenone; Urakami at 419; Karr at 1046; ’668 Patent at cols. 1-2; Gilbart at 78; Rousseau at 247; JP-A-10-109933 at [0001]; U.S. Patent Pub. No. 2006/0134085 at [0001], [0005].

A POSITA would have been motivated to combine the teachings of the ’040 Application with any of USP 25, Urakami, Gilbart, Karr, U.S. Patent No. 3,549,668, JP-A-10-109933, U.S. Patent Pub. No. 2006/0134085, and/or Rousseau, as the invention described “relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$” [0001] and the ’040 Application notes that “[t]he oxidized coenzyme $Q_{10}$ to be used in the practice of the invention may be one prepared by synthesis, fermentation, or extraction from a natural product, for instance, as mentioned hereinabove, or may be an existing high-purity grades of coenzyme $Q_{10}$” [0058], [0085]. A person of ordinary skill would look to existing teachings and existing compounds to obtain oxidized coenzyme $Q_{10}$ to be used in the practice of the invention described in the ’040 Application. Urakami, Karr, Gilbart and the ’668 Patent each provide a starting point and beneficial properties for natural products that may be used for the synthesis, fermentation, or extraction of oxidized coenzyme $Q_{10}$, and USP 25 describes existing high-purity grade of coenzyme $Q_{10}$. *See* Appendix A-3. Rousseau describes the applicability of reduction processes to Coenzyme Q compounds, and a person of ordinary skill would recognize its applicability to the compounds described in (or possible to obtain from) USP 25, Urakami, Karr, Gilbart and the ’668 Patent. Accordingly, it would be obvious to consider the teachings of USP 25, Urakami, Gilbart, Karr, U.S. Patent No. 3,549,668, JP-A-10-109933, U.S. Patent Pub. No. 2006/0134085, and/or Rousseau in combination with the ’040 Application. U.S. Patent Pub. No. 2006/0134085 at [0005] and [0029] notes that a goal of the disclosed invention was to “provide a CoQ10-containing composition suitably applicable for food use, which has excellent storage stability and improved bioabsorbability of CoQ10” and discloses that “since the CoQ10 having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention

may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."

A POSITA would have been motivated to combine the teachings of the '301 Application with any of USP 25, Urakami, Gilbart, Karr, U.S. Patent No. 3,549,668, JP-A-10-109933, U.S. Patent Pub. No. 2006/0134085, and/or Rousseau, as the invention described "relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$" [0001] and the '040 Application notes that "[t]he oxidized coenzyme $Q_{10}$ to be used in the practice of the invention may be one prepared by synthesis, fermentation, or extraction from a natural product, for instance, as mentioned hereinabove, or may be an existing high-purity grade of coenzyme $Q_{10}$" [0058], [0085]. A person of ordinary skill would look to existing teachings and existing compounds to obtain oxidized coenzyme $Q_{10}$ to be used in the practice of the invention described in the '301 Application. Urakami, Karr, Gilbart and the '668 Patent each provide a starting point and beneficial properties for natural products that may be used for the synthesis, fermentation, or extraction of oxidized coenzyme $Q_{10}$, and USP 25 describes existing high-purity grades of coenzyme $Q_{10}$. *See* Appendix A-4. Rousseau describes the applicability of reduction processes to Coenzyme Q compounds, and a person of ordinary skill would recognize its applicability to the compounds described in (or possible to obtain from) USP 25, Urakami, Karr, Gilbart and the '668 Patent. Accordingly, it would be obvious to consider the teachings of USP 25, Urakami, Gilbart, Karr, U.S. Patent No. 3,549,668, JP-A-10-109933, U.S. Patent Pub. No. 2006/0134085, and/or Rousseau in combination with the '301 Application. U.S. Patent Pub. No. 2006/0134085 at [0005] and [0029] notes that a goal of the disclosed invention was to "provide a CoQ10-containing composition suitably applicable for food use, which has excellent storage stability and improved bioabsorbability of CoQ10" and discloses that "since the CoQ10 having an isoprenoid chain

composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."

Application of the teachings of the '040 Application, '301 Application, USP 25, Urakami, Gilbart, Karr, U.S. Patent No. 3,549,668, JP-A-10-109933, U.S. Patent Pub. No. 2006/0134085, and/or Rousseau in the manner described herein and in Appendices A-3 and A-4 would have been well within the skill of a POSITA.

### *C. Secondary Considerations of Non-Obviousness.*

Plaintiff has not raised any secondary considerations of non-obviousness, and Defendants contend that there are none. To the extent that any are raised by Plaintiff, Defendants reserve the right to respond.

## IV. EACH OF THE CHALLENGED CLAIMS IS INVALID UNDER 35 U.S.C. § 112.

To the extent that any claim construction renders the limitations of either "reduced coenzyme $Q_{10}$ and one or both of… reduced coenzyme $Q_{11}$" (for claim 5) or "wherein the composition comprises reduced coenzyme $Q_{10}$ and one or both of… reduced coenzyme $Q_{11}$" (for claim 15) as meaning anything other than the plain and ordinary meaning of such limitations (*e.g.*, by imposing numerical limitations on the requisite amount of reduced coenzyme $Q_{11}$), the Challenged Claims are invalid under 35 U.S.C. § 112 as indefinite for failing to inform a person skilled in the art about the scope of the invention with reasonable certainty.

The Challenged Claims are also invalid under 35 U.S.C. § 112 for lack of written description. As an example, the specification of the '080 patent fails to provide adequate written description to reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter, including but not limited to, because the '080 patent fails to explain how to ascertain the amounts of reduced coenzyme $Q_9$ and/or reduced coenzyme $Q_{11}$ that is contained

in the Challenged Claims and because the only example in the ’080 patent disclosing the presence of reduced coenzyme $Q_{11}$ shows 0.1% of reduced coenzyme $Q_{11}$. The Challenged Claims do not contain any limitation, either lower or upper, on the amount of reduced coenzyme $Q_{11}$ needed to be present in the composition to fall within the scope of the claims, and thus the sparse disclosure of 0.1% of reduced coenzyme $Q_{11}$ provided by the specification of the ’080 patent fails to provide written description support for the entire scope of the Challenged Claims.

The Challenged Claims are also invalid under 35 U.S.C. § 112 for lack of enablement. The specification of the ’080 patent fails to enable a person of ordinary skill to make and use the full scope of the Challenged Claims without undue experimentation, including but not limited to, because the ’080 patent fails to explain how to ascertain the amounts of coenzyme $Q_9$ and/or coenzyme $Q_{11}$ that is contained in claims 5 and 15, and because the only example in the ’080 patent disclosing the presence of $CoQ_{11}$ (Example 4) shows 0.1% of reduced $CoQ_{11}$, nothing smaller. The ’080 patent also does not show how to make or use the full scope of the claimed invention because it shows no utility of any presence of reduced $CoQ_{11}$ (let alone the miniscule quantities of reduced $CoQ_{11}$ required to meet the claim scope), and this information was not possessed by the inventors at the time the patent application was filed. *See Janssen Pharmaceutica N.V. v. Teva Pharms. USA, Inc. (In re '318 Patent Infringement Litig.)*, 583 F.3d 1317, 1324 (Fed. Cir. 2009); [redacted]. The asserted claims of the ’080 patent do not contain any limitation, either lower or upper, on the amount of reduced $CoQ_{11}$ needed to be present in the composition to fall within the scope of the claims. This is emphasized by the fact that the specification of the ’080 patent explicitly makes it a point to state that the amount of reduced coenzyme $Q_{11}$ contained in the claimed invention is “not particularly limited,” but is “generally not less than about 0.1 wt%” with an upper limit that is “not particularly limited” but is “generally not more than 99 wt %.” Thus, if

the amount of $CoQ_{11}$ falling within the scope of the asserted claims is to be limited at all, it would be from 0.1 wt% to 99 wt%. Accordingly, the sparse disclosures in the '080 patent relating to how to ascertain the amounts of coenzyme $Q_9$ and/or coenzyme $Q_{11}$ and the lone example of 0.1 wt% of reduced $CoQ_{11}$ provided in the specification fail to enable those skilled in the art to make and use any alleged invention without undue experimentation.

## V. ADDITIONAL GROUNDS OF INVALIDITY.

Defendants also incorporate by reference all potential grounds of invalidity advanced in *Kaneka Corp. v. Designs for Health, et. al.* (1:21-cv-00209), which were requested in discovery by Defendants by March 29, 2024, and have yet to be produced. Each primary or secondary prior art reference, motivation to combine, expert analysis, or other evidence relied upon to support invalidity in that litigation may be relied upon by Defendants, alone or in combination with any of the above grounds of invalidity.

Defendants hereby incorporate by reference all contentions made in their Answer and Counterclaims (Dkt. 22) regarding invalidity of the Challenged Claims.

Defendants reserve the right to rely upon test results relating to prior art products and methods as well as expert witness analysis, including the performance of testing or provision of background knowledge of one of ordinary skill in the art, consistent with the Rules of Federal Procedure and the deadlines for expert discovery in this matter to advance, support, and elaborate on any of these disclosed invalidity theories.

## VI. UNENFORCEABILITY OF THE CHALLENGED CLAIMS.

Each Challenged Claim, as well as any unasserted claims, of the '080 patent are unenforceable because, among other reasons, of inequitable conduct committed during prosecution of the patent, including obtaining a patent with claims directed to reduced Coenzyme $Q_{11}$ in any amount, despite knowing that reduced Coenzyme $Q_{11}$ is an inevitable impurity in the process of

obtaining reduced Coenzyme $Q_{10}$, *i.e.*, reduction of Coenzyme $Q_{10}$, as discussed in the prior art, which will unavoidably reduce a certain amount of Coenzyme $Q_{11}$ since Coenzyme $Q_{11}$ is very similar to Coenzyme $Q_{10}$ in terms of chemical reactivity, especially when getting reduced by unselective reducing agents such as those described in the ’080 patent. Kaneka’s own application to the FDA in 2005 proves that Kaneka was aware of Coenzyme $Q_{11}$ as a known impurity of ubidecarenone. This can also be seen in U.S. Patent Pub. No. 2007/0258967, which notes at [0001]-[0002] that “[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein.” U.S. Patent Pub. No. 2007/0258967 lists as inventors Takahiro Ueda and Shiro Kitamura, who are also listed as inventors for the ’080 patent, ’040 Application, and the ’301 Application. *See also* KAN0012163 at -2170; CoCrystal_0008258; CoCrystal_0000610; KAN0079890 - KAN0079950; Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60; Deposition of Mr. Takahiro Ueda in Case No. 21-209-RGA (D. Del.) (June 22, 2022) at pages 68-70. Failure to disclose this critical information to the USPTO during prosecution of the ’080 patent amounts to inequitable conduct.

