UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
KANEKA CORPORATION,

Plaintiff,

v.

COCRYSTAL TECHNOLOGY (JIAXING) CO., LTD. and COCRYSTAL HEALTH INDUSTRY (ZHEJIANG) CO., LTD.,

Defendants.
---------------------------------------------------------------X

**MEMORANDUM AND ORDER**
23-CV-7483-SJB-SDE

**BULSARA, United States District Judge:**

Kaneka Corporation ("Kaneka") brought this case against Cocrystal Technology (Jiaxing) Co., Ltd. and Cocrystal Health Industry (Zhejiang) Co., Ltd. (collectively, "Cocrystal") for infringement of its patent covering certain compositions of coenzyme $Q_{10}$ ("$CoQ_{10}$"). The patent, referred to here as the '080 patent, includes one claim for a composition of $CoQ_{10}$ and one claim for how to make that composition. Both cover a composition of $CoQ_{10}$ that includes any amount of $CoQ_{11}$, a coenzyme with a similar chemical structure. In response to claims of infringement, Cocrystal brought counterclaims seeking a declaration that the two claims in the '080 patent are invalid, as well as tort and antitrust liability. At the heart of Cocrystal's invalidity challenge is the assertion that Kaneka had no information about the effect of $CoQ_{11}$ when it filed its patent—making the asserted claims essentially an unpatentable hypothesis about the usefulness and efficacy of the composition it claimed.

After stipulating to infringement, the parties sought summary judgment on Cocrystal's invalidity defenses and counterclaims, and state tort and antitrust

counterclaims. For the reasons explained below, the Court finds claims 5 and 15 of Kaneka's '080 patent invalid for failure to meet the enablement and utility requirements for the full claimed scope, which includes a composition of $CoQ_{10}$ with *any* amount of $CoQ_{11}$. Then, the Court dismisses Cocrystal's tort and antitrust counterclaims. And the Court denies the associated *Daubert* motions as moot, and denies, albeit with leave to renew, the motions to seal.

## STANDARD FOR SUMMARY JUDGMENT

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions,

interrogatory answers, or other materials." *Id.* R. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth purported undisputed facts or, if controverting any fact, responding to each assertion. *See* Loc. Civ. R. 56.1(a)–(b). In both instances, the party must support its position by citing to admissible evidence from the record. *Id.* R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). Furthermore, "[l]egal arguments are impermissible in any Rule 56.1 Statement

and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)). The court may not grant summary judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence. *E.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir. 2003) (vacating grant of summary judgment to defendants based on facts enumerated in Rule 56.1 statement supported only by arguments in briefs rather than admissible evidence).

The Court must also disregard conclusory denials that lack citations to admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions[.]"), *aff'd*, 56 F. App'x 27, 29 (2d Cir. 2003). Also, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Loc. Civ. R. 56.1(c). The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in evaluating declarations or affidavits. *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary

judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139, 143 (2d Cir. 2009).

PROCEDURAL HISTORY

Kaneka filed its Amended Complaint on November 16, 2023, claiming that Cocrystal had been both directly infringing and inducing infringement of the '080 patent. (Am. Compl., Dkt. No. 5 ¶¶ 25–33). Cocrystal answered on February 14, 2024, contending both as a defense and counterclaim that the asserted claims of the '080 patent are invalid, and seeking a declaratory judgment as to the same. (Answer, Dkt. No. 22 at 9–10; Counterclaim, Dkt. No. 22 ¶¶ 24–40). Cocrystal's invalidity counterclaim alleges claims 5 and 15 of the '080 patent are directed to patent-ineligible subject matter, violate the on-sale bar, lack novelty, are anticipated or obvious, are not enabled or set forth in a sufficient written description, and are indefinite. (Counterclaim ¶¶ 26–34). Cocrystal's counterclaim also seeks declaratory judgments of non-infringement and unenforceability due to inequitable conduct, and brings separate claims for tortious interference, unfair competition, and antitrust violations. (*Id.* ¶¶ 41–116).

The Court held a *Markman* hearing on January 24, 2025 as to claim 15 of the '080 patent. *Kaneka Corp. v. Cocrystal Tech. (Jiaxing) Co.*, No. 23-CV-7483, 2025 WL 788977, at *1 (E.D.N.Y. Mar. 12, 2025).

On October 6, 2025, the parties stipulated to Cocrystal's infringement of claims 5 and 15 of the '080 patent, and Cocrystal withdrew its claims and defenses as to non-infringement. (*See* Stipulation of Infringement, Dkt. No. 74). On November 17, 2025, the parties filed their fully briefed *Daubert* motions, and on December 1, 2025, they filed their fully briefed cross-motions for summary judgment. Kaneka moved for summary judgment on Cocrystal's invalidity defenses and counterclaims, as well as Cocrystal's claims for tortious interference, unfair competition, and antitrust violations. (Pl.'s Mot. for Summ. J. dated Oct. 6, 2025 ("Pl.'s Mot. for Summ. J."), Dkt. No. 100 at 1). Cocrystal filed a cross-motion for summary judgment on its invalidity claims. (Defs.' Opp'n to Pl.'s Mot. & Cross-Mot. for Summ. J. dated Oct. 27, 2025 ("Defs.' Opp'n & Cross-Mot."), Dkt. No. 102 at 2–3). Cocrystal also moved for summary judgment on two of Kaneka's damages theories (seeking lost profits and lost value damages), in the event the asserted claims are found to be valid. (*Id.* at 49, 55). And Cocrystal seeks partial summary judgment on the issue of the relevant "market" for its antitrust counterclaims. (*Id.* at 57). Finally, Cocrystal withdrew its counterclaim for unfair competition. (*Id.* at 47 n.21).

<u>FACTS</u>

Kaneka is a Japanese company that produces and supplies $CoQ_{10}$ supplements. (Am. Compl. ¶ 4; Pl.'s 56.1 Statement dated Oct. 6, 2025 ("Pl.'s 56.1 Stmt."), Dkt. No. 100-1 ¶ 28; Defs.' Resp. 56.1 Statement dated Oct. 27, 2025 ("Defs.' 56.1 Resp."), Dkt. No.

102-1 ¶ 28). The human body uses $CoQ_{10}$ to produce energy necessary for cell growth and maintenance. (*Id.* ¶ 29; Pl.'s 56.1 Stmt. ¶ 29). Because the body's ability to produce $CoQ_{10}$ decreases over time, many people take daily supplements. (Am. Compl. ¶ 10).