Kaneka was undoubtedly aware that the ’080 patent is invalid as anticipated under 35 U.S.C. § 102 and/or rendered obvious under 35 U.S.C. § 103 because it was known before the application for the ’080 patent that $CoQ_{11}$ is present as an inevitable impurity in $CoQ_{10}$. For example, the USP standard for ubidecarenone (another term for $CoQ_{10}$), which was published as early as 2002, clearly describes $CoQ_{11}$ as an impurity. Kaneka, as a self-proclaimed leader in the development of $CoQ_{10}$, was undoubtedly aware of the USP standard. Indeed, Kaneka’s own application to the FDA around 2005 also describes $CoQ_{11}$ as an impurity contained in $CoQ_{10}$. As

explained in Appendices A-1 to A-4, Urakami also disclosed in a paper published in 1986 that $CoQ_{11}$ is present as an impurity in CoQ10. It was also unquestionably known to Kaneka's inventors as a matter of basic science, and obvious to one of ordinary skill in the art, that reducing $CoQ_{10}$ would necessarily yield a compound with some small, trace amounts of reduced $CoQ_{11}$. Any remaining limitations of the asserted claims of the ’080 patent can be found in, at least, the references listed on the face of the ’080 patent and the references cited or referred to in the prosecution history of the ’080 patent. Thus, it was undoubtedly known to the Applicant, including at least the inventors of the ’080 patent and Kaneka’s in-house patent department, that reducing $CoQ_{10}$ would necessarily yield a compound with some amount of reduced $CoQ_{11}$.

Instead of clearly disclosing that it was known in the art that reduced $CoQ_{11}$ is present as an impurity in reduced $CoQ_{10}$ compositions, and that reducing $CoQ_{10}$ would necessarily yield a composition with some amount of reduced $CoQ_{11}$, throughout prosecution of the ’080 patent, the Applicant diverted the USPTO Examiner’s attention to the presence of reduced Coenzyme $Q_9$ in the claimed reduced $CoQ_{10}$ composition, and repeatedly stated that any reduced $CoQ_{11}$ present in the claimed composition must be “added” to the composition instead of it naturally being present as an impurity.

At least the patent applicant (Kaneka), inventors (Takahiro Ueda, Shiro Kitamura, Hiroshi Kubo, and Kazunori Hosoe), and Kaneka’s in-house patent department involved in the preparation and prosecution of U.S. Application No. 11/741,290 (the “’290 application”) (collectively, “Applicant”) knowingly and intentionally failed to disclose and/or misrepresented known bases for invalidity under 35 U.S.C. § 102, 103, and/or 112. This includes that Kaneka knew that it had no evidence of the utility of any presence of $Q_{11}$ with any claimed composition or method, and yet represented otherwise in the specification of the ’080 Patent. *See* ’080 Patent at 2:36-40;

[redacted]. These deliberate omissions and/or misrepresentations were material to patentability, made with the intent to deceive the patent examiner, and were justifiably relied upon by the examiner in ultimately issuing the ’080 patent. In view of these circumstances, the single most reasonable inference that can be drawn is that these material misrepresentations and omissions during prosecution were made with the intent to deceive the USPTO.

Defendants further incorporate by reference all contentions made in their Answer and Counterclaims (Dkt. 22) regarding unenforceability of the Challenged Claims.

Fact discovery is ongoing, and material information has been requested from Kaneka but has not yet been made available. Defendants therefore reserve the right to supplement their contentions and/or rely upon expert witness analysis to support their contentions of unenforceability.

Dated: March 12, 2025

Respectfully submitted,

/s/ Gary M. Hnath
Gary M. Hnath (admitted *pro hac vice*)
Jing Zhang (admitted *pro hac vice*)
Clark S. Bakewell (admitted *pro hac vice*)
ghnath@mayerbrown.com
jzhang@mayerbrown.com
cbakewell@mayerbrown.com
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3001

Jessica A. Lehrman
jlehrman@mayerbrown.com
MAYER BROWN LLP

1221 Avenue of the Americas
New York, NY 10020-1001
Telephone: (212) 506-2863
Facsimile: (212) 262-1910

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, ____Clark S. Bakewell________ hereby certify that on this _12th_ day of March, 2025, copies of the foregoing were served on the following via electronic mail:

**CARTER LEDYARD & MILBURN LLP**
Gerald W. Griffin
Keith D. Nowak
Leonardo Trivigno
Nilima M. Singh
Meredith B. Spelman
Jodutt M. Basrawi
Nathan D. Harp

28 Liberty Street, 41st Floor
New York, New York 10005
Tel. 212-732-3200
Email: griffin@clm.com
nowak@clm.com
trivigno@clm.com
singh@clm.com
spelman@clm.com
basrawi@clm.com
harp@clm.com

Counsel for Plaintiff Kaneka Corporation

/s/ Clark S. Bakewell

## Appendix A-1

## Invalidity of U.S. Patent No. 7,829,080 under 35 U.S.C. § 102 in view of U.S. Patent Pub. No. 2004/0215040

Claims 5 and 15 of the ’080 Patent are invalid as anticipated by U.S. Patent Pub. No. 2004/0215040 (the “’040 Application”), including those properties inherently present in compositions formed according to this prior art. The ’040 Application was published on October 28, 2004, and qualifies as prior art to the ’080 Patent under at least 35 U.S.C. § 102(b) (pre-AIA).

| ’080 Patent Claim | Relevant Evidence and Disclosure in Prior Art |
|---|---|
| **[5.pre]** A reduced coenzyme $Q_{10}$-containing composition comprising | The ’040 Application teaches a reduced coenzyme $Q_{10}$-containing composition.<br><br>“The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$.” ’040 Application at [0001]; *see also id.* at [0103], [0012].<br><br>The ’080 Patent itself references the method taught by the ’040 Application, stating that “reduced coenzyme $Q_{10}$ having a high proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ can be efficiently obtained by the method described in WO 03/06408.” *See* ’080 Patent at 5:13-17. The ’040 Application claims priority to PCT/JP02/07143, which corresponds to WO 03/06408. |
| **[5.a(i)]** reduced coenzyme $Q_{10}$ and one or both of (a) and (b): | The ’040 Application teaches a composition comprising reduced coenzyme $Q_{10}$.<br><br>“The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$.” ’040 Application at [0001]; *see also id.* at [0103], [0012].<br><br>*Satisfaction of the* “and one or both of (a) and (b)” *language addressed in claim element [5.a(iii)] below.* |

| | |
|---|---|
| **[5.a(ii)]** (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and | *Not required by claim language due to claim element [5.a(iii)] below.* |
| **[5.a(iii)]** (b) reduced coenzyme $Q_{11}$ | Application of the reduction process taught in the '040 Application will inherently result in a composition comprising reduced coenzyme $Q_{11}$.<br><br>The '040 Application states that "The oxidized coenzyme Q $_{10}$ to be used in the practice of the invention may be one prepared by synthesis, fermentation, or extraction from a natural product, for instance, as mentioned hereinabove, or may be an existing high-purity grade of coenzyme $Q_{10}$." '040 Application at [0058]; *see also id.* at [0085], [0003]. One example of a composition used in the disclosed process is "Oxidized coenzyme $Q_{10}$ (100 g; containing 0.40% of oxidized coenzyme $Q_9$, purity 99.4%)" (*id.* at [0103]; *see also e.g.* [0112] (alternative example)), but any such composition containing $Q_{10}$ will inherently include $Q_{11}$ when prepared by synthesis, fermentation, or extraction from a natural product.<br><br>While the '040 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the '040 Application separately disclosed that "It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)" and that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein." U.S. Patent Pub. No. 2007/0258967 (at [0002]; *see also* [0003], |

| | |
|---|---|
| | [0007]). Accordingly, the inventors recognized that reduction of oxidized coenzyme $Q_{10}$ obtained by "synthesis, fermentation, or extraction from a natural product" would inherently include $Q_{11}$.<br><br>For example, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains "not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis" and specifies the test for $Q_{11}$ as a known impurity. *See also* USP 36 at 1613-1616 (similar disclosure for ubidecarenone). Further, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], "since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."<br><br>Other evidence includes: |

| | |
|---|---|
| | • Chinese Patent Publication No. CN108084007B, which notes that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10."<br><br>• Chinese Patent Publication No. CN108047014B, which notes that "The production process of the coenzyme Q10 mainly comprises a biological extraction method, a chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be absorbed by human body; the coenzyme Q10 product produced by the microbial fermentation method has great competitive advantages in production cost and product quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."<br><br>• Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that |

| | |
|---|---|
| | the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent."<br><br>• U.S. Patent No. 3,549,668, which discloses that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves, and discloses a preparation method for these compounds. *See* '668 Patent at cols. 1-2.<br><br>• Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 ("Each of the six named *Legionella* species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components.").<br><br>• *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"<br><br>• U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].<br><br>• Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$. |

| | |
|---|---|
| | • Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and that $CoQ_{11}$ accumulated in Pseudomonas samples.<br><br>• WO2021036386A1 discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 -demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11."<br><br>• US11773043B2 discloses that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."<br><br>• Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60<br><br>• Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities. |

| | |
|---|---|
| | • Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of $CoQ_1$ through $CoQ_{12}$, which includes $CoQ_{11}$.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: "Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…" G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the reduction process taught in the '040 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>The '080 Patent itself references the method taught by the '040 Application as applicable to $Q_{11}$, stating that "[i]n the stabilization method of the present invention, the aforementioned (a) and/or (b) can be separately prepared by any suitable technique. For example, the separate preparation can be preparation by extraction and purification from a naturally occurring substance, reduction of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ according to the aforementioned method described in WO 03/06408, or coupling reaction of isoprenyl side chain with 2-methyl-5,6-dimethoxy-1,4-benzohydroquinone and the like." *See* '080 Patent at 5:47-58.<br><br>Kaneka's own infringement contentions specify that "Oxidized CoQ10 and oxidized Q11 are both items which are used to develop ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11." Defendants have followed the process of the '040 Application, and therefore Kaneka's own assertions (and the evidence supporting them) show the application |