There are two forms of $CoQ_{10}$: oxidized $CoQ_{10}$, known as ubiquinone, and reduced $CoQ_{10}$, known as ubiquinol. (Pl.'s 56.1 Stmt. ¶¶ 1, 28; Defs.' 56.1 Resp. ¶¶ 1, 28). Ubiquinol is more easily absorbed by the human body. (*Id.* ¶ 30; Pl.'s 56.1 Stmt. ¶ 30). Ubiquinol, however, quickly oxidizes and converts to ubiquinone when exposed to air, a problem that prompted Kaneka to develop a method to stabilize ubiquinol. (Am. Compl. ¶ 12). To that end, Kaneka manufactures ubiquinol by first reducing ubiquinone with a reducing agent and then removing impurities. (Pl.'s 56.1 Stmt. ¶ 1; Defs.' 56.1 Resp. ¶ 1).

Kaneka[1] was awarded a patent covering its ubiquinol products: U.S. Patent No. 7,829,080 (the "'080 patent"), filed on April 27, 2007 and issued on July 23, 2010. (*Id.* ¶¶ 32, 34; Pl.'s 56.1 Stmt. ¶¶ 32, 34). Two of the patent's claims are at issue here. Claim 5 of the '080 patent is directed toward a composition of ubiquinol, and claim 15 is directed to a method of making that same composition of ubiquinol. (*Id.* ¶ 33; Defs.' 56.1 Resp. ¶ 33).

[1] Takahiro Ueda, Shiro Kitamura, Hiroshi Kubo, and Kazunori Hosoe are listed the inventors and Kaneka is the assignee of the patent rights. ('080 Patent, attached to Pl.'s Mot. for Summ. J. as Ex. 1, Dkt. No. 100-3 at 1).

Claim 5 provides:

> **5**. A reduced coenzyme $Q_{10}$-containing composition comprising reduced coenzyme $Q_{10}$ and one or both of (a) and (b):
> (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and
> (b) reduced coenzyme $Q_{11}$
> wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and
> wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %.

('080 Patent, attached to Pl.'s Mot. for Summ. J. as Ex. 1, Dkt. No. 100-3 at col. 16, ll. 55–65; Pl.'s 56.1 Stmt. ¶ 73; Defs.' 56.1 Resp. ¶ 73). It claims a composition containing ubiquinol that has one or both of: "(a) not less than 1.5 wt% to not more than 99 wt% of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$, and (b) reduced coenzyme $Q_{11}$." (Defs.' 56.1 Statement dated Oct. 27, 2025 ("Defs.' 56.1 Stmt."), Dkt. No. 102-2 ¶ 1; Pl.'s Resp. to Defs.' 56.1 Stmt. dated Nov. 17, 2025 ("Pl.'s 56.1 Resp."), Dkt. No. 103-1 ¶ 1). In other words, the final $CoQ_{10}$ composition can have either reduced $CoQ_9$ in the amount specified or any amount of $CoQ_{11}$, or both. (*Id.* ¶ 3; Defs.' 56.1 Stmt. ¶ 3). There is no minimum amount of $CoQ_{11}$ required to satisfy this limitation of claim 5: "even one molecule of reduced $CoQ_{11}$ would suffice." (*Id.* ¶ 73; Pl.'s 56.1 Resp. ¶¶ 73, 90).

Claim 15 provides:

> **15**. A method for producing a reduced coenzyme $Q_{10}$-containing composition, which method comprises
> providing a composition comprising oxidized coenzyme $Q_{10}$ with one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$, and then
> reducing oxidized coenzyme $Q_{10}$ and reducing one or both of oxidized coenzyme $Q_9$ and oxidized coenzyme $Q_{11}$ to prepare the reduced coenzyme $Q_{10}$-containing composition,

> wherein the composition comprises reduced coenzyme $Q_{10}$ and one or both of (a) not less than 1.5 wt % to not more than 99 wt % of reduced coenzyme $Q_9$ relative to reduced coenzyme $Q_{10}$ and (b) reduced coenzyme $Q_{11}$,
> wherein not less than 0.01 wt % of reduced coenzyme $Q_{10}$ is contained in the composition, and
> wherein the proportion of reduced coenzyme $Q_{10}$ relative to the total amount of coenzyme $Q_{10}$ is not less than 90 wt %.

('080 Patent at col. 18, ll. 4–21; Pl.'s 56.1 Stmt. ¶ 74; Defs.' 56.1 Resp. ¶ 74). This claim covers the method for producing the final $CoQ_{10}$-containing composition recited in claim 5.

The parties agree that claims 5 and 15 of the '080 patent do not have any stabilization component—for example, these claims do not require that $CoQ_{11}$ has a stabilizing effect on ubiquinol. (*Id.* ¶ 66; Pl.'s 56.1 Stmt. ¶ 66). But whether Kaneka had demonstrated its stabilizing effect when it filed the '080 patent is central to Cocrystal's invalidity arguments. (*See id.* ¶ 63; Defs.' 56.1 Resp. ¶ 63). This is because both claims cover not just ubiquinol, or the process to create it, but ubiquinol with *any* amount of reduced $CoQ_{11}$. And to do so, Kaneka was required to show—through testing or data—that $CoQ_{11}$'s presence had some utility. *See infra* p. 13. But the parties dispute the research Kaneka conducted prior to filing on April 27, 2007. (*E.g.*, Defs.' 56.1 Stmt. ¶¶ 7, 9; Pl.'s 56.1 Resp. ¶¶ 7, 9). Kaneka says it "studied the stabilizing effect of $CoQ_{11}$ and found that it has a stabilizing effect on [ubiquinol]." (Pl.'s 56.1 Stmt. ¶ 70). In support, it points to testing performed in 2008 and 2015. (*Id.* (citing testimony by one of the inventors discussing 2008 testing and a document submitted in connection with a European Patent Application in 2015)).

Cocrystal asserts that none of the *pre*-filing testing involved any reduced $CoQ_{11}$. (Defs.' 56.1 Stmt. ¶ 9). Kaneka does not offer a factual basis to refute that statement. It cites various testing data underlying the examples in the patent, demonstrating that $CoQ_9$ has a stabilizing effect on $CoQ_{10}$. (Pl.'s 56.1 Resp. ¶ 9). Kaneka then points out that the '080 patent, its expert report, and one of the inventors all made statements to the effect of "there is no difference between whether $CoQ_9$ or $CoQ_{11}$ is present." (*Id.*). And it adds that testing conducted in September and October 2008 confirms the same. (*Id.*). None of that, of course, creates any genuine dispute over the fact that Kaneka did not test, and had no data regarding, the stabilizing effect of $CoQ_{11}$ on ubiquinol when it filed the '080 patent in April 2007.