| | |
|---|---|
| | of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka's usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the '040 Application. |
| **[5.b]** wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | The '040 Application teaches that not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition.<br><br>"The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.6/0.4, and the purity of the reduced coenzyme $Q_{10}$ was 99.2%." '040 Application at [0103]; *see also id.* at [0108]-[0115], [0117]. |
| **[5.c]** wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | The '040 Application teaches that the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %.<br><br>"The invention still further provides a reduced coenzyme $Q_{10}$ crystal with a reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of not lower than 96/4." '040 Application at [0016]; *see also id.* at [0099], [0103], [0108]-[0115], [0117]. |
| | |
| **[15.pre]** A method for producing a reduced coenzyme $Q_{10}$-containing composition, which method comprises | The '040 Application teaches a method for producing a reduced coenzyme $Q_{10}$-containing composition.<br><br>"The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$." '040 Application at [0001]; *see also id.* at [0103], [0012]. |

| | |
|---|---|
| | The ’080 Patent itself references the method taught by the ’040 Application, stating that “reduced coenzyme $Q_{10}$ having a high proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ can be efficiently obtained by the method described in WO 03/06408.” *See* ’080 Patent at 5:13-17. |
| **[15.a]** providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, and then | The ’040 Application teaches a method that comprises providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$.<br><br>The ’040 Application states that “The oxidized coenzyme Q $_{10}$ to be used in the practice of the invention may be one prepared by synthesis, fermentation, or extraction from a natural product, for instance, as mentioned hereinabove, or may be an existing high-purity grade of coenzyme $Q_{10}$.” ’040 Application at [0058]; *see also id.* at [0085], [0003]. One example of a composition used in the disclosed process is “Oxidized coenzyme $Q_{10}$ (100 g; containing 0.40% of oxidized coenzyme $Q_9$, purity 99.4%)” (*id.* at [0103]; *see also e.g.* [0112] (alternative example)), but any such composition containing $Q_{10}$ will inherently include $Q_{11}$ when prepared by synthesis, fermentation, or extraction from a natural product.<br><br>While the ’040 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the ’040 Application separately disclosed that “It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)” and that “[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, |

| | |
|---|---|
| | ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein." U.S. Patent Pub. No. 2007/0258967 (at [0002]; *see also* [0003], [0007]). Accordingly, the inventors recognized that reduction of oxidized coenzyme $Q_{10}$ obtained by "synthesis, fermentation, or extraction from a natural product" would inherently include $Q_{11}$.<br><br>For example, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains "not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis" and specifies the test for $Q_{11}$ as a known impurity. *See also* USP 36 at 1613-1616 (similar disclosure for ubidecarenone). Further, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], "since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."<br><br>Other evidence includes: |

| | |
|---|---|
| | • Chinese Patent Publication No. CN108084007B, which notes that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10."<br><br>• Chinese Patent Publication No. CN108047014B, which notes that "The production process of the coenzyme Q10 mainly comprises a biological extraction method, a chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be absorbed by human body; the coenzyme Q10 product produced by the microbial fermentation method has great competitive advantages in production cost and product quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."<br><br>• Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that |

| | |
|---|---|
| | the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent."<br><br>• U.S. Patent No. 3,549,668, which discloses that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves, and discloses a preparation method for these compounds. *See* '668 Patent at cols. 1-2.<br><br>• Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 ("Each of the six named *Legionella* species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components.").<br><br>• *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"<br><br>• U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].<br><br>• Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$. |

| | |
|---|---|
| | • Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and that $CoQ_{11}$ accumulated in Pseudomonas samples.<br><br>• WO2021036386A1 discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 -demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11."<br><br>• US11773043B2 discloses that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."<br><br>• Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60<br><br>• Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities. |

| | |
|---|---|
| | • Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of $CoQ_1$ through $CoQ_{12}$, which includes $CoQ_{11}$. |
| **[15.b]** reducing oxidized coenzyme $Q_{10}$ and | The '040 Application teaches a method that comprises reducing oxidized coenzyme $Q_{10}$.<br><br>"The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$." '040 Application at [0001]; *see also id.* at [0103], [0012], [0100]-[0118]. |
| **[15.c]** reducing one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition, | The '040 Application teaches a method that reduces oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: "Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…" G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the reduction process taught in the '040 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>The '080 Patent itself references the method taught by the '040 Application as applicable to $Q_{11}$, stating that "[i]n the stabilization method of the present invention, the aforementioned (a) and/or (b) can be separately prepared by any suitable technique. For example, the separate preparation can be preparation by extraction and purification from a naturally occurring substance, reduction of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ according to the aforementioned method described in WO 03/06408, or coupling |

| | |
|---|---|
| | reaction of isoprenyl side chain with 2-methyl-5,6-dimethoxy-1,4-benzohydroquinone and the like." *See* '080 Patent at 5:47-58.<br><br>Kaneka's own infringement contentions specify that "Oxidized CoQ10 and oxidized Q11 are both items which are used to develop ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11." Defendants have followed the process of the '040 Application, and therefore Kaneka's own assertions (and the evidence supporting them) show the application of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka's usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the '040 Application. |
| **[15.d(i)]** wherein the composition comprises reduced coenzyme $Q_{10}$ and one or both of | The '040 Application teaches a method that produces a reduced coenzyme $Q_{10}$-containing composition.<br><br>"The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$." '040 Application at [0001]; *see also id.* at [0103], [0012], [0100]-[0118].<br><br>*Satisfaction of the* "and one or both" *language addressed in claim element [15.d(iii)] below.* |
| **[15.d(ii)]** (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$ and | *Not required by claim language due to claim element [15.d(iii)] below.* |

| | |
|---|---|
| **[15.d(iii)]** (b) reduced coenzyme $Q_{11}$, | Application of the reduction process taught in the ’040 Application will inherently result in a composition comprising reduced coenzyme $Q_{11}$.<br><br>The ’040 Application states that “The oxidized coenzyme $Q_{10}$ to be used in the practice of the invention may be one prepared by synthesis, fermentation, or extraction from a natural product, for instance, as mentioned hereinabove, or may be an existing high-purity grade of coenzyme $Q_{10}$.” ’040 Application at [0058]; *see also id.* at [0085], [0003]. One example of a composition used in the disclosed process is “Oxidized coenzyme $Q_{10}$ (100 g; containing 0.40% of oxidized coenzyme $Q_9$, purity 99.4%)” (*id.* at [0103]; *see also e.g.* [0112] (alternative example)), but any such composition containing $Q_{10}$ will inherently include $Q_{11}$ when prepared by synthesis, fermentation, or extraction from a natural product.<br><br>While the ’040 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the ’040 Application separately disclosed that “It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)” and that “[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein.” U.S. Patent Pub. No. 2007/0258967 (at [0002]; *see also* [0003], [0007]). Accordingly, the inventors recognized that reduction of oxidized coenzyme $Q_{10}$ obtained by “synthesis, fermentation, or extraction from a natural product” would inherently include $Q_{11}$. |

| | |
|---|---|
| | For example, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains "not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis" and specifies the test for $Q_{11}$ as a known impurity. *See also* USP 36 at 1613-1616 (similar disclosure for ubidecarenone). Further, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], "since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."<br><br>Other evidence includes:<br><br>• Chinese Patent Publication No. CN108084007B, which notes that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10."<br><br>• Chinese Patent Publication No. CN108047014B, which notes that "The production process of the coenzyme Q10 mainly comprises a biological extraction method, a |

| | |
|---|---|
| | chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be absorbed by human body; the coenzyme Q10 product produced by the microbial fermentation method has great competitive advantages in production cost and product quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."<br><br>• Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent."<br><br>• U.S. Patent No. 3,549,668, which discloses that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves, and discloses a preparation method for these compounds. *See* '668 Patent at cols. 1-2. |

| | |
|---|---|
| | • Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 ("Each of the six named *Legionella* species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components.").<br><br>• *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"<br><br>• U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].<br><br>• Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$.<br><br>• Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and that $CoQ_{11}$ accumulated in Pseudomonas samples. |

| | |
|---|---|
| | • WO2021036386A1 discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 -demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11."<br><br>• US11773043B2 discloses that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."<br><br>• Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60<br><br>• Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities.<br><br>• Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of $CoQ_1$ through $CoQ_{12}$, which includes $CoQ_{11}$.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: "Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…" G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid* |

| | |
|---|---|
| | *Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the reduction process taught in the ’040 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>The ’080 Patent itself references the method taught by the ’040 Application as applicable to $Q_{11}$, stating that “[i]n the stabilization method of the present invention, the aforementioned (a) and/or (b) can be separately prepared by any suitable technique. For example, the separate preparation can be preparation by extraction and purification from a naturally occurring substance, reduction of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ according to the aforementioned method described in WO 03/06408, or coupling reaction of isoprenyl side chain with 2-methyl-5,6-dimethoxy-1,4-benzohydroquinone and the like.” *See* ’080 Patent at 5:47-58.<br><br>Kaneka’s own infringement contentions specify that “Oxidized CoQ10 and oxidized Q11 are both items which are used to develop ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11.” Defendants have followed the process of the ’040 Application, and therefore Kaneka’s own assertions (and the evidence supporting them) show the application of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka’s usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the ’040 Application. |

| | |
|---|---|
| **[15.e]** wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | The ’040 Application teaches that not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition.<br><br>“The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.6/0.4, and the purity of the reduced coenzyme $Q_{10}$ was 99.2%.” ’040 Application at [0103]; *see also id.* at [0108]-[0115], [0117]. |
| **[15.f]** wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | The ’040 Application teaches that the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %.<br><br>“The invention still further provides a reduced coenzyme $Q_{10}$ crystal with a reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of not lower than 96/4.” ’040 Application at [0016]; *see also id.* at [0099], [0103], [0108]-[0115], [0117]. |

# Appendix A-2

## Invalidity of U.S. Patent No. 7,829,080 under 35 U.S.C. § 102 in view of U.S. Patent Pub. No. 2004/0214301

Claims 5 and 15 of the ’080 Patent are invalid as anticipated by U.S. Patent Pub. No. 2004/0214301 (the “’301 Application”), including those properties inherently present in compositions formed according to this prior art. The ’301 Application was published on October 28, 2004, and qualifies as prior art to the ’080 Patent under at least 35 U.S.C. § 102(b) (pre-AIA).