Thus, there is no genuine dispute that prior to filing the '080 patent, Kaneka had not conducted any testing specific to the stabilizing effect of $CoQ_{11}$—it had only tested $CoQ_9$.[2] Cocrystal argues that renders claims 5 and 15 of the '080 patent invalid for lack

[2] Other aspects of the record confirm the same. Kaneka's expert, Dr. Allan S. Myerson, explicitly says that the data in the '080 patent showing the effect of reduced $CoQ_9$ "does not report the specific results with respect to the stabilizing effect of $CoQ_{11}$." (Rebuttal Report of Dr. Allan S. Myerson, attached to Pl.'s Mot. for Summ. J. as Ex. 6, Dkt. No. 100-8 ¶ 155). And Ueda, one of the inventors, testified that beyond a March 2006 report "about stability when reduced $Q_9$ and $Q_{10}$ are present together," which he acknowledged contained nothing about $Q_{11}$, there was no testing or data about $Q_{11}$ in existence before filing the '080 patent. (Dep. of Takahiro Ueda ("Ueda Dep."), attached to Defs.' Opp'n & Cross-Mot. as Ex. 48, Dkt. No. 102-4 at 109:17–110:15 ("Q: Is there anything in this test relating to Q11? A: No, there isn't. . . . Q: Other than this document, are there any other reports or documents that exist relating to tests that were done before the application for the 080 patent? . . . A: As I said, this is the only data.")). Ueda explained that Kaneka tested the stability of reduced $CoQ_{11}$ in 2008 because Kaneka did "not have data for the reduced form of $Q_{11}$," and understood that "there was a risk that in the application process in various countries . . . there might be an issue with our not having that data." (*Id.* at 112:5–113:10).

of enablement and utility. (Defs.' Opp'n & Cross-Mot. at 2–7, 12–17). For the reasons explained below, the Court agrees.

DISCUSSION

**I. Patent Validity: Enablement**

Both Kaneka and Cocrystal have moved for summary judgment on the question of whether the asserted claims of the '080 patent are invalid for lack of enablement. (*Id.*; Pl.'s Mot. for Summ. J. at 17–20).

"[A] party seeking to invalidate a patent at summary judgment must submit . . . clear and convincing evidence of invalidity." *Univ. Of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 920 (Fed. Cir. 2004) (quotation omitted); *see also Malico, Inc. v. Cooler Master USA Inc.*, 594 F. App'x 621, 626 (Fed. Cir. 2014) ("Because issued patents enjoy a presumption of validity, a party moving for summary judgment of invalidity must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise." (quotation omitted)).

Section 112(a) provides in relevant part:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same[.]

35 U.S.C. § 112(a); *see also In re McLeay*, No. 2023-2338, 2025 WL 516809, at *2 (Fed. Cir. Feb. 18, 2025), *cert. denied sub nom. McLeay v. Stewart*, 145 S. Ct. 2852 (2025). This obligation of "enablement" "requires that the specification adequately discloses to one skilled in the relevant art how to make, or in the case of a process, how to carry out, the

claimed invention without undue experimentation," and is determined as of the effective filing date of the patent application. *In re '318 Pat. Infringement Litig.*, 583 F.3d 1317, 1323 (Fed. Cir. 2009) (quotation omitted). "The specification must enable the full scope of the invention as defined by its claims, allowing for a reasonable amount of experimentation." *In re McLeay*, 2025 WL 516809, at *2 (quotation omitted). "Enablement is a legal question based on underlying factual determinations." *Wyeth LLC v. AstraZeneca Pharms. LP*, 180 F.4th 1371, 1379 (Fed. Cir. 2026) (quotation omitted).

"Enablement is closely related to the requirement for utility." *'318 Pat. Litig.*, 583 F.3d at 1323; *see also* 35 U.S.C. § 101 (requiring that a patented invention be "new and useful"). The utility requirement "prevents the patenting of a mere research proposal or an invention that is simply an object of research." *'318 Pat. Litig.*, 583 F.3d at 1324. That is because "a patent is not a hunting license. It is not a reward for the search, but compensation for its successful conclusion." *Id.* (quoting *Brenner v. Manson*, 383 U.S. 519, 536 (1966)). "Allowing . . . objects only of research to be patented has the potential to give priority to the wrong party and to 'confer power to block off whole areas of scientific development, without compensating benefit to the public.'" *Id.* (quoting *Brenner*, 383 U.S. at 534); *see also In re Fisher*, 421 F.3d 1365, 1372 (Fed. Cir. 2005) ("[U]tilities that require or constitute carrying out further research to identify or reasonably confirm a 'real world' context of use are not substantial utilities." (quotation omitted)). "[I]f a patent claim fails to meet the utility requirement because it is not useful or operative, then it also fails to meet the how-to-use aspect of the enablement requirement." *In re McLeay*, 2025 WL 516809, at *3 (quotation omitted). At the same

time, "utility informs a court in making an enablement determination," but "a claim's utility alone should not end the enablement inquiry." *Id.* So, even if a claim is found to lack utility, the Court must also determine whether practicing "the full scope of the claimed range would require undue experimentation." *See id.*

"[W]hen there is a complete absence of data supporting the statements which set forth the desired results of the claimed invention," the invention may fail for lack of enablement or utility or both. *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1323 (Fed. Cir. 2005) (quotation omitted).[3] While experimental data is not required to demonstrate efficacy of a claim, applications are typically supported by test results. *See Nuvo Pharms. (Ir.) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368, 1380 (Fed. Cir. 2019).

[3] "The party alleging invalidity for lack of enablement bears the burden" of demonstrating lack of enablement by "clear and convincing evidence." *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1318 (Fed. Cir. 2007). For the reasons explained *infra*, Cocrystal has satisfied that standard here.

Both claim 5 and 15 cover ubiquinol with "reduced coenzyme $Q_{11}$" in any amount. ('080 Patent at col. 16 ll. 55–65, col. 18 ll. 4–21).[4] Because of the presence of this claim language, Cocrystal argues Kaneka was required to show, at the time the application was filed, utility of ubiquinol with any amount of reduced $CoQ_{11}$. And Cocrystal contends that Kaneka did not actually conduct any tests focused on the utility of reduced $CoQ_{11}$ with respect to ubiquinol—Kaneka had only tested the utility of a different compound: $CoQ_9$. (Defs.' Opp'n & Cross-Mot. at 5). Kaneka concedes that it did not conduct such testing, *see supra* pp. 9–10 & n.2; (*see also* Pl.'s Reply in Supp. of Summ. J. & Opp'n to Defs.' Cross-Mot. dated Nov. 17, 2025 ("Pl.'s Reply & Opp'n"), Dkt. No. 103 at 31 (describing only *post*-filing studies and data)); however, it contends that there is still no utility or enablement barrier to patentability.