| ’080 Patent Claim | Relevant Evidence and Disclosure in Prior Art |
|---|---|
| **[5.pre]** A reduced coenzyme $Q_{10}$-containing composition comprising | The ’301 Application teaches a reduced coenzyme $Q_{10}$-containing composition.<br><br>“The present invention relates to a method of producing a reduced coenzyme $Q_{10}$ crystal.” ’301 Application at [0001]; *see also id.* at [0102]-[0116], [0043], [0012]. |
| **[5.a(i)]** reduced coenzyme $Q_{10}$ and one or both of (a) and (b): | The ’301 Application teaches a composition comprising reduced coenzyme $Q_{10}$.<br><br>“The present invention relates to a method of producing a reduced coenzyme $Q_{10}$ crystal.” ’301 Application at [0001]; *see also id.* at [0102]-[0116], [0043], [0012].<br><br>*Satisfaction of the* “and one or both of (a) and (b)” *language addressed in claim element [5.a(iii)] below.* |
| **[5.a(ii)]** (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and | *Not required by claim language due to claim element [5.a(iii)] below.* |
| **[5.a(iii)]** (b) reduced coenzyme $Q_{11}$ | Application of the reduction process taught in the ’301 Application will inherently result in a composition comprising reduced coenzyme $Q_{11}$. |

| | |
|---|---|
| | The ’301 Application states that “[r]educed coenzyme $Q_{10}$ used for crystallization may be obtained by conventional methods such as synthesis, fermentation or extraction from a natural product.” ’301 Application at [0016], [0017]. One example of a composition used in the disclosed process is “Oxidized coenzyme $Q_{10}$ (100 g; containing 0.40% of oxidized coenzyme $Q_9$, purity 99.4%)” (*id.* at [0102]), but any such composition containing $Q_{10}$ will inherently include $Q_{11}$ when prepared by synthesis, fermentation, or extraction from a natural product.<br><br>While the ’301 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the ’301 Application separately disclosed that “It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)” and that “[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein.” U.S. Patent Pub. No. 2007/0258967 (at [0002]; *see also* [0003], [0007]). Accordingly, the inventors recognized that reduction of oxidized coenzyme $Q_{10}$ obtained by “synthesis, fermentation, or extraction from a natural product” would inherently include $Q_{11}$.<br><br>For example, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains “not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis” and specifies the test for $Q_{11}$ as a known impurity. *See also* USP 36 at 1613-1616 (similar disclosure for ubidecarenone). Further, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and* |

| | |
|---|---|
| | *Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], "since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."<br><br>Other evidence includes:<br><br>• Chinese Patent Publication No. CN108084007B, which notes that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10."<br><br>• Chinese Patent Publication No. CN108047014B, which notes that "The production process of the coenzyme Q10 mainly comprises a biological extraction method, a chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be absorbed by human body; the coenzyme Q10 product produced by the microbial fermentation method has great |

| | |
|---|---|
| | competitive advantages in production cost and product quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."<br><br>• Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent."<br><br>• U.S. Patent No. 3,549,668, which discloses that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves, and discloses a preparation method for these compounds. *See* '668 Patent at cols. 1-2.<br><br>• Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 ("Each of the six named *Legionella* species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components."). |

| | |
|---|---|
| | • *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"<br><br>• U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].<br><br>• Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$.<br><br>• Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and that $CoQ_{11}$ accumulated in Pseudomonas samples.<br><br>• WO2021036386A1 discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 -demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11." |

| | |
|---|---|
| | • US11773043B2 discloses that "CoQ$_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When CoQ$_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme Q$_9$, coenzyme Q$_{10}$ isomeride, coenzyme Q$_{11}$."<br><br>• Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60<br><br>• Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities.<br><br>• Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of CoQ$_1$ through CoQ$_{12}$, which includes CoQ$_{11}$.<br><br>Any reduction process that reduces Q$_{10}$ will also reduce Q$_{11}$: "Because the physico-chemical properties of Q$_{11}$ are very similar to those of Q$_{10}$ and Q$_9$, potential reactions that would affect Q$_{10}$ and Q$_9$ would likely also affect Q$_{11}$ to a similar extent…" G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme Q$_{11}$ that is reduced using the reduction process taught in the '301 Application will result in reduced coenzyme Q$_{11}$ in the final composition. |

| | |
|---|---|
| | Kaneka's own infringement contentions specify that "Oxidized CoQ10 and oxidized Q11 are both items which are used to develop ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11." Defendants have substantively followed the process of the '301 Application, and therefore Kaneka's own assertions (and the evidence supporting them) show the application of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka's usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the '301 Application. |
| **[5.b]** wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | The '301 Application teaches that not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition.<br><br>"The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.3/0.7, and the purity of the reduced coenzyme $Q_{10}$ was 99.0%." '301 Application at [0102]; *see also id.* at [0103]-[0115]. |
| **[5.c]** wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | The '301 Application teaches that the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %.<br><br>"The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.3/0.7, and the purity of the reduced coenzyme $Q_{10}$ was 99.0%." '301 Application at [0102]; *see also id.* at [0103]-[0115]. |
| | |

| | |
|---|---|
| **[15.pre]** A method for producing a reduced coenzyme $Q_{10}$-containing composition, which method comprises | The ’301 Application teaches a method for producing a reduced coenzyme $Q_{10}$-containing composition.<br><br>“The present invention relates to a method of producing a reduced coenzyme $Q_{10}$ crystal.” ’301 Application at [0001]; *see also id.* at [0102]-[0116], [0043], [0012]. |
| **[15.a]** providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, and then | The ’301 Application teaches a method that comprises providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$.<br><br>The ’301 Application states that “[r]educed coenzyme $Q_{10}$ used for crystallization may be obtained by conventional methods such as synthesis, fermentation or extraction from a natural product.” ’301 Application at [0016], [0017]. One example of a composition used in the disclosed process is “Oxidized coenzyme $Q_{10}$ (100 g; containing 0.40% of oxidized coenzyme $Q_9$, purity 99.4%)” (*id.* at [0102]), but any such composition containing $Q_{10}$ will inherently include $Q_{11}$ when prepared by synthesis, fermentation, or extraction from a natural product.<br><br>While the ’301 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the ’301 Application separately disclosed that “It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)” and that “[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein.” U.S. Patent Pub. No. 2007/0258967 (at [0002]; *see also* [0003], |

| | |
|---|---|
| | [0007]). Accordingly, the inventors recognized that reduction of oxidized coenzyme $Q_{10}$ obtained by "synthesis, fermentation, or extraction from a natural product" would inherently include $Q_{11}$.<br><br>For example, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains "not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis" and specifies the test for $Q_{11}$ as a known impurity. *See also* USP 36 at 1613-1616 (similar disclosure for ubidecarenone). Further, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], "since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."<br><br>Other evidence includes: |

| | |
|---|---|
| | • Chinese Patent Publication No. CN108084007B, which notes that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10."<br><br>• Chinese Patent Publication No. CN108047014B, which notes that "The production process of the coenzyme Q10 mainly comprises a biological extraction method, a chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be absorbed by human body; the coenzyme Q10 product produced by the microbial fermentation method has great competitive advantages in production cost and product quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."<br><br>• Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that |

| | |
|---|---|
| | the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent."<br><br>• U.S. Patent No. 3,549,668, which discloses that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves, and discloses a preparation method for these compounds. *See* '668 Patent at cols. 1-2.<br><br>• Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 ("Each of the six named *Legionella* species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components.").<br><br>• *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"<br><br>• U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].<br><br>• Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$. |

| | |
|---|---|
| | • Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and that $CoQ_{11}$ accumulated in Pseudomonas samples.<br><br>• WO2021036386A1 discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 - demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11."<br><br>• US11773043B2 discloses that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."<br><br>• Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60<br><br>• Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities. |

| | |
|---|---|
| | • Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of $CoQ_1$ through $CoQ_{12}$, which includes $CoQ_{11}$.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: "Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…" G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the reduction process taught in the '301 Application will result in reduced coenzyme $Q_{11}$ in the final composition. |
| **[15.b]** reducing oxidized coenzyme $Q_{10}$ and | The '301 Application teaches a method that comprises reducing oxidized coenzyme $Q_{10}$.<br><br>"The present invention relates to a method of producing a reduced coenzyme $Q_{10}$ crystal." '301 Application at [0001]; *see also id.* at [0102]-[0116], [0043], [0012]. |
| **[15.c]** reducing one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition, | The '301 Application teaches a method that reduces oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: "Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…" G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, |

| | |
|---|---|
| | any present oxidized coenzyme $Q_{11}$ that is reduced using the reduction process taught in the '301 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>Kaneka's own infringement contentions specify that "Oxidized CoQ10 and oxidized Q11 are both items which are used to develop ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11." Defendants have substantively followed the process of the '301 Application, and therefore Kaneka's own assertions (and the evidence supporting them) show the application of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka's usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the '301 Application. |
| **[15.d(i)]** wherein the composition comprises reduced coenzyme $Q_{10}$ and one or both of | The '301 Application teaches a method that produces a reduced coenzyme $Q_{10}$-containing composition.<br><br>"The present invention relates to a method of producing a reduced coenzyme $Q_{10}$ crystal." '301 Application at [0001]; *see also id.* at [0102]-[0116], [0043], [0012].<br><br>*Satisfaction of the* "and one or both" *language addressed in claim element [15.d(iii)] below.* |
| **[15.d(ii)]** (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$ and | *Not required by claim language due to claim element [15.d(iii)] below.* |

| | |
|---|---|
| **[15.d(iii)]** (b) reduced coenzyme $Q_{11}$, | Application of the reduction process taught in the ’301 Application will inherently result in a composition comprising reduced coenzyme $Q_{11}$.<br><br>The ’301 Application states that “[r]educed coenzyme $Q_{10}$ used for crystallization may be obtained by conventional methods such as synthesis, fermentation or extraction from a natural product.” ’301 Application at [0016], [0017]. One example of a composition used in the disclosed process is “Oxidized coenzyme $Q_{10}$ (100 g; containing 0.40% of oxidized coenzyme $Q_9$, purity 99.4%)” (*id.* at [0102]), but any such composition containing $Q_{10}$ will inherently include $Q_{11}$ when prepared by synthesis, fermentation, or extraction from a natural product.<br><br>While the ’301 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the ’301 Application separately disclosed that “It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)” and that “[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein.” U.S. Patent Pub. No. 2007/0258967 (at [0002]; *see also* [0003], [0007]). Accordingly, the inventors recognized that reduction of oxidized coenzyme $Q_{10}$ obtained by “synthesis, fermentation, or extraction from a natural product” would inherently include $Q_{11}$.<br><br>For example, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains “not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis” |

| | |
|---|---|
| | and specifies the test for $Q_{11}$ as a known impurity. *See also* USP 36 at 1613-1616 (similar disclosure for ubidecarenone). Further, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], "since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."<br><br>Other evidence includes:<br><br>• Chinese Patent Publication No. CN108084007B, which notes that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10."<br><br>• Chinese Patent Publication No. CN108047014B, which notes that "The production process of the coenzyme Q10 mainly comprises a biological extraction method, a chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost |

| | |
|---|---|
| | and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be absorbed by human body; the coenzyme Q10 product produced by the microbial fermentation method has great competitive advantages in production cost and product quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."<br><br>• Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent."<br><br>• U.S. Patent No. 3,549,668, which discloses that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves, and discloses a preparation method for these compounds. *See* '668 Patent at cols. 1-2.<br><br>• Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 ("Each of the six named *Legionella* |

| | |
|---|---|
| | species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components.”).<br><br>• *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for “Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities”<br><br>• U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that “$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$.” *See also id.* at [0062], [0077], [0109].<br><br>• Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$.<br><br>• Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in “tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria,” and that $CoQ_{11}$ accumulated in Pseudomonas samples.<br><br>• WO2021036386A1 discloses at [0050] that for “coenzyme Q10 crude extract,” the “impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 - |

| | |
|---|---|
| | demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11."<br><br>• US11773043B2 discloses that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."<br><br>• Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60.<br><br>• Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities.<br><br>• Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of $CoQ_1$ through $CoQ_{12}$, which includes $CoQ_{11}$.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: "Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…" G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the |

| | |
|---|---|
| | reduction process taught in the ’301 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>Kaneka’s own infringement contentions specify that “Oxidized CoQ10 and oxidized Q11 are both items which are used to develop ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11.” Defendants have substantively followed the process of the ’301 Application, and therefore Kaneka’s own assertions (and the evidence supporting them) show the application of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka’s usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the ’301 Application. |
| **[15.e]** wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | The ’301 Application teaches that not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition.<br><br>“The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.3/0.7, and the purity of the reduced coenzyme $Q_{10}$ was 99.0%.” ’301 Application at [0102]; *see also id.* at [0103]-[0115]. |
| **[15.f]** wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | The ’301 Application teaches that the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %.<br><br>“The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.3/0.7, and the purity of the reduced |

| | |
|---|---|
| | coenzyme $Q_{10}$ was 99.0%." '301 Application at [0102]; *see also id.* at [0103]-[0115]. |

## Appendix A-3

### Invalidity of U.S. Patent No. 7,829,080 under 35 U.S.C. § 102 in view of U.S. Patent Pub. No. 2004/0215040

Claims 5 and 15 of the ’080 Patent are invalid as rendered obvious by U.S. Patent Pub. No. 2004/0215040 (the “’040 Application”) in view of USP 25, Urakami, Gilbart, Karr, U.S. Patent No. 3,549,668, JP-A-10-109933, U.S. Patent Pub. No. 2006/0134085, and/or Rousseau, including those properties inherently present in compositions formed according to this prior art (as demonstrated by the evidence herein). The ’040 Application was published on October 28, 2004, and qualifies as prior art to the ’080 Patent under at least 35 U.S.C. § 102(b) (pre-AIA).

| ’080 Patent Claim | Relevant Evidence and Disclosure in Prior Art |
|---|---|
| **[5.pre]** A reduced coenzyme $Q_{10}$-containing composition comprising | The ’040 Application teaches a reduced coenzyme $Q_{10}$-containing composition.<br><br>“The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$.” ’040 Application at [0001]; *see also id.* at [0103], [0012].<br><br>The ’080 Patent itself references the method taught by the ’040 Application, stating that “reduced coenzyme $Q_{10}$ having a high proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ can be efficiently obtained by the method described in WO 03/06408.” *See* ’080 Patent at 5:13-17. The ’040 Application claims priority to PCT/JP02/07143, which corresponds to WO 03/06408. |
| **[5.a(i)]** reduced coenzyme $Q_{10}$ and one or both of (a) and (b): | The ’040 Application teaches a composition comprising reduced coenzyme $Q_{10}$.<br><br>“The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$.” ’040 Application at [0001]; *see also id.* at [0103], [0012]. |

| | |
|---|---|
| | *Satisfaction of the* "and one or both of (a) and (b)" *language addressed in claim element [5.a(iii)] below.* |
| **[5.a(ii)]** (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and | *Not required by claim language due to claim element [5.a(iii)] below.* |
| **[5.a(iii)]** (b) reduced coenzyme $Q_{11}$ | Application of the reduction process taught in the '040 Application will inherently result in a composition comprising reduced coenzyme $Q_{11}$.<br><br>The '040 Application states that "The oxidized coenzyme Q $_{10}$ to be used in the practice of the invention may be one prepared by synthesis, fermentation, or extraction from a natural product, for instance, as mentioned hereinabove, or may be an existing high-purity grade of coenzyme $Q_{10}$." '040 Application at [0058]; *see also id.* at [0085], [0003]. It would have been obvious to use a composition containing at least both of oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$, as such compositions were well known in the art, and would have resulted from synthesis, fermentation, or extraction from natural products known in the prior art. For example, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. U.S. Patent No. 3,549,668, which |

| | |
|---|---|
| | discloses that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves, and discloses a preparation method for these compounds. *See* ’668 Patent at cols. 1-2. And Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 discloses that “Each of the six named *Legionella* species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components.” As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], “since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited.”<br><br>Kaneka itself produced and widely sold “an existing high-purity grade of coenzyme $Q_{10}$” (Kaneka Q10 ubiquinone) prior to the priority date of the ’080 Patent, and even prior to April 28, 2006, including in the United States. *See* KAN0020724, KAN0011110. This oxidized coenzyme $Q_{10}$ would have been an obvious to try source of oxidized coenzyme $Q_{10}$ to a POSITA, especially given the prominence of the Kaneka brand at that time and that this was a patent application assigned to Kaneka, as were other background references specified by the ’040 Application. *See* KAN0011110, KAN0011493. Kaneka’s oxidized coenzyme $Q_{10}$ contained $Q_{11}$. *See* Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60; Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities. |

| | |
|---|---|
| | Any composition resulting from synthesis, fermentation, or extraction from such (or similar) strains would contain both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$.<br><br>Other evidence includes:<br><br>• Chinese Patent Publication No. CN108084007B, which notes that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10."<br><br>• Chinese Patent Publication No. CN108047014B, which notes that "The production process of the coenzyme Q10 mainly comprises a biological extraction method, a chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be absorbed by human body; the coenzyme Q10 product produced by the microbial fermentation method has great competitive advantages in production cost and product quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar." |

- Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent."

- *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"

- U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].

- Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$.

- Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and

| | |
|---|---|
| | photosynthetic bacteria," and that $CoQ_{11}$ accumulated in Pseudomonas samples.<br><br>• WO2021036386A1 discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 -demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11."<br><br>• US11773043B2 discloses that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."<br><br>• Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of $CoQ_1$ through $CoQ_{12}$, which includes $CoQ_{11}$.<br><br>While the '040 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the '040 Application separately disclosed that "It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)" and that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein." U.S. Patent Pub. No. 2007/0258967. It would have been at least |

| | |
|---|---|
| | obvious to use the same sources of coenzyme $Q_{10}$ as used in JP-A-10-109933, which included coenzyme $Q_{11}$.<br><br>Further, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains "not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis" and specifies the test for $Q_{11}$ as a known impurity. Accordingly, at least some known and obvious sources of ubidecarenone would have included both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: "Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…" G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the reduction process taught in the '040 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>The '080 Patent itself references the method taught by the '040 Application as applicable to $Q_{11}$, stating that "[i]n the stabilization method of the present invention, the aforementioned (a) and/or (b) can be separately prepared by any suitable technique. For example, the separate preparation can be preparation by extraction and purification from a naturally occurring substance, reduction of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ according to the aforementioned method described in WO 03/06408, or coupling reaction of isoprenyl side chain with 2-methyl-5,6-dimethoxy-1,4-benzohydroquinone and the like." *See* '080 Patent at 5:47-58. |

| | |
|---|---|
| | Kaneka's own infringement contentions specify that "Oxidized CoQ10 and oxidized Q11 are both items which are used to develop ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11." Defendants have followed the process of the '040 Application, and therefore Kaneka's own assertions (and the evidence supporting them) show the application of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka's usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the '040 Application.<br><br>It is expected that third party discovery will show that obvious-to-use commercial sources of coenzyme $Q_{10}$ consistent with the disclosures of the '040 Application (known sources of oxidized coenzyme $Q_{10}$ or "an existing high-purity grade of coenzyme $Q_{10}$") (such as from ZCHT, Kingdomway, and/or Shenzhou) in fact contained at least some amount of oxidized coenzyme $Q_{11}$. |
| **[5.b]** wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | The '040 Application teaches that not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition.<br><br>"The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.6/0.4, and the purity of the reduced coenzyme $Q_{10}$ was 99.2%." '040 Application at [0103]; *see also id.* at [0108]-[0115], [0117]. |
| **[5.c]** wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | The '040 Application teaches that the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. |

| | |
|---|---|
| | "The invention still further provides a reduced coenzyme $Q_{10}$ crystal with a reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of not lower than 96/4." '040 Application at [0016]; *see also id.* at [0099], [0103], [0108]-[0115], [0117]. |
| | |
| **[15.pre]** A method for producing a reduced coenzyme $Q_{10}$-containing composition, which method comprises | The '040 Application teaches a method for producing a reduced coenzyme $Q_{10}$-containing composition.<br><br>"The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$." '040 Application at [0001]; *see also id.* at [0103], [0012].<br><br>The '080 Patent itself references the method taught by the '040 Application, stating that "reduced coenzyme $Q_{10}$ having a high proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ can be efficiently obtained by the method described in WO 03/06408." *See* '080 Patent at 5:13-17. |
| **[15.a]** providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, and then | The '040 Application teaches a method that comprises providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$.<br><br>The '040 Application states that "The oxidized coenzyme $Q_{10}$ to be used in the practice of the invention may be one prepared by synthesis, fermentation, or extraction from a natural product, for instance, as mentioned hereinabove, or may be an existing high-purity grade of coenzyme $Q_{10}$." '040 Application at [0058]; *see also id.* at [0085], [0003].<br><br>It would have been obvious to use a composition containing at least both of oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$, as such compositions were well known in the art, and would have |

| | |
|---|---|
| | resulted from synthesis, fermentation, or extraction from natural products known in the prior art. For example, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. U.S. Patent No. 3,549,668, which discloses that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves, and discloses a preparation method for these compounds. *See* '668 Patent at cols. 1-2. And Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 discloses that "Each of the six named *Legionella* species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components." As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], "since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."<br><br>Kaneka itself produced and widely sold "an existing high-purity grade of coenzyme $Q_{10}$" (Kaneka Q10 ubiquinone) prior to the priority date of the '080 Patent, and even prior to April 28, 2006, including in the United States. *See* KAN0020724, KAN0011110. This oxidized coenzyme $Q_{10}$ would have been an obvious to try |