For the reasons explained below, the asserted claims of the '080 patent fail to meet the utility requirement insofar as they cover ubiquinol compositions with *any* amount of reduced coenzyme $Q_{11}$. Having failed to conduct tests or provide any data

[4] The '080 patent does recite that when $CoQ_{11}$ is contained in ubiquinol, it "do[es] not prevent the effect of the reduced coenzyme $Q_{10}$," and that "a composition showing high biological absorbability of reduced coenzyme $Q_{10}$ can also be provided." ('080 Patent at col. 12 ll. 63–66, col. 13, ll. 14–15). And there is some evidentiary support for that assertion. (*See* Dep. of Allan S. Myerson ("Myerson Dep."), attached to Pl.'s Reply & Opp'n as Ex. 90, Dkt. No. 103-3 at 164:15–168:7). Cocrystal argues that cannot be a claimed utility, since "a lack of a disadvantage is not a utility," (Defs.' Opp'n & Cross-Mot. at 11), and notes that Ueda, one of the inventors, also testified about the same data, explaining that it shows "absorption does not change with the presence of [$CoQ_{11}$]," (Ueda Dep. at 60:13-14). In any event, to rely on this asserted utility, Kaneka would have to show that the composition has been used in that manner, and that there is a "specific and substantial" benefit to using the composition in that manner. *In re Fisher*, 421 F.3d at 1373–74. Kaneka does not make any argument or proffer evidence in that vein.

as to the efficacy of reduced coenzyme $Q_{11}$ in stabilizing ubiquinol, or otherwise demonstrate utility, Kaneka failed to establish utility as of the date the patent was filed. Consequently, practicing the full scope of the claimed invention would require undue experimentation, and the claims are invalid for lack of enablement.

**A. Utility Beyond Stability**

Kaneka attempts to sidestep the absence of pre-filing data by arguing that the claims at issue do not require any stabilizing effect of $CoQ_{11}$ on ubiquinol. (Pl.'s Mot. for Summ. J. at 18). But if there is no utility via stabilization, there must be some other utility to a composition of ubiquinol with some amount of $CoQ_{11}$. Otherwise, the claim language would be meaningless (and not entitled to protection). Kaneka argues that "the claimed composition could be used as a carrier for, among other things, antioxidants or other beneficial active ingredients" and that it could "improve the absorbability of reduced $CoQ_{10}$." (*Id.* at 19 (citing '080 Patent at col. 2, ll. 6–16, col. 11, ll. 7–8, col. 13, ll. 14–15)). As a preliminary matter, these asserted "hypothetical possibilities" cannot establish utility. *In re Fisher*, 421 F.3d at 1377 ("Fisher's laundry list of uses, like the terms 'biological activity' or 'biological properties' . . . are nebulous, especially in the absence of any data demonstrating that the claimed [genetic sequences] were actually put to the alleged uses.").

Even if they could, there are other problems with those contentions. The claim that the composition could be used as a carrier still does not specifically address (or provide data to support) the utility of reduced coenzyme $Q_{11}$-containing ubiquinol (as compared to, for example the $Q_9$-containing ubiquinol). (*See* '080 Patent at col. 11, ll. 10–

13 ("The composition of the present invention can contain other appropriate materials, besides the above-mentioned solvent, such as a carrier.")). Nor do any of the other alleged uses for $CoQ_{11}$ have any data, testing, or evidentiary support for them.

**B. Stability**

That leaves Kaneka reliant on $CoQ_{11}$'s stabilizing effect to establish utility for claims 5 and 15 of the '080 patent. Because Kaneka had no experimental results specific to the stabilizing effect of $CoQ_{11}$ on ubiquinol at the time it filed the '080 patent, the Court looks to whether Kaneka can establish utility in some other way. The Federal Circuit has established two alternative pathways to show utility in this circumstance. The first is if the conclusion is obvious enough that its utility would be immediately apparent to someone of ordinary skill in the field.[5] *See Rasmusson*, 413 F.3d at 1323 ("In the context of determining whether sufficient utility as a drug, medicant, and the like in human therapy has been alleged, it is proper for the examiner to ask for substantiating evidence unless one with ordinary skill in the art would accept the allegations as obviously correct." (quotation omitted)); *Thermolife Int'l, LLC v. Myogenix Corp.*, No. 13-CV-0651, 2015 WL 11237635, at *11 (S.D. Cal. Dec. 8, 2015) ("[T]he first question in the utility and enablement context is not whether data are presented, but whether a skilled artisan, reading the patent at the time of invention, would doubt that the invention

[5] A person of ordinary skill in the art, or the POSA, is "patent law's hypothetical, legal construct akin to the 'reasonable person' used as a reference in negligence determinations" in tort law. *McCoy v. Heal Sys., LLC*, 850 F. App'x 785, 787–88 (Fed. Cir. 2021) (quotation omitted). "This theoretical person is the objective vantage point for making obviousness determinations," and is distinct from someone with "expert" skill. *Id.* at 788.

actually works—or in other words, would doubt its utility. Such doubt, if present, would often stem from a lack of knowledge of correlation between the compound and its therapeutic use in the relevant field."). The second option, though rarely if ever found, is to establish utility by analytical reasoning. *See '318 Pat. Litig.*, 583 F.3d at 1326 ("Although no case has been called to our attention where utility was established simply by analytic reasoning, the PTO's Manual of Patent Examining Procedure ("MPEP") has recognized that 'arguments or reasoning' may be used to establish an invention's therapeutic utility." (footnote omitted)).

Testimony by Kaneka's own expert forecloses the first path, because it makes clear that even an expert in the field at the time would have been surprised by the stabilizing effect of $CoQ_{11}$ on ubiquinol—and affirmatively states that someone of ordinary skill certainly would not infer this utility as an obvious conclusion.

Dr. Myerson testified:

> Q. Do you consider it to be surprising that reduced $CoQ_{11}$ would contribute to the stability of reduced $CoQ_{10}$?
> . . .
> A. I think it's surprising that both $CoQ_9$ and $CoQ_{11}$ have a stabilizing effect. I don't know that a POSA would think that that would occur.
> Q. Why is it surprising that both would have a stabilizing effect?
> A. Well, surprising that either would have a stabilizing effect. But as I discussed in my report, if $CoQ_9$ has a stabilizing effect, you would think that likely the $CoQ_{11}$ would have a stabilizing effect. But mechanistically, I've not really investigated, but I—I don't see any obvious mechanism as to why it works. But the data shows it does.
> Q. So would a POSA, in 2005 or 2006, have expected that reduced $CoQ_9$ or reduced $CoQ_{11}$ would have a stabilizing effect?
> A. I think I've already said -- answered that question.
> . . .
> A. And said, no.