| | |
|---|---|
| | source of oxidized coenzyme $Q_{10}$ to a POSITA, especially given the prominence of the Kaneka brand at that time and that this was a patent application assigned to Kaneka, as were other background references specified by the '040 Application. *See* KAN0011110, KAN0011493. Kaneka's oxidized coenzyme $Q_{10}$ contained $Q_{11}$. *See* Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60; Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities.<br><br>Any composition resulting from synthesis, fermentation, or extraction from such (or similar) strains would contain both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$.<br><br>Other evidence includes:<br><br>• Chinese Patent Publication No. CN108084007B, which notes that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10."<br><br>• Chinese Patent Publication No. CN108047014B, which notes that "The production process of the coenzyme Q10 mainly comprises a biological extraction method, a chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be absorbed by human body; the coenzyme Q10 product produced by the microbial fermentation method has great competitive advantages in production cost and product |

| | |
|---|---|
| | quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."<br><br>• Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent."<br><br>• *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"<br><br>• U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for |

| | |
|---|---|
| | example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].<br><br>• Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$.<br><br>• Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and that $CoQ_{11}$ accumulated in Pseudomonas samples.<br><br>• WO2021036386A1 discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 - demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11."<br><br>• US11773043B2 discloses that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."<br><br>• Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of $CoQ_1$ through $CoQ_{12}$, which includes $CoQ_{11}$.<br><br>While the '040 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the '040 Application separately disclosed that |

| | |
|---|---|
| | "It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)" and that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein." U.S. Patent Pub. No. 2007/0258967. It would have been at least obvious to use the same sources of coenzyme $Q_{10}$ as used in JP-A-10-109933, which included coenzyme $Q_{11}$.<br><br>Further, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains "not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis" and specifies the test for $Q_{11}$ as a known impurity. Accordingly, at least some known and obvious sources of ubidecarenone would have included both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$.<br><br>It is expected that third party discovery will show that obvious-to-use commercial sources of coenzyme $Q_{10}$ consistent with the disclosures of the '040 Application (known sources of oxidized coenzyme $Q_{10}$ or "an existing high-purity grade of coenzyme $Q_{10}$") (such as from ZCHT, Kingdomway, and/or Shenzhou) in fact contained at least some amount of oxidized coenzyme $Q_{11}$. |
| **[15.b]** reducing oxidized coenzyme $Q_{10}$ and | The '040 Application teaches a method that comprises reducing oxidized coenzyme $Q_{10}$.<br><br>"The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$." '040 Application at [0001]; *see also id.* at [0103], [0012], [0100]-[0118]. |

| | |
|---|---|
| **[15.c]** reducing one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition, | The ’040 Application teaches a method that reduces oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: “Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…” G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the reduction process taught in the ’040 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>The ’080 Patent itself references the method taught by the ’040 Application as applicable to $Q_{11}$, stating that “[i]n the stabilization method of the present invention, the aforementioned (a) and/or (b) can be separately prepared by any suitable technique. For example, the separate preparation can be preparation by extraction and purification from a naturally occurring substance, reduction of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ according to the aforementioned method described in WO 03/06408, or coupling reaction of isoprenyl side chain with 2-methyl-5,6-dimethoxy-1,4-benzohydroquinone and the like.” *See* ’080 Patent at 5:47-58.<br><br>Kaneka’s own infringement contentions specify that “Oxidized CoQ10 and oxidized Q11 are both items which are used to develop ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11.” Defendants have followed the process of the ’040 Application, and therefore Kaneka’s own |

| | |
|---|---|
| | assertions (and the evidence supporting them) show the application of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka's usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the '040 Application. |
| **[15.d(i)]** wherein the composition comprises reduced coenzyme $Q_{10}$ and one or both of | The '040 Application teaches a method that produces a reduced coenzyme $Q_{10}$-containing composition.<br><br>"The present invention relates to a method of synthesizing and a method of crystallizing reduced coenzyme $Q_{10}$." '040 Application at [0001]; *see also id.* at [0103], [0012], [0100]-[0118].<br><br>*Satisfaction of the* "and one or both" *language addressed in claim element [15.d(iii)] below.* |
| **[15.d(ii)]** (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$ and | *Not required by claim language due to claim element [15.d(iii)] below.* |
| **[15.d(iii)]** (b) reduced coenzyme $Q_{11}$, | Application of the reduction process taught in the '040 Application will inherently result in a composition comprising reduced coenzyme $Q_{11}$.<br><br>The '040 Application states that "The oxidized coenzyme Q $_{10}$ to be used in the practice of the invention may be one prepared by synthesis, fermentation, or extraction from a natural product, for instance, as mentioned hereinabove, or may be an existing high-purity grade of coenzyme $Q_{10}$." '040 Application at [0058]; *see also id.* at [0085], [0003]. |

| | |
|---|---|
| | It would have been obvious to use a composition containing at least both of oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$, as such compositions were well known in the art, and would have resulted from synthesis, fermentation, or extraction from natural products known in the prior art. For example, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. U.S. Patent No. 3,549,668, which discloses that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves, and discloses a preparation method for these compounds. *See* '668 Patent at cols. 1-2. And Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 discloses that "Each of the six named *Legionella* species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components." As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], "since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."<br><br>Kaneka itself produced and widely sold "an existing high-purity grade of coenzyme $Q_{10}$" (Kaneka Q10 ubiquinone) prior to the |

| | |
|---|---|
| | priority date of the ’080 Patent, and even prior to April 28, 2006, including in the United States. *See* KAN0020724, KAN0011110. This oxidized coenzyme $Q_{10}$ would have been an obvious to try source of oxidized coenzyme $Q_{10}$ to a POSITA, especially given the prominence of the Kaneka brand at that time and that this was a patent application assigned to Kaneka, as were other background references specified by the ’040 Application. *See* KAN0011110, KAN0011493. Kaneka’s oxidized coenzyme $Q_{10}$ contained $Q_{11}$. *See* Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60; Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities.<br><br>Any composition resulting from synthesis, fermentation, or extraction from such (or similar) strains would contain both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$.<br><br>Other evidence includes:<br><br>• Chinese Patent Publication No. CN108084007B, which notes that “coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10.”<br><br>• Chinese Patent Publication No. CN108047014B, which notes that “The production process of the coenzyme Q10 mainly comprises a biological extraction method, a chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be |

| | |
|---|---|
| | absorbed by human body; the coenzyme Q10 product produced by the microbial fermentation method has great competitive advantages in production cost and product quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."<br><br>• Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent."<br><br>• *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"<br><br>• U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant |

| | |
|---|---|
| | tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].<br><br>• Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$.<br><br>• Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and that $CoQ_{11}$ accumulated in Pseudomonas samples.<br><br>• WO2021036386A1 discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 -demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11."<br><br>• US11773043B2 discloses that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."<br><br>• Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of $CoQ_1$ through $CoQ_{12}$, which includes $CoQ_{11}$. |

| | |
|---|---|
| | While the ’040 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the ’040 Application separately disclosed that “It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)” and that “[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein.” U.S. Patent Pub. No. 2007/0258967. It would have been at least obvious to use the same sources of coenzyme $Q_{10}$ as used in JP-A-10-109933, which included coenzyme $Q_{11}$.<br><br>Further, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains “not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis” and specifies the test for $Q_{11}$ as a known impurity. Accordingly, at least some known and obvious sources of ubidecarenone would have included both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: “Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…” G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the |

| | |
|---|---|
| | reduction process taught in the ’040 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>The ’080 Patent itself references the method taught by the ’040 Application as applicable to $Q_{11}$, stating that “[i]n the stabilization method of the present invention, the aforementioned (a) and/or (b) can be separately prepared by any suitable technique. For example, the separate preparation can be preparation by extraction and purification from a naturally occurring substance, reduction of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ according to the aforementioned method described in WO 03/06408, or coupling reaction of isoprenyl side chain with 2-methyl-5,6-dimethoxy-1,4-benzohydroquinone and the like.” *See* ’080 Patent at 5:47-58.<br><br>Kaneka’s own infringement contentions specify that “Oxidized CoQ10 and oxidized Q11 are both items which are used to develop ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11.” Defendants have followed the process of the ’040 Application, and therefore Kaneka’s own assertions (and the evidence supporting them) show the application of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka’s usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the ’040 Application.<br><br>It is expected that third party discovery will show that obvious-to-use commercial sources of coenzyme $Q_{10}$ consistent with the disclosures of the ’040 Application (known sources of oxidized coenzyme $Q_{10}$ or “an existing high-purity grade of coenzyme $Q_{10}$”) |

| | |
|---|---|
| | (such as from ZCHT, Kingdomway, and/or Shenzhou) in fact contained at least some amount of oxidized coenzyme $Q_{11}$. |
| **[15.e]** wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | The ’040 Application teaches that not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition.<br><br>“The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.6/0.4, and the purity of the reduced coenzyme $Q_{10}$ was 99.2%.” ’040 Application at [0103]; *see also id.* at [0108]-[0115], [0117]. |
| **[15.f]** wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | The ’040 Application teaches that the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %.<br><br>“The invention still further provides a reduced coenzyme $Q_{10}$ crystal with a reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of not lower than 96/4.” ’040 Application at [0016]; *see also id.* at [0099], [0103], [0108]-[0115], [0117]. |

## Appendix A-4

## Invalidity of U.S. Patent No. 7,829,080 under 35 U.S.C. § 102 in view of U.S. Patent Pub. No. 2004/0214301

Claims 5 and 15 of the ’080 Patent are invalid as rendered obvious by U.S. Patent Pub. No. 2004/0214301 (the “’301 Application”) in view of USP 25, Urakami, Gilbart, Karr, U.S. Patent No. 3,549,668, JP-A-10-109933, U.S. Patent Pub. No. 2006/0134085, and/or Rousseau, including those properties inherently present in compositions formed according to this prior art (as demonstrated by the evidence herein). The ’301 Application was published on October 28, 2004, and qualifies as prior art to the ’080 Patent under at least 35 U.S.C. § 102(b) (pre-AIA).