(Dep. of Allan S. Myerson ("Myerson Dep."), attached to Defs.' Opp'n & Cross-Mot. as Ex. 49, Dkt. No. 102-5 at 61:14–62:19). That conclusion is only bolstered by testimony from the other inventors on the '080 patent.[6] Kitamura was asked at a deposition: "At the time you and your group were doing research on the 080 patent, did you believe that whatever results you got for reduced $Q_9$ would also apply to reduced $Q_{11}$?" (Dep. of Shiro Kitamura, attached to Defs.' Opp'n & Cross-Mot. as Ex. 51, Dkt. No. 102-7 at 79:22-24). Kitamura responded, "I don't remember." (*Id.* at 80:1).

Next, there is no basis to conclude this is the rare case where analytic reasoning alone, without test results, establishes utility. For one thing, the reasoning is only cursorily explained in the patent specification. (*See* '080 Patent at col. 2, ll. 36–41 ("[R]educed coenzyme $Q_{10}$ can be stabilized by the co-presence of reduced coenzyme $Q_9$ and/or reduced coenzyme $Q_{11}$, which are analogs of reduced coenzyme $Q_{10}$."); *id.* at col. 4, ll. 46–53 ("[R]educed coenzyme $Q_9$ and reduced coenzyme $Q_{11}$ show the same effect in the body as reduced coenzyme $Q_{10}$. Therefore, when reduced coenzyme $Q_9$ and reduced coenzyme $Q_{11}$ contained in reduced coenzyme $Q_{10}$ are ingested, the effect of the reduced coenzyme $Q_{10}$ is not prevented, and a greater effect of coenzyme Q can be exhibited as compared to a composition containing reduced coenzyme $Q_{10}$ alone[.]")).

---

[6] Kaneka's argument that the inventors' lack of understanding as to "the precise stabilization mechanism" is "irrelevant" misses the mark. (Pl.'s Reply & Opp'n at 30 n.9). It is not sufficient for a patent "to disclose simply that the invention *works*, without explaining *why* it works." *Petito v. Puritan's Pride, Inc.*, 35 F. Supp. 3d 494, 508 & n.10 (S.D.N.Y. 2014) ("[A]lthough a patentee need not generally know how or why the invention works, such explanations do become necessary where, as here, the inventor did not know at the time of filing whether the invention was in fact operable." (quotation omitted)).

Put simply, the disclosures in the patent never connect the dots between the analogous structure of reduced coenzyme $Q_9$ and $Q_{11}$ and the claimed stabilizing effect on ubiquinol, as Kaneka asserts. (*See* Pl.'s Reply & Opp'n at 31).

Kaneka has *now* offered a compelling explanation of an inferential chain in this litigation: it tested the stabilizing effect of $CoQ_9$ on ubiquinol, and the stabilizing mechanism is unrelated to the isoprenoid side chain, so whether the molecule's side chain is 9 or 11 units long is irrelevant, and one may logically conclude that $CoQ_{11}$ will show identical stabilizing effects on ubiquinol as $CoQ_9$. (*E.g.*, Ueda Dep. at 60:20–61:20). But there is no basis to find that analytical chain of reasoning, on its own, sufficient to establish utility for the first time in patent law, particularly since the critical linking insights were not disclosed in the patent. *See '318 Pat. Litig.*, 583 F.3d at 1326 ("These insights, however, are nowhere described in the specification.").

Further, Kaneka's argument about the identical stabilizing effect from $CoQ_9$ and $CoQ_{11}$ hinges on its contention that the length of the isoprenoid chain—that is, what makes $CoQ_9$ different from $CoQ_{11}$—has no effect on stability. (Pl.'s Reply & Opp'n at 31; Ueda Dep. at 60:20–61:20). But its inventor, Kubo, said that he thought at that time (and also now) that "the side chain length of [c]oenzyme $Q_9$ might have some contribution to that stability." (Dep. of Hiroshi Kubo, attached to Defs.' Opp'n & Cross-Mot. as Ex. 64, Dkt. No. 102-20 at 51:5–53:5). In other words, the inventor's own understanding defeats any analytical inference that Kaneka's lawyers now seek to draw.

The record makes clear that Kaneka failed to establish utility of ubiquinol containing $CoQ_{11}$ at the time of filing by any permissible avenue: test results, obviousness to an ordinary person in the field, or analytical reasoning. The Court next turns to the import of non-utility on enablement.

**C. Undue Experimentation**

Even where a court concludes that a patentee has failed to show utility—for example, in a case where it appears to have patented "a mere research proposal," the Federal Circuit requires further inquiry into enablement, *In re McLeay*, 2025 WL 516809, at *3, and specifically, whether undue experimentation is necessary to practice the invention. The *Wands* factors guide this determination. They direct consideration of "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *See In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

The '080 patent provides one example "for formulating the composition with $CoQ_{11}$," (Pl.'s Reply & Opp'n at 29; '080 Patent at col. 14, ll. 15–32 (providing a production example using 0.1% of oxidized coenzyme $Q_{11}$)), but Kaneka openly admits it leaves for a person of ordinary skill to "formulate $CoQ_{11}$-containing compositions . . . and test stability similarly to the stability tests of $CoQ_9$," (Pl.'s Reply & Opp'n at 30–31). Put simply, the '080 patent discloses a single example of reduced $CoQ_{11}$ in one precise quantity—despite no prior testing demonstrating its utility or explanation of *how* it

functions—and then claims broad enablement of all ubiquinol compositions with any amount of reduced $CoQ_{11}$. *E.g.*, *In re Starrett*, No. 2022-2209, 2023 WL 3881360, at *4 (Fed. Cir. June 8, 2023) ("Here, much is claimed, and little is enabled."). All this in the context of chemistry, which is not only generally regarded as an unpredictable art, *see* 3 Chisum on Patents § 7.03(7)(b) ("Disclosure of one or a limited number of embodiments is more likely to provide sufficient enabling support for a broader, more generic claim in 'predictable' arts, such as mechanics or electronics, than 'unpredictable' arts, such as chemistry or biotechnology."), but is particularly "unpredictable" here, where even the patent holder's expert notes the lack of complete understanding of the underlying mechanisms of the chemical stability, (*e.g.*, Myerson Dep., attached to Defs.' Opp'n & Cross-Mot. as Ex. 49, at 61:2-9 ("Q. How does the presence of reduced $CoQ_{11}$ improve the stability of reduced $CoQ_{10}$? . . . A. I don't know. I don't think anybody knows.")). Broadly applied here, the *Wands* factors suggest the experimentation required is undue.