| ’080 Patent Claim | Relevant Evidence and Disclosure in Prior Art |
|---|---|
| **[5.pre]** A reduced coenzyme $Q_{10}$-containing composition comprising | The ’301 Application teaches a reduced coenzyme $Q_{10}$-containing composition.<br><br>“The present invention relates to a method of producing a reduced coenzyme $Q_{10}$ crystal.” ’301 Application at [0001]; *see also id.* at [0102]-[0116], [0043], [0012]. |
| **[5.a(i)]** reduced coenzyme $Q_{10}$ and one or both of (a) and (b): | The ’301 Application teaches a composition comprising reduced coenzyme $Q_{10}$.<br><br>“The present invention relates to a method of producing a reduced coenzyme $Q_{10}$ crystal.” ’301 Application at [0001]; *see also id.* at [0102]-[0116], [0043], [0012].<br><br>*Satisfaction of the* “and one or both of (a) and (b)” *language addressed in claim element [5.a(iii)] below.* |
| **[5.a(ii)]** (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and | *Not required by claim language due to claim element [5.a(iii)] below.* |

| | |
|---|---|
| **[5.a(iii)]** (b) reduced coenzyme $Q_{11}$ | Application of the reduction process taught in the ’301 Application will inherently result in a composition comprising reduced coenzyme $Q_{11}$.<br><br>The ’301 Application states that “[r]educed coenzyme $Q_{10}$ used for crystallization may be obtained by conventional methods such as synthesis, fermentation or extraction from a natural product.” ’301 Application at [0016], [0017].<br><br>It would have been obvious to use a composition containing at least both of oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$, as such compositions were well known in the art, and would have resulted from synthesis, fermentation, or extraction from natural products known in the prior art. For example, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. U.S. Patent No. 3,549,668, which discloses that coenzymes $Q_{10}$ and $Q_{11}$ may be produced from mulberry leaves, and discloses a preparation method for these compounds. *See* ’668 Patent at cols. 1-2. And Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 discloses that “Each of the six named *Legionella* species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components.” As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], “since |

| | |
|---|---|
| | the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."<br><br>Kaneka itself produced and widely sold an existing high-purity grade of coenzyme $Q_{10}$ (Kaneka Q10 ubiquinone) prior to the priority date of the '080 Patent, and even prior to April 28, 2006, including in the United States. *See* KAN0020724, KAN0011110. This oxidized coenzyme $Q_{10}$ would have been an obvious to try source of oxidized coenzyme $Q_{10}$ to a POSITA, especially given the prominence of the Kaneka brand at that time and that this was a patent application assigned to Kaneka, as were other background references specified by the '301 Application. *See* KAN0011110, KAN0011493. Kaneka's oxidized coenzyme $Q_{10}$ contained $Q_{11}$. *See* Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60; Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities.<br><br>Any composition resulting from synthesis, fermentation, or extraction from such (or similar) strains would contain both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$.<br><br>Other evidence includes:<br><br>• Chinese Patent Publication No. CN108084007B, which notes that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10." |

| | |
|---|---|
| | • Chinese Patent Publication No. CN108047014B, which notes that "The production process of the coenzyme Q10 mainly comprises a biological extraction method, a chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be absorbed by human body; the coenzyme Q10 product produced by the microbial fermentation method has great competitive advantages in production cost and product quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."<br><br>• Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent." |

| | |
|---|---|
| | • *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"<br><br>• U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].<br><br>• Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$.<br><br>• Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and that $CoQ_{11}$ accumulated in Pseudomonas samples.<br><br>• WO2021036386A1 discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 - demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11." |

| | |
|---|---|
| | • US11773043B2 discloses that "Co$Q_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When Co$Q_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."<br><br>• Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of Co$Q_1$ through Co$Q_{12}$, which includes Co$Q_{11}$.<br><br>While the '301 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the '301 Application separately disclosed that "It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)" and that "[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein." U.S. Patent Pub. No. 2007/0258967. It would have been at least obvious to use the same sources of coenzyme $Q_{10}$ as used in JP-A-10-109933, which included coenzyme $Q_{11}$.<br><br>Further, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains "not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis" and specifies the test for $Q_{11}$ as a known impurity. Accordingly, at least some known and obvious sources of ubidecarenone would have included both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$. |

| | |
| --- | --- |
| | Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: "Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…" G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the reduction process taught in the '301 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>Kaneka's own infringement contentions specify that "Oxidized CoQ10 and oxidized Q11 are both items which are used to develop ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11." Defendants have substantively followed the process of the '301 Application, and therefore Kaneka's own assertions (and the evidence supporting them) show the application of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka's usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the '301 Application.<br><br>It is expected that third party discovery will show that obvious-to-use commercial sources of coenzyme $Q_{10}$ consistent with the disclosures of the '301 Application (such as from ZCHT, Kingdomway, and/or Shenzhou) in fact contained at least some amount of oxidized coenzyme $Q_{11}$. |

| | |
|---|---|
| **[5.b]** wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | The ’301 Application teaches that not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition.<br><br>“The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.3/0.7, and the purity of the reduced coenzyme $Q_{10}$ was 99.0%.” ’301 Application at [0102]; *see also id.* at [0103]-[0115]. |
| **[5.c]** wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | The ’301 Application teaches that the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %.<br><br>“The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.3/0.7, and the purity of the reduced coenzyme $Q_{10}$ was 99.0%.” ’301 Application at [0102]; *see also id.* at [0103]-[0115]. |
| | |
| **[15.pre]** A method for producing a reduced coenzyme $Q_{10}$-containing composition, which method comprises | The ’301 Application teaches a method for producing a reduced coenzyme $Q_{10}$-containing composition.<br><br>“The present invention relates to a method of producing a reduced coenzyme $Q_{10}$ crystal.” ’301 Application at [0001]; *see also id.* at [0102]-[0116], [0043], [0012]. |
| **[15.a]** providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, and then | The ’301 Application teaches a method that comprises providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$.<br><br>The ’301 Application states that “[r]educed coenzyme $Q_{10}$ used for crystallization may be obtained by conventional methods such as |

| | |
|---|---|
| | synthesis, fermentation or extraction from a natural product." '301 Application at [0016], [0017].<br><br>It would have been obvious to use a composition containing at least both of oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$, as such compositions were well known in the art, and would have resulted from synthesis, fermentation, or extraction from natural products known in the prior art. For example, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. And Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 discloses that "Each of the six named *Legionella* species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components." As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], "since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."<br><br>Kaneka itself produced and widely sold an existing high-purity grade of coenzyme $Q_{10}$ (Kaneka Q10 ubiquinone) prior to the priority date of the '080 Patent, and even prior to April 28, 2006, |

| | |
|---|---|
| | including in the United States. *See* KAN0020724, KAN0011110. This oxidized coenzyme $Q_{10}$ would have been an obvious to try source of oxidized coenzyme $Q_{10}$ to a POSITA, especially given the prominence of the Kaneka brand at that time and that this was a patent application assigned to Kaneka, as were other background references specified by the ’301 Application. *See* KAN0011110, KAN0011493. Kaneka’s oxidized coenzyme $Q_{10}$ contained $Q_{11}$. *See* Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60; Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities.<br><br>Any composition resulting from synthesis, fermentation, or extraction from such (or similar) strains would contain both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$.<br><br>Other evidence includes:<br><br>• Chinese Patent Publication No. CN108084007B, which notes that “coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10.”<br><br>• Chinese Patent Publication No. CN108047014B, which notes that “The production process of the coenzyme Q10 mainly comprises a biological extraction method, a chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be absorbed by human body; the coenzyme Q10 product |

| | |
|---|---|
| | produced by the microbial fermentation method has great competitive advantages in production cost and product quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."<br><br>• Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent."<br><br>• *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"<br><br>• U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. |

| | |
|---|---|
| | When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].<br><br>• Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$.<br><br>• Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and that $CoQ_{11}$ accumulated in Pseudomonas samples.<br><br>• WO2021036386A1 discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 - demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11."<br><br>• US11773043B2 discloses that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."<br><br>• Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of $CoQ_1$ through $CoQ_{12}$, which includes $CoQ_{11}$. |

| | |
|---|---|
| | While the ’301 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the ’301 Application separately disclosed that “It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)” and that “[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein.” U.S. Patent Pub. No. 2007/0258967. It would have been at least obvious to use the same sources of coenzyme $Q_{10}$ as used in JP-A-10-109933, which included coenzyme $Q_{11}$.<br><br>Further, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains “not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis” and specifies the test for $Q_{11}$ as a known impurity. Accordingly, at least some known and obvious sources of ubidecarenone would have included both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: “Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…” G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the |

| | |
|---|---|
| | reduction process taught in the ’301 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>It is expected that third party discovery will show that obvious-to-use commercial sources of coenzyme $Q_{10}$ consistent with the disclosures of the ’301 Application (such as from ZCHT, Kingdomway, and/or Shenzhou) in fact contained at least some amount of oxidized coenzyme $Q_{11}$. |
| **[15.b]** reducing oxidized coenzyme $Q_{10}$ and | The ’301 Application teaches a method that comprises reducing oxidized coenzyme $Q_{10}$.<br><br>“The present invention relates to a method of producing a reduced coenzyme $Q_{10}$ crystal.” ’301 Application at [0001]; *see also id.* at [0102]-[0116], [0043], [0012]. |
| **[15.c]** reducing one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition, | The ’301 Application teaches a method that reduces oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: “Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…” G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the reduction process taught in the ’301 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>Kaneka’s own infringement contentions specify that “Oxidized CoQ10 and oxidized Q11 are both items which are used to develop |

| | |
|---|---|
| | ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11." Defendants have substantively followed the process of the '301 Application, and therefore Kaneka's own assertions (and the evidence supporting them) show the application of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka's usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the '301 Application. |
| **[15.d(i)]** wherein the composition comprises reduced coenzyme $Q_{10}$ and one or both of | The '301 Application teaches a method that produces a reduced coenzyme $Q_{10}$-containing composition.<br><br>"The present invention relates to a method of producing a reduced coenzyme $Q_{10}$ crystal." '301 Application at [0001]; *see also id.* at [0102]-[0116], [0043], [0012].<br><br>*Satisfaction of the* "and one or both" *language addressed in claim element [15.d(iii)] below.* |
| **[15.d(ii)]** (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$ and | *Not required by claim language due to claim element [15.d(iii)] below.* |
| **[15.d(iii)]** (b) reduced coenzyme $Q_{11}$, | Application of the reduction process taught in the '301 Application will inherently result in a composition comprising reduced coenzyme $Q_{11}$.<br><br>The '301 Application states that "[r]educed coenzyme $Q_{10}$ used for crystallization may be obtained by conventional methods such as |