Kaneka throughout its briefing posits that, although *Kaneka itself* "did not test the stability of [ubiquinol] with reduced $CoQ_{11}$," the invention is nonetheless enabled because the specification calls for only "a reasonable amount of experimentation to make and use," and a person of ordinary skill in the art "would simply need to formulate $CoQ_{11}$-containing compositions . . . and test stability similarly to the stability tests of $CoQ_9$ shown." (Pl.'s Reply & Opp'n at 30–31).

The fatal defect with that line of argument is that it leaves to a person of ordinary skill to do all of Kaneka's homework, which the law does not permit. Leaving a user to test whether an embodiment works at all is insufficient, and it amounts to requiring

undue experimentation. *See Wyeth LLC*, 180 F.4th at 1382 ("[W]ithout teaching how to distinguish operative from inoperative embodiments, the specification leaves that task to the skilled artisan. That is precisely the type of undue experimentation that the enablement requirement forbids." (citation omitted)); *see also Seagen Inc. v. Daiichi Sankyo Co.*, 160 F.4th 1322, 1333 (Fed. Cir. 2025) ("Under these circumstances, where the scale of trial and error is so vast and the science so unpredictable, such experimentation is undue[.]" (citing *Amgen Inc. v. Sanofi*, 598 U.S. 594, 615 (2023)).[7]

In summary, Kaneka tested and proved the efficacy of reduced $CoQ_9$ in stabilizing ubiquinol. It then hypothesized that the same would be true for $CoQ_{11}$ in any amount, but did not proffer an explanation or analysis as to why, and did not conduct any tests to assess that hypothesis before filing the '080 patent. Kaneka now argues that a person of ordinary skill in the art could have simply tested the stability of $CoQ_{11}$ on their own. Though it may have eventually proven its hypothesis correct by test results several years later, this is precisely the sort of "object of research" invention

[7] A specification is not "necessarily inadequate just because it leaves the skilled artist to engage in some measure of adaptation or testing." *Amgen*, 598 U.S. at 611. But the reasonableness of experimentation allowed depends on the nature of the invention and underlying art, and this context does not permit such indefiniteness. *See id.* at 612. The examples the Supreme Court supplied in which a more liberal degree of testing was permissible were: 1) where a patent gave a general rule about the proportion of dust and clay needed to make bricks, even though some small variations may be required if the artist used a different variety of clay, or 2) where it would have been impossible for the patent to specify the precise process for separating metal from mineral ores with respect to a particular ore, since there are infinite variations. *Id.* at 611–12. Neither scenario is comparable to this context.

that the utility requirement protects against. *'318 Patent Litig.*, 583 F.3d at 1324.[8]

Having found the asserted claims of the '080 patent invalid for lack of utility and enablement, the Court does not reach the parties' additional arguments on invalidity or damages related to infringement.

## II. Tortious Interference and Antitrust Counterclaims

The remaining claims not disposed of by the Court's invalidity finding are Cocrystal's tortious interference with prospective economic advantage and *Walker Process* counterclaims.

"To prevail on a claim for tortious interference with business relations—also known as tortious interference with prospective economic advantage—under New York law, a plaintiff must show that (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (quotation and citation omitted). "[T]he 'wrongful means' element sets a high bar. . . . [A] claim for tortious interference with business relations requires a plaintiff to show, 'as a general rule,' that 'the defendant's conduct . . . amount[ed] to a crime or an independent tort.'" *Id.* at 262 (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)).

---

[8] Kaneka's reliance on cases about the ability to use post-filing data to demonstrate enablement merely begs the question of whether the utility of $CoQ_{11}$ is obvious to a POSA or does not require undue experimentation. (*See* Pl.'s Reply & Opp'n at 31). And for the reasons explained, Kaneka's assumptions about the same are not supported by the record.

In patent cases, where the allegations of interference are based upon a party's improper assertion of patent rights, an additional showing of bad faith is required. That is because state law interference claims are generally preempted. "The federal patent laws . . . bar state-law liability for communications concerning alleged infringement so long as those communications are not made in 'bad faith.'" *Globetrotter Software, Inc. v. Elan Comput. Grp., Inc.*, 362 F.3d 1367, 1374–75 (Fed. Cir. 2004). The "bad faith" standard in this context has objective and subjective components. *800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1370 (Fed. Cir. 2008). The objective component "requires a showing that the infringement allegations are objectively baseless." *Id.* (quotation omitted). "Objectively baseless" means "no reasonable litigant could realistically expect success on the merits"—or more pointedly, that the patentee "had no reasonable basis to believe that its patent claims were valid." *Id.* (quoting *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993)). Only if that first showing is made do courts reach the second component, which requires showing the patentee's subjective bad faith. *Id.* "[I]f the patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith representations is made out." *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1354 (Fed. Cir. 1999).

Cocrystal has made no showing that Kaneka's belief in the validity of its patent was objectively baseless. Indeed, Kaneka's patent was recently upheld against invalidity challenges. *See Kaneka Corp. v. Designs for Health, Inc.*, 760 F. Supp. 3d 152, 159, 183 (D. Del. 2024). Of course, this Court comes to a different conclusion based on

different challenges and supporting evidence. But that the patent was previously sustained, and the degree of complexity and contestation here—in addition to Cocrystal's admission of infringement—would not permit a reasonable jury to conclude that the patent was "obviously invalid" and that Kaneka's conduct was "objectively baseless." *Globetrotter Software*, 362 F.3d at 1375; *800 Adept*, 539 F.3d at 1371 (explaining that in light of dueling expert opinions, no reasonable jury could have found the patentee had no reasonable basis to believe its patent was valid).

Turning to the *Walker Process*[9] antitrust claim, Cocrystal must make a strong showing of deceptive intent:

> To overcome summary judgment, a *Walker Process* claimant must present evidence showing that the patentee obtained a patent through actual fraud upon the PTO. To prove *Walker Process* fraud, the plaintiffs must make high threshold showings of intent and materiality. The misrepresentation or omission alleged to be fraudulent must evidence a clear intent to deceive the examiner and thereby cause the PTO to grant an invalid patent. And a finding of inequitable conduct does not by itself support a finding of *Walker Process* fraud.