| | |
|---|---|
| | synthesis, fermentation or extraction from a natural product." '301 Application at [0016], [0017].<br><br>It would have been obvious to use a composition containing at least both of oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$, as such compositions were well known in the art, and would have resulted from synthesis, fermentation, or extraction from natural products known in the prior art. For example, as shown by *Methanol-Utilizing Ancylobacter Strains and Comparison of Their Cellular Fatty Acid Compositions and Quinone Systems with Those of Spirosoma, Flectobacillus, and Runella Species* (Teizi Urakami and Kazuo Komagata, International Journal of Systematic Bacteriology, July 1986, Vol. 36, No. 3), strains of facultative methylotroph Ancylobacter aquaticus along with many other bacterium samples all include both $Q_{10}$ and $Q_{11}$, such as in the ratios provided on page 419 in Table 5. Further, as shown by *High-performance liquid chromatographic analysis of uibquinones from new Legionella species* (James Gilbart and Matthew D. Collins, FEMS Microbiology Letters 26, 1985), strains of *Legionella* bacterium contain both $Q_{10}$ and $Q_{11}$. And Karr, Bibb, and Moss, *Isoprenoid Quinones of the Genus Lenionella*, Journal of Clinical Microbiology, June 1982 Vol. 15, No. 6 at 1046 discloses that "Each of the six named *Legionella* species examined in this study contained ubiquinones $Q_{11}$ and $Q_{12}$ as major components." As shown in U.S. Patent Pub. No. 2006/0134085 at [0029], "since the $CoQ_{10}$ having an isoprenoid chain composed of 1 to 12 isoprene units (CoQ1-12) exists in nature, the CoQ10 of the present invention may partly contain these analogues having different lengths of isoprenoid chains so long as the exhibition of the desired effects of the present invention is not inhibited."<br><br>Kaneka itself produced and widely sold an existing high-purity grade of coenzyme $Q_{10}$ (Kaneka Q10 ubiquinone) prior to the priority date of the '080 Patent, and even prior to April 28, 2006, |

| | |
|---|---|
| | including in the United States. *See* KAN0020724, KAN0011110. This oxidized coenzyme $Q_{10}$ would have been an obvious to try source of oxidized coenzyme $Q_{10}$ to a POSITA, especially given the prominence of the Kaneka brand at that time and that this was a patent application assigned to Kaneka, as were other background references specified by the '301 Application. *See* KAN0011110, KAN0011493. Kaneka's oxidized coenzyme $Q_{10}$ contained $Q_{11}$. *See* Deposition of Mr. Joshua Garey in Case No. 21-209-RGA (D. Del.) (June 23, 2022) at pages 54-60; Hideyuki Ikematsu, Kenjiro Nakamura, Shin-ichi Harashima, Kenji Fujii, and Naoki Fukutomi, *Safety assessment of coenzyme Q10 (Kaneka Q10) in healthy subjects: A double-blind, randomized, placebo-controlled trial*, Regulatory Toxicology and Pharmacology (2006) discloses that Kaneka Q10 includes CoQ9 and CoQ11 as major impurities.<br><br>Any composition resulting from synthesis, fermentation, or extraction from such (or similar) strains would contain both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$.<br><br>Other evidence includes:<br><br>• Chinese Patent Publication No. CN108084007B, which notes that "coenzyme Q11 [] is one of main impurities in the crude extract of the coenzyme Q10."<br><br>• Chinese Patent Publication No. CN108047014B, which notes that "The production process of the coenzyme Q10 mainly comprises a biological extraction method, a chemical synthesis method, a cell culture method and a microbial fermentation method, wherein the product produced by the biological extraction method has high cost and high price; the product of the chemical synthesis method has poor biological activity and is not easy to be absorbed by human body; the coenzyme Q10 product |

| | |
|---|---|
| | produced by the microbial fermentation method has great competitive advantages in production cost and product quality, and is considered as the most promising production mode. In any coenzyme Q10 produced by the process, a crude coenzyme Q10 product needs to be extracted from a raw material and further separated and purified to obtain a pure coenzyme Q10 product, so the development of an efficient coenzyme Q10 refining process is the key in industrial production. The crude extract of coenzyme Q10 mainly contains coenzyme Q10, coenzyme Q11, coenzyme Q9, coenzyme Q8, reduced coenzyme Q10 and the like, and because the structures of the coenzyme Q10, the coenzyme Q11, the reduced coenzyme Q10 and the like are similar."<br><br>• Chinese Patent Publication No. CN112920035A, which notes that "With the national improvement of the quality standard of medicines, the limit of the impurity of coenzyme Q10 is increased, and the European pharmacopoeia provides clear requirements for the limit control of the impurity of Q11 in coenzyme Q10, so that the process requirement for removing the impurity of Q11 in coenzyme Q10 is urgent."<br><br>• *Safety Assessment of Ubiquinone Ingredients as Used in Cosmetics*, April 14, 2022 Cosmetic Ingredient Review Expert Panel for Cosmetic Ingredient Safety members (p.4), which notes that for "Ubiquinone produced by yeast fermentation… coenzyme Q9 and coenzyme Q11 [are] the two major impurities"<br><br>• U.S. Patent Pub. No. 2020/0087235 discloses at [0004] that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. |

| | |
|---|---|
| | When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$." *See also id.* at [0062], [0077], [0109].<br>• Chinese Patent Pub. No. 112479848A at [0008], [0016], [0017], [0019], which provides for $Q_{11}$ as a main impurity along with $Q_{10}$.<br>• Natori and Nagasaki, *Formation of Coenzyme $Q_{11}$ by Pseudomonas M16, a Mutant*, Agric. Biol. Chem., 43 (4) 797-801 (1979), $CoQ_{11}$ is known to occur in "tissues of rats, green peppers, etionated maize shoots, and photosynthetic bacteria," and that $CoQ_{11}$ accumulated in Pseudomonas samples.<br>• WO2021036386A1 discloses at [0050] that for "coenzyme Q10 crude extract," the "impurities mainly contain coenzyme Q9, reduced coenzyme Q9, 5 – demethoxycoenzyme Q10, reduced coenzyme Q10, coenzyme Q11 and reduced coenzyme Q11."<br>• US11773043B2 discloses that "$CoQ_{10}$ can be obtained according to conventionally-known methods such as extraction from animal and/or plant tissues, chemical synthesis, and microbial fermentation. When $CoQ_{10}$ is produced by the aforementioned methods, various impurities are contained therein including, for example, coenzyme $Q_9$, coenzyme $Q_{10}$ isomeride, coenzyme $Q_{11}$."<br>• Canadian Patent No. 2,550,186 ("Fujii") discloses at 4:1-9 the use of $CoQ_1$ through $CoQ_{12}$, which includes $CoQ_{11}$. |

| | |
|---|---|
| | While the ’301 Application notes that JP-A-10-109933 teaches a method of reducing coenzyme $Q_{10}$ (*see id.* at [0003]), two of the named inventors of the ’301 Application separately disclosed that “It is known that reduced coenzyme $Q_{10}$ can be obtained, for example, by purifying coenzyme $Q_{10}$ obtained according to a conventionally-known method such as synthesis, fermentation, extraction from a naturally occurring substance and the like (see JP-A-10-109933)” and that “[w]hen reduced coenzyme $Q_{10}$ is obtained by the aforementioned synthesis, fermentation, extraction from a naturally occurring substance and the like, various reduced coenzyme $Q_{10}$ analogs (e.g., cis-reduced coenzyme $Q_{10}$, ubichromenol, reduced coenzyme $Q_{11}$ etc.) are contained therein.” U.S. Patent Pub. No. 2007/0258967. It would have been at least obvious to use the same sources of coenzyme $Q_{10}$ as used in JP-A-10-109933, which included coenzyme $Q_{11}$.<br><br>Further, USP 25 (2002) specifies that Ubidecarenone (Coenzyme $Q_{10}$) contains “not less than 98.0 percent and not more than 101.0 percent of $C_{59}H_{90}O_4$ calculated on the anhydrous basis” and specifies the test for $Q_{11}$ as a known impurity. Accordingly, at least some known and obvious sources of ubidecarenone would have included both oxidized coenzyme $Q_{10}$ and oxidized coenzyme $Q_{11}$.<br><br>Any reduction process that reduces $Q_{10}$ will also reduce $Q_{11}$: “Because the physico-chemical properties of $Q_{11}$ are very similar to those of $Q_{10}$ and $Q_9$, potential reactions that would affect $Q_{10}$ and $Q_9$ would likely also affect $Q_{11}$ to a similar extent…” G. Rousseau and F. Varin, *Determination of Ubiquinone-9 and 10 Levels in Rat Tissues and Blood by High-Performance Liquid Chromatography with Ultraviolet Detection*, Journal of Chromatographic Science, Vol. 36, May 1998 at 247. Accordingly, any present oxidized coenzyme $Q_{11}$ that is reduced using the |

| | |
|---|---|
| | reduction process taught in the ’301 Application will result in reduced coenzyme $Q_{11}$ in the final composition.<br><br>Kaneka’s own infringement contentions specify that “Oxidized CoQ10 and oxidized Q11 are both items which are used to develop ubiquinol and reduced Q11, respectively. That is, Defendants first started with providing a composition comprising ubiquinone and oxidized Q11 before manufacturing a composition containing ubiquinol and reduced Q11.” Defendants have substantively followed the process of the ’301 Application, and therefore Kaneka’s own assertions (and the evidence supporting them) show the application of this process to the creation of reduced coenzyme $Q_{11}$. Furthermore, Kaneka’s usage of reduced coenzyme $Q_9$ as a reference for reduced coenzyme $Q_{11}$ for testing purposes in its infringement contentions further shows that coenzyme $Q_{11}$ and coenzyme $Q_9$ are affected by the same reduction reactions, such as in the ’301 Application.<br><br>It is expected that third party discovery will show that obvious-to-use commercial sources of coenzyme $Q_{10}$ consistent with the disclosures of the ’301 Application (such as from ZCHT, Kingdomway, and/or Shenzhou) in fact contained at least some amount of oxidized coenzyme $Q_{11}$. |
| **[15.e]** wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and | The ’301 Application teaches that not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition.<br><br>“The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.3/0.7, and the purity of the reduced coenzyme $Q_{10}$ was 99.0%.” ’301 Application at [0102]; *see also id.* at [0103]-[0115]. |

| | |
|---|---|
| **[15.f]** wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %. | The '301 Application teaches that the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %.<br><br>"The reduced coenzyme $Q_{10}$/oxidized coenzyme $Q_{10}$ weight ratio of the crystals obtained was 99.3/0.7, and the purity of the reduced coenzyme $Q_{10}$ was 99.0%." '301 Application at [0102]; *see also id.* at [0103]-[0115]. |