*Giuliano v. SanDisk LLC*, 705 F. App'x 957, 960 (Fed. Cir. 2017) (quotations and citations omitted); *see also Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007) ("[T]o find a prosecution omission fraudulent there must be evidence of intent separable from the simple fact of the omission."). "That intent cannot be shown merely from the absence of evidence which would come about from the jury's discounting [the patentee's] explanation." *Dippin' Dots*, 476 F.3d at 1348. Indeed, in the inequitable

[9] In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 176–77 (1965), the Supreme Court held that enforcement of a fraudulently procured patent can be the basis for an antitrust claim under the Sherman Act.

conduct realm, which requires a "nearly identical" showing, "gross negligence or negligence under a should have known standard is insufficient" to show intent to deceive—"instead, actual deceptive intent must be shown to be the single most reasonable inference able to be drawn from the evidence." *Glob. Tubing LLC v. Tenaris Coiled Tubes LLC*, 167 F.4th 1357, 1370, 1378 (Fed. Cir. 2026) (quotation omitted). "Specifically, the accused infringer must prove by clear and convincing evidence that the applicant knew of the [withheld] reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* at 1370 (quotation omitted).

Cocrystal relies on three alleged omissions or misrepresentations for this claim. (Defs.' Opp'n & Cross-Mot. at 44–46). Those arguments do not present any evidence—direct or circumstantial—of deceptive intent by Kaneka.

First, Cocrystal asserts Kaneka "knew during patent prosecution that $CoQ_{11}$ was an impurity of $CoQ_{10}$ created by fermentation" but "withheld" the information from the PTO. (*Id.* at 45). But Kaneka did advise the PTO during prosecution that "reduced coenzyme $Q_{10}$ is present . . . and impurities such as reduced coenzyme $Q_9$ and reduced coenzyme $Q_{11}$ also are present." (Patent Prosecution History, attached to Pl.'s Mot. for Summ. J. as Ex. 2, Dkt. No. 100-4 at 38). That was stated to the PTO on May 10, 2010, before the patent was allowed. (*Id.* at 41). Accordingly, there is no basis to conclude the omission Cocrystal alleges occurred, let alone that it evinces intentional deception. *Cf. La. Health Serv. & Indem. Co. v. Celgene Corp.*, No. 23-CV-7871, 2025 WL 1056668, at *21 (S.D.N.Y. Apr. 8, 2025) (dismissing claim of fraud on the PTO where the record reflected the allegedly concealed information was in fact disclosed).

Cocrystal's second contention is that Kaneka omitted information about prior sales that would have been material to the on-sale bar. (Defs.' Opp'n & Cross-Mot. at 46). And its third basis is that Kaneka made a misrepresentation to the patent examiner that "[t]he present inventors have conducted intensive studies . . . and found that reduced coenzyme $Q_{10}$ can be stabilized by the co-presence of reduced coenzyme $Q_9$ and/or reduced coenzyme $Q_{11}$." ('080 Patent at col. 2, ll. 36–40; Defs.' Opp'n & Cross-Mot. at 46). Cocrystal states in conclusory fashion that this statement "evidences an intent to deceive the examiner." (Defs.' Opp'n & Cross-Mot. at 46). These two allegations, and Cocrystal's unsupported assertion of Kaneka's intent, are insufficient as a matter of law.

As to the alleged on-sale bar omission, allegations that a patent holder knew of its prior sales of similar or identical products but intentionally concealed that information from the PTO cannot support a *Walker Process* claim absent some separate evidence of intent to deceive, which is not present here. *E.g.*, *LEGO A/S v. ZURU, Inc.*, No. 18-CV-2045, 2020 WL 13145135, at *9 (D. Conn. Apr. 22, 2020). And the statement about "intensive studies" is not obviously a representation that Kaneka expressly tested the stabilizing effect of $CoQ_{11}$ on ubiquinol, and certainly not a statement standing alone, without any other allegation or evidence, that Kaneka's specific intent was to obtain protection for an otherwise unpatentable invention.

Failing to make the weighty showing required for a *Walker Process* claim requires dismissal. *E.g.*, *Vaughan Co. v. Glob. Bio-Fuels Tech., LLC*, No. 12-CV-1292, 2013 WL 5755389, at *7–*8 (N.D.N.Y. Oct. 23, 2013) ("There are no allegations of serious

misconduct, such as perjury or the manipulation or suppression of evidence, on the part of any Vaughan employees or agents. Instead, defendants offer only conclusory allegations that the mere nondisclosure of information to the PTO suggests such was done with specific intent to deceive. This is not enough to establish, by clear and convincing evidence, the threshold showing of inequitable conduct[.]").

Kaneka's motion for summary judgment on Cocrystal's tortious interference and *Walker Process* antitrust counterclaims is granted. Since the antitrust claim is dismissed, the Court need not resolve Cocrystal's motion for summary judgment on the issue of the relevant market.

**III. Evidentiary Challenges**

Both sides seek to exclude certain opinions of the damages experts of their opponents. (*See* Defs.' Mot. to Strike Certain Damages Opinions of James Donohue dated Oct. 6, 2025, Dkt. No. 90-1; Pl.'s Mot. to Exclude Testimony of Douglas Cameron and Philip Kline dated Oct. 6, 2025 ("Pl.'s *Daubert* Mot."), Dkt. No. 92-9). Because the Court has concluded that the asserted claims of the '080 patent are invalid and dismisses Cocrystal's remaining counterclaims that implicate damages, it need not reach these *Daubert* motions.

Kaneka also moved to exclude the opinions of Cocrystal's expert, Dr. Douglas Cameron, who concluded that there were other reasons the asserted claims of the '080 patent are invalid. (Pl.'s *Daubert* Mot. at 4–9). The Court does not reach these other bases for invalidity and therefore need not reach the propriety of these opinions.

Finally, Cocrystal requests to strike a single sentence from the rebuttal report of Kaneka's expert, Dr. Myerson, that supposedly "sets forth legal opinions" about patent eligibility based on issued patents. (Defs.' Mot. to Strike Legal Opinions of Allan S. Myerson dated Oct. 6, 2025, Dkt. No. 88-1 at 1). Here, too, the Court need not decide the motion because it does not reach the issue of patent eligible subject matter.

## IV. Motion to Seal

The parties jointly request to seal certain documents filed with their *Daubert* and summary judgment motions. The motions do not clearly lay out precisely what materials are being redacted or sealed, but the parties generally ask to redact the following:

- Information about Cocrystal's cost, pricing, customer identities, and sales volumes. (Mot. to Seal dated Nov. 17, 2025 ("Mot. to Seal Donohue Materials"), Dkt. No. 89 at 2; Mot. to Seal dated Nov. 17, 2025 ("Mot. to Seal Cameron & Kline Materials"), Dkt. No. 91 at 1–2; Mot. to Seal dated Dec. 1, 2025 ("Mot. to Seal Summ. J. Materials"), Dkt. No. 98 at 2).

- Detailed revenue figures for Kaneka's ubiquinol products by fiscal year and customer segment, sales volumes, pricing data, profit margins, cost structures, financial performance data, and related damages calculations. (Mot. to Seal Donohue Materials at 2; Mot. to Seal Cameron & Kline Materials at 1).

- The results of various tests and experiments related to Kaneka's product formulations that are not publicly disclosed. (Mot. to Seal Summ. J. Materials at 1–2).

> In deciding whether to seal or unseal filed materials, a court properly conducts a three-step inquiry: First, the court determines whether the record at issue is a judicial document—a document to which the presumption of public access attaches. Second, if the record sought is determined to be a judicial document, the court proceeds to determine the weight of the presumption of access to that document. Third, the court must identify all of the factors that legitimately counsel against disclosure

> of the judicial document and balance those factors against the weight properly accorded the presumption of access.

*Giuffre v. Maxwell*, 146 F.4th 165, 175 (2d Cir. 2025) (quoting *Stafford v. Int'l Bus. Machs. Corp.*, 78 F.4th 62, 69 (2d Cir. 2023)). For the reasons explained, the motions to seal are denied.

The materials at issue are judicial documents, since they were "filed on a federal court's docket in the ordinary course of litigation." *Id.* at 176. The presumption of public access applies with full force to a dispositive motion, such as this motion for summary judgment. *Id.* at 177; *see also Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (attaching "strong presumption" to summary judgment materials). The same is true for *Daubert* motions. *Ndugga v. Bloomberg L.P.*, No. 20-CV-7464, 2025 WL 2302089, at *1 (S.D.N.Y. Aug. 11, 2025). In light of the strong presumption of access, sealing "may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Brown*, 929 F.3d at 47 (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006)).

Kaneka generally contends that it "is a privately held Japanese corporation that is not subject to public securities disclosure requirements and does not publicly disclose product-line specific revenue, subsidiary financial statements, customer-specific pricing, or detailed cost structures." (Mot. to Seal Summ. J. Materials at 1–2). Kaneka also says the material was "classified as confidential and attorneys' eyes-only." (*Id.* at 2). And one of the sealing motions contains a general statement that "the redacted information concerns confidential business information of each party which could cause

material prejudice in the marketplace if publicly known." (Mot. to Seal Donohue Materials at 1). But Kaneka does not support these conclusory contentions with any detail, let alone meaningfully address the relevant factors. Cocrystal's argument is similar, though with one added note that the information "could be leveraged by [its] competitors if made public to take advantage of [its] sales efforts and undercut its strategies," with a citation. (*E.g.*, Mot. to Seal Summ. J. Materials at 2 (citing *Uni-Systems, LLC v. U.S. Tennis Ass'n*, No. 17-CV-0147, 2019 WL 3753780, at *4 (E.D.N.Y. Aug. 8, 2019))).

That a party designated materials confidential in discovery and does not typically publicly disclose the information it now seeks to seal are not arguments that automatically entitle them to sealing of documents. *See In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009) ("[T]he fact that business documents are secret or that their disclosure might result in adverse publicity does not automatically warrant a protective order. . . . [B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail[.]"). And even assuming the parties had met their burden to show why the presumption against public access should be overcome, except for their memoranda of law and Rule 56.1 statements, their redactions are certainly not narrowly tailored. For example, the entirety of the expert report of Philip W. Kline is redacted—apparently at Cocrystal's behest—and it includes, among many other things, Kline's qualifications and a summary of his opinions. (*See* Report of Philip Kline, attached to Pl.'s *Daubert* Mot. as Ex. 4, Dkt. No. 92-5; Mot. to Seal Cameron & Kline Materials at 2). Wholesale sealing of such a document is not "narrowly tailored" under

*Lugosch*. *E.g.*, *Susquehanna Int'l Grp. Ltd. v. Hibernia Express (Ir.) Ltd.*, No. 21-CV-0207, 2021 WL 3540221, at *4 (S.D.N.Y. Aug. 11, 2021) (denying motion to seal for lack of narrow tailoring).

Much of the content the parties seek to keep sealed could potentially warrant protection. *E.g.*, *In re Parmalat Sec. Litig.*, 258 F.R.D. at 244. But that showing has not been made in the sparse few sentences provided by each party, and wholesale sealing of dozens of exhibits undoubtedly includes material to which the public is entitled access. And much of the information being kept from public eyes has already been disclosed publicly—in other litigation, in other motion practice, other publicly available documents, or during the *Markman* hearing. Accordingly, the motions to seal are denied. The parties are directed to file a renewed motion to seal that meaningfully addresses the relevant factors, *see Lugosch*, 435 F.3d at 119–24, and are directed to file public versions with narrowly tailored redactions of any material they wish to maintain under seal, or otherwise explain the basis to seal entire documents. If the parties again try to seal documents in this manner, the Court will not give additional opportunities to correct the failure, and will impose appropriate monetary sanctions. The motion to seal is denied.[10]

[10] In borderline sanctionable conduct, some legal briefs are filed on the docket with the disclaimer "Highly Confidential—Attorneys' Eyes Only." And the letter motions to seal themselves are under seal, in violation of the Court's Individual Practices, § III(G)(3). Federal cases are not arbitrations, and courts do not operate in secret. This kind of litigation conduct is repugnant to the rule of law, and counsel involved certainly know better than to file briefs and exhibits in the manner they have done in this case.

CONCLUSION

For the reasons explained above, claims 5 and 15 of the '080 patent fail the utility and enablement requirements. Cocrystal's motion for summary judgment as to invalidity is granted on that basis. Kaneka's motion for summary judgment is granted insofar as Cocrystal's tortious interference and antitrust counterclaims are dismissed; Cocrystal voluntarily withdrew its unfair competition counterclaim, which is also dismissed. The parties' *Daubert* motions, and their summary judgment motions with respect to any other invalidity arguments, are denied as moot. The parties are directed to file a renewed motion for sealing that comports with *Lugosch* by **September 16, 2026**. Despite the denial of the motions to seal, the exhibits associated with the motions shall provisionally remain under seal, pending the disposition of any renewed motion to seal. However, the Clerk is directed to unseal docket entries 89, 91, and 98, which are the letter motions to seal themselves. Because no claims remain, the Clerk is directed to enter judgment consistent with this opinion and close this case.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date: September 2, 2026
Central Islip, New York